AO 241 (Rev. 5/85)

PETITION UNDER 28 USC § 2254 FOR WRIT OF
HABEAS CORPUS BY A PERSON IN STATE CUSTODY

## United States District Court

| | District |
|---|---|
| Name  James Mackey   Prisoner No. E-76532 | Case No. |

Place of Confinement

Mule Creek State Prison

| Name of Petitioner (include name under which convicted) | Name of Respondent (authorized person having custody of petitioner) |
|---|---|
| James Mackey | v. Richard Subia, Warden |

The Attorney General of the State of:

## PETITION

1. Name and location of court which entered the judgment of conviction under attack  San Joaquin County Superior Court

2. Date of judgment of conviction   11/07/89

3. Length of sentence   25 years to life

4. Nature of offense involved (all counts)   First Degree Murder, P.C. 187

5. What was your plea? (Check one)
   (a) Not guilty   ___
   (b) Guilty   ___
   (c) Nolo contendere   ✓
   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:

   _____

   _____

6. If you pleaded not guilty, what kind of trial did you have? (Check one)
   (a) Jury   ☐
   (b) Judge only   ___

7. Did you testify at the trial?
   Yes ___  No ___

8. Did you appeal from the judgment of conviction?
   Yes ___  No ✓

(2)

AO 241 (Rev. 5/85)

9. If you did appeal, answer the following:

    (a) Name of court _____

    (b) Result _____

    (c) Date of result and citation, if known _____

    (d) Grounds raised _____

    (e) If you sought further review of the decision on appeal by a higher state court, please answer the following:

        (1) Name of court _____

        (2) Result _____

        (3) Date of result and citation, if known _____

        (4) Grounds raised _____

    (f) If you filed a petition for certiorari in the United States Supreme Court, please answer the following with respect to each direct appeal:

        (1) Name of court _____

        (2) Result _____

        (3) Date of result and citation, if known _____

        (4) Grounds raised _____

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?
Yes ✓ No ___

11. If your answer to 10 was "yes," give the following information:
    (a) (1) Name of court    *San Joaquin County Superior Court*

        (2) Nature of proceeding    *Habeas Corpus*

        (3) Grounds raised    *Please see attachment for all grounds raised.*

AO 241 (Rev. 5/85)

_____

_____

_____

(4)  Did you receive an evidentiary hearing on your petition, application or motion?
Yes ___ No ✓

(5)  Result    Denied.

(6)  Date of result    March 8, 2006

(b)  As to any second petition, application or motion give the same information:

(1)  Name of court    California Supreme Court

(2)  Nature of proceeding    Habeas Corpus

(3)  Grounds raised    Please see attachment
_____

_____

_____

(4)  Did you receive an evidentiary hearing on your petition, application or motion?
Yes ___ No ✓

(5)  Result    Denied

(6)  Date of result    December 13, 2006

(c)  Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?

(1)  First petition, etc.,      Yes ✓  No ☐
(2)  Second petition,         Yes ☐  No ☐

(d)  If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

_____

_____

_____

12.  State *concisely* every ground on which you claim that you are being held unlawfully. Summarize *briefly* the *facts* supporting each ground. If necessary, you may attach pages stating additional grounds and *facts* supporting same.

   CAUTION: In order to proceed in the federal court, you must ordinarily first exhaust your available state court remedies as to each ground on which you request action by the federal court. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds at a later date.

(4)

AO 241 (Rev. 5/85)

For your information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed if you have exhausted your state court remedies with respect to them. However, *you should raise in this petition all available grounds* (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.

(a)  Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.

(b)  Conviction obtained by use of coerced confession.

(c)  Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(d)  Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(e)  Conviction obtained by a violation of the privilege against self-incrimination.

(f)  Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g)  Conviction obtained by a violation of the protection against double jeopardy.

(h)  Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(I)  Denial of effective assistance of counsel.

(j)  Denial of right of appeal.

A.  Ground one:    Please see attachment

Supporting FACTS (state *briefly* without citing cases or law)

B.  Ground two:

Supporting FACTS (state *briefly* without citing cases or law):

(5)

AO 241 (Rev. 5/85)

   C.  Ground three: _____

_____

      Supporting FACTS (state *briefly* without citing cases or law): _____

_____

_____

_____

_____

_____

_____

   D.  Ground four: _____

_____

      Supporting FACTS (state *briefly* without citing cases or law): _____

_____

_____

_____

_____

_____

_____

13.  If any of the grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal, state *briefly* what grounds were not so presented, and give your reasons for not presenting them: _____

_____

_____

_____

14.  Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?
Yes ___ No ✓

15.  Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:
(a) At preliminary hearing _____

(b) At arraignment and plea  Hamilton L. Hintz, 301 Court Plaza Bldg. 901 H Street, Sacramento, CA 95814

(c) At trial _____

(d) At sentencing _Hamilton Hintz_____

_____

(e) On appeal _____

_____

(f) In any post-conviction proceeding _Benjamin Ramos 7405 Greenback_
_Lane #287 Citrus Heights, CA 95610_

(g) On appeal from any adverse ruling in a post-conviction proceeding _____

_____

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
Yes ___ No ✓

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
Yes ___ No ✓
(a) If so, give name and location of court which imposed sentence to be served in the future: _____

_____

(b) Give date and length of the above sentence: _____

_____

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
Yes ___ No ✓

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

_Benjamin Ramos_____
Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct. Executed

_01/08/07_____
(date)

_James Mackey_____
Signature of Petitioner

(7)

1  BENJAMIN RAMOS, State Bar No.:156643
   LAW OFFICE OF BENJAMIN RAMOS
2  7405 Greenback Lane #287
   Citrus Heights, CA  95610
3  Telephone: (916) 967-2927

4

5  Attorney for Petitioner
   JAMES MACKEY, E-76532
6  Mule Creek State Prison
7  P.O. BOX 409040
   Ione, CA  95640
8

9

SUPREME COURT
FILED

MAY 0 1 2006

Frederick K. Ohlrich Clerk
DEPUTY

10              IN THE SUPREME COURT

11             STATE OF CALIFORNIA

12

13  In re JAMES MACKEY, E-76532        Case No.:  S143015

14
                                      PETITION FOR WRIT OF
15     Petitioner,                     HABEAS CORPUS;
                                       MEMORANDUM OF POINTS
16                                     AND AUTHORITIES IN
                                       SUPPORT THEREOF
17  On Habeas Corpus.

18

19

20

21

22

23

24

25

COPY

Petition for Writ of Habeas Corpus of James Mackey,  Page 1 of 31

# I. INTRODUCTION

1.     On June 1, 1989, Petitioner, James Mackey was placed under arrest for the murder of Laurence Carnegie. (**Exhibit A.**)[1]

2.     On October 16, 1989, Information number 45624 was filed in the Municipal Court of San Joaquin County, Lodi Judicial Branch, charging petitioner, James Mackey, with first degree murder. (**Exhibits A, B.**)

3.     The facts of petitioner's case are set forth at pages one through twelve of the Probation Officer's Report. (**Exhibit A.**)

4.     On August 30, 1989, Petitioner signed a contract and written plea agreement with the San Joaquin County District's Attorney's office. On November 7, 1989, Petitioner pled no contest to the charge of first-degree murder and gave up his constitutional rights in exchange for the District Attorney's promise to write a letter "personally" to the Parole Board and "recommend [petitioner's] release at the earliest possible time." (**Exhibit C.**)

5.     The contract and written plea agreement expressly stated that petitioner would be required to give truthful testimony relative to the murder of Laurence Carnegie and persons responsible. In exchange for petitioner's full cooperation, the District Attorney agreed personally to write a letter to the Board of Prison Terms (now called Board of Parole Hearings) and or the California Department of Corrections recommending that petitioner be released at the earliest possible time upon having served the minimum sentence of first-degree murder. (**Exhibit C.**)

---

[1] All exhibits referred to in this petition and the accompanying memorandum and all exhibits attached hereto are incorporated herein by reference. In Re Rosenkrantz, (2002) 29 Cal.4th 616 citing In re Serrano, (1995) 10 Cal.4th 447, 456; In re Fields, (1990) 51 Cal.3d 1063, 1070, fn.

6. During negotiations with the District Attorney regarding the above-alleged plea agreement, petitioner alleges he received numerous assurances from his attorney, Mr. Hamilton Hintz, that petitioner would be released from prison after serving 16 years eight months if he accepted the plea agreement and fulfilled its terms by cooperating with the District Attorney's office. Mr. Hintz informed petitioner unequivocally that if petitioner accepted the plea agreement, cooperated with the District Attorney's office, and was a model prisoner, petitioner would be granted parole at his first parole hearing. Based on these representations from Mr. Hintz, petitioner accepted the plea agreement and fulfilled its terms.

7.    Petitioner alleges that Mr. Hintz' assurances were based on the mistaken assumption that a parole recommendation from the District Attorney's office would carry enough weight to ensure that petitioner received parole at his initial parole hearing. This assumption by both Mr. Hintz and petitioner was incorrect. The District Attorney's written recommendation carried no weight at petitioner's first parole hearing, and petitioner was denied parole for a period of four (4) out of five (5) possible years. Based on this mistaken assumption, petitioner requests that the court grant rescission under *Civil Code* section 1689 or, alternatively, specific performance.

8.    During plea negotiations with Mr. Phillips, the San Joaquin County District Attorney, Mr. Phillips informed petitioner that his office worked closely with the Board of Prison Terms, and a letter from the District Attorney's office would carry "great weight" with the Board. Mr. Phillips implied that his letter to the parole Board would result in petitioner receiving parole at his first parole hearing after having served the minimum prison term. Petitioner's attorney, Mr. Hintz, assured him that the written recommendation from the District Attorney's office was a rare opportunity and that petitioner should accept the deal offered by the District Attorney. Petitioner understood

1  these express and implied assurances from his attorney and Mr. Phillips as

2  "guarantees" that his cooperation under the plea agreement coupled with the District

3  Attorney's personal recommendation would result in his being granted parole at his

4  first parole hearing and released from prison.  Petitioner further understood that it was

5  the intent of both the District Attorney and Mr. Hintz that petitioner would receive

6  parole at his first parole hearing in exchange for his cooperation. No representation,

7  implication or suggestion was made by Mr. Phillips or Mr. Hintz during plea

8  negotiations that petitioner might not receive parole at his first parole hearing and,

9  instead of being released on parole, would be required to remain incarcerated for

10  decades beyond his minimum eligible release date. Based on the failure of this

11  consideration, petitioner requests rescission under *Civil Code* section 1689.

12        9.     Petitioner's objective expectation at the time he entered the contract and

13  plea agreement with the District Attorney's office was that he would be granted parole

14  at his first parole hearing and subsequently released from prison. Based upon the

15  express and implied assurances from Mr. Hintz and Mr. Phillips alleged above,

16  petitioner waived his constitutional rights, accepted the plea agreement, entered a

17  contract with the San Joaquin County District Attorney's office and cooperated fully

18  with the District Attorney's office in the prosecution of Michael Blatt, who had been

19  charged in connection with the murder of Laurence Carnegie.

20        10.    Petitioner has cooperated extensively with the District Attorney's office,

21  testifying in both criminal prosecutions against Michael Blatt, and has completely

22  fulfilled his obligations under the contract and plea agreement. **(Exhibit D.)** Had

23  petitioner been aware at the time he entered his plea that the District Attorney's

24  personal recommendation would not be binding on the Board and would not have the

25

1   weight represented by Mr. Phillips and Mr. Hintz, he would not have entered the

2   contract and plea agreement.

3       11.    Petitioner alleges that his prior attorney who represented him during the

4   above-alleged plea negotiations, Mr. Hamilton Hintz, testified in both criminal

5   prosecutions against Michael Blatt regarding his representation of petitioner and the

6   nature of petitioner's contract and plea agreement with the District Attorney's office.

7   Petitioner has attempted to obtain copies of Mr. Hintz' testimony in both Blatt trials but

8   has been unsuccessful. Petitioner alleges that an evidentiary hearing may be necessary

9   to obtain testimony from Mr. Hintz and District Attorney John Phillips in regard to the

10  content of petitioner's plea negotiations.

11      12.    Petitioner's minimum eligible parole date as determined by the contract

12  and written plea agreement was sixteen years and eight months. (**Exhibit C, pg.2.**)

13      13.    On 11/20/90, petitioner, James Mackey E-76532, was received by the

14  Department of Corrections to begin serving a prison term of 25 years to-life in the

15  California Department of Corrections.  (**Exhibits K, L.**)

16      14.    Petitioner raises no challenges herein to the judgment of conviction

17  referenced above. Petitioner raises only contract claims and requests rescission or

18  specific performance as set forth herein.

