# EXHIBIT E

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life   )
Term Parole Consideration   )        CDC Number E-76532
Hearing of:                 )
                            )
JAMES MACKEY                )
_____)

MULE CREEK STATE PRISON

IONE, CALIFORNIA

MAY 6, 2005

PANEL PRESENT:

BOOKER WELCH, Presiding Commissioner
LOUIE DININNI, Deputy Commissioner

OTHERS PRESENT:

JAMES MACKEY, Inmate
CHERYL MONTGOMERY, Attorney for Inmate
EUAL DESMOND BLANSETT Jr., Deputy District Attorney
JEAN WEISS, Observer
GREG KANE, Observer
SUSAN GABLER, Observer
TOM CARNEGIE, Victim's Next of Kin
BARBARA CARNEGIE, Victim's Next of Kin
ADRIAN FARLEY, Victim's Next of Kin
ANGEL CARRAZCO, Observer
KAREN CARNEGIE, Victim's Next of Kin

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No        See Review of Hearing
_____ Yes       Transcript Memorandum

April Allen            Capitol Electronic Reporting

INDEX

                                                                    Page

Proceedings.........................................   1

Case Factors........................................  16

Pre-Commitment Factors..............................  35

Post-Commitment Factors.............................  41

Parole Plans........................................  53

Closing Statements..................................  83

Recess.............................................. 123

Decision............................................ 124

Adjournment......................................... 136

Transcriber Certification........................... 137


--oOo--

P R O C E E D I N G S

DEPUTY COMMISSIONER DININNI: We're on the record.

PRESIDING COMMISSIONER WELCH: Okay. Good morning, Mr. Mackey.

INMATE MACKEY: Good morning.

PRESIDING COMMISSIONER WELCH: How are you this morning?

INMATE MACKEY: Fine. Thank you.

PRESIDING COMMISSIONER WELCH: Okay. Just relax. There's a lot of people here. Some of them are victims. And we'll introduce everybody to you as we go along. Okay.

INMATE MACKEY: Okay.

PRESIDING COMMISSIONER WELCH: So we need to get started. So this is an initial hearing for you. Is that correct?

INMATE MACKEY: Yes.

PRESIDING COMMISSIONER WELCH: So I'll take a few minutes and explain -- Well, first of all, let's read your case factors in the record. The prisoner's name is Mackey, M-A-C-K-E-Y. First name is James, J-A-M-E-S. CDC number is E-76532. The date of the hearing is 5/06/05. The location is Mule Creek State Prison. The prisoner was received CDC on 10/20/1990 from San Joaquin County for the offense of murder first, Case number 45624, count

1    one, Penal Code violated 187.  Total term, 25 years

2    to life.  Minimum eligible parole date was -- Well,

3    I should say is 1/29/2006.  Mr. Mackey, this

4    hearing will be tape-recorded today.  Okay.

5         **INMATE MACKEY:**  Okay.

6         **PRESIDING COMMISSIONER WELCH:**  So for the

7    purpose of voice identification, we'll need to go

8    around the room and identify ourselves, stating our

9    full name and spelling our last name.  I'll start

10   with myself and I'll go to my left.  My name is

11   Booker Welch.  It's spelled W-E-L-C-H,

12   Commissioner, Board of Prison Terms.

13        **DEPUTY COMMISSIONER DININNI:**  Louie DiNinni,

14   D-I-N-I-N-N-I, Deputy Commissioner.

15        **PRESIDING COMMISSIONER WELCH:**  We'll start

16   here.

17        **MS. WEISS:**  Jean Weiss, W-E-I-S-S, victim

18   support.

19        **PRESIDING COMMISSIONER WELCH:**  Okay.

20        **MR. KANE:**  Greg Kane, K-A-N-E, Stockton

21   Records.

22        **PRESIDING COMMISSIONER WELCH:**  Okay.

23   Stockton what?

24        **MR. KANE:**  Records.

25        **PRESIDING COMMISSIONER WELCH:**  Okay.

26        **MS. GABLER:**  Susan Gabler, G-A-B-L-E-R,

27   Victim Service committee representative.

1          **MR. CARNEGIE:**  Tom Carnegie,

2  C-A-R-N-E-G-I-E, Larry's older brother.

3          **PRESIDING COMMISSIONER WELCH:**  Thank you.

4          **MS. B. CARNEGIE:**  Barbara Carnegie,

5  C-A-R-N-E-G-I-E, Larry's beloved younger sister.

6          **PRESIDING COMMISSIONER WELCH:**  Thank you.

7          **MS. FARLEY:**  Adrian Farley, wife of

8  attempted victim -- murder victim, John Farley.

9  Last name spelled F-A-R-L-E-Y.

10          **PRESIDING COMMISSIONER WELCH:**  Thank you.

11          **MR. CARRAZCO:**  Angel Carrazco,

12  C-A-R-R-A-Z-C-O, criminal investigator with San

13  Joaquin County District Attorney's office.

14          **PRESIDING COMMISSIONER WELCH:**  Thank you.

15          **MS. K. CARNEGIE:**  Karen Carnegie, widow.

16          **PRESIDING COMMISSIONER WELCH:**  Okay.  Let's

17  go -- And you're here as --

18          **MR. CARRAZCO:**  I'm with the District

19  Attorney from San Joaquin County.

20          **PRESIDING COMMISSIONER WELCH:**  Okay.  Thank

21  you.  District Attorney.

22          **DEPUTY DISTRICT ATTORNEY BLANSETT:**  Eual

23  Desmond Blansett Jr., B-L-A-N-S-E-T-T.  I'm a

24  Deputy District Attorney with San Joaquin County.

25          **PRESIDING COMMISSIONER WELCH:**  Thank you,

26  District Attorney.

27          **ATTORNEY MONTGOMERY:**  Cheryl Montgomery,

1    M-O-N-T-G-O-M-E-R-Y, attorney for Mr. Mackey.

2         PRESIDING COMMISSIONER WELCH:  Thank you,

3    Ms. Montgomery.  Mr. Mackey, would you introduce

4    yourself, please.

5         INMATE MACKEY:  James Mackey, M-A-C-K-E-Y.

6         PRESIDING COMMISSIONER WELCH:  Okay.  Would

7    you spell your last name, Mr. Mackey.

8         INMATE MACKEY:  M-A-C-K-E-Y.

9         PRESIDING COMMISSIONER WELCH:  And your CDC

10   number.

11        INMATE MACKEY:  E-76532.

12        PRESIDING COMMISSIONER WELCH:  Okay.

13   Mr. Mackey, that identifies everyone in the room

14   with the exception of the two correctional peace

15   officers.  And they are here for security purposes

16   only and will not be taking part in today's

17   proceedings.  Okay.

18        INMATE MACKEY:  Okay.

19        PRESIDING COMMISSIONER WELCH:  All right.

20   Mr. Mackey, before we get started, there's some

21   things I need to talk to you about.  Are you

22   familiar with the American With Disabilities law?

23        INMATE MACKEY:  Yes, Sir.

24        PRESIDING COMMISSIONER WELCH:  Had an

25   opportunity to talk about that law with your

26   correctional counselor?

27        INMATE MACKEY:  Yes, Sir.

1    **PRESIDING COMMISSIONER WELCH:**  Very good.

2    There's an overview of the law in front of you on

3    that statement.  So we'll have documentation that

4    you are cognizant of the law, what I'd like for you

5    to do is to read that statement into the record,

6    please.

