1   participate in, quote, "The Four Agreements,"
2   unquote, a component of the Stay Out of Prison
3   program.  July 12th, '02, laudatory chrono, E.
4   Hobbs, H-O-B-B-S, floor officer, assigned as EOP
5   aid, commended for his assistance and diligence.
6   July 12, '02,

7           "Mr. Mackey alerted staff that an EOP
8            inmate was down and required medical
9            assistance.  As he was performing his
10           assignment, he heard a strange sound
11           coming from the lower section shower,
12           went to investigate.  Upon arriving
13           at the shower, Mackey found the EOP
14           inmate lying on the shower floor,
15           covered in blood.  He immediately
16           alerted staff to what was happening,
17           allowing us to respond promptly.
18           Mr. Mackey's alertness and diligence
19           possibly saved the inmate's life and
20           should be recognized."

21  Two chronos related to the paralegal studies course
22  and authorization to receive books.  A laudatory
23  chrono, N. Andrews, A-N-D-R-E-W-S, psych tech,
24  January 22nd, '04, assigned to EOP, commended for
25  assistance and extraordinary dedication to his
26  assignment and to the inmate participants in the
27  EOP program.

```
 1              "Personal attention Mr. Mackey gives
 2              to individual inmates is far greater
 3              than is expected in EOP.  He
 4              demonstrates a genuine desire to see
 5              program succeed.  Accomplishes
 6              helping inmates in the program
 7              improve their quality of life through
 8              talking, listening, and generally
 9              making himself available to these
10              men.  He has the ability to gain
11              trust of inmates who are new to the
12              program and are going through times
13              of adjustment, which takes a great
14              burden from staff, allowing us
15              greater freedom to do our jobs.  His
16              hands-on approach is very effective
17              and should be a model for other
18              inmates in this position."
19    And this is part of your vocation, M. Sandoval,
20    S-A-N-D-O-V-A-L, vocational instructor, June 24th,
21    '04, successfully demonstrated and completed all
22    criteria pertaining to safe refrigerant handling
23    and recoveries mandated by EPA Section 608 of the
24    Clean Air Act of 1990.  Inmate's test scores
25    qualify him for rating as universal certified
26    technician.  And verification of your high school
27    diploma, L. Bernardo, B-E-R-N-A-R-D-O, August 11th
```

1    of '04, East Union High School.  Another chrono by

2    Protestant Chaplain Barham, 9/30/04, successfully

3    completed 40 Days of Purpose Bible study.

4             "Forty Days of Purpose is based on

5             the best selling book A Purpose

6             Driven Life.  The program is small

7             group, hands on, in-depth study.

8             Purpose one, your plan for God's

9             pleasure, two, form God's family,

10            three, create and become like Christ,

11            four, shape for serving God, five,

12            you were made for a mission.

13            Mr. Mackey's participation has been

14            very valuable to the other men.

15            (Inaudible) the five purposes for

16            life the God apply them to his life

17            and use them and encourage others.

18            Serious, well-grounded man of God.

19            His insights, pleasant attitude, and

20            renewed mind demonstrate a positive

21            change in his lifestyle.  It brings

22            honor and glory to God."

23    Another chrono from Pastor Barnham dated November

24    15th of '04, a 40-week course entitled The Purpose

25    Driven Life.  And I note your certification of

26    completion in heating, ventilation, air

27    conditioner, refrigeration, October 1, 2004.  A

1   certificate as technician for stratosphere ozone

2   completion certification.  Don't have a date on

3   that.  But it looks like you have a paralegal

4   foundation course, July 23, '03, through 4/06/04.

5   And that's dated June 9th of '04.  Is there an

6   expiration date on this stratosphere ozone

7   completion?  Okay.  So it's just a universal

8   certification.  It goes with the chrono I read.

9            **INMATE MACKEY:**  Yes.

10           **DEPUTY COMMISSIONER DININNI:**  All right.

11   And several certificates for components leading up

12   to your completion in air condition.  Is there

13   another trade that I missed?

14           **INMATE MACKEY:**  No, there isn't.

15           **DEPUTY COMMISSIONER DININNI:**  Okay.  Very

16   good.  With that I'll go to the progress report.

17   There's no information noted from the Board Report

18   for post-conviction for me to note.  Counsel might

19   decide otherwise.  The Board Report was prepared by

20   Christian, H., Christian, C-H-R-I-S-T-I-A-N.  And

21   that was for 2004, December calendar.  Progress

22   report, most recent one, remained in vocational air

23   condition and refrigeration assignment October 8,

24   2004, when he was unassigned due to completing a

25   program completed with all satisfactory marks, CDC

26   128(e).  Assigned program aide for enhanced

27   outpatient program facility-B, 10/16/04, received

1    three laudatory chronos during the review period,

2    13-week study program Breaking the Cycle chrono

3    dated 12/01/04, 40-week course for preserving life.

4    We talked about successfully completed 40 days of

5    purpose.  We talked about that chrono.  And I'll

6    open for you to discuss any other assignments you

7    want to point out, because I only went over the

8    recent ones.  Okay.  With that, I'm going to go to

9    the psych report that's authored by K. M. Mahoney,

10   M-A-H-O-N-E-Y, Ph.D., contract psychologist,

11   November 17th, 2004.  In risk for violence,

12            "Mr. Mackey was a high functioning

13            individual in the community and has

14            continued to be a high functioning

15            inmate.  He has no juvenile history,

16            no substance abuse history, and has

17            been an excellent programmer with

18            CDC.  Outwardly, he has both the

19            abilities and interpersonal skills

20            for a successful parole.  In this

21            case, dynamics lie within the crime

22            scenario and to the extreme and

23            violent lengths to which Mr. Mackey

24            was willing to go for personal gain

25            and recognition.  On interview,

26            Mr. Mackey attempted to mitigate his

27            responsibility for his own actions by

1        shifting blame onto others as noted

2        in section three.  In my opinion,

3        Mr. Mackey poses a moderate risk for

4        reoffense if released to the

5        community at this time.  In

6        conclusion, James Oliver Mackey is a

7        40-year-old African-American inmate

8        convicted of Penal Code Section 187,

9        murder in the first degree for murder

10       for hire that occurred in 1989.  No

11       juvenile history.  No prior criminal

12       record.  No substance abuse issues.

13       When in CDC he has been an excellent

14       programmer with only one 115 that was

15       for horseplay.  CDC work evaluations

16       have ranged from satisfactory to

17       exceptional and most often being

18       placed at exceptional.  Due to the

19       nature of the crime, Mr. Mackey's

20       inability to take full responsibility

21       for it, it is my opinion Mr. Mackey

22       poses a moderate degree of risk for

23       violence as a calculated preplanned

24       means to an end if released to the

25       community at this time."

26  Mr. Mackey or Counsel, regarding post-conviction

27  factors, any gaps you'd like to fill, corrections

1   you'd like to make?

2          **ATTORNEY MONTGOMERY:**  I was unclear as to

3   what the psychologist actually meant in that last

4   sentence.  It didn't make a great deal of sense to

5   me.  The only other thing that I would point out is

6   that under the Axis I and Axis II, No Diagnosis was

7   offered.  And I'm going to address that more in my

8   closing, this report as well.