19      15.    On May 6, 2005, petitioner attended his initial parole consideration

20  hearing before the Board of Parole Hearings at Mule Creek State Prison in Ione,

21  California. The Board was provided with a copy of the written contract and plea

22  agreement and had or should have had knowledge of the terms thereof before

23  conducting the hearing.  (**See Exhibit E, Transcript pgs. 13-16, 76-77, 90-92, and 96-97.**)

24  After consideration of the facts of the case, pre-commitment factors, post-commitment

25  factors, parole plans, the closing statements of counsel and adverse statements by the

victim's family and the District Attorney's representative, the panel denied parole to

petitioner for four years. **(Exhibit E, pgs. 124-136.)** Based on the failure of this

consideration, petitioner requests rescission under *Civil Code* section 1689. Petitioner

alleges that because he was not granted parole at his initial parole consideration

hearing, he has been required to serve more than the "minimum" sentence and,

therefore, the consideration for the above alleged contract and plea agreement has

failed.

      16.     Petitioner alleges the San Joaquin County District Attorney's

representative violated the contract and written plea agreement by claiming to remain

"neutral" yet making adverse statements during petitioner's parole suitability hearing.

Specifically, the written contract and plea agreement expressly stated that District

Attorney John Phillips would *personally* recommend to the Board of Prison Terms

and/or the California Department of Corrections that petitioner be "**released at the**

**earliest possible time**" upon having served the "**minimum sentence**" for first-degree

murder. The District Attorney's representative, however, Mr. Eual Blansett, failed to

abide by the promise of District Attorney John Phillips: He impeached petitioner's

hearing testimony, thereby impliedly advocating *against* petitioner's parole, and he

also informed the Board that it was in no way bound to honor petitioner's written plea

agreement for early release **(Exhibit E, Transcript pgs. 92-97.)** thereby substantially

detracting from the weight and influence of the District Attorney's personal

recommendation for early release. Had petitioner known that the District Attorney's

office would send a representative to petitioner's initial parole hearing who would

attempt to impeach petitioner's hearing testimony and convince the Board that it was

not bound to honor petitioner's plea agreement with the District Attorney's office, nor

the District Attorney's recommendation that petitioner receive "early release," he

would not have entered the agreement or pled to the charges. For these reasons,

petitioner alleges the San Joaquin County District Attorney's office breached the written contract and plea agreement, and that the essential consideration for the contract failed. (**Exhibit E, Transcript pgs. 92-97.**) Based on the failure of this consideration, petitioner requests rescission under *Civil Code* Section 1689.

17.    On February 6, 2006, petitioner filed a habeas corpus petition in the San Joaquin County Superior Court raising legal claims in connection with his above-alleged plea bargain. The court denied the petition on March 8, 2006. (**Exhibit N**)

## II. PARTIES

18.    Petitioner, James Mackey E-76532 is a prisoner of the State of California incarcerated at Mule Creek State Prison in Ione.

19.    Respondent is the San Joaquin County District Attorney's office.

20.    Petitioner alleges the San Joaquin District Attorney's office breached the written contract and plea agreement alleged above in violation of petitioner's state and federal due process rights.

## III.  PRAYER FOR RELIEF

Petitioner is without remedy save this Petition for Writ of Habeas Corpus and requests the following relief either in whole or part as the Court deems appropriate.

WHEREFORE, petitioner prays that the Court:

(1)    Declare the rights of the parties;

(2)    Grant rescission or specific performance of the contract, ordering petitioner's immediate release from prison based on time served;

(3)    Subpoena Mr. John Phillips and Mr. Hamilton Hintz for an evidentiary hearing, if necessary;

(4)    Any other relief the Court deems just and proper.

Dated: **4 — 24**, 2006       By: _____

Benjamin Ramos, Attorney for
Petitioner, James Mackey

Petition for Writ of Habeas Corpus of James Mackey,  Page 7 of 31

# IV.

## STATEMENT OF FACTS

On February 28, 1989, Laurence Carnegie was murdered in San Joaquin County. After an investigation, Petitioner and a co-defendant were arrested. It was the belief of the San Joaquin County District Attorney that another person was the contractor for this murder. However, there was not sufficient evidence to support that belief. (**Exhibit D.**)

Petitioner was offered a written contract and plea agreement, which was accepted on August 30, 1989. The Court also accepted the written contract and plea agreement. Petitioner would have proceeded to trial if this plea agreement had not been offered. The contract and plea agreement in no uncertain terms provides that petitioner:

> [G]ive truthful testimony relative to the murder of Laurence Carnegie and as to the persons responsible, in exchange for the opportunity to enter a plea of guilty or no contest to murder in the first degree without enhancements or special circumstances.

The agreement further provided that:

> District Attorney, John Phillips, shall personally write a letter to the Board of Prison Terms and/or the Department of Corrections recommending that petitioner be released at the earliest possible time upon having served the minimum sentence for first degree murder. (**Exhibit C.**)

The District Attorney's obligations were clear: District Attorney John Phillips agreed personally to recommend that petitioner be released from prison after serving sixteen years and eight months, making petitioner's minimum eligible parole date January 29th of 2006. The Board's then executive officer, Mr. Patterson, also

Petition for Writ of Habeas Corpus of James Mackey, Page 8 of 31

1   acknowledged this contract and plea agreement that was signed by the District

2   Attorney and signed by petitioner and his counsel.

3       On November 20, 1989, petitioner was sentenced to the California Department of

4   Corrections for the term of twenty-five to life.  **(Exhibit D)**

5       Petitioner has cooperated with the San Joaquin County Sheriff's Department and

6   the District Attorney's Office in connection with the prosecution of *People v. Michael*

7   *Blatt*, San Joaquin County Superior Court Information Number 46070, which resulted in

8   two jury trials.  Because of Petitioner's agreement to cooperate with law enforcement

9   and prosecutors in exchange for a plea to first degree murder without enhancements or

10  special circumstances and a recommendation for parole at the earliest possible time, the

11  District Attorney's office was able to prosecute the person they believe to be morally

12  and legally responsible for the murder. Thus, petitioner honored the terms of the

13  written contract and plea agreement. **(See Exhibit D, pg. 2.)**

14      On May 6, 2005, petitioner attended his initial parole suitability hearing at Mule

15  Creek State prison in Ione.  Under the terms of the contract and written plea agreement,

16  the District Attorney was to recommend parole at the earliest possible time. **(See**

17  **Exhibit C.)**  The Board was provided with a copy of the written contract and plea

18  agreement and had or should have had knowledge of the terms before conducting the

19  hearing.  **(See Exhibit E, Transcript pgs. 13-16, 76-77, 90-92, and 96-97.)**

20      A letter dated November 1990, was sent to the Department of Corrections by

21  District Attorney John Phillips in an effort to satisfy the contract. **(See Exhibit D.)**

22  However, the District Attorney's office sent a representative to the parole suitability

23  hearing, Mr. Eual Blansett. Mr. Blansett effectively neutralized the support letter sent by

24  District Attorney Phillips by impeaching petitioner and making statements against

25  petitioner's interest in receiving parole, contrary to the terms of the plea agreement.

    Rather than "recommending an early release" or even remaining neutral, the District

1  Attorney's representative became an advocate against the Petitioner during his hearing.

2  Initially, the District Attorney's representative stated:

> I cannot and will not do anything to undermine the
> letter that was sent to the Board. (**Exhibit E,**
> **Transcript pgs. 15-16.**)  [m]y job here is merely to be a
> representative of the District Attorney's office.
> (**Exhibit E, Transcript pg. 79.**)

    Later the District Attorney's representative abandoned his role as a "mere
representative" and became an advocate against the Petitioner.

> Mr. Commissioner, if I may just for a moment, I'm not
> going to make any statement whatsoever contrary to
> the negotiations that were reached between Mr. Hintz
> and Mr. Phillips, but there are some
> misrepresentation… One is that *this was not a*
> *contract that was meant to bind in any way any*
> *commission regarding how they saw Mr. Mackey.*
> (**Exhibit E pg. 92-93.**)

    This clarification by Mr. Blansett is directly contrary to petitioner's

understanding of the contract and the expressed intent of District Attorney John

Phillips, as understood by petitioner. Moreover, it is puzzling how Mr. Blansett can

represent the District Attorney's state of mind when Mr. Blansett was not a party to the

contract. (**Exhibit C; Exhibit E at 79**)

    The representations made during plea negotiations by District Attorney Phillips

were that the letter would have enough weight to sway the parole board to grant parole

at the earliest opportunity. Petitioner was left with no doubt concerning the Board's

response to the District Attorney's letter: Parole would be granted. Petitioner did not

bargain for a non-binding, "advisory" recommendation that he *hoped* would be

followed. Petitioner understood and relied upon the express and implied

1  representations that the District Attorney's letter would secure his "early release" upon

2  parole after having served the minimum term.

3        The District Attorney's representative also gave a closing argument making

4  many assertions adverse to Petitioner.

> Mr. Mackey did not turn himself in to authorities in
> the sense that he found out they were investigating
> him, and therefore, turned himself in. He was brought
> in for questioning. He made a statement, initial
> statement that implicated himself in the murder…
> Mr. Mackey then agreed to cooperate with law
> enforcement. And having a wire attached to his body,
> he went in to Mr. Blatt's office with the idea that he
> was going to get Mr. Blatt to implicate himself in the
> murder.  But what Mr. Mackey did, unfortunately,
> was to alert Mr. Blatt to the fact that he was
> wired…He gave me a full statement of the entire case.
> Mr. Mackey's statement to me was that he went back
> to the trunk.  That he took the rope, and that he aided
> in the strangulation of Larry Carnegie… But again,
> that's not in any way to go back on the deal that Mr.
> Phillips made.

17        Had petitioner known that the District Attorney's office would send a

18  representative to petitioner's initial parole hearing who would attempt to impeach

19  petitioner's hearing testimony and convince the Board that it was <u>not bound to honor</u>

20  <u>petitioner's plea agreement for early release,</u> <u>nor the District Attorney's</u>

21  <u>recommendation</u> for the same, he would not entered the agreement or pled to the

22  charges.

## V.
## VERIFICATION

I, James Mackey E-76532, declare:

I am the petitioner in this action. I have read the foregoing petition for a writ of habeas corpus and the facts stated therein are true of my own knowledge, except as to matters that are therein stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed at, _____I o N E_____ California on _April 18_, 2006.

_James Mackey_
Petitioner, James Mackey
CDC# E-76532

Petition for Writ of Habeas Corpus of James Mackey,  Page 12 of 31

## MEMORANDUM OF POINTS AND AUTHORITIES

### A.

### RELEASE ON PAROLE WAS A TERM BARGAINED FOR BY PETITIONER AND DENIED BY THE BOARD; THEREFORE, SPECIFIC PERFORMANCE IS THE APPROPRIATE REMEDY.

The California Supreme Court follows precedent set by the U.S. Supreme Court in *Santobello v. New York*, 404 U.S. 257 (1971) regarding plea agreements. The California Supreme Court observed:

> In vacating the judgment rendered by the trial court, the Supreme Court held in *Santobello* that the plea-negotiating process "must be attended by safeguards to insure the defendant what is reasonably due in the circumstances. Those circumstances will vary, but a constant factor is that when a plea rests in any significant degree *on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.* [¶] On this record, *petitioner 'bargained' and negotiated for a particular plea in order to secure dismissal of more serious charges, but also on condition that no sentence recommendation would be made by the prosecutor.* It is now conceded that the promise to abstain from a recommendation was made, and at this stage the prosecution is not in a good position to argue that its inadvertent breach of agreement is immaterial.... That the breach of agreement was inadvertent does not lessen its impact." (*Santobello v. New York, supra*, 404 U.S. at p. 262 [30 L.Ed.2d at p. 433], italics added.)

*In re Moser*, 6 Cal.4th 342 (1993) at 355.

The U.S. Supreme Court additionally held in *Santobello* that a criminal defendant has a due process right to enforce the terms of his plea agreement. *See also Brown v.*

1  *Poole*, 337 F.3d 1155, 1159 (9th Cir. 2003) ("[The defendant's] due process rights

2  conferred by the federal constitution allow [him] to enforce the terms of the plea

3  agreement."). The construction and interpretation of state court plea agreements "and

4  the concomitant obligations flowing therefrom are, within broad bounds of

5  reasonableness, matters of state law." *Ricketts v. Adamson*, 483 U.S. 1, 6 n.3 (1987). In

6  California, "[a] negotiated plea agreement is a form of contract, and it is interpreted

7  according to general contract principles," *People v. Shelton*, 37 Cal. 4th 759, 767 (2006),

8  and "according to the same rules as other contracts," *People v. Toscano*, 124 Cal. App. 4th

9  340, 344 (2004) (cited with approval in *Shelton* along with other California cases to same

10  effect dating back to 1982). Thus, under *Adamson*, California courts are required to

11  construe and interpret plea agreements in accordance with state contract law.