7    **INMATE MACKEY:**

8            "The Americans With Disabilities Act,

9            ADA, is a law to help people with

10           disabilities.  Disabilities are

11           problems that make it harder for some

12           people to see, hear, breathe, talk,

13           walk, learn, think, work, or take

14           care of themselves than it is for

15           others.  Nobody can be kept out of

16           public places or activities because

17           of a disability.  If you have a

18           disability, you have the right to ask

19           for help to get ready for your BPT

20           hearing, get to the hearing, talk,

21           read forms and papers, and understand

22           the hearing process.  BPT will look

23           at what you ask for to make sure that

24           you have a disability that is covered

25           by the ADA and that you have asked

26           for the right kind of help.  If you

27           do not get help, or if you don't

1       think you got the kind of help you

2       need, ask for a BPT 1074 Grievance

3       Form.  You can also get help to fill

4       it out."

5       PRESIDING COMMISSIONER WELCH:  That give you

6   a pretty good overview of what the law is all

7   about?

8       INMATE MACKEY:  Yes.

9       PRESIDING COMMISSIONER WELCH:  Now that

10  you're armed with that knowledge, let me ask you

11  again, do you have a disability as defined under

12  the American With Disabilities law?

13      INMATE MACKEY:  No.

14      PRESIDING COMMISSIONER WELCH:  Okay.  Very

15  good.  Do you wear glasses?  I don't see you have

16  any on today.

17      INMATE MACKEY:  Not for reading.

18      PRESIDING COMMISSIONER WELCH:  Okay.  Do you

19  have any problems talking or reading or hearing,

20  any of those areas?

21      INMATE MACKEY:  No.

22      PRESIDING COMMISSIONER WELCH:  Okay.  You

23  have a college degree.  Is that correct?

24      INMATE MACKEY:  Yes, Sir.

25      PRESIDING COMMISSIONER WELCH:  Certainly

26  with a college degree you should be able to read

27  and understand the documents necessary to prepare

1    for this hearing.  Is that correct?

2        INMATE MACKEY:  Yes, Sir.

3        PRESIDING COMMISSIONER WELCH:  Okay.  Have

4    you received any mental health treatment within the

5    last 12 months?

6        INMATE MACKEY:  No.

7        PRESIDING COMMISSIONER WELCH:  Okay.

8    Counselor, do you have any concerns about your

9    client's rights as it relates to the Americans With

10   Disabilities law?

11       ATTORNEY MONTGOMERY:  No, I don't.  I don't

12   believe there's anything that would interfere with

13   his ability to participate or comprehend the

14   proceedings.

15       PRESIDING COMMISSIONER WELCH:  I also noted

16   that your correctional counselor reviewed your file

17   and noted on the BPT Form 1073 that you have no

18   documentation that would preclude you from

19   proceeding with this hearing.  Okay.  Then are you

20   ready to proceed with the hearing, Counselor?

21       ATTORNEY MONTGOMERY:  Yes, I am.

22       PRESIDING COMMISSIONER WELCH:  You,

23   Mr. Mackey?

24       INMATE MACKEY:  Yes, Sir.

25       PRESIDING COMMISSIONER WELCH:  Okay.

26   Mr. Mackey, this hearing is being conducted

27   pursuant to Penal Code 3041 and 3042 and the rules

1   and regulations of the Board of Prison Terms

2   governing life parole consideration hearings for

3   life prisoners.  The purpose of today's hearing is

4   to determine your suitability for parole.  Now we

5   will consider the nature and the number of the

6   crimes you were committed for, your prior

7   criminality, your social history, and your behavior

8   and programming since your commitment.  We will

9   reach a decision today and inform you whether we

10  find you suitable for parole.  If we find that you

11  are suitable for parole, the length of confinement

12  will also be explained to you.  Do you understand

13  all that so far?

14          INMATE MACKEY:  Yes, Sir.

15          PRESIDING COMMISSIONER WELCH:  Any

16  questions?

17          INMATE MACKEY:  No.

18          PRESIDING COMMISSIONER WELCH:  All right.

19  Since this is an initial hearing, I'm going to take

20  a few minutes and tell you what's going to occur

21  today so you'll be cognizant of it.  Okay.  First

22  of all, we went over -- we read your case factors

23  in the record, and then I talked to you a little

24  bit about the American With Disabilities Act.  Now

25  what I'm doing is going over your due process

26  issues to ensure that all of the issues  -- your

27  rights are adhered to.  Now when I'm finished doing

1    that, I will talk to you about the crime if you
2    choose to do so, your prior criminality, and your
3    social history.  When I'm finished talking to you
4    about those issues, my colleague will talk to you
5    about your post-conviction factors.  Now post-
6    conviction factors is anything that have occurred
7    since you've been in prison to include positive
8    behavior, negative behavior, accomplishments, all
9    of those kinds of things, all of your prison
10   behavior, whether it's negative or positive.  When
11   I'm finished talking to you about that -- or when
12   my colleague finished talking to you about that, I
13   will talk to you about your parole plans.  And once
14   I cover your parole plans with you, I'll cover the
15   3042 notices.  And that's letters objecting to your
16   parole (indiscernible).  And when I'm finished with
17   that, we'll go to questions.  Myself and my
18   colleague will ask questions to clarify any issues
19   that we may have.  Then we'll permit the District
20   Attorney the opportunity to ask questions if he
21   chooses to do so.  However, his questions will be
22   directed to the Panel if he chooses to ask them,
23   and he'll be given the opportunity.  And in turn,
24   you will answer to the Panel.  You will not answer
25   directly to the District Attorney.  And there's a
26   reason for that.  District Attorney, this is not an
27   adversarial type of hearing.  It's a parole

1    suitability hearing.  So the District Attorney will

2    not cross-examine you directly.  Do you understand

3    that?

4        INMATE MACKEY:  Yes, Sir.

5        PRESIDING COMMISSIONER WELCH:  Now before we

6    recess for deliberations, there again, if the

7    District Attorney chooses to do so, he will be

8    permitted to make a closing statement regarding

9    your suitability for parole and the length of

10   confinement.  Your attorney will also be permitted

11   to make the same kind of statement, as well as

12   you'll be able to make the same type of statement.

13   Do you understand all that so far?

14       INMATE MACKEY:  Yes.

15       PRESIDING COMMISSIONER WELCH:  Now once you

16   make your statement, we have victims here.  And at

17   least three of them will be permitted to make

18   victim impact statements.  And a victim impact

19   statement is in terms of how the crime impacted

20   their lives, the crime that you committed.  Do you

21   understand that?

22       INMATE MACKEY:  Yes, Sir.

23       PRESIDING COMMISSIONER WELCH:  And then

24   we'll recess, deliberate, reach a decision, and

25   then we'll reconvene.  And at that time we'll let

26   you know what our decision is.  Do you understand

27   all that so far?

1     INMATE MACKEY:  Yes.

2         PRESIDING COMMISSIONER WELCH:  Any

3     questions?

4         INMATE MACKEY:  No.

5         PRESIDING COMMISSIONER WELCH:  Okay.  Very

6     good.

7         DEPUTY COMMISSIONER DININNI:  I might point

8     out to Mr. Mackey that those are the general

9     procedures of these hearings.  In this particular

10    hearing, the District Attorney won't be making any

11    statements or questions.  Okay.  That's in general,

12    what Mr. Welch was describing to you.