9          **DEPUTY COMMISSIONER DININNI:**  All I can do

10  is restate it.

11             "Due to the nature of the crime, and

12             Mr. Mackey's inability to take full

13             responsibility for it, it is my

14             opinion that Mr. Mackey poses a

15             moderate risk for violence as a

16             calculated preplanned means to an end

17             if released to the community at this

18             time."

19  I can't put what the person means by it.  All I can

20  conclude is reiterating the risk for violence,

21  because the statement is somewhat mitigated, and

22  she outlined section three, which is the crime.

23  And the crime was a calculated preplanned means to

24  an end.  So all it says here is a moderate risk to

25  reoffend.  And that's without my adding anything to

26  what she stated.

27          **ATTORNEY MONTGOMERY:**  Right.

1    **DEPUTY COMMISSIONER DININNI:**  I'm just

2    referring to her risk for violence.  Looks like a

3    restatement to me.  The Panel member could take it

4    in a different way.  Anything further?

5    **ATTORNEY MONTGOMERY:**  No.  Thank you.

6    **DEPUTY COMMISSIONER DININNI:**  With that I'll

7    return to the Chair.

8    **PRESIDING COMMISSIONER WELCH:**  Okay.  Thank

9    you.  Okay.  Mr. Mackey, let's talk about your

10   parole plans.  In case you receive a parole date,

11   tell the Panel where you're planning to live.

12   **INMATE MACKEY:**  In Manteca with my wife.

13   **PRESIDING COMMISSIONER WELCH:**  Okay.  And

14   how are you planning to support yourself?  I do

15   have a letter from your wife by the way.

16   **INMATE MACKEY:**  I have a couple of job

17   offers.

18   **PRESIDING COMMISSIONER WELCH:**  You want to

19   tell us about them?

20   **INMATE MACKEY:**  One is a place where my wife

21   works.  It's California Natural Products.  I'd be

22   working in the warehouse, and The Cottage Bakery in

23   Lodi where I'd be driving a forklift.

24   **PRESIDING COMMISSIONER WELCH:**  Okay.  Any

25   other options?

26   **INMATE MACKEY:**  The reason I took the

27   heating and air conditioning course is because it's

1    highly, you know, -- There's a lot of jobs

2    available out there in that field.

3         **PRESIDING COMMISSIONER WELCH:**  Okay.

4    Anything else you want to tell us about your

5    employment plans before I go to your letters?  You

6    do have letters, and you do have some job offers

7    here.  Okay.  Then I'll go to your letter.  You

8    have a letter from Janet.  Who is Janet?

9         **INMATE MACKEY:**  My wife.

10        **PRESIDING COMMISSIONER WELCH:**  Wife.  Okay.

11   Janet Mackey.  Is that correct?

12        **INMATE MACKEY:**  Uh-hmm.

13        **PRESIDING COMMISSIONER WELCH:**  And she

14   writes,

15             "I would like to start by thanking

16             you for taking the time to read my

17             letter requesting the Board to

18             release my husband James Mackey.

19             James and I have known each other

20             since 1977 when James was only 12

21             years old.  I saw James grow from a

22             young man to a man I fell in love

23             with and married 11 years ago.  Our

24             relationship grows stronger every

25             year, and we look forward to spending

26             the rest of our lives together.

27             James has brought the best qualities

1    out in me, and we have become a very

2    strong Christian family.  James is

3    very close to my two children, and

4    they love him very much.  Our entire

5    family gives James the support he

6    will need both financially and

7    emotionally when he comes home.

8    James did change everyone's life

9    around him, but not more than it

10   changed his life.  It was devastating

11   and unbelievable that such a

12   wonderful, intelligent young man, and

13   someone who had the future in his

14   hands could actually commit the act

15   he did.  No one is sorrier for his

16   acts than James and would turn back

17   the clock if a second chance -- if he

18   could.  I feel and pray for the

19   victim's family often.  I know James

20   does and hope that they have it in

21   their hearts to forgive James.  I

22   have met one person that doesn't

23   think James is a -- I haven't met one

24   person that doesn't think James is a

25   wonderful person.  He have impacted

26   his qualities on so many people.  As

27   our home is still in town we grew up

1    in, so many people are looking
2    forward to him coming back into the
3    community.  James was a college
4    graduate when he entered the prison
5    system, and James has continued his
6    education while in prison through
7    correspondence classes and, of
8    course, courses offered to inmates.
9    When James is released, he will
10   already be employed and be able to
11   contribute and support our family.
12   When James is released, he will
13   reside in our home, and that's in
14   Manteca.  I thank you so much for
15   taking the time to read my letter,
16   and I hope you find it in your hearts
17   to see James -- who James really is,
18   a best friend, a lover, a carrying
19   husband, a wonderful father, and a
20   friend to so many people.  Please
21   feel free to call me if you have any
22   additional questions.  Janet Mackey."
23   That was from your wife.  Lee Denaca?
24        **INMATE MACKEY:**  Lana.
25        **PRESIDING COMMISSIONER WELCH:**  Lana.  Lana
26   Mackey, that's L-A-N-A Mackey.  She writes you a
27   very supportive letter.  That's from your niece.

1    And you have another support letter from Kenneth

2    Elkridge.

3         INMATE MACKEY:  Eskridge.

4         PRESIDING COMMISSIONER WELCH:

5    E-S-K-R-I-D-G-E.  That's your brother?

6         INMATE MACKEY:  Yes, Sir.

7         PRESIDING COMMISSIONER WELCH:  He writes you

8    a very supportive letter.  He feels that you have

9    had the opportunity to find redemption and redeem

10   your errors, and that he loves you very much and

11   he's willing to support you.  And he feels that you

12   would be a benefit to society.  I have another

13   letter from your father-in-law Clyde Waller.  He

14   writes you a very supportive letter.  He says,

15        "My name is Clyde Waller, the father-

16        in-law of James Mackey.  I understand

17        that James will be considered for

18        parole.  I have known James since he

19        was in high school and can remember

20        watching him play football in East

21        Union High School."

22   He feels that you've been a model inmate, and that

23   you'll do good in the community and have a

24   bachelor's degree in sports medicine from the

25   University Pacific in his opinion.  I have a letter

26   here, I believe, from your former high school coach

27   Jim C. Brown.  Mr. Brown writes,

1    "I've written this letter as former
2    teacher and high school football
3    coach during James' high school days
4    and his friend since he graduated
5    from high school.  I recently visited
6    James in Mule Creek State Prison.   In
7    my opinion, James showed great
8    contrition for his past and made a
9    tremendous effort to rehabilitate and
10   grow as a human being while in
11   prison.  I feel confident James will
12   contribute -- will be a contributing
13   member to society if given the
14   opportunity.  Had I not retired
15   recently and put my painter's
16   contractor's license on inactive
17   status, I would offer James a job
18   myself.  I will offer my
19   recommendation for his employment to
20   anyone who asks."
21   He feels that you paid your debt to society.
22   Another letter here from Rebecca (indiscernible)
23   Williams.  She was -- I guess her husband was
24   James' -- her husband was Dr. Ronald Williams.  I
25   guess he did some surgery on your shoulder, and
26   he's known you.  She writes you a very supportive
27   letter also.  Hamilton L. Hintz, attorney at law.