12         In California, "[a]ll contracts, whether public or private, are to be interpreted by

13  the same rules . . . ." Cal. *Civil Code* §1635; *see also Shelton*, 37 Cal. 4th at 766-67; *Toscano*,

14  124 Cal. App. 4th at 344. A court must first look to the plain meaning of the agreement's

15  language. Cal. *Civil Code* §§ 1638, 1644. If the language in the contract is ambiguous, "it

16  must be interpreted in the sense in which the promisor believed, at the time of making

17  it, that the promisee understood it." Cal. *Civil Code* § 1649. The inquiry considers not the

18  subjective belief of the promisor but, rather, the "objectively reasonable" expectation of

19  the promisee. *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1265 (1992); *Badie v.*

20  *Bank of Am.*, 67 Cal. App. 4th 779, 802 n.9 (1998) ("Although the intent of the parties

21  determines the meaning of the contract, the relevant intent is objective—that is, the

22  objective intent as evidenced by the words of the instrument, not a party's subjective

23  intent." (internal quotation marks and citation omitted)). Courts look to the "objective

24  manifestations of the parties' intent . . . ." *Shelton*, 37 Cal. 4th at 767. If after this second

25  inquiry the ambiguity remains, "the language of a contract should be interpreted most

1 strongly against the party who caused the uncertainty to exist." Cal *Civil Code* § 1654; *see*

2 *also Toscano*, 124 Cal. App. 4th at 345 ("ambiguities [in a plea agreement] are construed

3 in favor of the defendant"). (2000).  However, broken plea agreements do not require a

4 showing of predudice:

> 5  [I]n the context of a **broken plea agreement**, there is
> 6  more at stake than the liberty of the defendant or the
>    length of his term. "At stake is the honor of the
> 7  government[,] public confidence in the fair
>    administration of justice, and the efficient
> 8  administration of justice ...." ' [Citations.]"

9

10 *In re Moser*, 6 Cal.4th 342 (1993) at 354, *citing, People v. Walker*, 54 Cal.3d 1013; 1

11 Cal.Rptr.2d 902 (1991). (emphasis added).

12 Petitioner alleges that his release on parole was a critical "inducement" and *part*

13 *of the plea agreement*. Although the contract indicated that , "[T]he actual release date

14 will be determined by the Board of PrisonTerms or its equivalent agency" (**Exhibit C**),

15 petitioner alleges it was understood and intended by the District Attorney that his

16 written recommendation would have sufficient weight to persuade the Board to grant

17 parole to petitioner at his first parole hearing and that the "actual release date" would

18 not necessarily be 16 years 8 months exactly, but as determined by the Board *after*

19 granting parole.  In other words, petitioner alleges there was no doubt on the part of the

20 District Attorney, petitioner's attorney or petitioner whether petitioner would be

21 granted parole with the support of the District Attorney's recommendation; the only

22 actual question was when petitioner's release would be scheduled, i.e., how close to his

23 minimum term of 16 years 8 months would petitioner be released? Thus, the essential

24 "inducement" offered by the District Attorney's office was the expectation that the

25 District Attorney's written support and recommendation for petitioner's early release

would be effective. As the *Santobello* court declared: "[W]hen a plea rests *in any*

*significant degree* on a promise or agreement of the prosecutor, so that it can be said to

1  be *part of the inducement* or consideration, such promise *must be fulfilled*." *Santobello,*

2  *supra*. The prosecutor's promise, however, that his letter would carry "great weight"

3  and secure petitioner's parole has not been fulfilled. Because the crucial, bargained-for

4  consideration failed, petitioner should be granted specific performance or, alternatively

5  the contract should be rescinded and petitioner sentenced to time served, as he has now

6  served more than the minimum term.

7      Petitioner submits the reasoning of *In re Moser*, 6 Cal.4th 342 (1993) is on point:

8

9          [A]t oral argument, petitioner's counsel argued
that, even if the present record fails to indicate that

10  the term of parole constituted an element of the
parties' plea agreement, petitioner's potential parole

11  term may have been discussed during plea
negotiations, and **the prosecutor may have made**

12  **promises or inducements regarding the term of**
**parole.** Counsel further argued that it would be

13  unfair simply to assume that no such discussions
occurred, when the People's argument in the superior

14  court appeared to concede that the three-year term of
parole was part of the parties' plea agreement, and

15  petitioner never was put on notice as to the necessity
of introducing evidence directed to this issue.

16

17

18          Counsel's argument is well taken. "In most
cases an examination of the record will reveal the

19  truth or falsity of the petitioner's allegations, thus
obviating the need for an evidentiary hearing." (*People*

20  *v. West*, (1970) 3 Cal.3d 595, 611 [91 Cal.Rptr. 385].) In
light of the nature of the People's argument in the

21  superior court in response to the order to show cause,
however, we believe it would be inappropriate to

22  foreclose petitioner from presenting evidence relating
to whether the length of petitioner's term of parole

23  was an element of the plea negotiations. Under the
unusual circumstances presented by this case, we

24  conclude this question should be the subject of further

25

Petition for Writ of Habeas Corpus of James Mackey, Page 16 of 31

proceedings on remand to the superior court. (*See Santobello v. New York, supra*, 404 U.S. 257, 262 [30 L.Ed.2d 427, 433].)

*In re Moser*, 6 Cal.4th 342 (1993) at 357-58.

Petitioner has alleged repeatedly that he was assured by his attorney that the District Attorney's recommendation would result in his receiving parole at his first parole hearing. Additionally, Mr. Phillips, the District Attorney, also informed petitioner that his letter would have "great weight" with the Board, implying that his support would be adequate to persuade the Board to grant parole. It was clear to petitioner that he was being told by both his attorney and the District Attorney, Mr. Phillips, that he would be granted parole at his first parole hearing on the strength of the District Attorney's written recommendation. Thus, "actual release" on parole was an essential inducement that secured petitioner's agreement to the contract. Because petitioner was denied the benefit of this essential consideration, the court should grant rescission and or specific performance and order petitioner's release on parole.

## B.
### THE CONTRACT WAS AMBIGUOUS CONCERING A CRUCIAL ELEMENT; THEREFORE, IT MUST BE INTERPRETATED AS UNDERSTOOD BY THE DISTRICT ATTORNEY AND PETITIONER.

Under California law, a three-part analysis is required to interpret petitioner's contract: (1) A court must first look to the plain meaning of the agreement's language. *Cal. Civil Code* §§ 1638, 1644. (2) If the language in the contract is ambiguous, "it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." *Cal. Civil Code* § 1649. (3) If after this second inquiry the ambiguity remains, "the language of a contract should be interpreted most strongly

1  against the party who caused the uncertainty to exist." Cal *Civil Code* § 1654; *see also*

2  *Toscano*, 124 Cal. App. 4th at 345.

3         The superior court found no ambiguities in petitioner's contract. (**Exhibit N**)

4  Paragraphs 6 of petitioner's contract, however, is ambiguous concerning time.  It states,

5  "However, the ***actual release date*** will be determined by the Board of Prison Terms or

6  its equivalent agency."  The phrase "actual release date" clearly suggests that

7  petitioner's release exactly on his minimum release date of 16 years 8 months was not

8  being guaranteed. Rather, the "actual" release date would be determined by the Board

9  or its equivalent agency. No time limit, however, is placed upon the Board or its

10  equivalent agency to make this determination.  In light of the preceding language of

11  paragraph 6 stating that District Attorney John D.  Phillips shall personally write a letter

12  to the Board of Prison Terms recommending that petitioner be released at the earliest

13  possible time upon having served the minimum sentence for first-degree murder, it is

14  unreasonable to conclude that the parties intended that the determination of petitioner's

15  actual release date would remain open-ended for perhaps decades after petitioner's

16  minimum eligible release date. If the parties actually intended that that there would be

17  no limit on ***when*** the Board could determine petitioner's release date, the District

18  Attorney's recommendation for petitioner's earliest possible release would have been a

19  meaningless phrase that would have served no purpose.  If the parties intended or

20  understood that the Board would retain petitioner for decades beyond his minimum

21  eligible release date, the contract likely would have specified that petitioner's actual

22  term of incarceration could exceed his minimum term by any number of years, decades,

23  or indefinitely. Believing and intending, however, that petitioner would be found

24  suitable for parole at his first parole suitability hearing with the support of the District

25  Attorney's office, it was unnecessary for the parties to include any such clarification in

1  the contract concerning the actual amount of time in prison petitioner might serve. All

2  negotiating parties believed and intended petitioner would serve the minimum term or

3  a similar term as determined by the Board or its equivalent agency.

4      Because the contract is ambiguous concerning *when* the Board or its equivalent

5  agency must determine petitioner's actual release date, that term must be interpreted as

6  understood by the District Attorney and petitioner at the time the contract was entered.

7  *Moser, Toscano, supra*. The parties agreed and understood that petitioner would be

8  released after serving the minimum term consistent with the District Attorney's written

9  recommendation. Therefore, this expectation should now be enforced.

10

11                            C.
       **THE DISTRICT ATTORNEY'S OFFICE BREACHED THE**

12     **PLEA BARGAIN.**

13     When the state enters a plea bargain with a criminal defendant, it receives

14 immediate and tangible benefits, such as promptly imposed punishment without

15 expenditure of prosecutorial resources. (*Newton v. Rumery*, (1987) 480 U.S. 386, 394.) In

16 pleading guilty, petitioner waived *inter alia*: his privilege against self-incrimination; his

17 right to a jury trial; and his right to confront his accusers. "A plea agreement is

18 interpreted according to the same rules as other contracts, the terms of the contract

19 become fixed at the time made and subsequent interpretations of that contract must be

20 based on an objective standard in which Petitioner's reasonable beliefs controls. (*People*

21 *v. Toscano*, (2004) 124 Cal.App.4[th] 340.) An invalid or illusory concession offered by the

22 state constitutes a species of fraud. (*In re Ibarra*, (1983) 34 Cal.3d 277, 289.) The state thus

23 must "keep its word when it offers inducements in exchange for a plea of guilty."

24 (*People v. Macheno*, (1982) 32 Cal.3d 855, 860.)   The defendant must do so as well.

25 Consequently, after providing full cooperation to the District Attorney's office,

1  petitioner did not receive the substantive benefit of his contract and written plea

2  agreement.

3         The Supreme Court has recognized that due process applies not only to the

4  procedure of accepting the plea, but that the requirements of due process attach also to

5  the implementation of the bargain itself.  A plea agreement is a contract; the

6  government is held to the literal terms of the agreement.  (*See Buckley v. Johnson*, 187

7  F.3d 1129, 1134 (*citing United States v. Baker*, (9th Cir. 1994) 25 F.3d 1452, 1458)  It follows,

8  when the prosecutor breaches its promise with respect to an executed plea agreement,

9  the defendant pleads guilty on a false premise.  "When a plea rests in any significant

10 degree on a promise or agreement of the prosecutor, so that it can be said to be part of

11 the inducement or consideration, such promise must be fulfilled." (*Santobello v. New*

12 *York*, (1971) 404 U.S. 257, 262, *supra*.)

13        According to the written contract and plea agreement, the District Attorney was

14 to "recommend petitioner's release at the earliest possible time". (**Exhibit C.**)  The

15 District Attorney's representative, however, made adverse statements during

16 petitioner's parole consideration hearing, in *violation* of the written plea agreement.

17 (**Exhibit E, pgs. 92-97.**) The District Attorney's representative effectively retracted the

18 prior written recommendation for early release through various adverse statements

19 made during the hearing, effectively opposing petitioner's parole.  Because the District

20 Attorney's representative did not "recommend early release" before the Board of Parole

21 Hearings, petitioner was denied the benefit of the bargain, a fair hearing and due

22 process of law. *Buckley v. Terhune*, No. 03-55045 September 27, 2005—San Francisco,

23 California Filed March 17, 2006 (9th Cir. 2006).

24        The plea agreement at issue specifically provided that the District Attorney's

25 office would "recommend that petitioner be released at the earliest possible time".