13        PRESIDING COMMISSIONER WELCH:  But he will

14    be given the opportunity should he choose to do so.

15    Okay.  Now the Board of Prison Term rules and the

16    law basically state that a parole date shall be

17    denied you if in the opinion of the two

18    Commissioners, your parole would pose an

19    unreasonable risk of danger to others.  However,

20    prisoners do have certain rights.  Counselor, --

21    Well, we'll just go over a few of your rights with

22    you.  You have the right to review your Central

23    File before you come to this hearing.  You have a

24    right to present relevant documents, and you have a

25    right to receive timely notification of this

26    hearing.  Those are three of your rights.  You have

27    additional rights.  Counselor, have your client's

1     rights been met?

2          ATTORNEY MONTGOMERY:  I believe they have,

3     Commissioners.  I believe if this hearing is like

4     every other hearing, this is late through no fault

5     of the present Commissioners, but it is late.

6          PRESIDING COMMISSIONER WELCH:  Okay.  Very

7     good.  You have an additional right, sir.  You have

8     the right to a fair and impartial Panel.  Any

9     reason to believe the Panel members would not be

10    fair and impartial to you?

11         INMATE MACKEY:  No.

12         PRESIDING COMMISSIONER WELCH:  Okay.  You

13    will receive a copy of our written tentative

14    decision today.  That decision becomes effective in

15    120 days.  You cannot appeal this decision to the

16    Board of Prison Terms.  There's no process for you

17    to appeal at the Board of Prison Terms.  However,

18    should you decided to file a writ with the court,

19    you may do so without exhausting you administrative

20    remedies with the Board of Prison Terms.  Do you

21    understand that?

22         INMATE MACKEY:  Yes, Sir.

23         PRESIDING COMMISSIONER WELCH:  Okay.  Very

24    good.  Commissioner, is there any confidential

25    information in the prisoner's C-File?

26         DEPUTY COMMISSIONER DININNI:  Only victim

27    information notice.

1     PRESIDING COMMISSIONER WELCH:  Okay.  Sir,

2     you're not required to talk about this crime.  I

3     didn't tell you that.  You're not required to admit

4     to guilt.  Do you understand that?

5          INMATE MACKEY:  Yes, Sir.

6          PRESIDING COMMISSIONER WELCH:  However, the

7     Panel members accept as true the findings of the

8     court.  Counselor, I just passed you a copy of a

9     checklist that we will be using today.  Would you

10    check to see if you have those documents.

11         ATTORNEY MONTGOMERY:  I do.  I have these.

12    And I'll pass this to the District Attorney.

13         PRESIDING COMMISSIONER WELCH:  District

14    Attorney, did you receive a packet of documents

15    from the Board of Prison Terms?

16         INMATE MACKEY:  Yes.

17         PRESIDING COMMISSIONER WELCH:  Do you have

18    those documents listed?

19         DEPUTY DISTRICT ATTORNEY BLANSETT:  Yes, I

20    do.

21         PRESIDING COMMISSIONER WELCH:  Okay.  All

22    right.  Counselor, I do have the documents that you

23    submitted prior to the hearing starting.  Do you

24    have any additional documents you'd like to submit

25    today?

26         ATTORNEY MONTGOMERY:  I do.  Thank you,

27    Commissioner.  This is a letter from the District

1    Attorney sent to the Department of Corrections

2    regarding the agreement reached in this case.  Here

3    is a copy of the terms of the contract, and here is

4    a memorandum prepared by your then executive

5    officer Mr. Patterson acknowledging this agreement.

6         **PRESIDING COMMISSIONER WELCH:**  Okay.  Very

7    good.

8         **ATTORNEY MONTGOMERY:**  I have a number of

9    laudatory chronos.  I don't want to inundate you

10   with these.  I believe that Commissioner DiNinni

11   probably already has these.  But I have them

12   readily available in case you can't find them.

13        **DEPUTY COMMISSIONER DININNI:**  Okay.

14        **PRESIDING COMMISSIONER WELCH:**  Okay.

15   Anything else?

16        **ATTORNEY MONTGOMERY:**  No.  Thank you.

17        **PRESIDING COMMISSIONER WELCH:**  Any

18.  preliminary objections?

19        **ATTORNEY MONTGOMERY:**  No, not really.  I

20   would like the record to reflect that my client did

21   seek an interview with the psychologist, and she

22   indicated she's no longer involved with BPT

23   evaluations.  So she could be of no help.  I would

24   point out to the Board that the psychologist seems

25   to base her conclusions on the information

26   contained in the Board Report.  And that particular

27   information was provided by my client when he was

1    specifically asked by the counselor to write down

2    what happened.  It is lengthy.  It's not unusual in

3    an initial hearing for the individual to have

4    outlined all of the specifics in this case as he

5    has done.  And it's not an attempt to minimize or

6    shift blame.  He is outlining all of the events as

7    they occurred.  And I do have the request for the

8    interview and the doctor's response.

9          **PRESIDING COMMISSIONER WELCH:**  Okay.  Very

10   good.  So your client will be participating -- Will

11   your client be participating in the hearing?  He'll

12   be answering questions?

13         **ATTORNEY MONTGOMERY:**  Yes, he will.

14         **PRESIDING COMMISSIONER WELCH:**  Okay.  So

15   he'll be speaking to the Panel.  Sir, would you

16   raise your right hand.  Do you solemnly swear or

17   affirm that the testimony you give today will be

18   the whole truth and nothing but the truth?

19         **INMATE MACKEY:**  I do.

20         **PRESIDING COMMISSIONER WELCH:**  Okay.  Before

21   we get started, let me just go to the District

22   Attorney.  District Attorney, do you plan to

23   participate in this hearing today?

24         **DEPUTY DISTRICT ATTORNEY BLANSETT:**  Not in

25   any significant way, and in particularly not in a

26   way that district attorneys normally participate.

27   I think Mr. Phillips who was the Deputy DA at the

16

1   time that I was doing both trials in this case made

2   an offer to Mr. Mackey that was accepted.  I will

3   -- I cannot and will not do anything to undermine

4   the letter that was sent to the Board.

5       **PRESIDING COMMISSIONER WELCH:**  Okay.  So

6   you'll be just as an observer today.

7       **DEPUTY DISTRICT ATTORNEY BLANSETT:**  Yes.

8       **PRESIDING COMMISSIONER WELCH:**  Okay.  Very

9   good.  All right.  Sir, what I'm going to do,

10  Mr. Mackey, is go to the Probationary Report.  And

11  I'm going to read the Statement of Facts into the

12  record, and I'll talk to you about it.  Okay.  And

13  I'll start on page one.  Under Summary of the

14  Offense it says,

15          "A real estate agent, Larry Carnegie,

16          stood with his back to an open garage

17          door on property at 14152 East Tokay

18          Colony Road, that's T-O-K-A-Y, in

19          Lodi, L-O-D-I.  He was shot in the

20          back with the bullet [sic] from a

21          cross bow fired by James Mackey.

22          Mackey had been hiding inside the

23          garage waiting for Carnegie to be

24          lured into position by Carl Hancock,

25          H-A-N-C-O-C-K, so Mackey could shoot

26          Carnegie.  The shooting occurred the

27          evening of February 28th, 1989.