1    Is that your ex-attorney?

2        INMATE MACKEY:  Uh-hmm.

3        PRESIDING COMMISSIONER WELCH:  Last name, by

4    the way, is spelled H-I-N-T-Z.  He says,

5        "I was the attorney for Mr. Mackey in

6        San Joaquin County Court Case number

7        45624, in which he was sentenced to

8        state prison on or about November 20,

9        1990, for the term of 25 years to life

10       for the murder of Lawrence Carnegie

11       pursuant to a plea and sentence

12       agreement with the District Attorney

13       John Phillips.  James cooperated with

14       the investigation and prosecution of

15       codefendant Michael Blatt, B-R-A-T-T

16       [sic] --"

17       INMATE MACKEY:  "L."

18       PRESIDING COMMISSIONER WELCH:  B-L-A-T-T.

19       "-- and testified as a prosecuting

20       witness in at least two trials in

21       Alameda County.  I attended both

22       trials as an observer when James

23       testified and was a witness myself.

24       Both trials ended with a hung jury,

25       and the case against Mr. Blatt was

26       eventually dismissed.  Without James,

27       however, his case would never have

1   been filed, and the person most

2   culpable in Mr. Carnegie's murder

3   would not have been exposed,

4   arrested, and prosecuted.   The

5   agreement I negotiated on James'

6   behalf with John Phillips

7   specifically called for the

8   recommendation that Mr. Phillip [sic]

9   be released on parole upon having

10  served a minimum sentence for first-

11  degree murder.   That is two-thirds of

12  the minimum sentence, 16 years, eight

13  months, provided that he was a good

14  prisoner.   James' minimum eligible

15  parole date is January 26th, 2006.   He

16  has proved that he has been a good

17  prisoner.   His record, as I

18  understand, contains only one CDC 115

19  in 1996, and the incident was

20  described as most consistent with

21  horseplay.   During James' years at

22  Mule Creek he have taken many

23  courses, received numerous

24  certificates, and possibly saved

25  another inmate's life.   I visited

26  James in 2004, and over the past 18

27  months have exchanged letters with

1  him.  He appears to have done

2  everything within his power to better

3  himself, abide by the rules, and make

4  the best of a terrible situation.

5  Very few inmates serving an

6  indeterminate sentence get his

7  circumstances.  I unequivocally and

8  respectfully urge that you give a

9  date now and that he be released on

10  parole at the earliest possible time.

11  He is unique for a life prisoner for

12  the following reasons:  He has no

13  past criminal history as a juvenile

14  or adult.  His prison record is not

15  simply good, but excellent.  As a

16  high school and college graduate, he

17  has the ability and opportunity for

18  employment and the intelligence and

19  motivation to make it on parole.  He

20  is remorseful and accepts

21  responsibility and is accountable

22  both legally and morally for the

23  offense.  Finally, James has the

24  recommendation of the elected

25  District Attorney of the county from

26  which he was committed and that he be

27  released on parole upon having served

62

1    the minimum sentence provided that he

2    has been a good prisoner.  John

3    Phillips wrote to the Board nearly 15

4    years ago.  And without the

5    cooperation and the prospective

6    testimony of Mr. Mackey, charges

7    would not have been filed against

8    Michael Blatt, nor a prosecution

9    initiated.  Thank you, Hamilton

10   Hintz."

11 Okay.  We have an Amanda Gomez.  Ms. Gomez writes

12 you a letter.  She said that you would be in need

13 of employment.  She's offering you employment with

14 California Natural Products, 11 dollars an hour,

15 she says, is the expected salary.  And Cottage

16 Bakery, another job offer.  And this is

17 Mr. Haslebacker, that's H-A-S-L-E-B-A-C-K-E-R.  He

18 writes you a supportive letter.  He says,

19   "Upon his release, I understand James

20   will be seeking employment.  I would

21   like to offer James the opportunity

22   for a Cottage Bakery -- at Cottage

23   Bakery as a warehouse forklift

24   driver.  That would be 14 dollars an

25   hour."

26 And this is (indiscernible).  They have bakeries, I

27 guess, in Lodi, Sacramento, and Stockton.  Is that

1  correct?

2       **INMATE MACKEY:**  Yes, Sir.

3       **PRESIDING COMMISSIONER WELCH:**  James

4  Mitchell, vice president, Creative Research.

5       "I have agreed to provide an

6       employment interview for James

7       Mackey.  I do not promise employment

8       will occur.  I have offered this

9       interview at the request of a friend

10      who knows Mackey."

11  And I do have the letter the counselor submitted

12  from the District Attorney back in 1990.  However,

13  the District Attorney is here, and he's already

14  testified as to his county's position on the

15  prisoner's parole.

16      **ATTORNEY MONTGOMERY:**  Commissioner, there

17  were three others.  They're in a packet.  There was

18  one --

19      **PRESIDING COMMISSIONER WELCH:**  And I'm going

20  to get to those.

21      **ATTORNEY MONTGOMERY:**  Okay.

22      **PRESIDING COMMISSIONER WELCH:**  I was just

23  covering the ones that you submitted.  And there

24  are some additional one in your packet.  Okay.

25  Charisse Mackey wrote you a very supportive letter,

26  and she's writing this letter on behalf of her

27  uncle.  And she noted that you have some very good

1  childhood memories and that today at the age of 23

2  she still have not changed.  After relocating to

3  Southern California she still receives letters,

4  birthday cards, and short stories from him via e-

5  mail.  How do you send e-mails to her?

6      INMATE MACKEY:  My wife does.  I send them

7  to my wife, and --

8      PRESIDING COMMISSIONER WELCH:  And then she

9  sends them to her.  Okay.  I didn't think prisoners

10  --

11      INMATE MACKEY:  No.

12      PRESIDING COMMISSIONER WELCH:  Okay.  So she

13  writes you a supportive letter.  Looks like one

14  from Janet.  Did I get Rebecca Williams?

15      INMATE MACKEY:  Yes.

16      PRESIDING COMMISSIONER WELCH:  Here's one

17  that I've missed.  Okay.  Rebecca Williams writes

18  you a supportive letter.  She's writing in support

19  of your upcoming parole consideration hearing.

20  "James have been a close friend of our family for

21  many years.  (Indiscernible) when I first saw him

22  as a patient."  I covered that one.

23      INMATE MACKEY:  Yeah.

24      PRESIDING COMMISSIONER WELCH:  Well, there's

25  something else I wanted to say about this, sir.

26  That (inaudible).  She said, "I wish that I was

27  able to offer (inaudible) surgery practice, but

 1  unfortunately my husband passed away suddenly in

 2  1996. I feel he will be an asset, however,

 3  wherever he has employment." That's highlighted.

 4  Did I miss any?

 5      ATTORNEY MONTGOMERY: There was a letter

 6  from a Criner, C-R-I-N-E-R, family.