26 (**Exhibit C.**)  Petitioner's plea was induced by a promise the District Attorney's

representative failed to fulfill. The District Attorney's representative made adverse

statements during the hearing and closing arguments and breached the written contract

and plea agreement. (**Exhibit E, Transcript pgs. 92-97.**) This attempt by the District

Attorney's representative to influence the Board of Parole Hearings was conduct

contrary to the written terms of the contract and plea agreement. Implicit in any plea

bargain is that the state cannot with one hand give a benefit and with the other take it

away. The District Attorney's representative was also bound to the terms of the

contract. Mr. Blansett's claim, however, that the contract was not intended to have any

binding effect on the Board is not supported by Mr. Phillip's letter. (**See** also **Exhibit E,**

Transcript pg. 79; **"I've never seen a copy of John Phillips letter. He didn't give me a**

**copy at the time he wrote it...John Phillips is no longer the DA, but the current DA**

**gave authorization to attend.".**)

Clearly, the San Joaquin County District Attorney's office breached the written

contract and plea agreement when Mr. Blansett claimed that the District Attorney's

office was remaining *neutral* (contrary to the written recommendation), then when Mr.

Blansett impeached petitioner's testimony, impliedly advocating *against* petitioner

rather than recommending his early release as agreed in writing, and clarifying that the

Board was *not bound* to honor petitioner's plea agreement for early release, even

though Mr. Blansett played no part in plea negotiations and could not possibly

represent Mr. Phillips intent concerning the plea agreement. (**Exhibit E, Transcript at**

**79.**)

Even if the breach were inadvertent it does not lessen its impact. (Santobello v.

New York, 404 U.S. 257, 262.) Because petitioner has fully complied with his obligations

under the contract and plea agreement to cooperate with the District Attorney's office,

petitioner should now receive the benefit of the bargain that was promised to him by

Mr. Hintz and impliedly recognized by Mr. Phillips. Because this essential

1    consideration failed, the court should grant specific performance or rescission and order

2    petitioner's release from prison.

### D.
### THE STATEMENTS OF THE DISTRICT ATTORNEY'S REPRESENTATIVE VIOLATED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

6    The adverse statements given by the District Attorney's representative were

7    arguably not made in good faith and were unfair in light of the written contract and

8    plea agreement. Because the comments of the District Attorney's representative did not

9    provide support for petitioner's parole, the comments could have been made for only

10   one purpose: to influence the Board of Parole Hearings to deny parole.  This attempt by

11   the District Attorney's representative to influence the Board of Prison Terms adversely

12   was conduct specifically prohibited by the written plea agreement.

13         In common usage the term "good faith" is ordinarily used to describe a state of

14   mind denoting honesty of purpose, freedom from intention to defraud, and being

15   faithful to one's duty or obligation. (*Efron v. Kalmanovitz*, 249 Cal.App.2d 187; see also

16   *Black's Law Dictionary*, 6th edition pg. 693.)  All contracts include an implied covenant of

17   good faith and fair dealing in performance and enforcement of contracts. '[I]n

18   California, the law implies in **every** contract a covenant of good faith and fair dealing'"];

19   *Mitchell v. Exhibition Foods, Inc.*,  (1986) 184 Cal.App.3d 1033, 1043; 229 Cal.Rptr. 535;

20   *Spindle v. Travelers Ins. Companies*, (1977) 66 Cal.App.3d 951, 959; 136 Cal.Rptr. 404] ["the

21   evolvement of the doctrine of implied covenant of good faith and fair dealing is an

22   expression of **public policy** in our state"].)  The covenant is also extra contractual; it "is

23   implied as a supplement to the express contractual covenants…". (*Waller v. Truck Ins.

24   Exchange, Inc.*, (1995) 11 Cal.4[th]1, 36.)  Conditions implied by law are conditions imposed

25   by state law; they are not negotiated by the contracting parties.

1    Petitioner's written contract and plea agreement with the District Attorney's

2  office is no exception to the public policy of this state that every contract contains an

3  implied covenant of good faith and fair dealing. Under this implied covenant of good

4  faith and fair dealing, petitioner reasonably could have expected that the District

5  Attorney would have provided unconditional support at petitioner's first parole

6  hearing, consistent with the District Attorney's promise to write a letter and

7  recommend petitioner's release at the earliest possible time. Petitioner did not receive

8  that support; instead, the District Attorney's office became an advocate against

9  petitioner, impeached his testimony, suggested that the Board was not bound to honor

10  petitioner's plea agreement and, therefore, the District Attorney's office violated the

11  implied covenant of good faith and fair dealing.

12    The California Supreme Court has stated that, "a party violates the covenant if it

13  subjectively lacks belief in the validity of its act or if its conduct is objectively

14  unreasonable." (*Carma Dev., Inc. v. Marathon Dev.*, (1992) 2Cal.4th 342.) For the District

15  Attorney's representative to make adverse statements rather than recommend release at

16  the earliest possible time and then say "he wasn't going back on the deal" is

17  unreasonable. (**Exhibit E, Transcript pg. 96.**) In light of the written contract and plea

18  agreement, the conduct of District Attorney's representative was unreasonable and

19  violated the implied covenant of good faith and fair dealing.

20    The primary contractual benefit petitioner expected in exchange for his

21  cooperation was early release, based upon the representations by his attorney and Mr.

22  John Phillips (*the* District Attorney) was that the District Attorney's support would

23  carry enough weight with the parole Board to secure petitioner receiving "early

24  release." In this effort, it would be essential to present a "united front" to the Board of

25  Parole Hearings. The obvious goal of petitioner's plea agreement was to use the

26  influence and prestige of the District Attorney's *personal recommendation* to secure

petitioner's early release on parole. Presenting this "united front" to obtain an actual

release date was essential. Anything less than full, unconditional support from the

District Attorney's office could be construed by the Board as opposition to parole. As

argued exhaustively, any position by the District Attorney's office other than full

support for petitioner's parole violated the contract. (See *U.S. v. Camarillo-Tello*, (9th cir.

2001) 236 F.3d 1024, 1028.)

The District Attorney's written recommendation for early release was undercut

both by its failure to support the recommendation presented at the hearing and by the

impeaching of petitioner's testimony, adverse statements, and assertions that the Board

was not bound to honor petitioner's plea agreement.

### E.
### PETITIONER'S DUE PROCESS RIGHTS WERE VIOLATED WHEN THE PLEA AGREEMENT WAS BREACHED.

Section 3041 of the California Penal Code creates in every inmate a cognizable

liberty interest in parole, which is protected by the procedural safeguards of the Due

Process clauses. (*In re Rosenkrantz*, 29 Cal.4th 616, 655-658.) Due process is flexible and

calls for such procedural protections as the particular situation demands. (*Morrissey v.

Brewer*, 408 U.S. 471, 481.) Because the District Attorney was bound to the terms of the

contract and written plea agreement, it was improper for the Board, an extension of the

courts, to allow the adverse statements as well.  In addition, the Board of Parole

Hearings was likely prejudiced or unduly influenced against Petitioner resulting in his

denial of four years.  *Penal Code* Section 3046 subdivision (c) states that the Board must

consider the statements and recommendations submitted by officials. (**Exhibit F.**)

It is of no consequence that the Board may not have construed the District

Attorney's statements as comments against the recommendation of parole or that the

statements may have had no effect.  The harmless error rule does not apply when the

government breaches a plea agreement.  (*In re Moser*, 6 Cal.4th 342 (1993) at 354, *citing, People v. Walker*, 54 Cal.3d 1013; 1 Cal.Rptr.2d 902 (1991). *U.S. v. Johnson*, 187 F.3d 1129, 1135.)  The integrity of our judicial system requires that the government strictly comply with its obligations under a plea agreement.  Accordingly, petitioner's right to due process was infringed when the District Attorney's representative breached the terms of the plea agreement. The court should rescind the contract or grant specific performance.

**F.**
**THE COURT SHOULD RESCIND THE CONTRACT**
**AND PLEA AGREEMENT.**

Civil Code section 1689 provides:

(a)     A contract may be rescinded if all the parties thereto consent.(b) A party to a contract may rescind the contract in the following cases:

(1)     If the consent of the party rescinding, or of any party jointly contracting with him, was given by mistake, or obtained through duress, menace, fraud, or undue influence, exercised by or with the connivance of the party as to whom he rescinds, or of any other party to the contract jointly interested with such party.

(2)     If the consideration for the obligation of the rescinding party fails, in whole or in part, through the fault of the party as to whom he rescinds.

(3)     If the consideration for the obligation of the rescinding party becomes entirely void from any cause.

(4)     If the consideration for the obligation of the rescinding party, before it is rendered to him, fails in a material respect from any cause.

(5)     If the contract is unlawful for causes which do not appear in its terms or conditions, and the parties are not equally at fault.

(6)     If the public interest will be prejudiced by permitting the contract to stand.

(7)     Under the circumstances provided for in Sections 39, 1533, 1566, 1785, 1789, 1930 and 2314 of this code, Section 2470 of the Corporations Code, Sections 331, 338, 359, 447, 1904 and 2030 of the Insurance Code or any other statute providing for rescission.

"A factual mistake by one party to a contract, or unilateral mistake, affords a ground for rescission in some circumstances." *Donovan v. RRL Corp.*, (2001) 26 Cal.4th 261, 278, fn. Omitted. In *Donovan*, the California Supreme Court explained that California does not follow the "traditional rule" recited in the first Restatement of Contracts, section 503, to the effect that "unilateral mistake did not render a contract voidable unless the other party knew of or caused the mistake." (*Donovan, supra,* 26 Cal.4th at p. 280.) Instead, the *Donovan* court applied the more expansive rule of Section 153 of the Restatement Second of Contracts allowing rescission due to unilateral mistake where enforcement of the contract would be unconscionable. (*Donovan, supra,* at p. 281.) In instances in which the other party was unaware of and did not cause the mistake, the party claiming unilateral mistake must show that "(1) the . . . mistake [was one] regarding a basic assumption upon which the [party claiming mistake] made the contract; (2) the mistake has a material effect upon the agreed exchange of performances that is adverse to the [party claiming mistake]; (3) the [party claiming mistake] does not bear the risk of the mistake; and (4) the effect of the mistake is such that enforcement of the contract would be unconscionable." (*Donovan, supra,* at p. 282.) As to the third

1  factor, both the Restatement Second of Contracts and Civil Code section 1577[28] note

2  that the mistaken party's "neglect of legal duty" will bar relief; however, ordinary

3  negligence does not constitute such "neglect of legal duty" that will preclude rescission.

4  (*Donovan, supra,* at p. 283; *see also, M. F. Kemper Const. Co. v. City of L. A.,* (1951) 37 Cal.2d

5  696, 702.)

6          Applying the elements, (1) the . . . mistake [was one] regarding a basic

7  assumption upon which the [party claiming mistake] made the contract, i.e., petitioner

8  believed and  assumed that the District Attorney's personal recommendation would

9  result in petitioner serving only the minimum term and being released on parole after

10  his initial parole consideration hearing, rather than spending a lifetime in prison; (2) the

11  mistake [had] a material effect upon the agreed exchange of performances that is

12  adverse to the [party claiming mistake]. Because the District Attorney's

13  recommendation carried no weight with the Board, petitioner will likely have to serve

14  many more years in prison, perhaps decades, before he is released, if ever; (3) the [party

15  claiming mistake] does not bear the risk of the mistake; petitioner cannot reasonably

16  bear the risk that the advice of the District Attorney himself and his own attorney

17  would be wrong; as a layman, petitioner would have no basis on which to dispute the

18  representations and legal advice provided by the District Attorney and his own

19  attorney and (4) the effect of the mistake is such that enforcement of the contract would

20  be unconscionable; the District Attorney's personal recommendation has already been

21  demonstrated to have no weight. Petitioner was denied parole for four out of five

22  possible years, despite the District Attorney's letter recommending early release.

23  Therefore, it is obvious that enforcing the contract based on the mistaken assumption of

24  all parties that the District Attorney's recommendation would secure petitioner's early

25

release on parole will result in the exact consequences petitioner was attempting to avoid by agreeing to the contract in the first place—a life term in prison. At the very least, it can be shown that petitioner's stay in prison has been extended by at least four years more than the minimum term. This result is unconscionable in light of petitioner's extensive cooperation with the District Attorney's office in the two criminal prosecutions of Michael Blatt. Thus, petitioner has shown prejudice and an "unconscionable" result from enforcing the contract as is.