1           Moments after Carnegie was shot, a

2           car driven by Denise Brock,

3           B-R-O-C-K, drove into the property.

4           Brock and the children in her car saw

5           Carnegie on the ground, saw Carl

6           Hancock running towards Brock's car,

7           and saw Mackey standing over Carnegie

8           with his back to the car.  Those in

9           the car was unable to give sheriff

10          deputies any more complete

11          description of Mackey then the

12          description of his clothing.  Brock

13          was frightened by the activity she

14          happened upon, quickly backed out of

15          the driveway, drove to a residence on

16          Telly, T-E-L-L-Y, Road and called 911

17          emergency dispatcher and reported

18          what she had seen.  When the deputies

19          from the sheriff's department went to

20          the residence on Tokay Colony Road,

21          they found a bloody sleeping bag, the

22          bloody bullet from a crossbow, and

23          Larry Carnegie's car.  Carnegie and

24          the two men described by Brock could

25          not be found.  Carnegie's body was

26          found the next afternoon at a rural

27          area along Highway 128 in Sonoma

18

1   County.  Subsequent investigation by

2   sheriff deputies involving 100s of

3   man hours of investigation revealed

4   that James Mackey had rented a Ford

5   on February 28th, 1989, that matched

6   the description of the car Brock had

7   seen parked at the shooting scene.

8   The car eventually was traced to

9   Southern California.  Deputies

10  retrieved the car and had it examined

11  by criminologists who found dried

12  blood in the Ford that matched

13  Carnegie's blood.  Mackey was

14  arrested for Carnegie's murder on

15  June 1st, 1989.  He told investigators

16  before and after his arrest several

17  different versions of his role in the

18  murder.  Mackey eventually implicated

19  Carl Hancock, H-A-N-C-O-C-K, as the

20  person who helped him kill Carnegie.

21  Mackey implicated Michael Blatt,

22  B-L-A-T-T, a wealthy local

23  businessman, property developer, and

24  business agent for athletes, as the

25  individual who solicited and paid

26  Mackey to kill Mr. Carnegie."

27  That's pretty much the Statement of Facts.  Did you

1    commit this crime, sir?

2            INMATE MACKEY:  Yes, Sir.

3            PRESIDING COMMISSIONER WELCH:  And why did

4    you commit the crime?

5            INMATE MACKEY:  I just got out of school and

6    didn't know what to do with myself.  And I went to

7    Blatt for advice on real estate, because I was

8    taking classes.  He said he would help me.  I also

9    asked him about investments.  And he had just

10   bought some condominiums where I was living, and he

11   said that I could buy one at the cost he paid.  And

12   he said we could move in, and we moved into this

13   place.  And after moving in, he told us that -- And

14   after moving in and fixing the place up, he told us

15   that we couldn't buy it because Mr. Carnegie was

16   suing him.  That it would just be a little while.

17   And until during that time, we had to pay rent.  So

18   as time went by, I kept asking him about it.  And

19   months and then a year went by and still he said --

20   he told us we couldn't buy the place.  And

21   sometimes he would say, boy, you know, if

22   Mr. Carnegie wasn't around, this wouldn't be a

23   problem.  And the first couple of times he said it

24   to me, I didn't pay any attention to him.  I

25   ignored him.  And the third time we were in his

26   office, and he said the same thing when I went to

27   ask him about the property.  So I bit.  I said, do

20

1   you want me to see what we can do about this.  And
2   he said, yeah.  And I asked a friend of mine Carl
3   Hancock, who I played football at UOP, if he knew
4   anyone.  He said he did and that he would get in
5   touch with us.  I just -- Time went by and nothing
6   happened.  And Blatt kept asking me, you know,
7   what's going on, what's going on.  And I was afraid
8   that he would think I was unreliable and not, you
9   know, want to have anything to do with me.  And so
10  I got personally involved, and I told Carl Hancock
11  to lure Mr. Carnegie to Tokay Colony Road, to the
12  property out there, where we waited for
13  Mr. Carnegie.  And after walking around the
14  property with Mr. Carnegie for a time, Carl lured
15  him in front of the garage.
16      PRESIDING COMMISSIONER WELCH:  You're going
17  to have to speak up just a little bit.  Would you
18  push this a little closer to you.
19      INMATE MACKEY:  He lured Mr. Carnegie in
20  front of the garage, and I pointed the bow at his
21  silhouette.  That's all I could see, because it was
22  dark, and I pulled the trigger.
23      PRESIDING COMMISSIONER WELCH:  Okay.  Why'd
24  you do that?
25      INMATE MACKEY:  I was just -- I was afraid.
26  I didn't know what to do.  And I was depending on
27  --

1          MR. CARNEGIE:  Excuse me, Sir.  Excuse me.

2     Could we ask (inaudible).

3          PRESIDING COMMISSIONER WELCH:  Sir, you

4     cannot --

5          MS. K. CARNEGIE:  And blocking my view.

6          PRESIDING COMMISSIONER WELCH:  Okay.  Hold

7     on just a second.

8          MR. CARNEGIE:  I'm sorry.  We can't hear.

9          PRESIDING COMMISSIONER WELCH:  Okay.

10          MR. CARNEGIE:  She's flipping pages.  I'm

11     sorry.

12          PRESIDING COMMISSIONER WELCH:  Okay.  We're

13     going to ask you to be quiet.  Okay.  All right.

14     Counselor, could you try to --

15          ATTORNEY MONTGOMERY:  Yes.

16          PRESIDING COMMISSIONER WELCH:  --

17     (inaudible) a little softer, please.

18          ATTORNEY MONTGOMERY:  I have reason to be

19     looking at documents.  I will try to keep it down.

20          PRESIDING COMMISSIONER WELCH:  Okay.  And

21     sir, could you speak up a little bit if you can.

22          INMATE MACKEY:  Like I said before, I had

23     just gotten out of school, and I was depending on

24     Mr. Blatt to help me, and I was afraid that -- I

25     was just -- I didn't know what to do with myself.

26     And I had been -- You know, when I was in school I,

27     you know, had been the guy who always knew what I

1  was doing.  And I wanted him to help me.

2      PRESIDING COMMISSIONER WELCH:  But I guess

3  my question to you is, why did you contemplate

4  murder?  Why did you decide to kill him at the

5  time?

6      INMATE MACKEY:  I was -- At the time when I

7  was at the property, I was just so afraid that if I

8  didn't, that the covers would be pulled.  Everybody

9  would know that I was just faking it, going through

10  this -- going through life.  And with Mr. Blatt's

11  friendship, people saw me as being somebody, and I

12  wanted to keep that.

13      PRESIDING COMMISSIONER WELCH:  So to you

14  that was worth killing a person, killing

15  Mr. Carnegie over?

16      INMATE MACKEY:  It was -- It was totally

17  illogical and stupid.  At the time I was just kind

18  of lost.

19      PRESIDING COMMISSIONER WELCH:  So this

20  offense is something that you --

21      INMATE MACKEY:  It's not a (indiscernible)

22  excuse.

23      PRESIDING COMMISSIONER WELCH:  Okay.  I'm

24  just trying to understand why you committed the

25  crime.  So basically I guess what I hear is that

26  you committed the crime over some real estate

27  property or to please someone else?

1    INMATE MACKEY:  Yeah.  Basically, yes.

2    PRESIDING COMMISSIONER WELCH:  Why would you

3    -- Could you give me any insight into why you would

4    be willing to take a person's life for those

5    reasons?