 7      PRESIDING COMMISSIONER WELCH: Yeah, I saw

 8  that one.

 9      ATTORNEY MONTGOMERY: And the sister-in-law

10  Robin Cordono.

11      PRESIDING COMMISSIONER WELCH: I have

12  (inaudible). The Criner family. Here it is.

13  Eric, Angela, Erica, and Angela, the Criner family.

14  They wrote you a very supportive letter.

15          "This letter is submitted on behalf

16          of James Mackey, and I've known

17          Mackey since 1969. I've always

18          thought that James would some day be

19          a real asset to his community. And I

20          feel James can love, respect, and

21          honor his fellow man and become a

22          productive citizen while in prison.

23          He had furthered his education."

24  She talks about all the things that you've done in

25  prison. "And we look forward to seeing him soon."

26  And the other one was from who now? James

27  Mitchell?

1    ATTORNEY MONTGOMERY: Robin Cordono, the

2  sister-in-law. It's handwritten.

3    PRESIDING COMMISSIONER WELCH:

4  (Indiscernible).

5    ATTORNEY MONTGOMERY: Yes, that's it.

6    PRESIDING COMMISSIONER WELCH: Okay. Robin

7  Cordono. And she's known you for 24 years, and you

8  attended high school together. "When James went on

9  to college at UOP, I felt he would pursue a career

10  as a professional football player." And she was

11  shocked and saddened when she discovered he was

12  sent to prison. Basically, she's writing you a

13  supportive letter. She supports you

14  unconditionally, spiritually, and financially in

15  your preparation for the future. Did I cover them

16  all, Counsel?

17    ATTORNEY MONTGOMERY: I believe you did.

18  Thank you.

19    PRESIDING COMMISSIONER WELCH: Quite a few

20  support letters. Quite a few job offers. And I

21  have most of the ones that you submitted already in

22  the file. Okay. Anything else about parole plans,

23  Counsel, before we move on to 3042 notices?

24    ATTORNEY MONTGOMERY: No, I think that you

25  have covered those. Thank you.

26    PRESIDING COMMISSIONER WELCH: Thank you.

27  Okay. We sent out notices pursuant to Penal Code

1    3042.  We sent those out to different agencies that

2    would have an interest in your case to include the

3    District Attorney's office, the Attorney General's

4    office, law enforcement agencies that had

5    jurisdiction, your attorney at the time.  And I

6    should have read your attorney's at the -- during

7    this portion, but I read it as your support,

8    because your attorney did respond, and to the judge

9    that presided in your case, and we sent letters out

10    to victims.  So in summary we received a letter

11    back from your attorney, and we received letters

12    from several victims.  And at this time I'll go

13    over the victims' letters.  And we have the

14    District Attorney here from San Joaquin County who

15    have opted not to participate in the hearing today.

16    But we did receive the letter and your documents.

17    Okay.  Charles Shrewsbury wrote a letter, He says

18    -- And his last name is spelled

19    S-H-R-E-W-S-B-U-R-Y.  He writes a letter.  He says,

20            "I'm writing this letter in regards

21            to the parole hearing of James

22            Mackey.  He was convicted of

23            murdering Larry Carnegie, my brother-

24            in-law.  Based on the circumstances

25            of this case and the severity of the

26            crime, I would respectfully urge you

27            not to release Mr. Mackey from prison

1    now or at any time in the future.

2    Mr. Mackey plotted to murder Larry

3    Carnegie in cold blood and

4    premeditated.  This was not a crime

5    of passion, not an accident, nor a

6    mistake.  This was nothing less than

7    murder in the first degree.

8    Mr. Mackey purchased a crossbow at a

9    sporting goods store for the sole

10   purpose of killing his victim.  He

11   had ample time to consider and

12   carefully weigh the consequences of

13   his actions.  He made the choice,

14   which was a clear and unobstructed

15   thought process.  James Mackey

16   ambushed Larry Carnegie, shooting him

17   in the back with a crossbow, stuffing

18   him into a trunk of a car, and later

19   strangling him.  This lie in wait not

20   only illustrates the clarity of

21   Mackey's intent, but it also

22   underlines the cunning mindset of

23   Mr. Mackey and the outright brutality

24   of his crime.  On that day,

25   Mr. Mackey clearly demonstrated his

26   own bitter disregard for human life.

27   When Mr. Mackey murdered Larry

1    Carnegie, I lost a dear loving family

2    member and a friend.  My sister lost

3    her husband.  Even more devastating,

4    my three nieces lost their father

5    forever.  Mr. Mackey brutally and

6    clearly, intentionally -- intentional

7    crime has devastated our family

8    deeply, dragging down to emotional

9    depth of grief, loss, and despair.

10   The destruction which Mr. Mackey

11   wreaked upon our lives can never be

12   undone.  The three little children

13   was robbed of their father, their

14   loving father, I should say, by

15   Mr. Mackey's savage and inhumane

16   action.  To set free such a dangerous

17   and violent criminal would be an

18   outrage of justice.  It would not be

19   fair to the victim, Larry Carnegie.

20   It would not be fair to Larry's wife,

21   his daughters, family, or his

22   friends.  And further, it would not

23   be fair to American public to have

24   such a dangerous murderer throughout

25   our midst.  Please do not give

26   Mr. Mackey the opportunity to kill

27   once again.  The facts of this case

1              clearly and painfully demonstrate the
2              (indiscernible) savagery of which
3              Mr. Mackey is capable of.  In the
4              interest of justice and safety for
5              our community, I respectfully request
6              that you do not release James Mackey
7              from prison now or at any time in the
8              future."
9    We have another letter here from Parents of
10   Murdered Children Incorporated.  And it have just
11   an array of signatures on it, and it says, "We the
12   undersigned strongly oppose the parole of James
13   Mackey.  Justice demands he serve the full prison
14   term given to him at the time he was sentenced."
15   Another letter here from Parents of Murdered
16   Children.  "Enclosed is a copy of the hearing for
17   James Mackey who was one of the killers in the
18   crime."  Okay.  And here's the attachment.  This
19   letter is from Vince J. Carnegie, brother of
20   Lawrence Joseph Carnegie.  It says,
21              "I am the youngest brother of
22              Lawrence Carnegie who was murdered by
23              James Mackey and Carl Hancock.  They
24              claim they never knew my brother, and
25              they did it as a murder for hire.
26              Their guilt is undeniable by the
27              evidence, and they confessed to the

1       first-degree murder.  In case you are

2       not familiar with the details of the

3       murder, I will inform you my brother,

4       devoted husband, father of three

5       children under five years old at the

6       time, was set up for murder in a cold

7       blooded, calculated way.  The murder

8       scheme was in the works for many

9       weeks.  In fact, the murderer set my

10      brother up for weeks in advance by

11      befriending him and pretending to be

12      interested in buying real estate.

13      They knew that he had children and a

14      wife, and he talked of them all the

15      time.  They lured him to a remote

16      location and shot him in the back

17      with a bow and deadly arrow.

18      Unfortunately, they were not inept.

19      He did not -- Unfortunately, they

20      were so inept, he did not die and

21      tried to fight for his life.  They

22      stuffed him a sleeping bag and threw

23      him in the back of a trunk of a car.