Moreover, the consideration for the contract failed as well. For petitioner, the actual benefit bargained for and assured was release after serving the minimum term. This failed to occur and petitioner has now served more than the minimum term. Therefore, under subsections (a)(2), (3), and (4), the consideration for which petitioner bargained failed, and the court should rescind the contract. There is no question that the beliefs of petitioner's Attorney and District Attorney John Phillips were mistaken in two fundamental respects: (1) the weight that the DA's letter would carry with the Board, and (2) the belief that petitioner would be released after having served the minimum term based upon the personal recommendation of the San Joaquin County District Attorney. The recommendations from the District Attorney's office or the actual District Attorney, however, are not binding on the Board of Parole Hearings and have only as much weight as the Board grants. In petitioner's case, the Board obviously accorded no weight to the District Attorney's recommendation. The Board denied parole for four years, one year short of the maximum denial period of five years, and failed to mention petitioner's contract with the District Attorney's office or his testimony when citing mitigating factors. Had petitioner been aware at the time he entered his plea that the District Attorney's personal recommendation would not be binding on the Board and would not have the weight represented by Mr. Phillips and Mr. Hintz, he would not have entered the contract and plea agreement. Furthermore, contract consideration failed when the District Attorney's representative violated the

1   written contract and plea agreement between the petitioner and the San Joaquin County

2   District Attorneys office. Accordingly, rescission based on breach contract (i.e., failure of

3   consideration) is appropriate.

4          Petitioner claims he was denied the primary benefit of his bargaining—actual

5   release. Although petitioner's contract and plea agreement do not expressly state that

6   petitioner would unconditionally be released after serving the minimum term,

7   petitioner has alleged that express and implied assurances were made to him that the

8   District Attorney's personal written recommendation would ensure that petitioner

9   would be granted parole and released from prison after serving the minimum term.

10  This was the "bait" used to secure petitioner's consent to the plea bargain and

11  cooperation in the prosecution of Michael Blatt. One might ask rhetorically, if petitioner

12  had not been assured that Mr. Phillips's letter would carry great weight with the Board

13  and secure his early release, what benefit would petitioner have received from a merely

14  advisory, nonbinding recommendation to the parole board?  Would petitioner have

15  waived his right to a jury trial and agreed to cooperate with the prosecution in the two

16  trials of Michael Blatt in exchange for a recommendation that had no binding legal

17  effect concerning petitioner's "early release" from prison? To believe this would require

18  one to believe that Mr. Mackey agreed to waive his rights and testify against a

19  codefendant with no real assurances that the District Attorney's "personal

20  recommendation" would be of any benefit or influence with the parole board. It is

21  simply inconceivable to think that under petitioner's written contract and plea

22  agreement there was not a clearly implied expectation that petitioner would actually be

23  released after serving the minimum term based on the weight of the District Attorney's

24  recommendation. Otherwise, there was no need to reduce this term to writing.

25  Accordingly, because petitioner has fully fulfilled his obligations under the plea

agreement, he is entitled to the promised benefit.

# VI.

## CONCLUSION

For all of the foregoing reasons, petitioner requests that the court grant the following relief and any additional relief the court deems appropriate:

(1)    Declare the rights of the parties;

(2)    Determine whether a breach of the contract and written plea agreement occurred;

(3)    Grant rescission of the contract under Civil Code Section 1689, or specific performance, ordering petitioner's immediate release from prison based on time served;

(4)    Subpoena Mr. John Phillips and Mr. Hamilton Hintz for an evidentiary hearing, if necessary;

(5)    Any other relief the Court deems just and proper

Respectfully submitted,


Dated: 4-24, 2006          By: _____

Benjamin Ramos, Attorney for
Petitioner, James Mackey

Petition for Writ of Habeas Corpus of James Mackey,  Page 30 of 31

## LIST OF EXHIBITS

Exhibit A          Probation Officer's Report dated November 2, 1990.

Exhibit B          Information #45624 filed on October 16, 1989.

Exhibit C          Contract and Terms of the Contract between Petitioner and District

Attorney John Phillips dated August 30, 1989.

Exhibit D          Letter dated November 20, 1990, from District Attorney John

Phillips to the Department of Corrections.

Exhibit E          Transcript dated May 6, 2005 the Initial Parole Consideration

Hearing of Petitioner, James Mackey.

Exhibit F          California Penal Code §3046

Exhibit G          Petitioner James Mackey's Psychiatric Reports.

Exhibit H          Petitioner James Mackey's Post –Conviction Progress Reports and

Lifer Prisoner Evaluation.

Exhibit I          Petitioner James Mackey's Laudatory Chronos.

Exhibit J          Petitioner James Mackey's Support Letters.

Exhibit K          Abstract of Judgment.

Exhibit L          Statement for Prison Officials dated February 22, 1991.

Exhibit M          Petitioner James Mackey's Vocational, Educational and Self-Help

Program Certificates.

Exhibit N          San Joaquin Superior Court Order Denying Habeas Corpus Petition

March 8, 2006

## ATTACHMENT TO FEDERAL HABEAS CORPUS PETITION OF

## JAMES MACKEY

### I. AEDPA STANDARDS

Under AEDPA, a court may grant the petition only if the state court's denial of relief:

> (1) resulted in a decision that was either "contrary to," or was an "unreasonable application" of, "clearly established federal law" as set forth by the United States Supreme Court; or

> (2) was based on an "unreasonable determination" of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Because the California Supreme Court summarily dismissed petitioner's habeas petition, the federal district courts "look through" that dismissal and review the "last reasoned" state court decision. *Bailey v. Rae*, 339 F.3d 1107, 1112 (9th Cir. 2003) (citation omitted). The last reasoned decision in this case is from the San Joaquin County Superior Court, dated March 6, 2006, denying petitioner's habeas corpus petition.

The "contrary to" and "unreasonable application of" clauses of § 2254(d) (1) provide independent avenues of relief. *Clark*, 331 F.3d at 1067. The "contrary to" clause of § 2254(d) (1) provides relief if the state court "fail[ed] to apply the correct controlling authority, or if it applie[d] the controlling authority to a case involving facts materially indistinguishable from those in a controlling case, but nonetheless reache[d] a different result." *Id.* (citation omitted). Under the "unreasonable application" clause of § 2254(d) (1), relief may be granted if the state court "identifie[d] the correct governing legal principle but unreasonably applie[d] that principle to the facts ..." *Id.* (citation and

Page 1 of 8

alteration omitted).

Even if the state court's decision was contrary to, or an unreasonable application

of, clearly established federal law, habeas relief may still be denied absent a showing of

prejudice. *See, Early v. Packer,* 537 U.S. 3, 10-11, 123 S.Ct. 362, 154 L.Ed.2d 263

(2002) (per curiam).

The starting point for review under AEDPA was stated succinctly by the 9th

Circuit in *Inthavong v. Lamarque,* 420 F.3d 1055 (9th Cir. 2005):

> To grant relief where a state court has determined
> that a constitutional error was harmless, we must
> both determine (1) that the state court's decision
> was "contrary to" or an "unreasonable application"
> of Supreme Court harmless error precedent, and (2)
> that the petitioner suffered prejudice under *Brecht*
> from the constitutional error.
>
> In following this two-part harmless error test, we
> are joined by the Tenth, the Seventh, and the Fourth
> Circuits. The Tenth Circuit has instructed that "if
> the district court concludes the [state] court's
> application of *Chapman* was objectively
> unreasonable, the court should engage in an
> independent harmless error analysis applying the
> standard articulated in *Brecht.' Saiz v. Burnett,* 296
> F.3d 1008, 1012-13 (10th Cir. 2002) (internal
> citation omitted); *see also Cargle* v. *Mullin,* 317
> F.3d 1196, 1220, 1224 (10th Cir. 2003) ("If the state
> courts did not address a harmless-error issue *(or did*
> *so under the wrong standard),* we apply the
> standard generally adopted for habeas purposes in
> *Brecht v. Abrahamson."* (internal citation omitted)
> (emphasis added)).

Additionally,

> [I]f a federal court applies a harmless error analysis
> in the first instance, the *Brecht* standard governs.
> *See Bains v. Cambra,* 204 F.3d 964, 977 (9th Cir.
> 2000) (applying *Brecht* when the state court decided
> the case under the wrong harmless error standard or
> failed to apply a harmless error analysis entirely).

Page 2 of 8

Because the state court in this case conducted a harmless error analysis, we are guided by the approach endorsed by the Supreme Court in *Esparza,* first deciding whether the state court's harmless error analysis is objectively unreasonable and, if so, applying *Brecht.*

Therefore, pursuant to *Mitchell v. Esparza,...* we hold that if a state court disposes of a constitutional error as harmless under an appropriate standard of review, federal courts must, for the purpose of the "unreasonable application" clause of § 2254(d)(1), first determine whether the state court's harmless error analysis was objectively unreasonable. Only if there is a predicate finding that the state court's harmless error analysis was objectively unreasonable, and thus an unreasonable application of clearly established federal law, should federal courts engage in a *Brecht* analysis.

*Medina v. Hornung*, 372 F.3d 1120 (th Cir. 2004) at 1126.

## II. ANALYSIS

### A.     THE SUPERIOR COURT'S ORDER WAS OBJECTIVELY UNREASONABLE.

The superior court failed to analyze petitioner's claims under federal law. Instead, the superior court essentially held that any error was harmless or that no breach of contract occurred. But the harmless error rule does not apply when the government breaches a plea agreement. (*In re Moser*, 6 Cal.4th 342 (1993) at 354, citing, *People v. Walker*, 54 Cal.3d 1013; 1 Cal.Rptr.2d 902 (1991). *U.S. v. Johnson*, 187 F.3d 1129, 1135.)

The California Supreme Court follows precedent set by the U.S. Supreme Court in *Santobello v. New York*, 404 U.S. 257 (1971) regarding plea agreements. The California Supreme Court observed:

> In vacating the judgment rendered by the trial court, the Supreme Court held in *Santobello* that the plea-negotiating process "must be attended by safeguards to insure the defendant what is reasonably due in the circumstances. Those circumstances will vary, but a constant factor is that when a plea rests in any significant degree *on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.* [¶] On this record, *petitioner 'bargained' and negotiated for a particular plea in order to secure dismissal of more serious charges, but also on condition that no sentence recommendation would be made by the prosecutor.* It is now conceded that the promise to abstain from a recommendation was made, and at this stage the prosecution is not in a good position to argue that its inadvertent breach of agreement is immaterial.... That the breach of agreement was inadvertent does not lessen its impact." (*Santobello v. New York, supra,* 404 U.S. at p. 262 [30 L.Ed.2d at p. 433], italics added.)

*In re Moser*, 6 Cal.4th 342 (1993) at 355.

The U.S. Supreme Court additionally held in *Santobello* that a criminal defendant

has a due process right to enforce the terms of his plea agreement. *See also Brown v.*

*Poole*, 337 F.3d 1155, 1159 (9th Cir. 2003) ("[The defendant's] due process rights

conferred by the federal constitution allow [him] to enforce the terms of the plea

agreement."). The construction and interpretation of state court plea agreements "and the

concomitant obligations flowing therefrom are, within broad bounds of reasonableness,

matters of state law." *Ricketts v. Adamson*, 483 U.S. 1, 6 n.3 (1987). In California, "[a]

negotiated plea agreement is a form of contract, and it is interpreted according to general

contract principles," *People v. Shelton*, 37 Cal. 4th 759, 767 (2006), and "according to the

same rules as other contracts," *People v. Toscano*, 124 Cal. App. 4th 340, 344 (2004)

(cited with approval in *Shelton* along with other California cases to same effect dating

back to 1982). Thus, under *Adamson*, California courts are required to construe and interpret plea agreements in accordance with state contract law. The superior court failed to analyze petitioner's contract under California law and, therefore, its order was objectively unreasonable.

In California, "[a]ll contracts, whether public or private, are to be interpreted by the same rules . . . ." Cal. *Civil Code* §1635; *see also Shelton*, 37 Cal. 4th at 766-67; *Toscano*, 124 Cal. App. 4th at 344. A court must first look to the plain meaning of the agreement's language. Cal. *Civil Code* §§ 1638, 1644. If the language in the contract is ambiguous, "it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." Cal. *Civil Code* § 1649. The inquiry considers not the subjective belief of the promisor but, rather, the "objectively reasonable" expectation of the promisee. *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1265 (1992); *Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 802 n.9 (1998) ("Although the intent of the parties determines the meaning of the contract, the relevant intent is objective—that is, the objective intent as evidenced by the words of the instrument, not a party's subjective intent." (internal quotation marks and citation omitted)). Courts look to the "objective manifestations of the parties' intent . . . ." *Shelton*, 37 Cal. 4th at 767. If after this second inquiry the ambiguity remains, "the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." Cal *Civil Code* § 1654; *see also Toscano*, 124 Cal. App. 4th at 345 ("ambiguities [in a plea agreement] are construed in favor of the defendant"). (2000). However, broken plea agreements do not require a showing of predudice:

> [I]n the context of a **broken plea agreement**, there
> is more at stake than the liberty of the defendant or

the length of his term. "At stake is the honor of the
government[,] public confidence in the fair
administration of justice, and the efficient
administration of justice ...." ' [Citations.]"