6    INMATE MACKEY:  I was just so caught up in

7    being the guy I was in high school, the guy I was

8    in college, that I did not want anyone to see me as

9    not being that guy.

10    PRESIDING COMMISSIONER WELCH:  So what does

11    that have to do with --

12    INMATE MACKEY:  Well, it's --

13    PRESIDING COMMISSIONER WELCH:  -- shooting

14    Mr. --

15    INMATE MACKEY:  I (indiscernible), you know,

16    the sum of our lives.  And that was just part of

17    it, you know.  It was a cumulative thing.  And when

18    I was out there, it was just that fear of everybody

19    seeing me for being -- not being anybody, you know,

20    special.

21    PRESIDING COMMISSIONER WELCH:  And where'd

22    you get the crossbow from?

23    INMATE MACKEY:  I bought it at a Big-5 in

24    Modesto.

25    PRESIDING COMMISSIONER WELCH:  And when you

26    shot Mr. Carnegie, how far from him were you?

27    INMATE MACKEY:  Maybe 15 feet, 10-15 feet.

1    PRESIDING COMMISSIONER WELCH: Had you used

2 the crossbow before?

3    INMATE MACKEY: I had taken it -- When we

4 bought it, I had taken it to my mother's house in

5 French Camp and fired it a few times.

6    PRESIDING COMMISSIONER WELCH: So you

7 practiced with it.

8    INMATE MACKEY: Yes, Sir.

9    PRESIDING COMMISSIONER WELCH: And why did

10 you buy it?

11    INMATE MACKEY: To shoot Mr. Carnegie.

12    PRESIDING COMMISSIONER WELCH: And then you

13 practiced?

14    INMATE MACKEY: Yes, Sir.

15    PRESIDING COMMISSIONER WELCH: Now when you

16 shot Mr. Carnegie, what did you do after you shot

17 him?

18    INMATE MACKEY: I stayed in the garage for a

19 while. And Carl Hancock came back to the garage

20 and said that he needed help, that Mr. Carnegie was

21 still alive. And when I went out to where they

22 were, I think Carl was struggling with

23 Mr. Carnegie. When I got over there, I didn't know

24 -- I don't remember -- All I really remember was

25 kneeling behind him and kind of holding him up.

26    PRESIDING COMMISSIONER WELCH: Who were you

27 holding up?

1      INMATE MACKEY:  Mr. Carnegie.

2      PRESIDING COMMISSIONER WELCH:  Okay.  Was he

3  still alive?

4      INMATE MACKEY:  Yeah.  I was just behind

5  him, put my arm around him, just holding him up.

6      PRESIDING COMMISSIONER WELCH:  So when you

7  looked at -- Where did the bullet strike him at?

8      INMATE MACKEY:  I couldn't see.

9      PRESIDING COMMISSIONER WELCH:  Okay.  Go

10  ahead.

11      INMATE MACKEY:  And I just -- I didn't know

12  what to do.

13      PRESIDING COMMISSIONER WELCH:  Well, it says

14  you -- What did you do?

15      INMATE MACKEY:  I just sat there, and that's

16  when the car drove up.  And when the light -- It

17  shined on my back and part of my face.  And

18  Mr. Carnegie turned around, and he looked at me,

19  and he looked like he recognized me.  And he said,

20  you're fucked.  And I sat there until the car left,

21  and I just panicked, and I hit him.

22      PRESIDING COMMISSIONER WELCH:  You did what?

23      INMATE MACKEY:  I hit him twice, and then I

24  kicked him (inaudible).  I was trying to make him

25  unconscious, so we could put him in the trunk.

26      PRESIDING COMMISSIONER WELCH:  And then what

27  did you do?

1    INMATE MACKEY:  After the car left, I called

2    Carl Hancock to help me and then put him in the

3    trunk.

4        PRESIDING COMMISSIONER WELCH:  Now did you

5    -- And after that what happened?

6        INMATE MACKEY:  I got in the passenger side.

7    Carl was driving.  And he was going too fast, and I

8    told him to slow down, to stop, and I'd drive, you

9    know.  And we drove out to Mendocino County where

10   we parked behind a little hill.  Carl went around

11   to the back.  I told him, man, you have to finish

12   it.  And he went back to the trunk.  And when he

13   came back to the car, it was done.

14       PRESIDING COMMISSIONER WELCH:  Now what

15   about this, "Hancock took the length of rope they

16   purchased that afternoon and tied a noose in it.

17   He put the rope around Carnegie's neck and gave the

18   other end of the rope to Mackey."  I'm on page six

19   if you're looking for where I'm at in the

20   Probationary Report --

21       ATTORNEY MONTGOMERY:  Thank you.

22       PRESIDING COMMISSIONER WELCH:  -- if you're

23   looking for that.  I'm on page six, and it's the

24   second paragraph.

25       ATTORNEY MONTGOMERY:  Yes.

26       PRESIDING COMMISSIONER WELCH:  You

27   following?

1    ATTORNEY MONTGOMERY:  Yes, I am.  Thank you.

2    PRESIDING COMMISSIONER WELCH:  Okay.

3         "He put the rope around Carnegie's

4         neck and gave the other end of the

5         rope to Mackey who was standing

6         outside the driver's door.  Hancock

7         told Mackey to pull on the rope.

8         Mackey pulled the rope until Carl

9         eventually took it from him.  The

10        defendant got back into the car, and

11        Hancock closed the trunk and joined

12        Mackey.  Then they drove east on 128

13        until they found a steep spot near

14        the road.  They removed the victim's

15        body from the trunk and threw it down

16        the embankment."

17   Is that true?

18        INMATE MACKEY:  I don't recall getting out

19   and saying that.  I don't recall getting out of the

20   car.

21        PRESIDING COMMISSIONER WELCH:  Well, let's

22   go back to the rope part.  Was there rope?

23        INMATE MACKEY:  Yes, Sir.

24        PRESIDING COMMISSIONER WELCH:  Did someone

25   -- Did you tie it into a noose?

26        INMATE MACKEY:  I was -- The rope was in the

27   trunk.

1    PRESIDING COMMISSIONER WELCH: Did you buy

2    the rope especially to be used on Mr. Carnegie?

3    INMATE MACKEY: Yes, we were going to take

4    him in a sleeping bag to Tahoe and drop him in the

5    lake.

6    PRESIDING COMMISSIONER WELCH: That was your

7    plan?

8    INMATE MACKEY: Yes, Sir.

9    PRESIDING COMMISSIONER WELCH: To drop --

10   I'm sorry. Were you going to say something,

11   Counsel?

12   ATTORNEY MONTGOMERY: What was the purpose

13   of the rope?

14   INMATE MACKEY: To tie a weight to it.

15   PRESIDING COMMISSIONER WELCH: So you were

16   going to weight him down in Lake Tahoe.

17   INMATE MACKEY: Yes, Sir.

18   PRESIDING COMMISSIONER WELCH: And so when

19   the witness drove up, they spoiled that.

20   INMATE MACKEY: Yes, Sir.

21   PRESIDING COMMISSIONER WELCH: And you guys

22   (indiscernible). Now let's go back to the rope.

23   Did you tie it around his neck?

24   INMATE MACKEY: No, Sir. I was in the car.

25   PRESIDING COMMISSIONER WELCH: Well, who

26   else was with you?