24      They drove him for three hours to a

25      remote mountain road as he struggled

26      for life, profusely bleeding to

27      death.  After three hours of

1    bleeding, they opened the trunk and
2    realized that he was still alive.
3    Being the smart guys that they are,
4    they took a piece of rope and
5    strangled him to finish off the kill.
6    They then dumped is body over the
7    road bank.  What a lovely story.
8    It's the story my family and I get to
9    live with every day of our lives.
10   It's the story I never told his
11   teenage daughters.  It's the story I
12   will never tell my children who will
13   never get to meet my brother and
14   their uncle.  It's always been the
15   story they told to the prosecuting
16   attorney when they were granted a
17   plea bargain agreement for their
18   testimony against the guy who
19   supposedly hired them to do the
20   murder.  After two years of court
21   cases, of which I spent hundreds of
22   hours, agonizing hours, their story
23   of murder for hire was not good
24   enough to convict the supposedly
25   point man.  How will we ever know the
26   truth of it.  It seemed to me that if
27   their testimony could not convict the

1    point man, maybe there never was a

2    point man.  Maybe the murder was just

3    for fun.  Maybe they did it for

4    (indiscernible).  Maybe they made up

5    the story to save themselves from

6    death row.  Maybe.  Maybe.  Maybe.

7    The murder facts are clear and

8    calculated and shows premeditation

9    over a long period of time, plenty of

10   time to realize that the heinous

11   crime against my family and society

12   as a whole is wrong, plenty of time

13   to realize not to do it.  They chose

14   to murder of their own free will.  No

15   amount of rehabilitation will change

16   their willingness to commit murder so

17   easy and so calculating.  The

18   physical and paper trail evidence

19   against them was overwhelming.  Now

20   they want to be released after 16

21   years, merely 16 years.  Why.  Why.

22   For that purpose to go kill some more

23   folks, to live a normal life, to

24   enjoy the free life, to stop their

25   suffering in jail.  They lost their

26   right with the cold-blooded murder of

27   my brother.  They should be on death

1    row, and they definitely should stay

2    in prison.  My brother is rotting in

3    his grave.  They have no right to

4    freedom.  They lost that when they

5    murdered my brother.  I could go on

6    and on and on of all of the lives

7    dramatically effected by the loss of

8    my brother.  Literally hundreds of

9    family members from states like

10    California, Oregon, Washington, Ohio,

11    Pennsylvania, Arizona, numerous

12    friends and business associates,

13    church activities, community

14    volunteers, Christmas, Easter,

15    Thanksgiving, July 4th, Carmel

16    vacation, Lake Tahoe ski trips, water

17    skiing on the Stockton delta,

18    whitewater rafting, family vacation,

19    Hawaii trips, shopping in San

20    Francisco, sports fishing in Baja,

21    family life raising kids, three

22    beautiful daughters growing up

23    without their father, explaining to a

24    five year old why daddy is not coming

25    home, watching my 67-year-old father

26    and 66-year-old mother crying for

27    this time in their life.  I was 29

1    years old when the murder occurred.

2    I need to go on.  The damage done by

3    this murder is overwhelming.  Sixteen

4    years in prison for a cold-blooded,

5    calculated, premeditated murder is a

6    joke.  Their premeditated murder

7    caused immense pain and damage to our

8    family members.  Our only solace is

9    knowing they are in prison.  We are

10   (indiscernible) to let them out of

11   prison.  They should never be set

12   free.  Protect the freedom of

13   upstanding citizens of the state of

14   California.  Give justice to the

15   family, which the court and

16   prosecuting attorney failed to do.

17   The facts are indisputable.  He

18   murdered my brother by premeditated

19   lying in wait.  Let our family have

20   some measure of peace.  Keep him in

21   jail.  Respectfully, Vince Carnegie."

22 I think I covered all the 3042 notices.  And with

23 that --

24          Thereupon, the tape was changed.]

25          **DEPUTY COMMISSIONER DININNI:**  We're back on

26 the record.  Did you get a copy of Bruce G. Troy,

27 D.S.?

1    **PRESIDING COMMISSIONER WELCH:** Yes, I'll

2    read it.  Thank you.  And this is a letter of

3    opposition from Bruce G. Troy, D.S., writing in

4    regards to parole of James Mackey.

5    "I feel that Mr. Mackey should not

6    have earned parole since he has no

7    regard for the life and suffering of

8    my friend Larry.  Larry was a father

9    of three small daughters who have

10   been robbed of their father.  Unlike

11   Mr. Mackey who will be released from

12   prison and be able to resume his

13   life, they will never have their

14   father again.  Mr. Mackey has not

15   taken responsibility for the brutal

16   murder.  He blamed the other people

17   involved.  He has shown no remorse.

18   Mr. Mackey thinks Larry's friends and

19   family should just forget it

20   happened.  We will never forget Larry

21   or the hardships on his family.

22   Please do not give James Mackey an

23   earlier parole.  Larry will never be

24   given the chance to see his daughter

25   grow up and enjoy the life he should

26   have had.  Bruce Troy, D.S."

27   **DEPUTY COMMISSIONER DININNI:** And since

1    we're considering November 20, 1990, John Phillips,

2    District Attorney letter.  I'd like to note

3    November 7th, 1994, California legislature, D. Neff

4    and Dahl (phonetic), assemblymen, seventeenth

5    district, current assemblymen representing San

6    Joaquin County.

7            "I wish to register my strong

8            opposition of granting parole to

9            Inmate James Oliver Mackey who's

10           currently serving a life term.  This

11           inmate will be eligible for parole

12           here in December 2004.  Represents

13           substantial risk to people of my

14           community.  I strongly believe that

15           public safety concerns and the nature

16           of this inmate's crime demand that he

17           continue to be incarcerated.  Please

18           note the Stockton and the rest of San

19           Joaquin County suffered

20           (indiscernible) violent crime rate.

21           And this inmate's release would be

22           likely to aggravate these conditions

23           further.  Please place this letter in

24           your files for review by BPT when

25           parole is considered for this inmate.

26           Sincerely, D. Neff and Dahl."

27           **ATTORNEY MONTGOMERY:**  I appreciate your

1    reading that into the record.  I have no idea why

2    that would have been put in confidential.

3        DEPUTY COMMISSIONER DININNI:  Not with this

4    type of letterhead.

5        ATTORNEY MONTGOMERY:  No.

6        DEPUTY COMMISSIONER DININNI:  Mr. Phillip's

7    letter is in confidential based on the testimony in

8    trial.  That's noted.  It's not confidential to

9    Mr. Mackey.  It's just confidential.  Don't want it

10   floating around.  So that's understandable.  But

11   this one, I don't understand.

12       PRESIDING COMMISSIONER WELCH:  Any others?

13       DEPUTY COMMISSIONER DININNI:  There's

14   approximately 13 opposition letters noted here.