*In re Moser*, 6 Cal.4th 342 (1993) at 354, *citing, People v. Walker*, 54 Cal.3d

1013; 1 Cal.Rptr.2d 902 (1991). (emphasis added).

Under California law, a three-part analysis is required to interpret petitioner's

contract: (1)  A court must first look to the plain meaning of the agreement's language.

*Cal. Civil Code* §§ 1638, 1644. (2) If the language in the contract is ambiguous, "it must

be interpreted in the sense in which the promisor believed, at the time of making it, that

the promisee understood it." Cal. *Civil Code* § 1649. (3) If after this second inquiry the

ambiguity remains, "the language of a contract should be interpreted most strongly

against the party who caused the uncertainty to exist." Cal *Civil Code* § 1654; *see also*

*Toscano*, 124 Cal. App. 4th at 345.

The superior court found no ambiguities in petitioner's contract. (**Exhibit N**)

Paragraph 6 of petitioner's contract, however, is ambiguous concerning time.  It states,

"However, the ***actual release date*** will be determined by the Board of Prison Terms or its

equivalent agency."  The phrase "actual release date" clearly suggests that petitioner's

release exactly on his minimum release date of 16 years 8 months was not being

guaranteed. Rather, the "actual" release date would be determined by the Board or its

equivalent agency. No time limit, however, is placed upon the Board or its equivalent

agency to make this determination.  In light of the preceding language of paragraph 6

stating that District Attorney John D.  Phillips shall personally write a letter to the Board

of Prison Terms recommending that petitioner be released at the earliest possible time

upon having served the minimum sentence for first-degree murder, it is unreasonable to

conclude that the parties intended that the determination of petitioner's actual release date would remain open-ended for perhaps decades after petitioner's minimum eligible release date. If the parties actually intended that that there would be no limit on *when* the Board could determine petitioner's release date, the District Attorney's recommendation for petitioner's earliest possible release would have been a meaningless phrase that would have served no purpose.  If the parties intended or understood that the Board would retain petitioner for decades beyond his minimum eligible release date, the contract likely would have specified that petitioner's actual term of incarceration could exceed his minimum term by any number of years, decades, or indefinitely. Believing and intending, however, that petitioner would be found suitable for parole at his first parole suitability hearing with the support of the District Attorney's office, it was unnecessary for the parties to include any such clarification in the contract concerning the actual amount of time in prison petitioner might serve. All negotiating parties believed and intended petitioner would serve the minimum term or a similar term as determined by the Board or its equivalent agency.

Because the contract is ambiguous concerning *when* the Board or its equivalent agency must determine petitioner's actual release date, that term must be interpreted as understood by the District Attorney and petitioner at the time the contract was entered. *Moser*, *Toscano*, *supra*. The parties agreed and understood that petitioner would be released after serving the minimum term consistent with the District Attorney's written recommendation. Therefore, because the superior court failed to engage in this analysis concerning the contract ambiguity relative to time, the superior court's order was objectively unreasonable.

**B      THE SUPERIOR COURT'S ORDER WAS "CONTRARY TO"**

**FEDERAL LAW.**

The "contrary to" clause of § 2254(d) (1) provides relief if the state

court "fail[ed] to apply the correct controlling authority, or if it applie[d]

the controlling authority to a case involving facts materially

indistinguishable from those in a controlling case, but nonetheless

reache[d] a different result." *Id.* (citation omitted). Here the superior court

failed to apply *Santobello v. New York*, 404 U.S. 257 (1971), as required

by California law.  In re *Moser*, 6 Cal.4th 342 (1993) at 355. Having failed

to apply the correct law, the superior court's order was "contrary to"

federal law.


For all the foregoing reasons, petitioner requests that the petition be granted.


Dated: 1/11 , 2007        By: _____

Benjamin Ramos, Attorney for
Petitioner, James Mackey

# EXHIBIT A

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN JOAQUIN
HON. STEPHEN G. DEMETRAS, JUDGE

PEOPLE OF THE STATE OF CALIFORNIA

vs.

JAMES OLIVER MACKEY        Defendant

No.  45624
     A-61058

P&J Date:  11-20-90

Eual Blansett, D.A.
Hamilton Hintz, Atty.

AGE:    26          DATE OF BIRTH:  08-12-64

OFFENSE:  A violation of Penal Code Section 187, Murder in the First
          Degree, a felony.

DATE OF OFFENSE:    02-28-89

DATE OF CONVICTION:  11-07-89

DATE OF ARREST:   06-01-89    AGENCY:  SJC Sheriff's Department

DAYS IN CUSTODY:  538      O.R.:              BAIL:

CO-DEFENDANTS AND STATUS:  Carl Hancock:  Awaiting sentencing for
                           First-Degree Murder.

Michael T. Blatt:  Pending trial for Murder and Conspiracy.

GUILTY BY:  Plea of Nolo Contendere

PLEA NEGOTIATION:  25 Years to Life in State Prison

RECOMMENDATION:                    REPORT SUBMITTED BY:

Denial of probation.               G. B. Fernandes
                                   Probation Officer III
                                   Adult Division

<u>Preface</u>:     The following section was written using information con-
                     tained in selected portions of San Joaquin County Sheriff's
Department Crime Report Number 89-7588 and selected portions of Sonoma
County Sheriff's Department Crime Report Number 89-0301-38.

## SUMMARY OF OFFENSE

As real ~~estate agent~~ Lawrence Carnegie stood with his back to an open
garage door on property at 14152 East Tokay Colony Road, Lodi, he was
shot in the back with the bolt from a crossbow fired by James Mackey.
Mackey had been hiding inside the garage, waiting for Carnegie to be
lured into position by Carl Hancock, so Mackey could shoot Carnegie.

The shooting occurred the evening of February 28, 1989. Moments after
Carnegie was shot, a car driven by Denise Brock drove onto the prop-
erty. Brock and the children in her car saw Carnegie on the ground,
saw Carl Hancock running toward Brock's car, and saw Mackey standing
over Carnegie with his back to the car. Those in the car were unable
to give Sheriff's Deputies any more complete description of Mackey
than the description of his clothing.

Brock was frightened by the activity she happened upon and quickly
backed out of the driveway. She drove to a residence on Tully Road
and called the "911" emergency dispatcher and reported what she had
seen.

When deputies from the Sheriff's Department went to the residence on
Tokay Colony Road, they found a bloody sleeping bag, the bloody bolt
from a crossbow, and Lawrence Carnegie's car. Carnegie and the two
men described by Brock could not be found.

Carnegie's body was found the next afternoon in a rural area along
Highway 128 in Sonoma County. Subsequent investigation by Sheriff's
Deputies, involving hundreds of man-hours of investigation, revealed
that James Mackey had rented a Ford on February 28, 1989, that matched
the description of the car Brock had seen parked at the shooting scene.
The car eventually was traced to Southern California. Deputies re-
trieved the car and had it examined by criminalists who found dried
blood in the Ford that matched Carnegie's blood.

Mackey was arrested for Carnegie's murder on June 1, 1989. He told
investigators before and after his arrest several different versions
of his role in the murder.

Mackey eventually implicated Carl Hancock as the person who helped him
kill Carnegie. Mackey implicated Michael T. Blatt, a wealthy local
businessman, property developer, and business agent for athletes, as
the individual who solicited and paid Mackey to have Carnegie killed.

- 1 -

## VICTIM'S STATEMENT

Karen Carnegie, the victim's widow, has been notified by telephone of the date scheduled for sentencing proceedings concerning defendant Mackey. She plans to attend the hearing when James Mackey is sentenced. She wants the Court to know that she has been left with three young daughters to raise. Her husband's death resulted in a hardship for her, as she has been left alone to raise her three children. She sold the real estate business that she and her husband operated so that she could get a fresh start in another town. She was unable to operate the business on a full-time basis and still take care of the children by herself. She did not want to remain in Stockton with Michael Blatt because she suspected he was in some way responsible for her husband's death, and Blatt also worked in the real estate business.

Mrs. Carnegie wants to be notified by the Parole Board whenever Mackey appears before the board for parole hearings.

## DEFENDANT'S STATEMENT

Defendant Mackey was interviewed in custody on October 19, 1990. The defendant gave the following statement regarding the murder of Lawrence Carnegie:

During the spring of 1988, Mackey and Michael Blatt were together in Blatt's car. Mackey was trying to buy a condominium from Blatt. Blatt said Mackey could not purchase the condominium because of a pending civil suit brought against Blatt by victim Carnegie. Blatt said it would not bother him one bit if Carnegie "wasn't around anymore." Mackey did not pay too much attention to the comment.

In January of 1989, Mackey was in Blatt's office, and they were talking about the condominium Mackey was living in. Blatt said something about Carnegie, and Mackey replied, "Do you want me to see if I can find someone to take care of him?" Blatt responded that he did want Carnegie "taken care of," but Blatt wanted his name kept out of the matter.

Mackey spoke to his friend, Carl Hancock. The two men attended the University of the Pacific together and played football together. Mackey discussed the possibility of Carl finding someone to kill Carnegie. Hancock made a telephone call and told Mackey, after the call, that he knew someone who could do the killing.

Mackey gave Hancock Carnegie's telephone number and told Hancock where Carnegie worked. Mackey also told Hancock the procedure for being able to get a realtor alone. Hancock was instructed by Mackey to tell Carnegie that Hancock was an out-of-town buyer with $100,000 cash to invest in a home and that Hancock wanted a quick sale.

- 2 -

Mackey later told Blatt that he had found someone to "do the job." Blatt then informed Mackey that Blatt had two men he wanted to have killed.  John Farley was the second man Blatt wanted murdered.

Mackey explained that John Farley was a Stockton football player who sued Blatt's firm for mismanaging Farley's financial assets.

Mackey explained that Blatt wanted Farley killed before Carnegie. Blatt told Mackey where Farley worked and what kind of car he drove. Mackey passed the information along to Hancock.

Hancock eventually asked Mackey how much money Blatt was willing to pay for the murders. When Mackey asked Blatt the same question, Blatt replied, "However much it takes."  Mackey then told Hancock that Mackey would solicit $20,000 from Blatt for the murders.  Mackey told Hancock to barter with whoever took the jobs to have the killings done as cheaply as possible.  Mackey then told Hancock that Hancock could keep the balance of the money that Blatt paid for the killings.

Hancock later reported to Mackey that Hancock had been following Farley around town, studying his activities and his routine, and told Mackey that Hancock intended to be present when Farley was murdered.

Mackey made a progress report to Blatt and told him that Farley was being followed.  Suddenly, Blatt changed his priorities and said that he wanted Carnegie killed before Farley.  Mackey notified Hancock about the change in priorities.  The next time he talked to Hancock, Mackey learned that Hancock had already met with Carnegie and had gone out with him twice to look at property, but "nothing happened."

The weekend before Carnegie's murder, Mackey went to Arizona to see a friend play basketball.  Before he left Stockton, Mackey told Blatt that two men would kill Carnegie and dump his body in Lake Tahoe. Mackey asked Blatt for some money so that he could go to Arizona to make final arrangements for the murder.  The following day, the Friday before the murder, Blatt gave Mackey $500 in cash for expenses. Mackey returned from Arizona on Sunday and called Blatt the next morning.  Mackey told Blatt that he needed some expense money to get some of the items that would be used during the murder.  Blatt told Mackey to meet him at Shannon's Restaurant later that day.  Mackey met Blatt at the restaurant and was given a check by Blatt for $2,000.  That same evening, Mackey and Hancock went to Lake Tahoe to scout the scene where they would dump Carnegie's body.  They intended to rent a boat and take Carnegie's body out into Lake Tahoe and sink it.  However, the marina they located was closed.  Mackey and Hancock returned to Stockton.  The following day, on February 28, 1989, Mackey and Hancock

- 3 -

drove to Modesto. They purchased a crossbow and sleeping bag at a sporting goods store and went to another store, where they purchased arrow tips. They then drove back to Mackey's mother's home in French Camp. They assembled the crossbow and practiced firing it several times, shooting at a paper target. It was Mackey's intention to accompany Hancock when the killing was committed but to have Hancock actually "do the job."

While the two men were target practicing, Hancock told Mackey that he could not commit the murder. At that point, Mackey decided he would have to kill Carnegie himself.

Mackey rented a car from the Stockton Airport the day he returned from Modesto. He and Hancock loaded the crossbow and sleeping bag into the trunk of the rental car. The defendant drove the rental car back to Stockton, and Hancock followed in Mackey's car. They dropped the rental car off at Mackey's office. Mackey then dropped Hancock off at Hancock's home. The defendant returned home in his vehicle, changed from the suit and tie he was wearing, and put on jeans and a T-shirt. Mackey then drove his car back to his office, picked up the rental car, and drove to Hancock's home. He picked up Hancock and a 50-pound weight the men intended to tie to the sleeping bag they purchased. Carnegie's body was to be placed inside the weighted sleeping bag and thrown into the water of Lake Tahoe.