27   INMATE MACKEY: Just Carl Hancock.

1      PRESIDING COMMISSIONER WELCH:  Just who?

2      INMATE MACKEY:  Carl Hancock.

3      PRESIDING COMMISSIONER WELCH:  Okay.  So

4  you're saying that you didn't participate in

5  choking him with the rope?

6      INMATE MACKEY:  No, Sir.  I was in the car.

7      PRESIDING COMMISSIONER WELCH:  Okay.  Now

8  how long you been in prison, sir?

9      INMATE MACKEY:  Sixteen years on June 1st.

10     PRESIDING COMMISSIONER WELCH:  Sixteen

11 years.  Now you've had time to think about this

12 crime.

13     INMATE MACKEY:  Yes, Sir.

14     PRESIDING COMMISSIONER WELCH:  Do you have

15 any insight into why you would do something like

16 this?

17     INMATE MACKEY:  Yes, I do.  I don't want to

18 -- I don't blame what I did on anyone else or

19 anything that happened to me when I was a young

20 kid, getting beaten or anything like that.  But

21 what I've learned, you know, through self-help and

22 self-examination is that many of those things are

23 factors, they do come -- you know, they are part of

24 your life and what happens to you.  I learned not

25 to tell anybody anything when I was little, just

26 keep things to myself.  That's what got me by.

27     PRESIDING COMMISSIONER WELCH:  Now what does

1    that have to do with committing a murder?

2        INMATE MACKEY:  Well, like I said before,

3    it's just part of who I became in my life.  I

4    didn't talk about things to people when I was

5    having problems.  And it made me have to -- I put

6    up this façade.  You know if something was wrong, I

7    couldn't talk about it.  When I got out of college,

8    I didn't even know what to do with myself.

9        PRESIDING COMMISSIONER WELCH:  Okay.  But

10   you know, a lot of folks get out of college.  A lot

11   of people get out of high school and don't know

12   what to do with themselves, but they don't go out

13   and murder someone.

14       INMATE MACKEY:  I understand.

15       PRESIDING COMMISSIONER WELCH:  Yeah.  But

16   what about you would make you go and murder someone

17   for financial gain?

18       INMATE MACKEY:  I guess my ego was so big

19   that I just could not let anybody see me as not

20   being successful.

21       PRESIDING COMMISSIONER WELCH:  Now this is

22   16 years later, but at the time of the crime, from

23   everything I can read, you eagerly participated in

24   this.

25       INMATE MACKEY:  Well, I wasn't eager.

26       PRESIDING COMMISSIONER WELCH:  Well, you did

27   it.

1    **INMATE MACKEY:**  Yeah, I was there.  I pulled

2    the trigger, and I committed the crime.

3    **PRESIDING COMMISSIONER WELCH:**  You had a

4    college education.  You had all these things going

5    for you.

6    **INMATE MACKEY:**  Yes, Sir.  They don't teach

7    you about things like this in  --

8    **PRESIDING COMMISSIONER WELCH:**  I've got to

9    tell you, I'm struggling to -- And I've given you a

10   lot of time to talk.  I'm struggling to determine

11   whether or not you have insight and why you would

12   do this.  And I don't understand.  I know you did

13   it.  You told me about the condo.  You told me

14   about the money.  But a person that had been a

15   football player, had been successful, got a college

16   degree, had the tools to succeed, I don't

17   understand why you would do something like that?

18   **INMATE MACKEY:**  It wasn't logical.

19   **PRESIDING COMMISSIONER WELCH:**  Well, I know

20   that.  But I want to know why.

21   **INMATE MACKEY:**  All I can tell you, Sir, is

22   that I wasn't emotionally prepared.  I wasn't ready

23   to enter life.

24   **PRESIDING COMMISSIONER WELCH:**  What does

25   that have to do with killing somebody?

26   **INMATE MACKEY:**  Well, it made me dependant

27   on Michael Blatt and his good favor.

1    PRESIDING COMMISSIONER WELCH:  Okay.

2    INMATE MACKEY:  And I was willing to do

3  anything to stay in his favor.

4    PRESIDING COMMISSIONER WELCH:  Why do you

5  feel you were so dependant on Michael Blatt?

6  Blatt, is that his name?

7    INMATE MACKEY:  Yeah.

8    PRESIDING COMMISSIONER WELCH:  Why were you

9  so dependant on Mr. Blatt?

10   INMATE MACKEY:  Because I had no -- I didn't

11  know what to do with myself, and I wanted --

12   PRESIDING COMMISSIONER WELCH:  Wasn't he a

13  -- He was a sports agent.  Is that correct?

14   INMATE MACKEY:  He was a sports agent, and

15  he was a booster at school who, you know, who kind

16  of befriended me when I was at school.  When I

17  wanted advice, I'd go talk to him.

18   PRESIDING COMMISSIONER WELCH:  Were you any

19  good at football?

20   INMATE MACKEY:  Yes, Sir.

21   PRESIDING COMMISSIONER WELCH:  Did you get

22  offered a pro contract?

23   INMATE MACKEY:  I tore up my knee

24  (inaudible).

25   PRESIDING COMMISSIONER WELCH:  You tore your

26  knee.  Okay.  Okay.  Is there anything else you

27  want to tell us about this crime?

1    INMATE MACKEY:  Just I've always been sorry.

2    PRESIDING COMMISSIONER WELCH:  That was

3    going to be my next question to you.  Do you have

4    any remorse?

5    INMATE MACKEY:  I've always been sorry.

6    PRESIDING COMMISSIONER WELCH:  So when did

7    you first become sorry?

8    INMATE MACKEY:  Well, that day.  I mean I

9    was sick for three months.  And I never even felt a

10    little bit better until I turned myself in.

11    PRESIDING COMMISSIONER WELCH:  Let me ask

12    you this now.  That remorse that you just described

13    to me, --

14    INMATE MACKEY:  Yes, Sir.

15    PRESIDING COMMISSIONER WELCH:  -- about what

16    time was it when you shot Mr. Carnegie?

17    INMATE MACKEY:  I don't know, Sir.  It was

18    early evening.

19    PRESIDING COMMISSIONER WELCH:  How early?

20    ATTORNEY MONTGOMERY:  About 7:00-7:30.

21    INMATE MACKEY:  About 7:00.

22    PRESIDING COMMISSIONER WELCH:  Was it dark,

23    light outside?

24    INMATE MACKEY:  It was dark.

25    PRESIDING COMMISSIONER WELCH:  It was dark.

26    Now you were standing there with the bow.  And this

27    feeling of remorse that you feel now, did you feel

1    that before you shot him, before you pulled the

2    strings back and let it go?

3          INMATE MACKEY:  No, I wasn't thinking about

4    it.  I wasn't considering anything else but myself.

5          PRESIDING COMMISSIONER WELCH:  Were you

6    drinking?

7          INMATE MACKEY:  No.

8          PRESIDING COMMISSIONER WELCH:  You were

9    stone sober?

10         INMATE MACKEY:  Yes, Sir.

11         PRESIDING COMMISSIONER WELCH:  Now this

12   thing you told me about your younger days, what

13   about that would cause you do to that?  You were

14   trying to tie that together before I cut you off.