15   And I believe they're only here for addresses.

16       PRESIDING COMMISSIONER WELCH:  And we will

17   consider those during deliberation.  And with that,

18   Commissioner, do you have any questions?

19       DEPUTY COMMISSIONER DININNI:  I'd like to

20   note that several of these letters are duplicate to

21   the one's he read on the record.  So it's not

22   necessarily an additional 13.

23       PRESIDING COMMISSIONER WELCH:  Okay.

24   Anything else?

25       DEPUTY COMMISSIONER DININNI:  No questions.

26       PRESIDING COMMISSIONER WELCH:  District

27   Attorney, do you want your turn back?

1          **DEPUTY DISTRICT ATTORNEY BLANSETT:**

2    Actually, I am interested in just one thing. I've

3    never seen a copy of John Phillips' letter. He

4    didn't give me a copy at the time he wrote it. And

5    I was kind of hoping that there would be a copy in

6    the material I got, and there was no copy there

7    either.

8          **PRESIDING COMMISSIONER WELCH:** We can give

9    you a copy. Anything else?

10          **DEPUTY DISTRICT ATTORNEY BLANSETT:** No,

11    that's it. As I've indicated to the Board before,

12    my job here is merely to be a representative of the

13    DA's office. John Phillips is no longer the DA.

14    But the current DA gave me authorization to attend.

15          **PRESIDING COMMISSIONER WELCH:** Okay. The

16    officer will make copies and give you a copy.

17          **DEPUTY DISTRICT ATTORNEY BLANSETT:** Thank

18    you.

19          **PRESIDING COMMISSIONER WELCH:** You're

20    welcome, sir. And with that, we'll go to questions

21    with Counsel. Counsel, do you have any questions

22    for your client?

23          **ATTORNEY MONTGOMERY:** Yes, I do. Thank you,

24    Commissioner. You provided the counselor with your

25    version of the commitment offense. Was that in

26    response to the counselor saying write down what

27    happened?

1    INMATE MACKEY:  Yes.

2    ATTORNEY MONTGOMERY:  Regardless of the

3    circumstances, you indicated that you alone are

4    responsible for this.  Is that correct?

5    INMATE MACKEY:  Yes, it is.

6    ATTORNEY MONTGOMERY:  Do you still accept

7    responsibility?

8    INMATE MACKEY:  I do.

9    ATTORNEY MONTGOMERY:  The Commissioner was

10   asking you how you can connect some of the problems

11   that you've uncovered dealing with your past when

12   you were a child.  Isn't it true that in those

13   self-help programs they indicate to you that you

14   need to examine your past to determine how you got

15   to where you ultimately took a life.

16   INMATE MACKEY:  True.

17   ATTORNEY MONTGOMERY:  Have those programs

18   been helpful to you?

19   INMATE MACKEY:  Definitely.

20   ATTORNEY MONTGOMERY:  Did the psychologist

21   indicate to you why she didn't want to have a

22   discussion with you about those particular

23   programs?

24   INMATE MACKEY:  No, not to my knowledge.

25   She didn't say anything at all about that.

26   ATTORNEY MONTGOMERY:  Okay.  Thank you.  I

27   don't have any further questions.

1    **PRESIDING COMMISSIONER WELCH:**  You know, you

2    just reminded -- I wrote myself a note here to ask

3    you client a question.  You can have your turn

4    back.  When my colleague went over your

5    psychological evaluation, on a scale of low,

6    medium, and high, she rated you as a medium risk to

7    society, which is still somewhere in the middle.

8    Do you have any comments on that?  How do you see

9    yourself?

10    **INMATE MACKEY:**  I don't see myself as --

11    because I'm so aware of how to get into this

12    situations now that my -- I don't see how it'd be

13    moderate.

14    **PRESIDING COMMISSIONER WELCH:**  When you say

15    you're aware of how you get into these situations,

16    what are you referring to?

17    **INMATE MACKEY:**  How I got into the

18    situation.  How other -- you know, other inmates

19    around me, how they, you know, get into these

20    things.  There are ways to avoid, you know, crimes

21    like these.  And like this, just taking a look at

22    yourself and thinking about what you're doing,

23    considering the consequences.

24    **PRESIDING COMMISSIONER WELCH:**  Okay.  All

25    right.  Counsel, you want your turn back?

26    **ATTORNEY MONTGOMERY:**  Can you think of one

27    particular program that was more helpful than

1    others in your self-help programs?

2        INMATE MACKEY:  Basically the first one.

3    Well, not the first one, but the Framework For

4    Recovery.  I went in there thinking that, you know,

5    there's a lot of guys in there that were drug

6    addicts and alcoholics.  And I had nothing in

7    common with these people.  And I didn't know what I

8    could get out of that, just kind of like sitting

9    there.  But what I got from it is just about taking

10   a look at yourself, learning, you know, to examine

11   yourself and taking responsibility for your

12   actions, you know, just every little thing, because

13   that's how things like alcohol and drugs sneak up

14   on you, if you're not paying attention.  And that

15   was a main -- the main thing.  Once you start

16   there, (inaudible) you know, once you start taking

17   a look at yourself, anything's possible.

18       ATTORNEY MONTGOMERY:  You also took an anger

19   management course.  Was that beneficial?  Did you

20   learn a lot of things about the techniques and

21   identifying anger?

22       INMATE MACKEY:  Just stop and considering

23   what you're doing, you know, just taking a second

24   to stop, walking away, and thinking about the

25   consequences.

26       ATTORNEY MONTGOMERY:  Okay.  I don't have

27   any further questions.  Thank you, Commissioner.

1     **PRESIDING COMMISSIONER WELCH:**  Okay.  Thank

2     you.  And since the District Attorney is not

3     participating, we'll go to you for a closing

4     statement.

5     **ATTORNEY MONTGOMERY:**  Thank you,

6     Commissioner.  As I mentioned earlier, I would ask

7     the Panel to consider that the psychological

8     evaluation is based in part on the statement that

9     my client gave to the correctional counselor in

10    response to the instruction, please write it down.

11    This is exactly what he did.  He wrote to the

12    psychologist indicating that his detailed

13    description and the interview were the result of

14    his wanting to convey to her the fact that he had,

15    in fact, examined the reasons behind the commitment

16    offense, his actions, and how those events

17    contributed to his thinking and behavior up to and

18    in the commitment offense.  Briefly I want to hit

19    on the self-help programs, because I know you were

20    concerned about that.  You're unable to -- or

21    perhaps my client wasn't perfectly clear in

22    attempting to convey to you that in the self-help

23    groups what they do is they examine, or they assist

24    you in examining your past to make a determination

25    why you behave the way you did in the commitment

26    offense.  And it's a step-by-step process.  And the

27    anger management class, and the Framework For

1    Recovery is pretty much the same.  You've got to go

2    back.  You've got to peel away the layers to arrive

3    at some conclusions and some answers.  And while it

4    is I think human nature for us to want a response

5    to the question why, there will never be a rational

6    explanation for what was an irrational act.