The two men drove to the Morada area, where Hancock called Carnegie to set up an appointment to see the property on Tokay Colony Road. Mackey had shown the property before and knew that it suited their needs. It was a rural location, close to a direct route to Lake Tahoe, and was vacant.

Carnegie told Hancock that his schedule would not allow for a meeting with Hancock until later in the day. Carnegie told Hancock to call him back and schedule a time to see the property for later that evening.

Mackey and Hancock had to pass a few hours before Carnegie would be available. The two men went to the Stockton Auto Center to visit the defendant's cousin, John Holmes. Holmes was not at work, so the men drove back to Morada. They bought some rope at a hardware store. They intended to use the rope to secure the weight to the sleeping bag. They then went to a pizza parlor, where they shared a pizza, and each man had one glass of beer.

Hancock and Mackey then drove to the property on Tokay Colony Road. They saw another realtor there, who was showing the property. The two assassins drove past the property and drove into Lockeford, where Hancock called Carnegie. Hancock scheduled an appointment to meet Carnegie at the property at six o'clock that evening. Mackey then called Blatt and told Blatt that Carnegie's murder would take place that night. Mackey asked Blatt to call the defendant's wife and tell her the defendant was going back to Lake Tahoe to look at some property for Blatt. Blatt promised to call the defendant's wife, but never made the call.

Hancock and Mackey returned to the home on Tokay Colony Road about 5:30 p.m. They backed the rental car up to the garage. Mackey decided to hide in the garage and wait for Hancock to lure Carnegie into the garage so Mackey could shoot the victim with the crossbow. Mackey took up a position behind some sheetrock. The two men waited for Carnegie, who showed up late, sometime between 6:30 and 7:00 p.m.

When Carnegie arrived at the property, he and Hancock went into the house while Mackey waited in the garage with the loaded crossbow. Hancock was not able to get Carnegie to go into the garage. Mackey became impatient and feared that the murder would not be accomplished. The garage doors consisted of two doors, hinged on either side, opening outward. The door was partially open, with a one-foot space between either side. As Carnegie and Hancock stood near the rental car, discussing the property, Carnegie had his back to the door. It was dark, but Mackey could see Carnegie's outline. Mackey pointed the crossbow at Carnegie's back, closed his eyes, and pulled the trigger. After firing the shot, Mackey knelt to the ground, and a few seconds later heard Carnegie say, "I'm shot, I'm shot." Carnegie then began running around and hollering. Hancock told him to lie down on the ground. When Carnegie lay down, Mackey came out of the garage and was approached by Hancock, who said, "He's not dead. We'll have to suffocate him." Hancock then put the sleeping bag over Carnegie and held his hands across Carnegie's face. Mackey was hiding his face from Carnegie so that Carnegie would not be able to see him. For some reason unknown to Mackey, Hancock then said, "Wait a minute," and Hancock ran toward the rental car. It was at this point that Brock's car drove into the driveway. Mackey was holding Carnegie on the ground when Carnegie looked at the defendant and apparently recognized him as another realtor. Carnegie then told Mackey, "You're fucked." Hancock began running towards Brock's car, yelling, "Help, help." Carnegie began to struggle towards the headlights of Brock's car when Mackey punched the victim once in the face, then kicked him once in the body. Carnegie lost consciousness. Mackey and Hancock then loaded Carnegie into the trunk of the rental car. Hancock started to

drive away from the scene, but could not find the car's headlight switch. He was driving erratically and was panicking.

Mackey took over the driving and realized that he would not be able to follow his original plan. He felt that he could not take Highway 88 towards Lake Tahoe because if Brock had called the Sheriff, deputies would be searching that highway, as it was closest to the home where the shooting occurred. Mackey and Hancock had blood on their shirts. They changed into shirts they had brought with them and threw the bloody garments out of the car. Mackey then decided to travel west on Highway 12, out of the county, towards the Bay Area. After driving for about an hour, near Fairfield, Mackey decided to take Carnegie to an isolated area the defendant knew about in Sonoma County. Mackey drove to a steep section of road, along Highway 128, northwest of Cloverdale, where he intended to dispose of Carnegie's body. On the way to their destination in Sonoma County, Mackey and Hancock heard noises in the trunk of the car that they thought were caused by Carnegie moving around. In retrospect, Mackey believes the noise they heard was the 50-pound weight shifting from side to side in the trunk. When the men arrived at a secluded area that was probably inside Mendocino County, Mackey stopped the car, and Hancock opened the trunk. Hancock told Mackey that Carnegie was still alive. Neither man could bring himself to finish the job they started. Mackey was unable to walk back to the trunk and look at Carnegie. Mackey felt that Hancock should complete the murder because Mackey had already done his share by shooting the victim.

Hancock took the length of rope they purchased that afternoon and tied a noose in it. He put the rope around Carnegie's neck and gave the other end of the rope to Mackey, who was standing outside the driver's door. Hancock told Mackey to pull on the rope. Mackey pulled the rope until Carl eventually took it from him. The defendant got back into the car as Hancock closed the trunk and joined Mackey. They then drove back, east on Highway 128, until they found a steep spot near the road. They removed the victim's body from the trunk and threw it down the embankment. They then drove back to Highway 101 and began driving south, toward the Bay Area. After they stopped for gas in Cloverdale, they saw blood on the outside of the trunk. They decided they would need to find a car wash and clean the car. They threw the crossbow and rope off a bridge as they drove into San Pablo. There the men rented a motel and took a shower. After they cleaned up, they left immediately for Stockton. While driving on Interstate 580, they stopped in Dublin to wash the car and clean out the trunk. They returned to Stockton at about five o'clock Wednesday morning March 1, 1989. They went to Hancock's home and picked up his vehicle. Mackey borrowed a clean pair of pants from Hancock because Mackey's pants were stained

with blood.  They drove back to the Stockton Airport, and Mackey threw his bloody pants away.  They dropped off the rental car, and Hancock drove the defendant back to the defendant's office so he could pick up his own car.  Mackey arrived at home about 5:30 Wednesday morning. His wife was awake and upset because she had no idea where he had been. Mackey indicates that Blatt never called Mrs. Mackey as he had promised the preceding evening.

Later that week, Mackey called Hancock and told his friend it would be a good idea if they did not see one another for a while.  Mackey feared that he and Hancock might somehow become suspects in Carnegie's death.

The day after Carnegie's death, Mackey went to Blatt's office.  Mackey assured Blatt that Carnegie was dead.  Blatt asked, "Are they gone?" Mackey assured Blatt that the killers had left town.

Mackey was upset all day Wednesday.  He could not stop thinking about what he and Hancock had done.  Mackey called Blatt's house Wednesday night and left a message with Blatt's son to call Mackey.  After a few hours, Mackey called Blatt's car telephone from Mackey's car telephone. He told Blatt all about Carnegie's killing but never told him that it was he and Hancock who committed the murder.  Mackey told Blatt that two men from out of town committed the murder.

Mackey told Blatt how scared he was and that he needed to get out of Stockton for a while.  Blatt assured Mackey that he had nothing to worry about.  However, Blatt told Mackey to go ahead and take a few days off and get out of town.  Blatt told Mackey to contact Blatt the next day.  Mackey said that he would need an excuse to be able to get away from his wife for a few days.  Blatt offered to tell Mrs. Mackey, who worked in Blatt's office, that Mackey was going to Southern California to look at some property in Blatt's behalf.

On Thursday, March 2, 1989, Mackey called Blatt and was instructed by Blatt to come by Blatt's house or office.

It was then that Mackey told his wife Blatt wanted the defendant to go out of town for a couple of days.  The defendant called a woman he was having an affair with and invited her to accompany him out of town. Mackey then drove to Blatt's house as Blatt was preparing to drive away to take his son to school.  Blatt gave the defendant an envelope that contained $3,000 in cash.  Mackey and his girl friend left town on Thursday, went to Los Angeles, to Mexico, and returned to Stockton the following Sunday.

- 7 -

Mackey believes that he is to blame for Lawrence Carnegie's death. He believes that he was the catalyst for the murder. Although Blatt wanted Farley and Carnegie killed and depended on Mackey to be the "middle man" to set up the killings, Mackey feels that if he had tried to talk Blatt out of the murders, Blatt would not have followed through with plans to kill either man.

Mackey is primarily concerned about his safety over the next few months. He fears that Blatt may attempt to retaliate against him if Blatt is convicted of hiring Carnegie's murder. Mackey feels he will not be in jeopardy if he and Blatt serve sentences in different institutions. Mackey also believes Blatt will not try to harm him if Blatt is not convicted for his part in the murder conspiracy.

## BACKGROUND

<u>Preface</u>: The following information was obtained from the interview with defendant Mackey and, except for records obtained from the Department of Motor Vehicles and the Department of Justice Bureau of Criminal Identification, has not been documented.

<u>Family</u>: James Oliver Mackey is a San Joaquin County native. He is the son of James Edward Mackey of Kansas City, Missouri, and Ruby Walker, of 3737 Cherryland Avenue, Stockton. The defendant's parents separated when he was an infant. He has had no contact with his father for more than 20 years.

The defendant's mother is self-employed and operates a board-and-care home for the retarded. Mackey was raised by his mother, who remarried on two occasions. She was married to Raymond Walker and then, for about six years, to Charles Holmes. Mackey was a youngster when his stepfathers lived in the home, and he recalls few details about them.

The defendant has four brothers and two sisters. He is the youngest son and next youngest child of the family. Three of his older brothers have been in prison. Thirty-five-year-old Donald Eskridge has been in prison many times. He currently is serving a term for a parole violation that occurred after Donald was paroled for a drug offense. Thirty-three-year-old Kenneth Eskridge has been to prison and is now on parole for drug offenses. Thirty-year-old Robert Eskridge is on parole for selling drugs.

When Mackey was arrested, he was living with his wife at 1431 West Swain Road, Stockton.

**Education:** Mackey graduated from East Union High School in Manteca. He then spent five years at the University of the Pacific before he graduated with a <u>Bachelor of Arts Degree in Sports Medicine</u>. Mackey attended the University of the Pacific on a football scholarship.

**Employment:** During Mackey's senior year at the University of the Pacific, he and two friends started a sports training business. Mackey stayed with the endeavor until six or seven months after he graduated from college. In May of 1987, he tried out with the Los Angeles Raiders. He spent four or five days at a mini-camp, but was not signed by the team. The following September, the defendant had a tryout with the San Francisco 49ers, during the strike season, and spent four or five days trying out for the team. When he was not signed by the 49ers, he decided to enter the real estate business. He began studying for his real estate license while he was still operating the fitness training business. He took the State examination for his real estate license, but failed it in March of 1988. He passed the test the following May. He began working as a <u>full-time real estate agent in July of 1988.</u>

The defendant worked for Coldwell Banker in Stockton from July of 1988 until April of 1989. Mackey worked entirely on a commission basis. After he left Coldwell Banker, he transferred to the Prudential Lurtsema Real Estate Office and was working there, on commission, when he was arrested for this offense on June 1, 1989.

**Financial:** When Carnegie was killed, the defendant's income was totally dependent on his commission from real estate sales. Sales were slow, but Mackey's wife was working, and they were having no financial difficulties. Mackey earned approximately $8,000 during 1988. During the first six months of 1989, he earned approximately $6,000 before he was arrested.

**Marital:** In May of 1987, the defendant married <u>Sharon Gabberd</u>. They have one child, Kevin Mackey, who was born <u>six weeks after</u> the defendant was arrested for this murder. The defendant's wife visits him about once a week.

**Military:** The defendant has not served in the armed forces.

**Health/Psychological:** Mackey is healthy but uses prescription medication for bleeding ulcers which have bothered him for the past seven years. He began suffering from the ulcers when he started college. He attributes the problem to the stress and pressure he experienced while attending college. He used medication for

the ulcer while in custody in Stockton. However, in other jail facil-
ities, the defendant has been able to cope without medication. He has
been using Motrin due to a back injury he suffered while playing
basketball in jail in another county.

The defendant's only exposure to counseling occurred when he spoke to
a marriage counselor, once, while having problems in his relationship
with his wife. He spoke to the counselor while in custody in another
county.

<u>Substance Abuse</u>:  The defendant's consumption of alcohol is limited to
an occasional beer. He never drinks enough to
bother his ulcer. His use of illegal drugs has been limited to trying
marijuana once when he was thirteen years old.

## EVALUATION

James Mackey pled Guilty to First-Degree Murder after entering into an
agreement with the prosecutor that he receive a prison sentence of 25
years to life in exchange for his testimony against Michael Blatt.