15         INMATE MACKEY:  I was just saying how I

16   didn't -- I couldn't express myself.  I didn't talk

17   to anybody about any problems I had.  I kept

18   everything to myself.  When something was wrong, I

19   felt I had to handle it.  And I got that from when

20   I was a kid.

21         PRESIDING COMMISSIONER WELCH:  But how does

22   that correlate to --

23         INMATE MACKEY:  I could not ask anybody for

24   help.  When something -- When I didn't feel

25   comfortable in a situation, I just -- You know, I

26   didn't -- I never depended on anybody.  And I

27   depended on Mr. Blatt.  That's the only time in my

1  whole life.

2          PRESIDING COMMISSIONER WELCH:  How do you

3  correlate those formative years to shooting

4  someone, what you just described?  How are you

5  going to correlate that?

6          INMATE MACKEY:  It's not the shooting.  It's

7  just this holding everything inside and having --

8  And the only time I ever depended on somebody was

9  this man.  When I learned -- When I was young, I

10  learned not to depend on anybody.

11          PRESIDING COMMISSIONER WELCH:  Okay.  All

12  right.  Let's go to your prior criminal history.

13  Were you ever arrested as a juvenile?

14          INMATE MACKEY:  No, Sir.

15          PRESIDING COMMISSIONER WELCH:  What about as

16  an adult?  Were you ever arrested as an adult?

17          INMATE MACKEY:  No.

18          PRESIDING COMMISSIONER WELCH:  And we've

19  already talked a little bit about your social

20  history.  Where were you born?

21          INMATE MACKEY:  Excuse me?

22          PRESIDING COMMISSIONER WELCH:  Where were

23  you born?

24          INMATE MACKEY:  In French Camp.

25          PRESIDING COMMISSIONER WELCH:  French Camp.

26  That's in -- That's down by Stockton?

27          INMATE MACKEY:  Uh-hmm.

1   PRESIDING COMMISSIONER WELCH:  Did you grow
2   up in an intact home with both parents in the home?
3   INMATE MACKEY:  No.
4   PRESIDING COMMISSIONER WELCH:  Who was the
5   primary caregiver?
6   INMATE MACKEY:  My mother.
7   PRESIDING COMMISSIONER WELCH:  Did she
8   provide a stable home for you?
9   INMATE MACKEY:  Yes, it was a stable home.
10  PRESIDING COMMISSIONER WELCH:  Any siblings
11  in the home?
12  INMATE MACKEY:  I have four brothers and two
13  sisters.
14  PRESIDING COMMISSIONER WELCH:  Have any of
15  them had problems with law enforcement agencies?
16  INMATE MACKEY:  Yes, Sir.
17  PRESIDING COMMISSIONER WELCH:  What kinds of
18  problems?
19  INMATE MACKEY:  Three of my brothers have
20  been in prison for drug charges.
21  PRESIDING COMMISSIONER WELCH:  Okay.
22  ATTORNEY MONTGOMERY:  These are half-
23  brothers.  Is that correct?
24  INMATE MACKEY:  Yes.
25  PRESIDING COMMISSIONER WELCH:  Okay.  What
26  about your sisters?
27  INMATE MACKEY:  Not that I know of.

1  PRESIDING COMMISSIONER WELCH:  Okay.  So I
2  already know about your education.  Just for the
3  record, you received a Bachelor of Arts degree in
4  sports medicine.  Is that correct?
5  INMATE MACKEY:  P.E.
6  PRESIDING COMMISSIONER WELCH:  P.E.
7  INMATE MACKEY:  Yes, Sir.
8  PRESIDING COMMISSIONER WELCH:  But it wasn't
9  sports medicine.  It was --
10  INMATE MACKEY:  P.E.
11  PRESIDING COMMISSIONER WELCH:  -- P.E.
12  INMATE MACKEY:  Yeah, it was P.E. with
13  sports medicine track.
14  PRESIDING COMMISSIONER WELCH:  With sports
15  medicine.  But you did get your bachelor's degree.
16  Is that correct?
17  INMATE MACKEY:  Yes, Sir.
18  PRESIDING COMMISSIONER WELCH:  And you
19  intended University Pacific?
20  INMATE MACKEY:  Yes, Sir.
21  PRESIDING COMMISSIONER WELCH:  Did you play
22  football on a scholarship?
23  INMATE MACKEY:  No.
24  PRESIDING COMMISSIONER WELCH:  And what
25  position did you play?
26  INMATE MACKEY:  Running back.
27  PRESIDING COMMISSIONER WELCH:  Running back.

1  Okay. Employment history, give me an overview of

2  your employment history prior to coming to prison.

3  What kind of jobs you held in the past.

4      INMATE MACKEY: I was always in school. So

5  most the jobs I had were summer jobs.

6      PRESIDING COMMISSIONER WELCH: Okay.

7      INMATE MACKEY: I was a taxi driver. At an

8  army base I was a cook's assistant. I did

9  landscaping, a bodyguard, worked at a planing mill.

10     PRESIDING COMMISSIONER WELCH: Okay.

11 Anything else?

12     INMATE MACKEY: Janitorial stuff.

13     PRESIDING COMMISSIONER WELCH: Okay. You

14 use any illegal drugs before you came to prison?

15     INMATE MACKEY: No, Sir.

16     PRESIDING COMMISSIONER WELCH: What about

17 steroids? Did you use any steroids?

18     INMATE MACKEY: No, Sir.

19     PRESIDING COMMISSIONER WELCH: Okay. Were

20 you married before you came to prison?

21     INMATE MACKEY: Yes.

22     PRESIDING COMMISSIONER WELCH: And how many

23 times?

24     INMATE MACKEY: Just once.

25     PRESIDING COMMISSIONER WELCH: Any children?

26     INMATE MACKEY: One son.

27     PRESIDING COMMISSIONER WELCH: How's he

1    doing?

2         INMATE MACKEY:  I haven't heard from him,

3    his mother, or any of them in a number of years.

4         PRESIDING COMMISSIONER WELCH:  No contact

5    with him?

6         INMATE MACKEY:  No.

7         PRESIDING COMMISSIONER WELCH:  So how old

8    would he be now?

9         INMATE MACKEY:  He's going to be 16 in July.

10        PRESIDING COMMISSIONER WELCH:  Sixteen.

11   Never used -- You never used any illegal drugs?  Is

12   that what you testified to earlier?

13        INMATE MACKEY:  I tried pot when I was in

14   junior high school.

15        PRESIDING COMMISSIONER WELCH:  So you've

16   tried marijuana once when you were 13.  Is that

17   correct?

18        INMATE MACKEY:  Yeah.

19        PRESIDING COMMISSIONER WELCH:  What about

20   alcohol?  How often did you use alcohol?

21        INMATE MACKEY:  Just if I went out with

22   somebody from work, I'd have one beer.  And I'd do

23   that maybe two or three times a week.

24        PRESIDING COMMISSIONER WELCH:  Okay.

25   Anything else you'd like to tell us about your

26   social history?  At the time you committed the

27   crime, I see you were in real estate.  Is that

1    correct?

2           INMATE MACKEY:  Yes, Sir.

3           PRESIDING COMMISSIONER WELCH:  Were you

4    making -- It says that you earned approximately --

5    What year did you commit the crime?

6           INMATE MACKEY:  Eighty-nine.

7           PRESIDING COMMISSIONER WELCH:  Eighty-nine.

8    In '89 you earned approximately 6,000 dollars in

9    real estate.  Is that correct?