7    According to Title 15, the Board, of course, is

8    required to consider a number of things.  And

9    certainly my client's performance in prison is a

10    consideration that you will take into

11    consideration.  I went back, and I looked at the

12    documentation references by the Deputy

13    Commissioner.  It was pretty benign.  I saw that

14    they recommended that Mr. Mackey participate in

15    some self-help as it became available, and that he

16    upgrade in a vocational program as needed.  But I

17    think it was abundantly clear that my client went

18    beyond -- well beyond that in many ways.  And I

19    think that this Panel would agree that his efforts

20    are significant, particularly at this point in

21    time.  This is his initial hearing.  Many people do

22    not come to the table with this much under their

23    belt at this time.  One of the areas that I look

24    for when I have a client who has committed a

25    homicide, I take a look at what they've done in

26    terms of giving back.  And think the Panel probably

27    does as well, in addition to the other things that

1    Title 15 requires you to consider.  I was not

2    disappointed in the least.  Laubach tutoring

3    clearly is a program once somebody is trained and

4    skilled in that area, it affords them a wonderful

5    opportunity to give back to some pretty needy

6    people within the institution in terms of helping

7    them to strengthen their language skills, their

8    writing skills.  My client helped people, and he

9    continues on an informal basis to do that as well.

10   You read the chrono -- Thank you, Commissioner

11   DiNinni, about the inmate that fell in the shower

12   and was covered in blood.  That particular chrono

13   dealt very specifically with that incident, and it

14   provided that my client's alertness and his

15   diligence possibility saved this man's life.  I

16   would have expected that Mr. Mackey would have

17   delved into the whys as they pertain to this crime.

18   And I was not disappointed.  I've had an

19   opportunity to sit down with this man and talk

20   about what he has gotten out of the various

21   programs.  There were a lot to cover today, and

22   there weren't a lot of questions asked about them,

23   but he certainly has an abundance of programs.

24   That included six months of AA, the Framework For

25   Recovery.  That was a 12-session program.

26   Understanding your feelings, 15 sessions, House of

27   Healing program.  That includes anger management

1   and improving coping skills, dealing effectively
2   also with shame, guilt, and forgiveness. He's
3   graduated from the Tier One, the Tier Two program,
4   Great Truths of the Bible, completed communication
5   styles and skills, Four Agreements, a personal
6   development course in '01, and advanced parenting
7   in '02. Also Taking the Limits Off Life, that was
8   a 12-week program and one that I'm not particularly
9   familiar with. But I am familiar with one that
10  followed, which was a 17-week program called
11  Supernatural Ministries, and a 15-week course
12  called Breaking the Cycle. Many of those, of
13  course, were spiritual in nature and overseen by
14  Pastor Barnham. The most recent group, Purpose
15  Drive Life, and that was a 42-hour session program,
16  pretty extensive. I asked Mr. Mackey about his
17  involvement in these particular programs, and I
18  came away with the sense that this is somebody that
19  entered these programs honestly and wanted to learn
20  about himself. He shared some revealing thoughts
21  about himself as a result of his participation in
22  these groups, too, and I'd like to share some of
23  those with you. In the Framework For Recovery
24  program he called that an eye opener. It forced
25  him to ask very painful questions of himself. The
26  parenting program helped him to examine his own
27  life and how his upbringing shaped his future.

1    This is what he was sharing with you earlier.  He
2    recognized that while he and his siblings were
3    never encouraged to open up, obviously the
4    consequences can be very, very harmful as emotions
5    are bottled up and is never dealt with or worked
6    through.  In the anger management program, he
7    learned that some of his own anger was actually
8    directed at himself.  He learned of new techniques
9    of addressing anger and facing it so that it does
10   not go unaddressed and it does not become
11   unmanageable.  From his involvement in these
12   programs, he has learned to open up and
13   communicate.  It has also shown him the need to
14   contemplate the consequences of his actions and to
15   ask himself who would be effected by each and every
16   decision that he makes.  As you know, academically,
17   my client has a bachelor's degree.  He has
18   continued to pursue his education.  We have the
19   paralegal course that he completed in '04.  I don't
20   recall if you did mention this, Commissioner
21   DiNinni, but in January of this year, he also began
22   to work towards a graduate degree in humanities.
23   The Domingas Hills College offers a wonderful
24   correspondence program that a lot of the lifers
25   have taken advantage of.  He's holding a clerks
26   position, and you've heard me say this before, but
27   clearly those individuals that are assigned clerk

1    positions are given that assignment because of the
2    fact that they've proven themselves to be reliable
3    and dependable within the institution.  They're
4    provided, or exposed rather to a lot of sensitive
5    information, and not just anybody can take on such
6    a position.  He's been acknowledged by staff for
7    efforts that demonstrate that he goes the extra
8    mile in his assignment. The recreation therapist
9    provided that his efforts at designing and
10   implementing a new system for the tracking of the
11   EOP inmates, which has proven to be a difficult
12   thing here, was all done while he was conducting
13   his regular job duties.  They also indicate that
14   that has made him an asset to the mental health
15   program.  She believes that he would also be an
16   asset to the community when he paroles.  In terms
17   of disciplinaries, the Board has discussed the one
18   in the file.  The author of that 115 indicated that
19   the conduct was, in fact, consistent with
20   horseplay, and that's exactly what they received
21   the write-up for.  I would add for the record this
22   was an administrative 115.  This is clearly an
23   exceptional record and one that -- I'm always
24   pleased to represent a client when they can come to
25   the Board without any 115s, without any 128s.  He's
26   been able to provide me with what I believe is a
27   good record.  The psychologist this year indicates