Mackey lacks a criminal record or history of juvenile delinquency. He
graduated from college and was working as a semiprofessional when he
entered into an agreement to kill a human being with whom he had no
grudge. Mackey possesses no outward manifestation that he is capable
of the cold-blooded, brutal murder he admitted committing.

While most individuals may be provoked, under extreme conditions or
unusual circumstances, to the point where they may commit murder, as a
crime of passion, this crime lacks any hint of provocation or justi-
fication. This Machiavellian crime was committed if not for pro-
fessional gain, then for the professional success or chance for career
advancement Mackey hoped to acquire by endearing himself to Blatt by
killing one of Blatt's enemies.

Extreme crimes demand extreme punishment. An indeterminate sentence
of the length agreed to by the terms of the negotiated plea appear
appropriate.

## SENTENCING FACTORS

<u>Criteria Affecting Probation</u>:  Penal Code Section 190(a) provided that
every person guilty of Murder in the
First Degree shall suffer death, confinement in State Prison for life
without possibility of parole, or confinement in State Prison for a
term of 25 years to life. The penalty to be applied shall be deter-
mined as provided in Penal Code Sections 190.1, 190.2, 190.3, 190.4,
and 190.5.

Penal Code Section 1203(e)(1) provides that except in unusual cases where the interests of justice would best be served if the person is granted probation, probation shall not be granted to any person who, unless the person had a lawful right to carry a deadly weapon, other than a firearm, at the time of the perpetration of the crime or his or her arrest, any person who has been convicted of Murder and was armed with such a weapon at either of those times.

Rule 416 of the California Rules of Court establishes criteria affecting probation in "unusual cases" within the meaning of Penal Code Section 1203(e). Of the seven listed criteria, the only criterion that appears to apply to the defendant is that he has no significant record of prior criminal offenses.

The first two criteria listed within Rule 416 provide consideration as an "unusual case" those individuals who are armed with a deadly weapon or who inflict great bodily injury when either condition results in a crime committed without advanced planning or under circumstances of great provocation. Due to the advanced planning and lack of provocation involved in the instant offense, the defendant does not appear to constitute an "unusual case" worthy of probation.

Circumstances in Aggravation:

Facts Relating to the Crime:

1.  The crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness, whether or not charged or chargeable as an enhancement under Section 12022.7.

2.  The defendant was armed with or used a weapon at the time of the commission of the crime, whether or not charged or chargeable as an enhancement under Section 12022 or 12022.5.

3.  The victim was particularly vulnerable in that he was lured to an isolated area, under cloak of darkness, was shot in the back with a crossbow bolt, was beaten and kicked, confined in the trunk of a car for a significant period of time while bleeding profusely from the wound inflicted by the defendant, and was taken to another isolated area, where he eventually was strangled by the defendant and a co-defendant acting in concert.

4.  The defendant induced others to participate in the commission of the crime or occupied a position of leadership or dominance of other participants in its commission.

- 11 -

JAMES OLIVER MACKEY

Facts Relating to the Defendant:  None.

<u>Circumstances in Mitigation</u>:

Facts Relating to the Crime:

1. The defendant contends that he had no predisposition to com-
mit the crime, but was induced by another to participate in
the crime.

Facts Relating to the Defendant:

1. The defendant has no criminal record.

2. The defendant voluntarily acknowledged wrongdoing prior to
arrest or at an early stage of the criminal process.

JAMES OLIVER MACKEY

RECOMMENDATION

The defendant pay a restitution fine pursuant to Section 13967(a) of the Government Code, in a manner to be determined by the District Attorney;

It is respectfully recommended that:

Probation be denied and that the defendant be committed to the California Department of Corrections.

Respectfully submitted,

DENNIS P. HANDIS
CHIEF PROBATION OFFICER

Approved by:

Hank Ledden
Unit Supervisor
Adult Division

ah

G. B. Fernandes
Probation Officer III
Adult Division

November 2, 1990

Read and considered:

DATED:

JUDGE OF THE SUPERIOR COURT

- 13 -

# EXHIBIT B

JOHN D. PH   LIPS
District Attorney
San Joaquin County
By: EUAL BLANSETT
Deputy District Attorney
Courthouse
Stockton, CA  95202

Telephone: (209) 944-3811

Attorneys for Plaintiff

FILED

1989 OCT 16  PM 2:03

RALPH W. EPPERSON, CLERK

BY: JANICE P. FIORE

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN JOAQUIN

| The People of the State of California, | ) | No. 45624 |
|---|---|---|
| Plaintiff, | ) | INFORMATION |
| v. | ) | |
| JAMES OLIVER MACKEY | ) | |
| CARL CHARLES HANCOCK, JR. | ) | |
| Defendant(s). | ) | |

The said defendant(s) is/are accused by the District Attorney of the County of San Joaquin of the State of California, by this Information, of the following crime(s):

COUNT: 1, On or about 2/28/89, defendant(s) did commit a FELONY, namely, a violation of Section 187 of the California Penal Code, MURDER, in that the said defendant(s) did wilfully, unlawfully, and with malice aforethought murder LAWRENCE "LARRY" CARNEGIE, a human being.

Dated: 10/16/89.

JOHN D. PHILLIPS
District Attorney

EUAL BLANSETT
Deputy District Attorney

1.

# EXHIBIT C

I/M copy

# CONTRACT AND TERMS OF CONTRACT

We, the undersigned, consisting of John D. Phillips, representing the Office of the District Attorney, in and for the County of San Joaquin; Hamilton Hintz, representing the defendant; and James Oliver Mackey, the defendant, do hereby agree as follows:

1. That James Oliver Mackey is charged by complaint #5026F on file in the Municipal Court of San Joaquin County, Lodi Judicial Branch, with the murder of Laurence Carnegie, committed on or about February 28, 1989.

2. That James Oliver Mackey will give truthful testimony relative to the murder of Laurence Carnegie and as to the persons responsible therefore, in exchange for the opportunity to enter a plea of guilty or no contest to murder in the first degree, without any enhancements or special circumstances being filed.

3. That James Oliver Mackey will in due course, waive his right to a preliminary examination in said Municipal Court, and thereafter enter a plea of guilty or no contest to murder in the first degree in the Superior Court of San Joaquin County. Sentencing shall be had at a time and place to be determined.

4. The Office of District Attorney agrees to offer the same proposal herein extended to Mr. Mackey to codefendant Carl Charles Hancock, Jr.

5. The District Attorney further agrees to make personal contact with the Department of Corrections for suitable placement

1.

prior to the imposition of sentence for both James Oliver Mackey and Carl Charles Hancock Jr., providing the latter accepts the proposal herein described.

6. District Attorney John D. Phillips shall personally write the letter to the Board of Prison Terms and or the California Department of Corrections recommending that James Oliver Mackey and Carl Charles Hancock Jr. be released at the earliest possible time upon having served the minimum sentence f. first degree murder. California Law now provides that the indeterminate sentence for first degree murder is 25 years to life. It is believed that the earliest possible release date for a person so convicted of first degree murder is two thirds of the minimum or sixteen years eight months. However, the actual release date will be determined by the Board of Prison Terms or its equivalent agency.

7. James Oliver Mackey and Carl Charles Hancock Jr., who ar both presently confined at the San Joaquin County Jail, shall be transferred to another county jail within California upon the arrest of any additional person in this case.

8. Should John Thomas Holmes be called as a witness by the prosecution in connection with the prosecution of any person responsible for the murder of Laurence Carnegie, said John Thoms Holmes shall be offered immunity at any judicial proceeding, pro viding that prior thereto, Mr. Holmes has cooperated fully with enforcement and has a given a full, fair and truthful statement

2.

regarding his knowledge of the facts and circumstances
surrounding the death of Laurence Carnegie.

9. That all terms of this agreement are null and void in the
event that James Oliver Mackey refuses directly or indirectly to
testify at any and all hearings or does not testify truthfully to
the best of his recollection. Whether or not there has been
compliance with the terms of this agreement will be determined
by the Court in which the testimony is to be given, is being
given, or has been given in the event of an alleged breach of
this agreement. The court will decide the matter by a prepon-
derance of the evidence and the burden of proof is on the party
alleging a breach of this agreement.


Dated: _Aug 30th 1989_        _John D. Phillips_
                              JOHN D. PHILLIPS, District
                              Attorney


Dated: _Aug 30, 1989_         _Hamilton L. Hintz Jr._
                              HAMILTON L. HINTZ, Counsel
                              for James Oliver Mackey


Dated: _Aug 30, 1989_         _James Oliver Mackey_
                              JAMES OLIVER MACKEY

3.

# EXHIBIT D

JOHN
PHILLIPS
DISTRICT ATTORNEY
San Joaquin County

Office of the District Attorney
San Joaquin County Courthouse, Rm. 202
222 E Weber Ave. Stockton, California 9520
P.O.Box 990, Stockton, California 95201
Telephone:(209) 468-2400

November 20, 1990                    (M copy)

Department of Corrections
1515 S. Street, Rm. 300N
Sacramento, CA 95814

Attention:    Director

Re:           People v James Oliver Mackey  #E76532

Dear Director:

I am the incumbent District Attorney of San Joaquin County,
California.

On February 28, 1989, Laurence Carnegie was murdered in San Joaquin
County and, after a massive investigation, arrests were made of
James Oliver Mackey on June 1, 1989, and of Carl Charles Hancock,
Jr., on July 6, 1989. At that time, it was our belief that another
person, Michael Blatt, was the instigator-contractor for this
murder; however, there was not sufficient evidence to support that
belief.

On August 30, 1989, a written plea and sentence agreement was
entered into with Mr. Mackey, through his attorney, Hamilton L.
Hintz, Jr. That agreement provided, in part, that Mr. Mackey "will
give truthful testimony relative to the murder of Laurence Carnegie
and as to the persons responsible therefore, in exchange for the
opportunity to enter a plea of guilty or no contest to murder in
the first degree, without any enhancements or special circumstances
being filed."

The agreement further provided that "District Attorney John D.
Phillips shall personally write a letter to the Board of Prison
Terms and/or the California Department of Corrections recommending
that James Oliver Mackey...be released at the earliest possible
time upon having served the minimum sentence for first degree
murder." (See Contract and Terms of Contract attached hereto.)

The purpose of this letter is to honor that agreement and
commitment to Mr. Mackey and his attorney; to comment upon the
extraordinary cooperation of Mr. Mackey; and to clarify that,
without the cooperation and prospective testimony of Mr. Mackey,
charges would not have been filed against Michael Blatt nor a
prosecution initiated.

Department of Corrections
November 20, 1990
Page 2

On November 7, 1989, Mr. Mackey entered a plea of no contest to the charge of first degree murder of Laurence Carnegie as contained in San Joaquin County Superior Court Information Number 45624.

Sentencing was deferred to November 20, 1990, at which time Mr. Mackey was sentenced to State Prison for the term of twenty-five years to life.

It is our recommendation that Mr. Mackey be released on parole upon having served the minimum sentence for first degree murder, that is, two-thirds of the minimum (or sixteen years, eight months), providing that he has been a good prisoner.

In this regard, it is our observation and belief that Mr. Mackey will do his time without incident or problems. He is intelligent and highly educated; has no prior criminal history; is not generally criminally oriented; and he should interact well with prison management and staff.

Since August 30, 1989, Mr. Mackey has cooperated with the San Joaquin County Sheriff's Department and District Attorney's Office in connection with the case of People v Michael Blatt, San Joaquin County Superior Court Information Number 46070.

Blatt solicited Mackey to find someone to kill Carnegie and a former professional football player, John Farley, with whom Blatt had personal and legal problems. Mackey's wife worked for Blatt as a secretary. Mackey was impressed by Blatt's wealth and power. Seeking to win favor with Blatt, Mackey agreed to arrange for the two murders through others. In fact, Mackey personally killed Carnegie. Farley was never harmed.

Prior to his arrest on June 1, 1989, Mackey made admissions to San Joaquin Sheriff's investigators implicating Blatt as the person behind the killing.

Since his agreement to cooperate with law enforcement and prosecutors in this County, in exchange for a plea to first degree murder without enhancement or special circumstances and a recommendation for parole at the earliest time eligible, we have been able to prosecute the person we believe to be morally and legally responsible for the Carnegie murder.

Department of Corrections
November 20, 1990
Page 4

Thank you for the opportunity of "going on the record" and being
heard.  I would be willing to respond to any follow-up questions in
writing or in person.

Very truly yours,

*John D. Phillips*

JOHN D. PHILLIPS
DISTRICT ATTORNEY
COUNTY OF SAN JOAQUIN