10          INMATE MACKEY:  Yes, Sir.

11          PRESIDING COMMISSIONER WELCH:  In '88 you

12   earned approximately 8,000 dollars.  So did you do

13   anything to supplement your income?

14          INMATE MACKEY:  Just some personal fitness

15   training.

16          PRESIDING COMMISSIONER WELCH:  Personal

17   fitness training.  So you worked for a major sports

18   club?

19          INMATE MACKEY:  No, just go to people's

20   homes, the people who could afford it.  Go to their

21   homes and help them exercise.

22          PRESIDING COMMISSIONER WELCH:  In their

23   homes?

24          INMATE MACKEY:  Yes, Sir.

25          PRESIDING COMMISSIONER WELCH:  Okay.  So

26   what did you do, calisthenics, weights, or what?

27          INMATE MACKEY:  Different things.  I'd take

1    some weight equipment or a bicycle, a rower.

2        PRESIDING COMMISSIONER WELCH:  Okay.  Very

3    good.  Sir, what I'd like for you to do now is give

4    your attention to my colleague.  He's going to talk

5    to you about post-conviction factors.  I'll come

6    back and talk to you about your parole plans in a

7    few minutes.  Okay.

8        DEPUTY COMMISSIONER DININNI:  Mr. Mackey,

9    this is your Initial Parole Consideration Hearing.

10   Your CDC 262 was last updated April 25th of '05,

11   indicates you were assigned as a clerk in Medium A

12   custody, and 19 points classification score.  Are

13   you still assigned as a clerk?

14       INMATE MACKEY:  Yes, Sir.

15       DEPUTY COMMISSIONER DININNI:  All right.

16   CDC 812 was last updated April 21st of '05,

17   indicated no gang affiliation.  And one non-

18   confidential enemy is Michael Blatt.

19       [Thereupon, the tape was turned over.]

20       DEPUTY COMMISSIONER DININNI:  Back on the

21   record.  Only off the record to turn the tapes

22   over.  You were received at DVI November 20th,

23   1990.  Does that sound right?

24       INMATE MACKEY:  Yes, Sir.

25       DEPUTY COMMISSIONER DININNI:  Okay.  Then

26   transferred to Folsom February 23, '91.  There's

27   several out to courts noted.  Received in Mule

42

1   Creek January 11, '93, and you've been here ever

2   since.  Is that correct?

3         INMATE MACKEY:  Yes, Sir.

4         DEPUTY COMMISSIONER DININNI:  Okay.

5   Disciplinary history indicates one 115.  That was

6   administrative, December 25, '96, and it was for

7   horseplay.  No 128(a)s noted.  Several chronos with

8   regard to your participation in self-help regarding

9   your performance, exceptional performance.  And

10  I'll note the ones Counsel wanted me to note there.

11  You want me to note the Board packet ones, is that

12  it?

13        ATTORNEY MONTGOMERY:  I think I have those

14  separate as well.  But yes, please.

15        DEPUTY COMMISSIONER DININNI:  For the

16  record, Mr. Welch asked me about confidential

17  information, and the Board Report indicates crime

18  partner information located in the confidential

19  section.

20        PRESIDING COMMISSIONER WELCH:  Okay.

21        DEPUTY COMMISSIONER DININNI:  As I noted,

22  only victim witness information is in there.  I

23  don't have the crime partner information.

24        PRESIDING COMMISSIONER WELCH:  Okay.  Thank

25  you.

26        DEPUTY COMMISSIONER DININNI:  We've got

27  laudatory chronos, several noted from Pastor Scott

1  Barham, B-A-R-H-A-M.  The most recent one December
2  1st, 2004, and 13-weeks one-hour study Breaking the
3  Cycle.  Also one dated August 1st, 2004, April 1,
4  2004, August 1, 2003, December 3rd, 2003, from that
5  author.  A chrono December 1, '93, literacy
6  facilitator, last name G-U-E-F-F-R-O-Y, indicating
7  completing the Laubach action tutor training
8  workshop.  And R. X. Perry, P-E-R-R-Y, correctional
9  counselor II, April 14th, '94, correctional
10 counselor II clerk, several months, willingness to
11 accept additional assignments, reliability, proven
12 to be an asset to classification process and
13 displays a pleasant attitude, willingness to accept
14 additional assignments.  That's R. X. Perry.  M.
15 Merritt, M-E-R-R-I-T-T, CC-II, May 1, 1995, STOP
16 program, Stay Out of Prison, Mule Creek State
17 Prison, 12 sessions of Framework For Recovery,
18 volunteered to enter the program and successfully
19 graduated.  Attendance and participation were good.
20 Displayed a desire to make positive changes in
21 life.  And now eligible for (indiscernible).
22 Alicia Ramirez-Brewer, R-A-M-I-R-E-Z hyphen
23 B-R-E-W-E-R, educational doctorate, May 18th, '95,
24 (indiscernible) University, books, participating in
25 a master's program in health, P.E., and sports
26 therapy medicine, and is improving that program.
27 Also cosigned by Associate Warden Claudia Weezer.

1    Another chrono by M. Merritt, October 19th of '95,

2    participated July, August, September of '95,

3    volunteer class, Understanding Your Feelings, 15-

4    session course covering topics including anger

5    management, modifying response to various feelings,

6    developing empathy, assertive communication skills.

7    Attitude and attendance were very good.  R. W.

8    Townsend, T-O-W-N-S-E-N-D, correctional counselor

9    II, laudatory chrono, March 21, '96, CC-II clerk,

10   27 months, proven reliable, dependable,

11   trustworthy, completes all assigned tasks, minimal

12   amount of supervision, consistently displays pride

13   in maintaining accuracy and has excellent rapport

14   with staff and inmates.  William Arbios,

15   A-R-B-I-O-S, medical secretary, 12/21/99, providing

16   assistance in mental health services department

17   approximately the last two years, volunteers

18   assistance purchasing equipment and supplies for

19   the department, demonstrated a high level of

20   competency, been able to obtain necessary

21   information, making purchases.  "I want to thank

22   Inmate Mackey for all the help these past years.

23   He has demonstrated a positive and helpful

24   attitude, enhanced quality and success in mental

25   health services."  AA chrono January 8, 2001, Bob

26   DiPiero, D-I capital P-I-E-R-O.  Another chrono

27   from mental health, program participation tracking

1   EOP inmate groups as needed, design and implement

2   new system and took on a job ordering supplies,

3   equipment, and furniture, tracking sheets for

4   approximately 150 inmates, all while performing his

5   assigned duties as CC-II clerk and facility

6   captain's clerk.  These duties are now performed by

7   three clerks who are assigned full time.

8           "Mr. Mackey's assistance to the

9           program has been invaluable.

10          Attitude regarding helping

11          inmates/staff should be commended.

12          Definitely been an asset to mental

13          health program, and I feel that he

14          would be an asset to the community

15          when he is paroled.  As you consider

16          his parole, please keep these things

17          in mind.  R. T. Geyser, G-E-Y-S-E-R,

18          recreational therapist, March 8,

19          '01."

20  An additional chrono from M. Merritt, May 10th,

21  2001.  Volunteered participation in emotional

22  literacy course, Houses of Healing, topics of anger

23  management, improving coping skills, dealing

24  effectively with shame, guilt, and forgiveness.

25  Participated fully and displayed a positive

26  attitude.  M. Kay, K-A-Y, CC-II, program

27  specialist, February 1, 2002.  Volunteered to