1    that he is a high functioning individual in this

2    setting.  She also notes that there's other

3    significant criteria that the Board examines in

4    assessing suitability, no juvenile record and no

5    substance abuse history.  That's huge, because

6    probably 90 percent of the cases before you, that's

7    exactly what you see in terms of histories.  I do

8    take issue with the psychological evaluation that

9    was prepared by Dr. Mahoney.  And I'll tell you

10   why.  While she does offer there's no diagnosis

11   under Axis I or II, that's certainly favorable, as

12   well as the Global Assessment of Functioning.  But

13   she takes issue with my client's version of the

14   commitment offense.  And I take issue with her

15   conclusions.  She provides that he poses a moderate

16   risk if he is released and relies upon his

17   statement for a basis of that conclusion.  I would

18   expect that a psychologist would acknowledge, or at

19   least enquire of my client's efforts that are

20   encouraged in the self-help and therapy groups when

21   it comes to facing and delving into one's past to

22   help determine the reason behind one's conduct in

23   the commitment offense.  I saw absolutely no

24   reference to those efforts, other than a benign

25   list of his accomplishments.  Granted, there are

26   many.  But without outlining them or discussing

27   them, she offers little.  Instead, she indicates

1  the he poses a moderate risk if he is released, and

2  her belief that he displays an inability to take

3  full responsibility for the crime. Those

4  conclusions do not have a foundation. And I would

5  ask the Board to consider that she knew that

6  Mr. Mackey had turned himself in to the

7  authorities. That's in the file. She apparently

8  gave no weight to the fact that he accepted a plea

9  and cooperated immensely with the authorities in a

10 separate prosecution that was associated with his

11 case. And also missing from her report, which I

12 think is very telling, is reference to the

13 Probation Report where on page eight it is stated

14 that Mackey believes he is to blame for Lawrence

15 Carnegie's death, and that he believes he was a

16 catalyst for this murder. If Dr. Mahoney believes

17 that a true risk existed, I find it particularly

18 odd that she specifically stated she had no

19 treatment recommendations for Mr. Mackey. I found

20 it also troublesome that she had the previous

21 report before her, dates back to 1993. Dr. Martin

22 prepared that. He concluded that my client was

23 somewhat vague about the causative factors of his

24 commitment offense. But since that particular

25 report, my client has completed no less than 12

26 different programs, which focused on addressing

27 causative factors. They've been huge. These

1    programs had been huge in his life.  And yet none

2    were discussed with him by Dr. Mahoney to ascertain

3    what he might have acquired.  This report is the

4    exact kind of conclusion that you have been

5    encouraged to disregard by the (indiscernible) task

6    force.  And instead you are urged to consider the

7    other reliable information before you in arriving

8    at your decision.  Finally, the parole plans, I

9    don't think I could have presented better parole

10   plans, a place to live in San Joaquin County, as

11   well as two job offers.  While he has training for

12   refrigeration and air conditioning, which by the

13   way he completed that trade at his first hearing,

14   his initial, many people don't often get a job

15   offer in the area that they're skilled.  Still he

16   has two job offers.  He has people that have

17   written on his behalf, and there's a strong

18   indication that these people will continue to

19   assist him in his transition in the community.  In

20   closing, Mr. Mackey was offered a plea by the

21   District Attorney of San Joaquin County.  It was

22   accepted by Mr. Mackey, and it was accepted by the

23   court.  Mr. Mackey would have proceeded to trial if

24   this plea agreement had not been offered.  And the

25   plea in no uncertain terms provides that the DA

26   recommends that the Board release Mr. Mackey at the

27   earliest possible time upon having served the

1   minimum sentence for first-degree murder.  The MEPD

2   has been established at January 29th of '06.  This

3   contract, which was signed by the District

4   Attorney, John Phillips, and signed by Mr. Mackey

5   and his counsel was also acknowledged by the

6   Board's then executive officer.  While this

7   particular hearing is administrative in nature, it

8   is also a continuation of the criminal process.

9   And as such I am respectfully requesting this Panel

10  to honor that agreement and set a release date at

11  this time.  And with that I will submit.

12          **PRESIDING COMMISSIONER WELCH:**  Thank you for

13  your comments, Ms. Montgomery.  At this time,

14  Mr. Mackey, you can make a closing statement, or

15  you can let your attorney's statement be your

16  closing statement.

17          **INMATE MACKEY:**  I'll let her statement be my

18  closing statement.

19          **PRESIDING COMMISSIONER WELCH:**  Okay.  Then

20  we'll go to victim impact statements.

21          **DEPUTY DISTRICT ATTORNEY BLANSETT:**

22  Mr. Commissioner, if I may just for a moment, I'm

23  not going to make any statement whatsoever contrary

24  to the negotiations that were reached between

25  Mr. Hintz and Mr. Phillips, but there are some

26  misrepresentation.  And I'm sure it's based upon

27  the stated facts as Counsel understands it that

1    have been made to this Board that I think are very

2    important.  One is that this was not a contract

3    that was meant to bind in any way any commission

4    regarding how they saw Mr. Mackey and --

5         PRESIDING COMMISSIONER WELCH:  And we

6    thoroughly understand that.

7         DEPUTY DISTRICT ATTORNEY BLANSETT:  Pardon?

8         PRESIDING COMMISSIONER WELCH:  We thoroughly

9    understand that.

10        DEPUTY DISTRICT ATTORNEY BLANSETT:  Okay.

11        PRESIDING COMMISSIONER WELCH:  The District

12   Attorney cannot bound the Board.

13        DEPUTY DISTRICT ATTORNEY BLANSETT:  And that

14   never, never the intent of the negotiations to bind

15   --

16        PRESIDING COMMISSIONER WELCH:  We understand

17   that.

18        DEPUTY DISTRICT ATTORNEY BLANSETT:  The

19   other thing that Counsel made reference to, and

20   that is that Mr. Mackey turned himself in.  That

21   was not the stated facts.

22        PRESIDING COMMISSIONER WELCH:  Now we're

23   getting into an area where -- Hold on Counsel.

24   We're getting into an area -- normally if the

25   District Attorney is going to make comments, it's

26   before Counsel speaks.  And then afterward Counsel

27   can address any issues that she might address.

1      DEPUTY DISTRICT ATTORNEY BLANSETT:  I agree

2  with the Commissioner.  The only reason I spoke up

3  was because what I perceived to be information

4  being presented to the Commission that was not the

5  true stated offense.

6      PRESIDING COMMISSIONER WELCH:  Well, let me

7  ask you this.

8      DEPUTY DISTRICT ATTORNEY BLANSETT:  Yeah.

9      PRESIDING COMMISSIONER WELCH:  Do you want

10  to make a closing statement?

11      DEPUTY DISTRICT ATTORNEY BLANSETT:  Not

12  contrary to the negations that were made in the

13  case.

14      PRESIDING COMMISSIONER WELCH:  Let's do

15  this.  I'll let you speak, and I'll give Counsel

16  her turn back.

17      DEPUTY DISTRICT ATTORNEY BLANSETT:  That'd

18  be fine.

19      PRESIDING COMMISSIONER WELCH:  Okay.

20      DEPUTY DISTRICT ATTORNEY BLANSETT:  There

21  were -- Actually, the three important areas, I've

22  covered one, and the Commissioner appears to

23  understand the state of the negotiations.  In

24  regards to Mr. Mackey, Mr. Mackey did not turn

25  himself in to authorities in the sense that he

26  found out they were investigating him, and

27  therefore, turned himself in.  He actually was

1    brought in for questioning.  He made a statement,

2    initial statement that implicated himself in the

3    murder as an accessory, which used to be called an

4    accessory before the fact.  Now it's a principle in

5    the commission of the murder, but denied any

6    involvement in the actual murder.  Mr. Mackey then

7    agreed to cooperate with law enforcement.  And

8    having a wire attached to his body, he went in to

9    Mr. Blatt's office with the idea that he was going

10   to get Mr. Blatt to implicate himself in the

11   murder.  But what Mr. Mackey did, unfortunately,

12   was to alert Mr. Blatt to the fact that he was

13   wired, which caused Mr. Blatt then not to implicate

14   himself, plus not to implicate Mr. Mackey any

15   further than Mr. Mackey had already implicated

16   himself.  Mr. Mackey at that point then after he

17   did that, went to a local attorney, Bud Marks, who

18   then called me up and said that Mr. Mackey now

19   wanted to turn himself back in and cooperate fully

20   with us.  And at that point, Mr. Mackey then was

21   taken into custody.  So in that sense, he did turn

22   himself in at that point, but that didn't consider

23   the activities that occurred before that time.

24         **PRESIDING COMMISSIONER WELCH:**  Okay.

25         **DEPUTY DISTRICT ATTORNEY BLANSETT:**  The

26   other issue, which to me is an important one in

27   terms of correcting the facts, and I would say