1    participate in, quote, "The Four Agreements,"
2    unquote, a component of the Stay Out of Prison
3    program.  July 12th, '02, laudatory chrono, E.
4    Hobbs, H-O-B-B-S, floor officer, assigned as EOP
5    aid, commended for his assistance and diligence.
6    July 12, '02,

7            "Mr. Mackey alerted staff that an EOP
8            inmate was down and required medical
9            assistance.  As he was performing his
10           assignment, he heard a strange sound
11           coming from the lower section shower,
12           went to investigate.  Upon arriving
13           at the shower, Mackey found the EOP
14           inmate lying on the shower floor,
15           covered in blood.  He immediately
16           alerted staff to what was happening,
17           allowing us to respond promptly.
18           Mr. Mackey's alertness and diligence
19           possibly saved the inmate's life and
20           should be recognized."
21   Two chronos related to the paralegal studies course
22   and authorization to receive books.  A laudatory
23   chrono, N. Andrews, A-N-D-R-E-W-S, psych tech,
24   January 22nd, '04, assigned to EOP, commended for
25   assistance and extraordinary dedication to his
26   assignment and to the inmate participants in the
27   EOP program.

1   "Personal attention Mr. Mackey gives
2   to individual inmates is far greater
3   than is expected in EOP.  He
4   demonstrates a genuine desire to see
5   program succeed.  Accomplishes
6   helping inmates in the program
7   improve their quality of life through
8   talking, listening, and generally
9   making himself available to these
10  men.  He has the ability to gain
11  trust of inmates who are new to the
12  program and are going through times
13  of adjustment, which takes a great
14  burden from staff, allowing us
15  greater freedom to do our jobs.  His
16  hands-on approach is very effective
17  and should be a model for other
18  inmates in this position."
19  And this is part of your vocation, M. Sandoval,
20  S-A-N-D-O-V-A-L, vocational instructor, June 24th,
21  '04, successfully demonstrated and completed all
22  criteria pertaining to safe refrigerant handling
23  and recoveries mandated by EPA Section 608 of the
24  Clean Air Act of 1990.  Inmate's test scores
25  qualify him for rating as universal certified
26  technician.  And verification of your high school
27  diploma, L. Bernardo, B-E-R-N-A-R-D-O, August 11th

1    of '04, East Union High School.  Another chrono by

2    Protestant Chaplain Barham, 9/30/04, successfully

3    completed 40 Days of Purpose Bible study.

4              "Forty Days of Purpose is based on

5              the best selling book A Purpose

6              Driven Life.  The program is small

7              group, hands on, in-depth study.

8              Purpose one, your plan for God's

9              pleasure, two, form God's family,

10             three, create and become like Christ,

11             four, shape for serving God, five,

12             you were made for a mission.

13             Mr. Mackey's participation has been

14             very valuable to the other men.

15             (Inaudible) the five purposes for

16             life the God apply them to his life

17             and use them and encourage others.

18             Serious, well-grounded man of God.

19             His insights, pleasant attitude, and

20             renewed mind demonstrate a positive

21             change in his lifestyle.  It brings

22             honor and glory to God."

23   Another chrono from Pastor Barnham dated November

24   15th of '04, a 40-week course entitled The Purpose

25   Driven Life.  And I note your certification of

26   completion in heating, ventilation, air

27   conditioner, refrigeration, October 1, 2004.  A

1    certificate as technician for stratosphere ozone

2    completion certification.  Don't have a date on

3    that.  But it looks like you have a paralegal

4    foundation course, July 23, '03, through 4/06/04.

5    And that's dated June 9th of '04.  Is there an

6    expiration date on this stratosphere ozone

7    completion?  Okay.  So it's just a universal

8    certification.  It goes with the chrono I read.

9         INMATE MACKEY:  Yes.

10        DEPUTY COMMISSIONER DININNI:  All right.

11   And several certificates for components leading up

12   to your completion in air condition.  Is there

13   another trade that I missed?

14        INMATE MACKEY:  No, there isn't.

15        DEPUTY COMMISSIONER DININNI:  Okay.  Very

16   good.  With that I'll go to the progress report.

17   There's no information noted from the Board Report

18   for post-conviction for me to note.  Counsel might

19   decide otherwise.  The Board Report was prepared by

20   Christian, H., Christian, C-H-R-I-S-T-I-A-N.  And

21   that was for 2004, December calendar.  Progress

22   report, most recent one, remained in vocational air

23   condition and refrigeration assignment October 8,

24   2004, when he was unassigned due to completing a

25   program completed with all satisfactory marks, CDC

26   128(e).  Assigned program aide for enhanced

27   outpatient program facility-B, 10/16/04, received

1   three laudatory chronos during the review period,

2   13-week study program Breaking the Cycle chrono

3   dated 12/01/04, 40-week course for preserving life.

4   We talked about successfully completed 40 days of

5   purpose.  We talked about that chrono.  And I'll

6   open for you to discuss any other assignments you

7   want to point out, because I only went over the

8   recent ones.  Okay.  With that, I'm going to go to

9   the psych report that's authored by K. M. Mahoney,

10  M-A-H-O-N-E-Y, Ph.D., contract psychologist,

11  November 17th, 2004.  In risk for violence,

12         "Mr. Mackey was a high functioning

13         individual in the community and has

14         continued to be a high functioning

15         inmate.  He has no juvenile history,

16         no substance abuse history, and has

17         been an excellent programmer with

18         CDC.  Outwardly, he has both the

19         abilities and interpersonal skills

20         for a successful parole.  In this

21         case, dynamics lie within the crime

22         scenario and to the extreme and

23         violent lengths to which Mr. Mackey

24         was willing to go for personal gain

25         and recognition.  On interview,

26         Mr. Mackey attempted to mitigate his

27         responsibility for his own actions by

1          shifting blame onto others as noted

2          in section three.  In my opinion,

3          Mr. Mackey poses a moderate risk for

4          reoffense if released to the

5          community at this time.  In

6          conclusion, James Oliver Mackey is a

7          40-year-old African-American inmate

8          convicted of Penal Code Section 187,

9          murder in the first degree for murder

10         for hire that occurred in 1989.  No

11         juvenile history.  No prior criminal

12         record.  No substance abuse issues.

13         When in CDC he has been an excellent

14         programmer with only one 115 that was

15         for horseplay.  CDC work evaluations

16         have ranged from satisfactory to

17         exceptional and most often being

18         placed at exceptional.  Due to the

19         nature of the crime, Mr. Mackey's

20         inability to take full responsibility

21         for it, it is my opinion Mr. Mackey

22         poses a moderate degree of risk for

23         violence as a calculated preplanned

24         means to an end if released to the

25         community at this time."

26    Mr. Mackey or Counsel, regarding post-conviction

27    factors, any gaps you'd like to fill, corrections

1    you'd like to make?

2          **ATTORNEY MONTGOMERY:**  I was unclear as to

3    what the psychologist actually meant in that last

4    sentence.  It didn't make a great deal of sense to

5    me.  The only other thing that I would point out is

6    that under the Axis I and Axis II, No Diagnosis was

7    offered.  And I'm going to address that more in my

8    closing, this report as well.

9          **DEPUTY COMMISSIONER DININNI:**  All I can do

10   is restate it.

11              "Due to the nature of the crime, and

12              Mr. Mackey's inability to take full

13              responsibility for it, it is my

14              opinion that Mr. Mackey poses a

15              moderate risk for violence as a

16              calculated preplanned means to an end

17              if released to the community at this

18              time."

19   I can't put what the person means by it.  All I can

20   conclude is reiterating the risk for violence,

21   because the statement is somewhat mitigated, and

22   she outlined section three, which is the crime.

23   And the crime was a calculated preplanned means to

24   an end.  So all it says here is a moderate risk to

25   reoffend.  And that's without my adding anything to

26   what she stated.

27          **ATTORNEY MONTGOMERY:**  Right.

1    **DEPUTY COMMISSIONER DININNI:** I'm just

2    referring to her risk for violence. Looks like a

3    restatement to me. The Panel member could take it

4    in a different way. Anything further?

5    **ATTORNEY MONTGOMERY:** No. Thank you.

6    **DEPUTY COMMISSIONER DININNI:** With that I'll

7    return to the Chair.

8    **PRESIDING COMMISSIONER WELCH:** Okay. Thank

9    you. Okay. Mr. Mackey, let's talk about your

10   parole plans. In case you receive a parole date,

11   tell the Panel where you're planning to live.

12   **INMATE MACKEY:** In Manteca with my wife.

13   **PRESIDING COMMISSIONER WELCH:** Okay. And

14   how are you planning to support yourself? I do

15   have a letter from your wife by the way.

16   **INMATE MACKEY:** I have a couple of job

17   offers.

18   **PRESIDING COMMISSIONER WELCH:** You want to

19   tell us about them?

20   **INMATE MACKEY:** One is a place where my wife

21   works. It's California Natural Products. I'd be

22   working in the warehouse, and The Cottage Bakery in

23   Lodi where I'd be driving a forklift.

24   **PRESIDING COMMISSIONER WELCH:** Okay. Any

25   other options?

26   **INMATE MACKEY:** The reason I took the

27   heating and air conditioning course is because it's

1  highly, you know, -- There's a lot of jobs

2  available out there in that field.

3       **PRESIDING COMMISSIONER WELCH:**  Okay.

4  Anything else you want to tell us about your

5  employment plans before I go to your letters?  You

6  do have letters, and you do have some job offers

7  here.  Okay.  Then I'll go to your letter.  You

8  have a letter from Janet.  Who is Janet?

9       **INMATE MACKEY:**  My wife.

10      **PRESIDING COMMISSIONER WELCH:**  Wife.  Okay.

11  Janet Mackey.  Is that correct?

12      **INMATE MACKEY:**  Uh-hmm.

13      **PRESIDING COMMISSIONER WELCH:**  And she

14  writes,

15          "I would like to start by thanking

16          you for taking the time to read my

17          letter requesting the Board to

18          release my husband James Mackey.

19          James and I have known each other

20          since 1977 when James was only 12

21          years old.  I saw James grow from a

22          young man to a man I fell in love

23          with and married 11 years ago.  Our

24          relationship grows stronger every

25          year, and we look forward to spending

26          the rest of our lives together.

27          James has brought the best qualities

1  out in me, and we have become a very

2  strong Christian family. James is

3  very close to my two children, and

4  they love him very much. Our entire

5  family gives James the support he

6  will need both financially and

7  emotionally when he comes home.

8  James did change everyone's life

9  around him, but not more than it

10  changed his life. It was devastating

11  and unbelievable that such a

12  wonderful, intelligent young man, and

13  someone who had the future in his

14  hands could actually commit the act

15  he did. No one is sorrier for his

16  acts than James and would turn back

17  the clock if a second chance -- if he

18  could. I feel and pray for the

19  victim's family often. I know James

20  does and hope that they have it in

21  their hearts to forgive James. I

22  have met one person that doesn't

23  think James is a -- I haven't met one

24  person that doesn't think James is a

25  wonderful person. He have impacted

26  his qualities on so many people. As

27  our home is still in town we grew up

1  in, so many people are looking
2  forward to him coming back into the
3  community.  James was a college
4  graduate when he entered the prison
5  system, and James has continued his
6  education while in prison through
7  correspondence classes and, of
8  course, courses offered to inmates.
9  When James is released, he will
10  already be employed and be able to
11  contribute and support our family.
12  When James is released, he will
13  reside in our home, and that's in
14  Manteca.  I thank you so much for
15  taking the time to read my letter,
16  and I hope you find it in your hearts
17  to see James -- who James really is,
18  a best friend, a lover, a carrying
19  husband, a wonderful father, and a
20  friend to so many people.  Please
21  feel free to call me if you have any
22  additional questions.  Janet Mackey."
23  That was from your wife.  Lee Denaca?
24        **INMATE MACKEY:**  Lana.
25        **PRESIDING COMMISSIONER WELCH:**  Lana.  Lana
26  Mackey, that's L-A-N-A Mackey.  She writes you a
27  very supportive letter.  That's from your niece.

1   And you have another support letter from Kenneth

2   Elkridge.

3           **INMATE MACKEY:**  Eskridge.

4           **PRESIDING COMMISSIONER WELCH:**

5   E-S-K-R-I-D-G-E.  That's your brother?

6           **INMATE MACKEY:**  Yes, Sir.

7           **PRESIDING COMMISSIONER WELCH:**  He writes you

8   a very supportive letter.  He feels that you have

9   had the opportunity to find redemption and redeem

10  your errors, and that he loves you very much and

11  he's willing to support you.  And he feels that you

12  would be a benefit to society.  I have another

13  letter from your father-in-law Clyde Waller.  He

14  writes you a very supportive letter.  He says,

15          "My name is Clyde Waller, the father-

16          in-law of James Mackey.  I understand

17          that James will be considered for

18          parole.  I have known James since he

19          was in high school and can remember

20          watching him play football in East

21          Union High School."

22  He feels that you've been a model inmate, and that

23  you'll do good in the community and have a

24  bachelor's degree in sports medicine from the

25  University Pacific in his opinion.  I have a letter

26  here, I believe, from your former high school coach

27  Jim C. Brown.  Mr. Brown writes,

1       "I've written this letter as former
2       teacher and high school football
3       coach during James' high school days
4       and his friend since he graduated
5       from high school.  I recently visited
6       James in Mule Creek State Prison.  In
7       my opinion, James showed great
8       contrition for his past and made a
9       tremendous effort to rehabilitate and
10      grow as a human being while in
11      prison.  I feel confident James will
12      contribute -- will be a contributing
13      member to society if given the
14      opportunity.  Had I not retired
15      recently and put my painter's
16      contractor's license on inactive
17      status, I would offer James a job
18      myself.  I will offer my
19      recommendation for his employment to
20      anyone who asks."
21  He feels that you paid your debt to society.
22  Another letter here from Rebecca (indiscernible)
23  Williams.  She was -- I guess her husband was
24  James' -- her husband was Dr. Ronald Williams.  I
25  guess he did some surgery on your shoulder, and
26  he's known you.  She writes you a very supportive
27  letter also.  Hamilton L. Hintz, attorney at law.

1    Is that your ex-attorney?

2              **INMATE MACKEY:**  Uh-hmm.

3              **PRESIDING COMMISSIONER WELCH:**  Last name, by

4    the way, is spelled H-I-N-T-Z.  He says,

5              "I was the attorney for Mr. Mackey in

6              San Joaquin County Court Case number

7              45624, in which he was sentenced to

8              state prison on or about November 20,

9              1990, for the term of 25 years to life

10             for the murder of Lawrence Carnegie

11             pursuant to a plea and sentence

12             agreement with the District Attorney

13             John Phillips.  James cooperated with

14             the investigation and prosecution of

15             codefendant Michael Blatt, B-R-A-T-T

16             [sic] --"

17             **INMATE MACKEY:**  "L."

18             **PRESIDING COMMISSIONER WELCH:**  B-L-A-T-T.

19             "-- and testified as a prosecuting

20             witness in at least two trials in

21             Alameda County.  I attended both

22             trials as an observer when James

23             testified and was a witness myself.

24             Both trials ended with a hung jury,

25             and the case against Mr. Blatt was

26             eventually dismissed.  Without James,

27             however, his case would never have

1    been filed, and the person most

2    culpable in Mr. Carnegie's murder

3    would not have been exposed,

4    arrested, and prosecuted.   The

5    agreement I negotiated on James'

6    behalf with John Phillips

7    specifically called for the

8    recommendation that Mr. Phillip [sic]

9    be released on parole upon having

10   served a minimum sentence for first-

11   degree murder.   That is two-thirds of

12   the minimum sentence, 16 years, eight

13   months, provided that he was a good

14   prisoner.   James' minimum eligible

15   parole date is January 26th, 2006.   He

16   has proved that he has been a good

17   prisoner.   His record, as I

18   understand, contains only one CDC 115

19   in 1996, and the incident was

20   described as most consistent with

21   horseplay.   During James' years at

22   Mule Creek he have taken many

23   courses, received numerous

24   certificates, and possibly saved

25   another inmate's life.   I visited

26   James in 2004, and over the past 18

27   months have exchanged letters with

1    him.  He appears to have done

2    everything within his power to better

3    himself, abide by the rules, and make

4    the best of a terrible situation.

5    Very few inmates serving an

6    indeterminate sentence get his

7    circumstances.  I unequivocally and

8    respectfully urge that you give a

9    date now and that he be released on

10   parole at the earliest possible time.

11   He is unique for a life prisoner for

12   the following reasons:  He has no

13   past criminal history as a juvenile

14   or adult.  His prison record is not

15   simply good, but excellent.  As a

16   high school and college graduate, he

17   has the ability and opportunity for

18   employment and the intelligence and

19   motivation to make it on parole.  He

20   is remorseful and accepts

21   responsibility and is accountable

22   both legally and morally for the

23   offense.  Finally, James has the

24   recommendation of the elected

25   District Attorney of the county from

26   which he was committed and that he be

27   released on parole upon having served

62

```
1        the minimum sentence provided that he
2        has been a good prisoner.  John
3        Phillips wrote to the Board nearly 15
4        years ago.  And without the
5        cooperation and the prospective
6        testimony of Mr. Mackey, charges
7        would not have been filed against
8        Michael Blatt, nor a prosecution
9        initiated.  Thank you, Hamilton
10       Hintz."
11   Okay.  We have an Amanda Gomez.  Ms. Gomez writes
12   you a letter.  She said that you would be in need
13   of employment.  She's offering you employment with
14   California Natural Products, 11 dollars an hour,
15   she says, is the expected salary.  And Cottage
16   Bakery, another job offer.  And this is
17   Mr. Haslebacker, that's H-A-S-L-E-B-A-C-K-E-R.  He
18   writes you a supportive letter.  He says,
19       "Upon his release, I understand James
20        will be seeking employment.  I would
21        like to offer James the opportunity
22        for a Cottage Bakery -- at Cottage
23        Bakery as a warehouse forklift
24        driver.  That would be 14 dollars an
25        hour."
26   And this is (indiscernible).  They have bakeries, I
27   guess, in Lodi, Sacramento, and Stockton.  Is that
```

1    correct?

2              **INMATE MACKEY:**  Yes, Sir.

3              **PRESIDING COMMISSIONER WELCH:**  James

4    Mitchell, vice president, Creative Research.

5              "I have agreed to provide an

6              employment interview for James

7              Mackey.  I do not promise employment

8              will occur.  I have offered this

9              interview at the request of a friend

10             who knows Mackey."

11   And I do have the letter the counselor submitted

12   from the District Attorney back in 1990.  However,

13   the District Attorney is here, and he's already

14   testified as to his county's position on the

15   prisoner's parole.

16             **ATTORNEY MONTGOMERY:**  Commissioner, there

17   were three others.  They're in a packet.  There was

18   one --

19             **PRESIDING COMMISSIONER WELCH:**  And I'm going

20   to get to those.

21             **ATTORNEY MONTGOMERY:**  Okay.

22             **PRESIDING COMMISSIONER WELCH:**  I was just

23   covering the ones that you submitted.  And there

24   are some additional one in your packet.  Okay.

25   Charisse Mackey wrote you a very supportive letter,

26   and she's writing this letter on behalf of her

27   uncle.  And she noted that you have some very good

1   childhood memories and that today at the age of 23

2   she still have not changed.  After relocating to

3   Southern California she still receives letters,

4   birthday cards, and short stories from him via e-

5   mail.  How do you send e-mails to her?

6       INMATE MACKEY:  My wife does.  I send them

7   to my wife, and --

8       PRESIDING COMMISSIONER WELCH:  And then she

9   sends them to her.  Okay.  I didn't think prisoners

10  --

11      INMATE MACKEY:  No.

12      PRESIDING COMMISSIONER WELCH:  Okay.  So she

13  writes you a supportive letter.  Looks like one

14  from Janet.  Did I get Rebecca Williams?

15      INMATE MACKEY:  Yes.

16      PRESIDING COMMISSIONER WELCH:  Here's one

17  that I've missed.  Okay.  Rebecca Williams writes

18  you a supportive letter.  She's writing in support

19  of your upcoming parole consideration hearing.

20  "James have been a close friend of our family for

21  many years.  (Indiscernible) when I first saw him

22  as a patient."  I covered that one.

23      INMATE MACKEY:  Yeah.

24      PRESIDING COMMISSIONER WELCH:  Well, there's

25  something else I wanted to say about this, sir.

26  That (inaudible).  She said, "I wish that I was

27  able to offer (inaudible) surgery practice, but

1    unfortunately my husband passed away suddenly in
2    1996.  I feel he will be an asset, however,
3    wherever he has employment."  That's highlighted.
4    Did I miss any?

5        **ATTORNEY MONTGOMERY:**  There was a letter
6    from a Criner, C-R-I-N-E-R, family.

7        **PRESIDING COMMISSIONER WELCH:**  Yeah, I saw
8    that one.

9        **ATTORNEY MONTGOMERY:**  And the sister-in-law
10    Robin Cordono.

11        **PRESIDING COMMISSIONER WELCH:**  I have
12    (inaudible).  The Criner family.  Here it is.
13    Eric, Angela, Erica, and Angela, the Criner family.
14    They wrote you a very supportive letter.

15        "This letter is submitted on behalf
16        of James Mackey, and I've known
17        Mackey since 1969.  I've always
18        thought that James would some day be
19        a real asset to his community.  And I
20        feel James can love, respect, and
21        honor his fellow man and become a
22        productive citizen while in prison.
23        He had furthered his education."
24    She talks about all the things that you've done in
25    prison.  "And we look forward to seeing him soon."
26    And the other one was from who now?  James
27    Mitchell?

1    ATTORNEY MONTGOMERY: Robin Cordono, the

2    sister-in-law. It's handwritten.

3    PRESIDING COMMISSIONER WELCH:

4    (Indiscernible).

5    ATTORNEY MONTGOMERY: Yes, that's it.

6    PRESIDING COMMISSIONER WELCH: Okay. Robin

7    Cordono. And she's known you for 24 years, and you

8    attended high school together. "When James went on

9    to college at UOP, I felt he would pursue a career

10   as a professional football player." And she was

11   shocked and saddened when she discovered he was

12   sent to prison. Basically, she's writing you a

13   supportive letter. She supports you

14   unconditionally, spiritually, and financially in

15   your preparation for the future. Did I cover them

16   all, Counsel?

17   ATTORNEY MONTGOMERY: I believe you did.

18   Thank you.

19   PRESIDING COMMISSIONER WELCH: Quite a few

20   support letters. Quite a few job offers. And I

21   have most of the ones that you submitted already in

22   the file. Okay. Anything else about parole plans,

23   Counsel, before we move on to 3042 notices?

24   ATTORNEY MONTGOMERY: No, I think that you

25   have covered those. Thank you.

26   PRESIDING COMMISSIONER WELCH: Thank you.

27   Okay. We sent out notices pursuant to Penal Code

1   3042.  We sent those out to different agencies that
2   would have an interest in your case to include the
3   District Attorney's office, the Attorney General's
4   office, law enforcement agencies that had
5   jurisdiction, your attorney at the time.  And I
6   should have read your attorney's at the -- during
7   this portion, but I read it as your support,
8   because your attorney did respond, and to the judge
9   that presided in your case, and we sent letters out
10  to victims.  So in summary we received a letter
11  back from your attorney, and we received letters
12  from several victims.  And at this time I'll go
13  over the victims' letters.  And we have the
14  District Attorney here from San Joaquin County who
15  have opted not to participate in the hearing today.
16  But we did receive the letter and your documents.
17  Okay.  Charles Shrewsbury wrote a letter, He says
18  -- And his last name is spelled
19  S-H-R-E-W-S-B-U-R-Y.  He writes a letter.  He says,
20          "I'm writing this letter in regards
21          to the parole hearing of James
22          Mackey.  He was convicted of
23          murdering Larry Carnegie, my brother-
24          in-law.  Based on the circumstances
25          of this case and the severity of the
26          crime, I would respectfully urge you
27          not to release Mr. Mackey from prison

1    now or at any time in the future.

2    Mr. Mackey plotted to murder Larry

3    Carnegie in cold blood and

4    premeditated.   This was not a crime

5    of passion, not an accident, nor a

6    mistake.   This was nothing less than

7    murder in the first degree.

8    Mr. Mackey purchased a crossbow at a

9    sporting goods store for the sole

10   purpose of killing his victim.   He

11   had ample time to consider and

12   carefully weigh the consequences of

13   his actions.   He made the choice,

14   which was a clear and unobstructed

15   thought process.   James Mackey

16   ambushed Larry Carnegie, shooting him

17   in the back with a crossbow, stuffing

18   him into a trunk of a car, and later

19   strangling him.   This lie in wait not

20   only illustrates the clarity of

21   Mackey's intent, but it also

22   underlines the cunning mindset of

23   Mr. Mackey and the outright brutality

24   of his crime.   On that day,

25   Mr. Mackey clearly demonstrated his

26   own bitter disregard for human life.

27   When Mr. Mackey murdered Larry

1    Carnegie, I lost a dear loving family
2    member and a friend.  My sister lost
3    her husband.  Even more devastating,
4    my three nieces lost their father
5    forever.  Mr. Mackey brutally and
6    clearly, intentionally -- intentional
7    crime has devastated our family
8    deeply, dragging down to emotional
9    depth of grief, loss, and despair.
10   The destruction which Mr. Mackey
11   wreaked upon our lives can never be
12   undone.  The three little children
13   was robbed of their father, their
14   loving father, I should say, by
15   Mr. Mackey's savage and inhumane
16   action.  To set free such a dangerous
17   and violent criminal would be an
18   outrage of justice.  It would not be
19   fair to the victim, Larry Carnegie.
20   It would not be fair to Larry's wife,
21   his daughters, family, or his
22   friends.  And further, it would not
23   be fair to American public to have
24   such a dangerous murderer throughout
25   our midst.  Please do not give
26   Mr. Mackey the opportunity to kill
27   once again.  The facts of this case

1    clearly and painfully demonstrate the

2    (indiscernible) savagery of which

3    Mr. Mackey is capable of.  In the

4    interest of justice and safety for

5    our community, I respectfully request

6    that you do not release James Mackey

7    from prison now or at any time in the

8    future."

9  We have another letter here from Parents of

10  Murdered Children Incorporated.  And it have just

11  an array of signatures on it, and it says, "We the

12  undersigned strongly oppose the parole of James

13  Mackey.  Justice demands he serve the full prison

14  term given to him at the time he was sentenced."

15  Another letter here from Parents of Murdered

16  Children.  "Enclosed is a copy of the hearing for

17  James Mackey who was one of the killers in the

18  crime."  Okay.  And here's the attachment.  This

19  letter is from Vince J. Carnegie, brother of

20  Lawrence Joseph Carnegie.  It says,

21    "I am the youngest brother of

22    Lawrence Carnegie who was murdered by

23    James Mackey and Carl Hancock.  They

24    claim they never knew my brother, and

25    they did it as a murder for hire.

26    Their guilt is undeniable by the

27    evidence, and they confessed to the

1    first-degree murder.  In case you are

2    not familiar with the details of the

3    murder, I will inform you my brother,

4    devoted husband, father of three

5    children under five years old at the

6    time, was set up for murder in a cold

7    blooded, calculated way.  The murder

8    scheme was in the works for many

9    weeks.  In fact, the murderer set my

10   brother up for weeks in advance by

11   befriending him and pretending to be

12   interested in buying real estate.

13   They knew that he had children and a

14   wife, and he talked of them all the

15   time.  They lured him to a remote

16   location and shot him in the back

17   with a bow and deadly arrow.

18   Unfortunately, they were not inept.

19   He did not -- Unfortunately, they

20   were so inept, he did not die and

21   tried to fight for his life.  They

22   stuffed him a sleeping bag and threw

23   him in the back of a trunk of a car.

24   They drove him for three hours to a

25   remote mountain road as he struggled

26   for life, profusely bleeding to

27   death.  After three hours of

1    bleeding, they opened the trunk and
2    realized that he was still alive.
3    Being the smart guys that they are,
4    they took a piece of rope and
5    strangled him to finish off the kill.
6    They then dumped is body over the
7    road bank.  What a lovely story.
8    It's the story my family and I get to
9    live with every day of our lives.
10   It's the story I never told his
11   teenage daughters.  It's the story I
12   will never tell my children who will
13   never get to meet my brother and
14   their uncle.  It's always been the
15   story they told to the prosecuting
16   attorney when they were granted a
17   plea bargain agreement for their
18   testimony against the guy who
19   supposedly hired them to do the
20   murder.  After two years of court
21   cases, of which I spent hundreds of
22   hours, agonizing hours, their story
23   of murder for hire was not good
24   enough to convict the supposedly
25   point man.  How will we ever know the
26   truth of it.  It seemed to me that if
27   their testimony could not convict the

1   point man, maybe there never was a

2   point man.  Maybe the murder was just

3   for fun.  Maybe they did it for

4   (indiscernible).  Maybe they made up

5   the story to save themselves from

6   death row.  Maybe.  Maybe.  Maybe.

7   The murder facts are clear and

8   calculated and shows premeditation

9   over a long period of time, plenty of

10  time to realize that the heinous

11  crime against my family and society

12  as a whole is wrong, plenty of time

13  to realize not to do it.  They chose

14  to murder of their own free will.  No

15  amount of rehabilitation will change

16  their willingness to commit murder so

17  easy and so calculating.  The

18  physical and paper trail evidence

19  against them was overwhelming.  Now

20  they want to be released after 16

21  years, merely 16 years.  Why.  Why.

22  For that purpose to go kill some more

23  folks, to live a normal life, to

24  enjoy the free life, to stop their

25  suffering in jail.  They lost their

26  right with the cold-blooded murder of

27  my brother.  They should be on death

1    row, and they definitely should stay
2    in prison.  My brother is rotting in
3    his grave.  They have no right to
4    freedom.  They lost that when they
5    murdered my brother.  I could go on
6    and on and on of all of the lives
7    dramatically effected by the loss of
8    my brother.  Literally hundreds of
9    family members from states like
10   California, Oregon, Washington, Ohio,
11   Pennsylvania, Arizona, numerous
12   friends and business associates,
13   church activities, community
14   volunteers, Christmas, Easter,
15   Thanksgiving, July 4ᵗʰ, Carmel
16   vacation, Lake Tahoe ski trips, water
17   skiing on the Stockton delta,
18   whitewater rafting, family vacation,
19   Hawaii trips, shopping in San
20   Francisco, sports fishing in Baja,
21   family life raising kids, three
22   beautiful daughters growing up
23   without their father, explaining to a
24   five year old why daddy is not coming
25   home, watching my 67-year-old father
26   and 66-year-old mother crying for
27   this time in their life.  I was 29

1    years old when the murder occurred.

2    I need to go on.  The damage done by

3    this murder is overwhelming.  Sixteen

4    years in prison for a cold-blooded,

5    calculated, premeditated murder is a

6    joke.  Their premeditated murder

7    caused immense pain and damage to our

8    family members.  Our only solace is

9    knowing they are in prison.  We are

10   (indiscernible) to let them out of

11   prison.  They should never be set

12   free.  Protect the freedom of

13   upstanding citizens of the state of

14   California.  Give justice to the

15   family, which the court and

16   prosecuting attorney failed to do.

17   The facts are indisputable.  He

18   murdered my brother by premeditated

19   lying in wait.  Let our family have

20   some measure of peace.  Keep him in

21   jail.  Respectfully, Vince Carnegie."

22   I think I covered all the 3042 notices.  And with

23   that --

24        Thereupon, the tape was changed.]

25        **DEPUTY COMMISSIONER DININNI:**  We're back on

26   the record.  Did you get a copy of Bruce G. Troy,

27   D.S.?

1    **PRESIDING COMMISSIONER WELCH:** Yes, I'll

2    read it. Thank you. And this is a letter of

3    opposition from Bruce G. Troy, D.S., writing in

4    regards to parole of James Mackey.

5        "I feel that Mr. Mackey should not

6        have earned parole since he has no

7        regard for the life and suffering of

8        my friend Larry. Larry was a father

9        of three small daughters who have

10        been robbed of their father. Unlike

11        Mr. Mackey who will be released from

12        prison and be able to resume his

13        life, they will never have their

14        father again. Mr. Mackey has not

15        taken responsibility for the brutal

16        murder. He blamed the other people

17        involved. He has shown no remorse.

18        Mr. Mackey thinks Larry's friends and

19        family should just forget it

20        happened. We will never forget Larry

21        or the hardships on his family.

22        Please do not give James Mackey an

23        earlier parole. Larry will never be

24        given the chance to see his daughter

25        grow up and enjoy the life he should

26        have had. Bruce Troy, D.S."

27    **DEPUTY COMMISSIONER DININNI:** And since

1    we're considering November 20, 1990, John Phillips,

2    District Attorney letter.  I'd like to note

3    November 7th, 1994, California legislature, D. Neff

4    and Dahl (phonetic), assemblymen, seventeenth

5    district, current assemblymen representing San

6    Joaquin County.

7         "I wish to register my strong

8          opposition of granting parole to

9          Inmate James Oliver Mackey who's

10         currently serving a life term.  This

11         inmate will be eligible for parole

12         here in December 2004.  Represents

13         substantial risk to people of my

14         community.  I strongly believe that

15         public safety concerns and the nature

16         of this inmate's crime demand that he

17         continue to be incarcerated.  Please

18         note the Stockton and the rest of San

19         Joaquin County suffered

20         (indiscernible) violent crime rate.

21         And this inmate's release would be

22         likely to aggravate these conditions

23         further.  Please place this letter in

24         your files for review by BPT when

25         parole is considered for this inmate.

26         Sincerely, D. Neff and Dahl."

27         **ATTORNEY MONTGOMERY:**  I appreciate your

1  reading that into the record.  I have no idea why

2  that would have been put in confidential.

3      DEPUTY COMMISSIONER DININNI:  Not with this

4  type of letterhead.

5      ATTORNEY MONTGOMERY:  No.

6      DEPUTY COMMISSIONER DININNI:  Mr. Phillip's

7  letter is in confidential based on the testimony in

8  trial.  That's noted.  It's not confidential to

9  Mr. Mackey.  It's just confidential.  Don't want it

10  floating around.  So that's understandable.  But

11  this one, I don't understand.

12      PRESIDING COMMISSIONER WELCH:  Any others?

13      DEPUTY COMMISSIONER DININNI:  There's

14  approximately 13 opposition letters noted here.

15  And I believe they're only here for addresses.

16      PRESIDING COMMISSIONER WELCH:  And we will

17  consider those during deliberation.  And with that,

18  Commissioner, do you have any questions?

19      DEPUTY COMMISSIONER DININNI:  I'd like to

20  note that several of these letters are duplicate to

21  the one's he read on the record.  So it's not

22  necessarily an additional 13.

23      PRESIDING COMMISSIONER WELCH:  Okay.

24  Anything else?

25      DEPUTY COMMISSIONER DININNI:  No questions.

26      PRESIDING COMMISSIONER WELCH:  District

27  Attorney, do you want your turn back?

1    **DEPUTY DISTRICT ATTORNEY BLANSETT:**

2    Actually, I am interested in just one thing. I've

3    never seen a copy of John Phillips' letter. He

4    didn't give me a copy at the time he wrote it. And

5    I was kind of hoping that there would be a copy in

6    the material I got, and there was no copy there

7    either.

8    **PRESIDING COMMISSIONER WELCH:** We can give

9    you a copy. Anything else?

10    **DEPUTY DISTRICT ATTORNEY BLANSETT:** No,

11    that's it. As I've indicated to the Board before,

12    my job here is merely to be a representative of the

13    DA's office. John Phillips is no longer the DA.

14    But the current DA gave me authorization to attend.

15    **PRESIDING COMMISSIONER WELCH:** Okay. The

16    officer will make copies and give you a copy.

17    **DEPUTY DISTRICT ATTORNEY BLANSETT:** Thank

18    you.

19    **PRESIDING COMMISSIONER WELCH:** You're

20    welcome, sir. And with that, we'll go to questions

21    with Counsel. Counsel, do you have any questions

22    for your client?

23    **ATTORNEY MONTGOMERY:** Yes, I do. Thank you,

24    Commissioner. You provided the counselor with your

25    version of the commitment offense. Was that in

26    response to the counselor saying write down what

27    happened?

1       INMATE MACKEY:  Yes.

2       ATTORNEY MONTGOMERY:  Regardless of the

3 circumstances, you indicated that you alone are

4 responsible for this.  Is that correct?

5       INMATE MACKEY:  Yes, it is.

6       ATTORNEY MONTGOMERY:  Do you still accept

7 responsibility?

8       INMATE MACKEY:  I do.

9       ATTORNEY MONTGOMERY:  The Commissioner was

10 asking you how you can connect some of the problems

11 that you've uncovered dealing with your past when

12 you were a child.  Isn't it true that in those

13 self-help programs they indicate to you that you

14 need to examine your past to determine how you got

15 to where you ultimately took a life.

16       INMATE MACKEY:  True.

17       ATTORNEY MONTGOMERY:  Have those programs

18 been helpful to you?

19       INMATE MACKEY:  Definitely.

20       ATTORNEY MONTGOMERY:  Did the psychologist

21 indicate to you why she didn't want to have a

22 discussion with you about those particular

23 programs?

24       INMATE MACKEY:  No, not to my knowledge.

25 She didn't say anything at all about that.

26       ATTORNEY MONTGOMERY:  Okay.  Thank you.  I

27 don't have any further questions.

1    **PRESIDING COMMISSIONER WELCH:**  You know, you

2    just reminded -- I wrote myself a note here to ask

3    you client a question.  You can have your turn

4    back.  When my colleague went over your

5    psychological evaluation, on a scale of low,

6    medium, and high, she rated you as a medium risk to

7    society, which is still somewhere in the middle.

8    Do you have any comments on that?  How do you see

9    yourself?

10    **INMATE MACKEY:**  I don't see myself as --

11    because I'm so aware of how to get into this

12    situations now that my -- I don't see how it'd be

13    moderate.

14    **PRESIDING COMMISSIONER WELCH:**  When you say

15    you're aware of how you get into these situations,

16    what are you referring to?

17    **INMATE MACKEY:**  How I got into the

18    situation.  How other -- you know, other inmates

19    around me, how they, you know, get into these

20    things.  There are ways to avoid, you know, crimes

21    like these.  And like this, just taking a look at

22    yourself and thinking about what you're doing,

23    considering the consequences.

24    **PRESIDING COMMISSIONER WELCH:**  Okay.  All

25    right.  Counsel, you want your turn back?

26    **ATTORNEY MONTGOMERY:**  Can you think of one

27    particular program that was more helpful than

82

1    others in your self-help programs?

2        INMATE MACKEY:  Basically the first one.

3    Well, not the first one, but the Framework For

4    Recovery.  I went in there thinking that, you know,

5    there's a lot of guys in there that were drug

6    addicts and alcoholics.  And I had nothing in

7    common with these people.  And I didn't know what I

8    could get out of that, just kind of like sitting

9    there.  But what I got from it is just about taking

10   a look at yourself, learning, you know, to examine

11   yourself and taking responsibility for your

12   actions, you know, just every little thing, because

13   that's how things like alcohol and drugs sneak up

14   on you, if you're not paying attention.  And that

15   was a main -- the main thing.  Once you start

16   there, (inaudible) you know, once you start taking

17   a look at yourself, anything's possible.

18       ATTORNEY MONTGOMERY:  You also took an anger

19   management course.  Was that beneficial?  Did you

20   learn a lot of things about the techniques and

21   identifying anger?

22       INMATE MACKEY:  Just stop and considering

23   what you're doing, you know, just taking a second

24   to stop, walking away, and thinking about the

25   consequences.

26       ATTORNEY MONTGOMERY:  Okay.  I don't have

27   any further questions.  Thank you, Commissioner.

1      **PRESIDING COMMISSIONER WELCH:**   Okay.    Thank

2      you.   And since the District Attorney is not

3      participating, we'll go to you for a closing

4      statement.

5      ·   **ATTORNEY MONTGOMERY:**   Thank you,

6      Commissioner.   As I mentioned earlier, I would ask

7      the Panel to consider that the psychological

8      evaluation is based in part on the statement that

9      my client gave to the correctional counselor in

10     response to the instruction, please write it down.

11     This is exactly what he did.   He wrote to the

12     psychologist indicating that his detailed

13     description and the interview were the result of

14     his wanting to convey to her the fact that he had,

15     in fact, examined the reasons behind the commitment

16     offense, his actions, and how those events

17     contributed to his thinking and behavior up to and

18     in the commitment offense.   Briefly I want to hit

19     on the self-help programs, because I know you were

20     concerned about that.   You're unable to -- or

21     perhaps my client wasn't perfectly clear in

22     attempting to convey to you that in the self-help

23     groups what they do is they examine, or they assist

24     you in examining your past to make a determination

25     why you behave the way you did in the commitment

26     offense.   And it's a step-by-step process.   And the

27     anger management class, and the Framework For

1    Recovery is pretty much the same.  You've got to go

2    back.  You've got to peel away the layers to arrive

3    at some conclusions and some answers.  And while it

4    is I think human nature for us to want a response

5    to the question why, there will never be a rational

6    explanation for what was an irrational act.

7    According to Title 15, the Board, of course, is

8    required to consider a number of things.  And

9    certainly my client's performance in prison is a

10   consideration that you will take into

11   consideration.  I went back, and I looked at the

12   documentation references by the Deputy

13   Commissioner.  It was pretty benign.  I saw that

14   they recommended that Mr. Mackey participate in

15   some self-help as it became available, and that he

16   upgrade in a vocational program as needed.  But I

17   think it was abundantly clear that my client went

18   beyond -- well beyond that in many ways.  And I

19   think that this Panel would agree that his efforts

20   are significant, particularly at this point in

21   time.  This is his initial hearing.  Many people do

22   not come to the table with this much under their

23   belt at this time.  One of the areas that I look

24   for when I have a client who has committed a

25   homicide, I take a look at what they've done in

26   terms of giving back.  And think the Panel probably

27   does as well, in addition to the other things that

```
 1   Title 15 requires you to consider.  I was not
 2   disappointed in the least.  Laubach tutoring
 3   clearly is a program once somebody is trained and
 4   skilled in that area, it affords them a wonderful
 5   opportunity to give back to some pretty needy
 6   people within the institution in terms of helping
 7   them to strengthen their language skills, their
 8   writing skills.  My client helped people, and he
 9   continues on an informal basis to do that as well.
10   You read the chrono -- Thank you, Commissioner
11   DiNinni, about the inmate that fell in the shower
12   and was covered in blood.  That particular chrono
13   dealt very specifically with that incident, and it
14   provided that my client's alertness and his
15   diligence possibility saved this man's life.  I
16   would have expected that Mr. Mackey would have
17   delved into the whys as they pertain to this crime.
18   And I was not disappointed.  I've had an
19   opportunity to sit down with this man and talk
20   about what he has gotten out of the various
21   programs.  There were a lot to cover today, and
22   there weren't a lot of questions asked about them,
23   but he certainly has an abundance of programs.
24   That included six months of AA, the Framework For
25   Recovery.  That was a 12-session program.
26   Understanding your feelings, 15 sessions, House of
27   Healing program.  That includes anger management
```

1    and improving coping skills, dealing effectively
2    also with shame, guilt, and forgiveness.  He's
3    graduated from the Tier One, the Tier Two program,
4    Great Truths of the Bible, completed communication
5    styles and skills, Four Agreements, a personal
6    development course in '01, and advanced parenting
7    in '02.  Also Taking the Limits Off Life, that was
8    a 12-week program and one that I'm not particularly
9    familiar with.  But I am familiar with one that
10   followed, which was a 17-week program called
11   Supernatural Ministries, and a 15-week course
12   called Breaking the Cycle.  Many of those, of
13   course, were spiritual in nature and overseen by
14   Pastor Barnham.  The most recent group, Purpose
15   Drive Life, and that was a 42-hour session program,
16   pretty extensive.  I asked Mr. Mackey about his
17   involvement in these particular programs, and I
18   came away with the sense that this is somebody that
19   entered these programs honestly and wanted to learn
20   about himself.  He shared some revealing thoughts
21   about himself as a result of his participation in
22   these groups, too, and I'd like to share some of
23   those with you.  In the Framework For Recovery
24   program he called that an eye opener.  It forced
25   him to ask very painful questions of himself.  The
26   parenting program helped him to examine his own
27   life and how his upbringing shaped his future.

1    This is what he was sharing with you earlier.  He
2    recognized that while he and his siblings were
3    never encouraged to open up, obviously the
4    consequences can be very, very harmful as emotions
5    are bottled up and is never dealt with or worked
6    through.  In the anger management program, he
7    learned that some of his own anger was actually
8    directed at himself.  He learned of new techniques
9    of addressing anger and facing it so that it does
10   not go unaddressed and it does not become
11   unmanageable.  From his involvement in these
12   programs, he has learned to open up and
13   communicate.  It has also shown him the need to
14   contemplate the consequences of his actions and to
15   ask himself who would be effected by each and every
16   decision that he makes.  As you know, academically,
17   my client has a bachelor's degree.  He has
18   continued to pursue his education.  We have the
19   paralegal course that he completed in '04.  I don't
20   recall if you did mention this, Commissioner
21   DiNinni, but in January of this year, he also began
22   to work towards a graduate degree in humanities.
23   The Domingas Hills College offers a wonderful
24   correspondence program that a lot of the lifers
25   have taken advantage of.  He's holding a clerks
26   position, and you've heard me say this before, but
27   clearly those individuals that are assigned clerk

1    positions are given that assignment because of the
2    fact that they've proven themselves to be reliable
3    and dependable within the institution.  They're
4    provided, or exposed rather to a lot of sensitive
5    information, and not just anybody can take on such
6    a position.  He's been acknowledged by staff for
7    efforts that demonstrate that he goes the extra
8    mile in his assignment. The recreation therapist
9    provided that his efforts at designing and
10   implementing a new system for the tracking of the
11   EOP inmates, which has proven to be a difficult
12   thing here, was all done while he was conducting
13   his regular job duties.  They also indicate that
14   that has made him an asset to the mental health
15   program.  She believes that he would also be an
16   asset to the community when he paroles.  In terms
17   of disciplinaries, the Board has discussed the one
18   in the file.  The author of that 115 indicated that
19   the conduct was, in fact, consistent with
20   horseplay, and that's exactly what they received
21   the write-up for.  I would add for the record this
22   was an administrative 115.  This is clearly an
23   exceptional record and one that -- I'm always
24   pleased to represent a client when they can come to
25   the Board without any 115s, without any 128s.  He's
26   been able to provide me with what I believe is a
27   good record.  The psychologist this year indicates

1    that he is a high functioning individual in this

2    setting.  She also notes that there's other

3    significant criteria that the Board examines in

4    assessing suitability, no juvenile record and no

5    substance abuse history.  That's huge, because

6    probably 90 percent of the cases before you, that's

7    exactly what you see in terms of histories.  I do

8    take issue with the psychological evaluation that

9    was prepared by Dr. Mahoney.  And I'll tell you

10   why.  While she does offer there's no diagnosis

11   under Axis I or II, that's certainly favorable, as

12   well as the Global Assessment of Functioning.  But

13   she takes issue with my client's version of the

14   commitment offense.  And I take issue with her

15   conclusions.  She provides that he poses a moderate

16   risk if he is released and relies upon his

17   statement for a basis of that conclusion.  I would

18   expect that a psychologist would acknowledge, or at

19   least enquire of my client's efforts that are

20   encouraged in the self-help and therapy groups when

21   it comes to facing and delving into one's past to

22   help determine the reason behind one's conduct in

23   the commitment offense.  I saw absolutely no

24   reference to those efforts, other than a benign

25   list of his accomplishments.  Granted, there are

26   many.  But without outlining them or discussing

27   them, she offers little.  Instead, she indicates

1    the he poses a moderate risk if he is released, and
2    her belief that he displays an inability to take
3    full responsibility for the crime. Those
4    conclusions do not have a foundation. And I would
5    ask the Board to consider that she knew that
6    Mr. Mackey had turned himself in to the
7    authorities. That's in the file. She apparently
8    gave no weight to the fact that he accepted a plea
9    and cooperated immensely with the authorities in a
10   separate prosecution that was associated with his
11   case. And also missing from her report, which I
12   think is very telling, is reference to the
13   Probation Report where on page eight it is stated
14   that Mackey believes he is to blame for Lawrence
15   Carnegie's death, and that he believes he was a
16   catalyst for this murder. If Dr. Mahoney believes
17   that a true risk existed, I find it particularly
18   odd that she specifically stated she had no
19   treatment recommendations for Mr. Mackey. I found
20   it also troublesome that she had the previous
21   report before her, dates back to 1993. Dr. Martin
22   prepared that. He concluded that my client was
23   somewhat vague about the causative factors of his
24   commitment offense. But since that particular
25   report, my client has completed no less than 12
26   different programs, which focused on addressing
27   causative factors. They've been huge. These

1    programs had been huge in his life.  And yet none

2    were discussed with him by Dr. Mahoney to ascertain

3    what he might have acquired.  This report is the

4    exact kind of conclusion that you have been

5    encouraged to disregard by the (indiscernible) task

6    force.  And instead you are urged to consider the

7    other reliable information before you in arriving

8    at your decision.  Finally, the parole plans, I

9    don't think I could have presented better parole

10   plans, a place to live in San Joaquin County, as

11   well as two job offers.  While he has training for

12   refrigeration and air conditioning, which by the

13   way he completed that trade at his first hearing,

14   his initial, many people don't often get a job

15   offer in the area that they're skilled.  Still he

16   has two job offers.  He has people that have

17   written on his behalf, and there's a strong

18   indication that these people will continue to

19   assist him in his transition in the community.  In

20   closing, Mr. Mackey was offered a plea by the

21   District Attorney of San Joaquin County.  It was

22   accepted by Mr. Mackey, and it was accepted by the

23   court.  Mr. Mackey would have proceeded to trial if

24   this plea agreement had not been offered.  And the

25   plea in no uncertain terms provides that the DA

26   recommends that the Board release Mr. Mackey at the

27   earliest possible time upon having served the

1  minimum sentence for first-degree murder.  The MEPD

2  has been established at January 29th of '06.  This

3  contract, which was signed by the District

4  Attorney, John Phillips, and signed by Mr. Mackey

5  and his counsel was also acknowledged by the

6  Board's then executive officer.  While this

7  particular hearing is administrative in nature, it

8  is also a continuation of the criminal process.

9  And as such I am respectfully requesting this Panel

10  to honor that agreement and set a release date at

11  this time.  And with that I will submit.

12  **PRESIDING COMMISSIONER WELCH:**  Thank you for

13  your comments, Ms. Montgomery.  At this time,

14  Mr. Mackey, you can make a closing statement, or

15  you can let your attorney's statement be your

16  closing statement.

17  **INMATE MACKEY:**  I'll let her statement be my

18  closing statement.

19  **PRESIDING COMMISSIONER WELCH:**  Okay.  Then

20  we'll go to victim impact statements.

21  **DEPUTY DISTRICT ATTORNEY BLANSETT:**

22  Mr. Commissioner, if I may just for a moment, I'm

23  not going to make any statement whatsoever contrary

24  to the negotiations that were reached between

25  Mr. Hintz and Mr. Phillips, but there are some

26  misrepresentation.  And I'm sure it's based upon

27  the stated facts as Counsel understands it that

1   have been made to this Board that I think are very

2   important.  One is that this was not a contract

3   that was meant to bind in any way any commission

4   regarding how they saw Mr. Mackey and --

5        **PRESIDING COMMISSIONER WELCH:**  And we

6   thoroughly understand that.

7        **DEPUTY DISTRICT ATTORNEY BLANSETT:**  Pardon?

8        **PRESIDING COMMISSIONER WELCH:**  We thoroughly

9   understand that.

10        **DEPUTY DISTRICT ATTORNEY BLANSETT:**  Okay.

11        **PRESIDING COMMISSIONER WELCH:**  The District

12   Attorney cannot bound the Board.

13        **DEPUTY DISTRICT ATTORNEY BLANSETT:**  And that

14   never, never the intent of the negotiations to bind

15   --

16        **PRESIDING COMMISSIONER WELCH:**  We understand

17   that.

18        **DEPUTY DISTRICT ATTORNEY BLANSETT:**  The

19   other thing that Counsel made reference to, and

20   that is that Mr. Mackey turned himself in.  That

21   was not the stated facts.

22        **PRESIDING COMMISSIONER WELCH:**  Now we're

23   getting into an area where -- Hold on Counsel.

24   We're getting into an area -- normally if the

25   District Attorney is going to make comments, it's

26   before Counsel speaks.  And then afterward Counsel

27   can address any issues that she might address.

94

1        DEPUTY DISTRICT ATTORNEY BLANSETT:  I agree

2   with the Commissioner.  The only reason I spoke up

3   was because what I perceived to be information

4   being presented to the Commission that was not the

5   true stated offense.

6        PRESIDING COMMISSIONER WELCH:  Well, let me

7   ask you this.

8        DEPUTY DISTRICT ATTORNEY BLANSETT:  Yeah.

9        PRESIDING COMMISSIONER WELCH:  Do you want

10  to make a closing statement?

11       DEPUTY DISTRICT ATTORNEY BLANSETT:  Not

12  contrary to the negations that were made in the

13  case.

14       PRESIDING COMMISSIONER WELCH:  Let's do

15  this.  I'll let you speak, and I'll give Counsel

16  her turn back.

17       DEPUTY DISTRICT ATTORNEY BLANSETT:  That'd

18  be fine.

19       PRESIDING COMMISSIONER WELCH:  Okay.

20       DEPUTY DISTRICT ATTORNEY BLANSETT:  There

21  were -- Actually, the three important areas, I've

22  covered one, and the Commissioner appears to

23  understand the state of the negotiations.  In

24  regards to Mr. Mackey, Mr. Mackey did not turn

25  himself in to authorities in the sense that he

26  found out they were investigating him, and

27  therefore, turned himself in.  He actually was

1    brought in for questioning.  He made a statement,

2    initial statement that implicated himself in the

3    murder as an accessory, which used to be called an

4    accessory before the fact.  Now it's a principle in

5    the commission of the murder, but denied any

6    involvement in the actual murder.  Mr. Mackey then

7    agreed to cooperate with law enforcement.  And

8    having a wire attached to his body, he went in to

9    Mr. Blatt's office with the idea that he was going

10   to get Mr. Blatt to implicate himself in the

11   murder.  But what Mr. Mackey did, unfortunately,

12   was to alert Mr. Blatt to the fact that he was

13   wired, which caused Mr. Blatt then not to implicate

14   himself, plus not to implicate Mr. Mackey any

15   further than Mr. Mackey had already implicated

16   himself.  Mr. Mackey at that point then after he

17   did that, went to a local attorney, Bud Marks, who

18   then called me up and said that Mr. Mackey now

19   wanted to turn himself back in and cooperate fully

20   with us.  And at that point, Mr. Mackey then was

21   taken into custody.  So in that sense, he did turn

22   himself in at that point, but that didn't consider

23   the activities that occurred before that time.

24           PRESIDING COMMISSIONER WELCH:  Okay.

25           DEPUTY DISTRICT ATTORNEY BLANSETT:  The

26   other issue, which to me is an important one in

27   terms of correcting the facts, and I would say

1    this, I worked with James Mackey, probably spent

2    more time with James Mackey than any male ever

3    spent with him in his entire life, probably

4    unfortunately including his own father.  I got to

5    know him very well.  He gave me a full statement of

6    the entire case.  Mr. Mackey's statement to me was

7    that he went back to the trunk.  That he took the

8    rope, and that he aided in the strangulation of

9    Larry Carnegie.  When he testified at trial, he

10   testified that he went back there, took the rope,

11   and then went back to the car.  So I was very

12   disappointed when I read his statement in the

13   material that was presented to me, because that's

14   not what the state of the evidence was either to

15   me, or as presented at trial by he and Carl

16   Hancock.  So those are the three areas I felt the

17   Commission needed some clarification.  But again,

18   that's not in any way to go back on the deal that

19   Mr. Phillips made.  They're merely to clarify those

20   areas for the Commission.

21          **PRESIDING COMMISSIONER WELCH:**  Okay.  You

22   know, and pursuant to Penal Code 3204, the District

23   Attorney have a right to appear.  And whatever

24   grievance that the District Attorney's office may

25   or may not make, as far as I'm concerned, it's not

26   -- it's between the District Attorney and the

27   inmate.  But, however, in the interest of hearing

1    this, I will give Counsel her turn back --

2         **DEPUTY DISTRICT ATTORNEY BLANSETT:**  Yes.

3         **PRESIDING COMMISSIONER WELCH:**   -- to

4    addendum her closing statement.

5         **ATTORNEY MONTGOMERY:**  Thank you.  The

6    District Attorney wants to suggest I made

7    misrepresentation.  My client has provided his

8    version of the commitment offense.  And I believe

9    it is on page four where he does make reference to

10   having turned himself in.  If we're arguing

11   semantics here, be that as it may, he did

12   ultimately turn himself in.  He believes that this

13   is -- he says this is not a contract.  Well, I've

14   got a separate piece of paper that says contract

15   right here at the top of it.  And it's abundantly

16   clear what the District Attorney's office was in

17   this particular case.  And I would also submit to

18   the Panel this was, in fact, a plea and an

19   agreement that was accepted by the court.  And we

20   are all bound by the court's decision in this

21   matter.  I believe we are also bound by this

22   agreement.

23        **PRESIDING COMMISSIONER WELCH:**  Okay.  Thank

24   you very much, Counsel.  And you have no closing

25   statement, since I gave everyone else their chance

26   back?

27        **INMATE MACKEY:**  Mr. Blansett said that I

1    didn't turn myself in.  I was sitting at home when

2    I spoke to my attorney.  And he said, well, James,

3    you can run, or you can turn yourself in.  He said,

4    if you want to turn yourself in, come over, I'll

5    drive you down to the station.  And that's what we

6    did.

7         PRESIDING COMMISSIONER WELCH:  Okay.

8    Anything else?

9         INMATE MACKEY:  That's all I have.

10        PRESIDING COMMISSIONER WELCH:  Okay.  At

11   this time we'll go to victim impact statements.

12   Who will be making the first victim impact

13   statement?

14        MS. K. CARNEGIE:  Karen Carnegie.

15        PRESIDING COMMISSIONER WELCH:  Will you

16   state -- Well, you already stated your name.  Just

17   go ahead and make your statement.

18        MS. K. CARNEGIE:  Okay.  I first met Larry

19   when I was 22, and it was at a real estate seminar,

20   and I was working with my parents in Modesto.  And

21   Larry had so much going for him.  He graduated from

22   UOP pharmacy school.  He was athletic.  He had a

23   lot of friends, and he was a hard worker.  And

24   after we met, we always went to church together.

25   Our honeymoon was a trip around the world, and we

26   were gone almost three months.  And when we came

27   home, I didn't think I could adjust to time apart

1  from him.  We were best friends, and we wanted to
2  work together and be together all the time.  We
3  owned a real estate office together.  And before we
4  had any children, we opened our home to foreign
5  exchange students.  And from that experience I saw
6  that Larry was an excellent father.  When we did
7  have children, we had three daughters, and they're
8  all two years apart.  And we planned to have four,
9  but in 1988 we both decided that four was not
10  enough, and we decided that we wanted six children.
11  We always planned and we dreamed our future.  My
12  parents have been married over 50 years, and
13  Larry's parents are married more than 50 years.  We
14  had a wonderful, faithful marriage, and he was
15  truly my best friend.  James Mackey planned and
16  executed the murder without ever knowing Larry.
17  James Mackey had plenty of time to think it over
18  and decide not to do such a horrible thing as
19  murder, which has permanent and lasting
20  consequences.  He weaved such a web of deceit that
21  two juries could not unanimously agree.  He has
22  been in prison for 16 years, and so have I.  My
23  mind goes on as long as I live, when I'm awake and
24  when I'm asleep.  Our children have suffered
25  terribly.  Telling my soon-to-be five-year-old
26  daughter that her father was dead was like a
27  matador thrusting the blade into the bull's neck.

100

1  My words caused her little head to fall.  I'll

2  never forget the anguish and then the depression

3  that besieged our family.  Two of our children are

4  plagued with emotional problems directly related to

5  the murder.  They have anxiety and feelings of

6  abandonment.  One is in therapy, and the other one

7  should be, and not to mention all the growing up

8  years without their father to see their school

9  activities, their sports, the holidays.  And I've

10  been so busy working to support them, my children,

11  in the last five years I added a second job to pay

12  for their college.  What James Mackey did has

13  caused us unspeakable grief, and he did it

14  willingly and of his own free will with much

15  forethought and planning.  It was no accident, and

16  it was not a crime of passion.  It was a cold-

17  blooded, calculated murder, the most serious crime.

18       **PRESIDING COMMISSIONER WELCH:**  Thank you.

19  Thank you for your comments.  Who's the next person

20  that's going to speak?

21       **MR. CARNEGIE:**  Tom Carnegie.

22       **PRESIDING COMMISSIONER WELCH:**  What's your

23  name, sir?

24       **MR. CARNEGIE:**  Tom Carnegie.

25       **PRESIDING COMMISSIONER WELCH:**  Okay.  Now

26  proceed.

27       **MR. CARNEGIE:**  My name is Tom Carnegie.  I'm

1    Larry's older brother.  We were roommates and

2    playmates for 18 years.  We played badminton and

3    baseball in the back yard, countless hours of

4    Checkers and Monopoly indoors.  We attended the

5    same parochial schools.  We were both active in boy

6    scouts and little league baseball.  Dad was always

7    assistant scoutmaster or scoutmaster or assistant

8    manager or a manager.  Dad was an auto mechanic who

9    instilled in us an ethic to work hard for what you

10   want.  I went to EOP pharmacy school, graduating in

11   1972, and Larry followed after his military service

12   and graduated from EOP pharmacy school in 1977.

13   While in pharmacy school, Larry met a classmate who

14   was selling real estate.  Larry kind of took it up

15   as a sideline.  He worked for (indiscernible) and

16   when he graduated, he worked at a pharmacy and the

17   real estate, eventually meeting Karen and getting

18   involved through the reality.  Karen and Larry were

19   married.  They had three children, owned their own

20   business, owned a nice home, and they earned it all

21   on their own hard work they had to achieve to get

22   there.  This all changed when a lying cheater,

23   Mr. Mackey, motivated by greed and personal gain,

24   personal recognition, brought the holocaust to our

25   family.  The perpetrator was James Mackey.  The

26   crime was heinous, repulsive, planned.  The result

27   of the holocaust -- or this holocaust was terrible

1   devastation.  My dad was a man of purpose and

2   pride.  Eight years in the army and navy from 1937

3   to 1945 guided him.  He survived a lot of battled

4   and outlived a lot of men who died around him.  Dad

5   was never the same after this.  He never said

6   anything was wrong.  He just no longer had a spring

7   in his step.  I've only seen my dad cry once, at

8   (inaudible).  I saw him cry a second time when he

9   handed me the apology letter from James Mackey.

10  James, you sent my dad --

11         **PRESIDING COMMISSIONER WELCH:**  Excuse me,

12  sir.  Hold on.  No.  You (inaudible).  We'll give

13  you the opportunity to finish your letter, but you

14  have to address the Panel, not the inmate.

15         **MR. CARNEGIE:**  I'm sorry.

16         **PRESIDING COMMISSIONER WELCH:**  Okay.

17         **MR. CARNEGIE:**  I read the letter, and dad

18  asked -- He handed me this apology letter which

19  James had written.  I read the letter, and my dad

20  asked, why would someone write this crap.  I said

21  someone, an attorney or an inmate advocate, told

22  him it would look good in his file.  When dad says,

23  he says he would not have killed Larry if he knew

24  he had three children.  And I said, well, Dad, he

25  knew he had three children because they've met.

26  And what he didn't say was he would have killed

27  somebody with no children.  Dad said, well, you're

1   right.  I said the only thing he's sorry for, Dad,
2   is he's sorry his luck is so bad that he got
3   caught.  Somebody drove into the crime scene.  That
4   upset the apple cart.  There were actually two,
5   another homicide planned.  There would have been
6   two deaths.  Adrian Farley who is here today was on
7   that hit list, not just Larry.  If that lady hadn't
8   driven into the crime scene, John Farley would be
9   dead also and maybe someone else, too, because
10  success breeds success.  I told dad to notice that
11  he wouldn't -- that he never said he would not kill
12  anyone.  My dad asked, what does this mean.  Why
13  would he write this.  I said, well, it means he's
14  washed his hands of it, Dad.  He's sorry, and
15  you're going to have to get over it, because you're
16  not to blame because you can't forgive him.  He's
17  (indiscernible) his guilt.  It's your fault, Dad,
18  not his.  He feels better now.  So touch shit, Dad.
19  My dad passed away a tormented man.
20  (Indiscernible) step.  And I can't even put into
21  words the damage done.  Karen and the girls
22  struggled terribly.  And I remember Renee, age
23  three at the time, and we were at the house.  This
24  was probably just a few days after this holocaust.
25  Karen had just spoken to the girls.  This was
26  probably after a couple days when finally there had
27  to do some sort of announcement as to why -- where

1   Larry wasn't.  And Renee, age three at the time,

2   walks into the living room full of adults and

3   announcing to all of us -- There was probably 10 or

4   12 in the room, announcing to us, my daddy's gone

5   away.  My daddy is dead.  My daddy is never coming

6   back.  There were --

7        PRESIDING COMMISSIONER WELCH:  Would you

8   like a short break, sir, --

9        MR. CARNEGIE:  No.

10        PRESIDING COMMISSIONER WELCH:  -- to

11   recompose yourself?

12        MR. CARNEGIE:  No.  There were 10 or 12

13   adults in the room.  And there was just

14   simultaneously choking back of the tears.  Another

15   adult, usually a relative, had to stay with Karen

16   for many months.  Karen just lived in fear until

17   the trial kind of moved a little bit forward.  She

18   moved three or four times, each time installing

19   expensive alarm systems out of fear, living in

20   fear.  Karen eventually gave up her reality and

21   entire client list, you know, real estate, and had

22   moved to where her parents lived who could provide

23   the additional support.  And the saddest part of

24   this is three kids were robbed of a very loving

25   father.  At Andrea's high school graduation, Larry

26   -- I thought about Larry.  And what I thought about

27   was that he could actually -- he could see it.  But

```
 1   I couldn't see the pride in his eyes.  James Mackey
 2   made all the free choices in the satanic acts that
 3   he performed.   These choices did not bother him.
 4   He responds by shifting the blame to others.
 5   (Indiscernible).  He purchased the weapon,
 6   (indiscernible) pulled the trigger, beat the
 7   victim.  On the autopsy report, page four, it says,
 8   Larry has no cuts or scratches.  (Inaudible) on his
 9   hands, forearms, or arms (inaudible), none.  Do you
10   know what that means, because he got beaten up.
11   His face had a convoluted fracture in the nose and
12   the jaw.  Do you know what that means.  Larry
13   couldn't get his hands up to defend himself.  He
14   beat the shit out of a guy who couldn't defend
15   himself.  James Mackey lied to us -- Well, let's
16   see.  James beat the victim, drove the get-away
17   car, and pulled on the end of the rope.  James
18   Mackey lied to his wife.  He married her because he
19   was a lowlife gold digger.  Lied to his pregnant
20   wife when quizzed about the crime and where he was.
21   He lied to his wife when he flew to Mexico with his
22   girlfriend a few days later.  He lied to the DA for
23   the plea bargain.  And it's just lies, lies, lies.
24   These lies allowed another co-conspirator to go
25   free.  The lies cost the taxpayers of California
26   millions of dollars in legal fees.  These lies
27   increased the pain for the survivor.  This crime
```

1    should have resulted in Mr. Mackey's execution.   In

2    fact, after 15 years on death row, today we could

3    be enjoying watching him, knowing that he would be

4    on his way to hell.   James could not have been

5    executed enough times, slowly enough to begin to

6    retribute his crimes and damages.   He's intently

7    motivated by his personal gain and will stop at

8    nothing to achieve that.   He can never be released

9    beyond these walls.   These prison walls separate

10   those instilled with goodness on the outside from

11   those filled with evil and coldness of Satan.

12   These walls, like the Great Wall of China, keep the

13   predators out, the Huns, the Mongols, etceteras,

14   from killing everybody.   Now they are corralled in

15   this institution.   There's a story, and it was

16   (indiscernible) about an airplane crash not 10

17   years ago.   These two computer geeks working one

18   Sunday morning at 6:30 in the morning at the end of

19   a runway in one of the buildings.   Near planes are

20   taking off.   And we hear the engines going.   And

21   all of a sudden one of the engines kind of revs and

22   it quits.   And then they here a horrific crash.

23   And the two geeks look up from their work where

24   they are, and look outside, and this plane is on

25   fire about 100 years away up the runway.   There was

26   nobody around, no one to help.   The two guys look

27   at that, the grab their jackets and blankets, and

1    they run across the runway because they could see a

2    guy sitting inside that cockpit.  They crawl like

3    lizards up to plane, help the guy unbuckle his

4    seatbelt because he was holding his own weight

5.   there, got him out of there, got about 100 yards --

6    I mean 100 feet from the plane.  The plane explodes

7    into flames.  And he would have been killed.  And

8    they're showered with all of the debris and

9    everything.  And they miraculously only received

10   like second-degree burns.  The two geeks were

11   interviewed by the newspaper afterwards and asked

12   them, why did you do that, because it was so

13   dangerous.  And he said, we couldn't stand and

14   watch him die.  We couldn't stand there and watch

15   him die.  That's why there's these walls.  The

16   people in this institution here are different than

17   the people outside the institution.  The people

18   outside love life.  The people on the inside don't

19   give a damn.

20        PRESIDING COMMISSIONER WELCH:  Okay.  Is

21   there another -- Is there someone else?

22        MS. B. CARNEGIE:  Yes.

23        PRESIDING COMMISSIONER WELCH:  Okay.

24        MS. B. CARNEGIE:  There's also a videotape.

25        PRESIDING COMMISSIONER WELCH:  We have the

26   videotape.  We need your statement at this time.

27        [Thereupon, the tape was turned over.]

108

1              DEPUTY COMMISSIONER DININNI:  Back on the

2   record.

3              PRESIDING COMMISSIONER WELCH:  Just state

4   your name and go ahead and make your statement.

5              MS. B. CARNEGIE:  My name is Barbara

6   Carnegie, and I'm the sister of Larry.  You ought

7   to know what he looks like, a beautiful young man

8   who didn't deserve this.  I also have two letters

9   that I was told to hand delivery to you.  One is

10  from Dario Farmer, assembly majority leader, and

11  one is from the mayor of Burbank in opposition of

12  any parole.

13             ATTORNEY MONTGOMERY:  And I would object.

14  I've not been provided with copies of these letters

15  pursuant to the 10-day rule.

16             PRESIDING COMMISSIONER WELCH:  Okay.  I'll

17  get you copies of it.

18             MS. B. CARNEGIE:  James Mackey is a total

19  freakish monster.  He is a true Jekyll and Hyde

20  personality.  To some people in his life, like

21  apparently many of the people in this prison, he's

22  charming, personable, helpful, what a great guy.

23  But to my brother and a slew of others that he left

24  in the dust, he's an opportunist, a liar, a

25  manipulator, calculating murderer, an ambusher, a

26  leader and recruiter of a death squad.  He is a

27  cold, callous, evil sociopath.  The brutal murder

1   of my brother was no accident, no fluke, no

2   mistake, no little error of judgment, no it

3   happened so fast kind of thing, no well, I didn't

4   know what I was doing kind of thing, no I was

5   manipulated into it kind of thing.  It involved

6   months of planning, calculation, recruiting people,

7   months of plotting to determine what weapon to use

8   and where to dispose of the body, months of

9   practicing with the weapon, months of lies to

10  virtually everyone in his life, months of

11  salivating over what his reward would be from his

12  great rich hope Michael Blatt.  All of it was

13  orchestrated, directed, and master-planned by James

14  Mackey, not Michael Blatt.  James Mackey.  It was

15  an intentional, deliberate act.  It was exactly

16  what he intended to accomplish, except for getting

17  caught.  And he wasn't planning just one murder.

18  As my brother said, he was planning two at the same

19  time.  This was one of the most heinous types of

20  murder that could ever occur.  Larry was a

21  completely innocent victim.  He didn't know James

22  Mackey.  And James Mackey really didn't know him,

23  other than seeing him in the office.  But they

24  didn't know each other as people.  Larry didn't do

25  anything to James Mackey.  Larry didn't do anything

26  to Michael Blatt.  All he was trying to do was get

27  the real estate commissions owed to him.  Everybody

1  wants to get paid for their work.  Larry's a
2  regular guy, just like you guys, doing his job,
3  working hard, trying to make a living, trying to
4  enjoy his three beautiful little kids.  Yet he was
5  stalked, lured, ambushed, beaten, double killed,
6  and tossed on a trash heap by this disgusting,
7  blood-on-his-hands psycho.  I've read his version
8  of the crime that he wrote in preparation for this
9  hearing.  And it's an offensive pile of rot, not
10  unlike himself.  However, it shows his true inner
11  pathological self, because he artfully uses all the
12  same creepy traits that he's used all his life in
13  trying to manipulate you to get what he wants,
14  which is to get out of this prison.  So I'm going
15  to briefly go through it.  First of all, the whole
16  tone of the statement is poor me.  I was done wrong
17  by my great rich hope.  But Mackey clearly states
18  many people warned me to be careful of Blatt, that
19  he was a user.  He offered me a job, which I
20  declined, because I had seen the way he treated
21  people.  He knew it.  Mackey, unlike my brother,
22  was forewarned that Blatt used and treated people
23  badly.  A normal person would have heeded those
24  warnings and stayed away from Blatt.  But Mackey
25  had enormous ambition.  And this is something that
26  I noticed he didn't state here.  You know, why did
27  you do this.  My ambition.  I didn't want to work.

1    I wanted what Blatt had, but I didn't want to have
2    to work for it.  It was way in excess of his actual
3    talent and morality.  He saw Blatt as a way to
4    achieve his own ambitions.  So he explored Blatt
5    for his benefit.  He cozied up to Blatt, so he
6    could use Blatt.  He states, "After graduating, I
7    was feeling totally lost, so I married my
8    girlfriend."  He had a free scholarship, which my
9    brothers paid for on their own.  He had a free
10   scholarship to one of the most elite universities
11   in the world.  He was among the top 10 percent of
12   the people in the whole world.  Normal graduates
13   they interviewed, get an entry-level job, they
14   work, work, work their way up the ladder. Not him.
15   He was, I was feeling lost.  He was plotting,
16   planning, calculating how he could get rich and not
17   have to work for it.  That's why he married his
18   first wife Sharon Gabber, the daughter of a wealthy
19   family.  He didn't love her.  He states in one of
20   the reports, well, her mother died just before I
21   was going to break up with her.  Well, so I married
22   her.  It wasn't because her mother died that he
23   married Sharon, it was because of Sharon's money.
24   He had many girlfriends during this marriage.  He
25   didn't care about the child she was carrying at the
26   time of the murder.  I think she was five or six
27   months pregnant.  He exploited her and her money

1    and then left her in the dust.  He later says, "My
2    wife inherited some money, so I went to Blatt for
3    advice.  This is the same Blatt that used people.
4    So he goes to this guy that uses people, that
5    people had warned him about, and he goes and asks
6    him for advice.  Where other people would have run,
7    he cozies up to them.  It wasn't Blatt cozying up
8    to Mackey.  Blatt wasn't searching Mackey out.  It
9    was Mackey searching Blatt.  Blatt had the money.
10   Blatt had the stuff that Mackey wanted.  So now
11   Mackey's going to get this incredible deal from the
12   guy that so many people had warned him about.  And
13   they're going to play a little game with the price,
14   so that Mackey can buy this condo.  And Mackey
15   knows all about Blatt's reputation.  And as a
16   licensed real estate agent, Mackey knows that this
17   financial chicanery is wrong.  But he doesn't care.
18   It shows the lengths he's willing to go to succeed
19   without really trying.  I mean his own real estate
20   career was an abject failure.  He made his biggest
21   commission off the sale of his own house, a house
22   paid for with Sharon Gabber's money.  He talks of
23   approaching several banks about loans for this
24   condo.  He doesn't tell you that he lied on every
25   application, every document he ever filled out
26   about his income.
27        **ATTORNEY MONTGOMERY:**  I'm going to object,

1    Commissioner.  Those are facts not in evidence.
2    This is information -- the individual speaking is
3    not under oath.  The Board is required to consider
4    reliable and relevant information, and that is
5    neither reliable or relevant.
6        **MS. B. CARNEGIE:**  The defense attorney --
7        **PRESIDING COMMISSIONER WELCH:**  Okay.  Hold
8    on just a second, ma'am.  I have to rule on the
9    attorney's objection.  I'm going to overrule your
10   objection, because the Board is totally capable of
11   deciphering through what's presented at the
12   hearing, and we will make a discrimination as to
13   the weight that we will give any given amount of
14   information that's given.  So we're going to
15   overrule your objection.  And now will you please
16   proceed.
17       **MS. B. CARNEGIE:**  Okay.  So following from
18   that, the defense attorneys at the Blatt trial had
19   a field day pulling out document after document in
20   which Mackey lied under penalty of perjury.  That
21   was their whole defense.  You can't believe this
22   guy, because look at this lie.  Look at this lie.
23   Look at this lie.  Look at this lie.  I don't have
24   the documents to be able to read it to you.
25   Perhaps Mr. Blansett can.  But that was the whole
26   point of their defense.  Their whole defense was
27   the guy is a big liar.  And that is in evidence.

1   Maybe not here, but it's in evidence in the trial

2   documents.  He states,

3           "I finally said the words Blatt had

4           been waiting for.  I wanted Blatt to

5           believe that I was dependable,

6           someone who got things done.  But I

7           was too naïve to recognize the smile

8           of satisfaction on his face, but I

9           see it clearly now."

10  This is all part of the, it wasn't my fault.  It

11  was Blatt's fault.  And oh, by the way, it was

12  Larry's fault, too, because I couldn't buy that

13  condo because of Larry.  Since Mackey seems to have

14  known that Blatt was waiting for some magic words

15  to be said, and Mackey seems to have known what

16  those magic words were, then Mackey knew just what

17  kind of person he was dealing with.  He continued

18  to have contact with Blatt despite all the

19  warnings.  Mackey went in with his eyes wide open

20  and mouth salivating.  He saw the opportunity to

21  score with Michael Blatt and be handsomely rewarded

22  for it.  Mackey jumped at this opportunity.  He

23  never ever backed away.  He was going to get his

24  condo, and he was going to get to blackmail Blatt

25  for the rest of Blatt's life.  Throughout all of

26  this, Mackey is in total control of his destiny.

27  He's not being threatened.  He's not being

1    tortured.  He's not being provoked in any manner.

2    So at this point he starts, of his own accord,

3    thinking and plotting to put together his little

4    death squad, because he doesn't want to get his

5    hands dirty, because he wants to be Michael Blatt.

6    He wants to be the big cheese.  So he recruits Carl

7    Hancock, his supposedly good friend and tells that

8    he'll pay him 15,000 dollars.  This is Mackey

9    plotting and calculating.  Blatt never said what he

10   was going to pay Mackey.  This is a number Mackey

11   chose that was large enough to lure Carl to get him

12   to do this.  Mackey's trying to get Carl to do the

13   dirty work.  It's Mackey that plans the murder.

14   Mackey that thinks about the entire process,

15   calculated, well, where can we do this so there's

16   no witnesses, and finds this little farmhouse out

17   in the deserted area of Lodi with no lights anyway.

18   Mackey that thinks, well, what kind of weapon.

19   Well, I need something silent.  He tries -- He

20   doesn't tell you, he tries to buy a silencer, but

21   he couldn't get it.  So then he settles for the

22   crossbow.  And then, well, why not buy it in

23   Stockton.  No, I'll go buy it in Modesto because

24   the further away I am, they won't remember me.

25   Always he -- And then he's, well, I never used a

26   crossbow, so I better go practice.  So he's always

27   thinking, thinking, thinking.  There's many ways to

116

1    kill a person, but he, Mackey, thought out all the
2    angles himself.  Mackey makes out later like, oh, I
3    was scared.  I was scared at the murder site that
4    Blatt would be upset that it wasn't done, and that
5    Blatt would get someone else to do it.  So what.
6    Mackey's such a master liar.  He lied to everyone
7    in his life.  He even lied to Blatt about going to
8    Phoenix.  He was supposed to go to Phoenix to
9    supposedly hook up with the people that he hired to
10   murder.  Instead he took the 3,000 dollars and went
11   to Phoenix with his girlfriend to see a basketball
12   game.  He lied.  He could have just told Blatt, you
13   know, I can't find anybody.  But he doesn't want to
14   do that, because the reward is there.  He doesn't
15   want anyone else to get the reward that he's
16   expecting to get from Blatt.  He's not thinking
17   about anybody's life but his own, just his own.  He
18   states that while he laid in ambush, well, I was
19   trying to talk myself out of what I was doing.  I
20   was terrified.  He never told the police that.
21   That's another self-serving lie.  In fact, he told
22   Probation Officer Fernandez, it's on page five of
23   the pre-sentencing report, Mackey became impatient
24   and feared that the murder would not be
25   accomplished.  That's not a guy that's afraid.
26   That's a guy that's like, we've got to get it done.
27   Let's get it done.  Let's get going.  He created

1    the whole situation.  And at any point he could

2    have walked away unscathed.  He states, a car

3    pulled in shining its lights onto the entire sad

4    situation.  You've got to be kidding me.  He

5    created the situation.  He didn't reveal one iota

6    of human compassion for my brother.  Instead, he

7    had the presence of mind to think on the run,

8    because now this car has pulled in the driveway.

9    Now they're not going to be able to drive to Tahoe.

10   And he comes up with an alternate plan for

11   disposing of the body on the run.  Now the really

12   big lie that he didn't -- that he had never pulled

13   the rope.  And we've addressed it with my brother

14   and Mr. Blansett, but I have his exact words at

15   trial.  Sorry.  One second.  Question, "What

16   happened then."  Answer, this is James Mackey at

17   trial,

18        "Carl said he needed help.  So I got

19        out, and I stood next to the car.

20        Carl went around the trunk, and I

21        just stood there.  And he came around

22        to my side of the car and handed me

23        the rope and said, pull.  And he went

24        back around to the trunk, and I

25        pulled."

26   Hancock's testimony.  Hancock's words.  "We put it

27   around --" It meaning rope, "-- around his neck and

1  both of us pulled it."

2      **ATTORNEY MONTGOMERY:**  Again, Commissioner,

3  we don't have any of those documents, and I don't

4  know what the Board is going to do in ascertaining

5  the authenticity and the reliability of the

6  documents relied upon.

7      **PRESIDING COMMISSIONER WELCH:**  And again,

8  Counsel, we will permit the victim's statement --

9  We'll give her latitude.  However, ma'am, we would

10  like for you to go ahead and wrap up your statement

11  if you would, please.

12      **MS. B. CARNEGIE:**  Okay.  That's from the

13  Superior Court reporter's statements.  I have a

14  complete trial document.  That's in the trial

15  document.  And you could have gotten that at any

16  point in time.  All throughout his statement are

17  all latter-day fiction, intended to make poor James

18  look like the victim, to make it look like Larry

19  was the one that hindered him.  To make it -- And

20  even sitting here like James has a conscience.

21  Like well, I really didn't want to do it.  Well, I

22  wasn't much of participant.  All the reluctance,

23  it's all baloney.  He completely admits a

24  description of how much blood, my brother's blood,

25  was all over him, all over the car.  He admits

26  cleaning up the car inside and out, washing Larry's

27  blood off of his freaking body.  Again, for this

1    Board, minimizing his actions. He claims he agreed

2    to cooperate with detectives, but he didn't. He

3    tried to implicate his cousin John Holms instead.

4    He tried to make it appear he was cooperating, but

5    he was trying to save his own hide all along and

6    sabotage efforts to implicate Michael Blatt,

7    because Blatt might reveal it was Mackey who

8    planned and arranged it. He told the psychologist

9    on 11/17/04 in the report that Hancock performed

10   the final strangulation. Not true. That's a lie

11   to the psychologist, as late as four or five months

12   ago. Also he told the psychologist that he was

13   going to pass the murder fee on to Hancock. That's

14   not true. Hancock didn't get anything. Mackey got

15   the money. Mackey got 5,000 of Blatt's money that

16   we know about, three thousand to go to Phoenix, and

17   two thousand to go to Mexico. I noted all the

18   little laudatories in his file. So what. That's

19   no different from his life before he murdered

20   Larry. The little programs. So what. He

21   graduated from college before the murder. The

22   letters from the family. So what. They said the

23   same things before he confessed to the murder. The

24   lying. The (indiscernible), the manipulating,

25   same, same, same, same, same now, same now, same in

26   November, same at this table. The stark ugly truth

27   is that this creepy freak sitting here with his

120

1   smarmy smile murdered my brother with his own

2   hands, got my brother's blood all over him, heard

3   my brother say, help me.  I've been shot.  Looked

4   into my brother's beautiful blue eyes and heard my

5   brother say, you're fucked, and continued unphased,

6   undeterred, unmoved on his merry murdering mission.

7   My brother would be 54 years old today.  You look

8   somewhere about that age, Sir.  You have a lot of

9   life ahead of you.  Well, so did Larry.  James

10  Mackey has no write to live the life he took from

11  Larry.  He forfeited his right to be in decent

12  society.  A sentence of 25 years to life doesn't

13  mean 16 years.  And that contract was ca contract

14  between the District Attorney and Mackey.  It was

15  not a contract for 16 years.  It was a contract to

16  write a letter recommending parole, just that I'll

17  write the letter recommending parole, but not a

18  contract that you get out at 16.  Otherwise, why

19  sentence him to 25 years to life.  Doesn't even

20  make sense.  My brother is the one that got the

21  life sentence six feet under, our whole family.

22  And that is what James Mackey deserves.  He did it.

23  We didn't do it to him.  He did it to us.  I oppose

24  any parole whatsoever for this evil freak.  Thank

25  you for letting me speak.

26        PRESIDING COMMISSIONER WELCH:  Okay.  Thank

27  you.  Okay.  We have a vidotape.  Yes, go ahead.

1    Let's play the videotape for the record, please.

2    Can you turn it up.  Could you start it over again,

3    and turn it up as loud as it can.  Is there any way

4    we can put it up here close to a mike?

5         **DEPUTY COMMISSIONER DININNI:**  Let's see how

6    far it goes.  That's about it.

7         **PRESIDING COMMISSIONER WELCH:**  Is there a

8    long enough cord to set that over here?  All right.

9    Thank you.

10        **[VIDEOTAPE:  MS. R. CARNEGIE]:**  My name is

11   Rita Carnegie.  I'm reading the statement I wrote

12   because I feel too emotional otherwise.  Today's

13   date is Tuesday, February the 15th, 2005.  This

14   statement is regarding the parole hearing scheduled

15   for March 10, 2005, for James Mackey, CDC number

16   E-76532.  However, as I'm now 85 years old, my

17   husband is now deceased, and I don't know if I'll

18   be able to make future statements.  But I direct

19   that this statement be submitted for any hearing

20   whatsoever, including for Carl Hancock and Michael

21   Blatt, having to do with the vicious killing of my

22   son Lawrence John Carnegie who was murdered

23   February the 28th, 1989.  This person, James

24   Mackey, deliberately set out to murder my son.

25   Mackey planned the murder, stalked my son, bought a

26   crossbow, practiced to use is it, set up an

27   appointment at a certain time and place to meet my

1    son.  He laid in wait while his partner did all of

2    the above.  Carl Hancock got my son into position

3    for him to shoot Larry, and then he shot my son.

4    James Mackey broke my son, broke his nose, and as

5    my son's life (indiscernible) away, stuff him

6    (inaudible) in a sleeping bag, tossed in a dark

7    (inaudible) trunk.  And when he thought my son

8    wasn't dead enough, he put a rope around my boy's

9    neck.  And with Carl Hancock pulling on the other

10   end, they strangled him.  Then he tossed my son

11   down into a trash heap.  Larry was a good and

12   decent man.  He was 38 years old.  He owned his own

13   home and his own business.  He was married.  He had

14   three younger daughters.  He honorably served our

15   country in the National Guard.  He put himself

16   through and graduated from the University of

17   Pacific pharmacy school.  My son worked hard for

18   everything he had.  They took all (indiscernible)

19   big hugs and kisses and smiles from his father and

20   me.  This was a premeditated capital offense, for

21   which James Mackey should have been executed.  My

22   son did nothing, nothing to James Mackey.  By his

23   own free will, by his own personal choice, Mackey

24   (indiscernible) my son's life.  I oppose and object

25   to any parole for James Mackey.  He should return

26   and remain in prison for the rest of his life.

27          **PRESIDING COMMISSIONER WELCH:**  Thank you.

1   Okay.  Yes.

2          **ATTORNEY MONTGOMERY:**  Commissioner, I know

3   we don't primarily do this.  Would it be possible

4   for my client to make one brief statement not

5   directed at anybody but the Panel members in

6   regards to an aspect of the commitment offense?

7          **PRESIDING COMMISSIONER WELCH:**  Normally we

8   don't do that.  Once the victims make their

9   statements, that's -- they're the last ones to

10  speak.  So at this point, I think it's best that we

11  follow our regular procedures as the victims have

12  the last comments.  Okay.  Was that it?

13         **ATTORNEY MONTGOMERY:**  Yes.

14         **PRESIDING COMMISSIONER WELCH:**  Okay.  Pardon

15  me?  Okay.  We'll take a recess.  And Mr. Mackey,

16  we'll let you know our decision.

17                      R E C E S S

18                       --o0o--

19

20

21

22

23

24

25

26

27

1  CALIFORNIA BOARD OF PRISON TERMS

2  D E C I S I O N

3  **DEPUTY COMMISSIONER DININNI:**  Back on

4  record.

5  **PRESIDING COMMISSIONER WELCH:**  Okay.

6  Mr. Mackey, we have a decision.  The Panel reviewed

7  all information received from the public and relied

8  on the following circumstances in concluding that

9  the prisoner is not suitable for parole and would

10  pose an unreasonable risk of danger to society or a

11  threat to public safety if released from prison.

12  Now Mr. Mackey, this is an initial hearing.  This

13  is going to be a four-year denial.  And I'll try to

14  articulate to you why as I go through this.  One,

15  the offense was carried out in an especially cruel

16  and callous manner.  We're talking about cruel and

17  callous.  You conspired to buy a crossbow.  You

18  knew the victim.  You lured him to an area, and you

19  waited for him, and you shot him.  The offense was

20  carried out in a dispassionate and calculated

21  manner.  This was really like an execution style

22  murder.  Certainly there's indication that the

23  victim was abused, indicate that he was not dead

24  when you shot him with the crossbow and then you

25  stuck him in a trunk.  So therefore we say he was

26  abused, indication that you put a rope around his

27  **JAMES MACKEY  E-76532        DECISION PAGE 1   5/06/05**

1  neck (indiscernible) your crime partner.  Certainly

2  that's abuse.  The offense was carried out in a

3  manner that demonstrates a total an exceptionally

4  callous disregard for another human being.  And the

5  motive for the crime was inexplicable or very

6  trivial on relationship to the offense.  And when

7  we gave you an opportunity to articulate the motive

8  for the crime, it was just a very trivial matter to

9  kill a person for real estate or for financial

10  gain.  I mean that's just very trivial, especially

11  when we take into consideration your education,

12  your potential for (indiscernible).  It was just

13  really trivial.  The conclusion was drawn from the

14  Statement of Facts wherein on 2/28/1989 deputies

15  from San Joaquin County was dispatched to a

16  residence on Tokay Colony Road in Lodi.  And there

17  was indication that a person had been assaulted.

18  When he arrived, they only found a bloody sleeping

19  bag.  The circumstances around the offense is that

20  you and your crime partner waited, and the victim,

21  Mr. Carnegie, showed up.  He was shot.  He was

22  placed in a car.  He was taken someplace off of

23  High 101, and his body -- and he was basically

24  killed, and his body was disposed of.  Here's one

25  of the more complexing things about this crime is

26  that there was no indication about your violence,

27  **JAMES MACKEY  E-76532        DECISION PAGE 2    5/06/05**

1   that you had the propensity to commit such a crime.

2   You didn't have any juvenile record. There's no

3   indication that you had an adult record. And for

4   you to even -- And for you to conceive a crime like

5   this, and more yet to think you could get away with

6   something like this, that you was willing to take

7   another human being's life. And we look at your

8   social factors. Quite candidly, you explanation of

9   your social factors that led to this just doesn't

10  make any sense to me. I don't see how what you

11  described to me about being a loner and keeping

12  everything would cause a man that had no prior

13  juvenile record, that was an athlete, that was

14  pampered more than likely through your high school

15  athletic program and through college. Athletes are

16  a pampered bunch. But I don't see anything in your

17  social history that would indicate what caused you

18  to do this. And I'm not -- And I guess another

19  reason for the four-year denial, it just doesn't

20  appear that you have a lot of insight in what would

21  cause you to do such a thing. Your programming in

22  prison, you've made some (indiscernible).

23  Certainly your programming has been positive.

24  You've only received one 115, and we encourage you

25  to become disciplinary-free. Another compelling

26  reason for a four-year denial is the psychological

27  **JAMES MACKEY   E-76532        DECISION PAGE 3   5/06/05**

1    evaluation.  The doctors still see you as a medium

2    threat to community if you were released.  And we

3    are requesting a new psychological evaluation.  And

4    your attorney pointed out that a lot of the

5    information was taken from the Board Report.  We

6    are requesting that a personal interview be

7    conducted with you at your next psychological

8    evaluation.  Be that as it may, but when we looked

9    at the psychological evaluation, overall, it

10   appears to be a good psychological evaluation in

11   terms of the effort that the psychologist put into

12   it.  But from our prospective, still a medium risk

13   of danger to the community is still high.  If you

14   look at a high, low, and -- And if you take into

15   consideration your testimony today, you really

16   don't have a clue why you did this, other than for

17   money.  And so that was another compelling reason

18   for the four-year denial.  Now your parole plans,

19   you have realistic parole plans.  Don't have a

20   problem with your parole plans.  You should -- And

21   your educational level should (indiscernible)

22   vocation that you're receiving marks in

23   refrigeration.  That's certainly in your favor.

24   However, on the other hand, you had a BA degree,

25   and you were employable then.  So certainly having

26   marketable skills at the time did not deter you,

27   **JAMES MACKEY  E-76532        DECISION PAGE 4   5/06/05**

1   but you haven't had (indiscernible) since you've

2   been in prison.  And we want to give you some

3   accolades for that.  The Hearing Panel notes that

4   in response to Penal Code 3042 notices indicate an

5   opposition of a finding of suitability.  The Deputy

6   District Attorney -- Are you the District Attorney?

7          DEPUTY DISTRICT ATTORNEY BLANSETT:  Deputy

8   District Attorney.

9          PRESIDING COMMISSIONER WELCH:  I want to

10  make sure I got it right.

11         DEPUTY DISTRICT ATTORNEY BLANSETT:  Thank

12  you.

13         PRESIDING COMMISSIONER WELCH:  The Deputy

14  District Attorney from Tulare County --

15         DEPUTY DISTRICT ATTORNEY BLANSETT:  San

16  Joaquin.  It's all right.  They all sound alike

17  after a while.

18         PRESIDING COMMISSIONER WELCH:  The cases

19  begin to run together.  From San Joaquin County

20  appeared today and actually he did not present an

21  objection.  He was neutral.  He just appeared as an

22  observer basically.  So he didn't voice his opinion

23  in terms of your suitability one way or the other

24  from what I gathered from speaking to him.  Is that

25  correct?

26         DEPUTY DISTRICT ATTORNEY BLANSETT:  Yes.

27  JAMES MACKEY  E-76532       DECISION PAGE 5   5/06/05

1      **PRESIDING COMMISSIONER WELCH:**  Okay.  And we

2      have victims.  We have at least three victims spoke

3      today, plus the video taped from the victim's

4      mother.  All spoke in opposition to a finding of

5      suitability at this time.  the Panel makes the

6      following findings:  We find that the biggest thing

7      that you're going to have to do, we find that you

8      need to develop insight into the crimes that you

9      committed, that you need to involve yourself in

10     positive kinds of programs, self-help, victim

11     awareness programs.  Victim awareness program is a

12     really (indiscernible).  To know how your crime

13     impacted the lives of people.  And know how a crime

14     in general affects the lives of victims.  That's a

15     really important program for you to get into if you

16     can possibly get into it.  Another thing, in your

17     testimony you testified that you were stone cold

18     sober when you committed this crime, that you

19     cannot blame it on alcohol or anything else.  So

20     we're not going to recommend you're involvement in

21     such programs as Alcoholics Anonymous or other type

22     of substance abuse programs.  But for a person to

23     be stone sober and to commit a crime like that, it

24     is really mind-boggling when we look at your prior

25     criminal history.  Until enough progress is made,

26     the prisoner continues to be unpredictable and a

27     **JAMES MACKEY   E-76532        DECISION PAGE 6   5/06/05**

1   threat to others.  Nevertheless, there is just an

2   array of things we need to commend you for.  Not

3   the least of is your behavior in prison.  With the

4   exception of the one 115, you have been a good

5   prisoner.  And we want to give you some accolades

6   for that.  You have participated in an array of

7   self-help programs.  Just to mention a few, 40 Days

8   of Purpose Bible study, Breaking the Cycle,

9   supernatural ministries, the Four Agreements, House

10  of Healing, communication styles and skills, Great

11  Truth of the Bible, understanding your feelings.

12  So you participated in self-help programs.

13  However, those positive aspects of your behavior at

14  this time does not outweigh the factors of

15  unsuitability -- of suitability.  So we are going

16  to deny your parole for four years.  And one of the

17  reasons is the crime.  This was just an awful,

18  awful crime.  The crime was carried out in an

19  especially cruel and callous manner.  So in a

20  separated decision, the Hearing Panel finds that it

21  is not reasonable to expect that parole would be

22  granted at a hearing during the following four

23  years.  One was the crime.  The crime that you

24  committed is a type of crime that shocks the

25  conscience of the community.  It would cause people

26  to stop and pause and wonder about their own safety

27  **JAMES MACKEY   E-76532        DECISION PAGE 7   5/06/05**

1   in the community or the people that they work with,

2   other people that's working next to them.   The

3   offense was carried out in a dispassionate, and

4   there's no getting around it, it was calculated.

5   You had lots of time to think about this crime.   It

6   was a calculated crime.   And certainly there is no

7   argument that the victim was abused.   And based on

8   your own testimony today, the victim was still

9   alive, and he was stuffed into a trunk and he was

10   beaten to ensure that he was dead.   The offense was

11   carried out in a manner that showed a total callous

12   disregard for another human being.   And the motive

13   for the crime is inexplicable, and as I previously

14   mentioned, it was trivial.   Recent psychological

15   evaluation was not a particularly supportive

16   evaluation at this time in terms of your release.

17   It indicates a longer period of observation and

18   evaluation before you shall be found suitable for

19   parole.   The prisoner has not completed the

20   necessary programming which is essential to his

21   adjustment.   So you need to continue to participate

22   in self-help programs.   I think I articulated a few

23   of them to you, Victim Awareness and other kinds of

24   programs, anger management.   But you didn't even

25   mention that you were angry when you committed this

26   crime with the individual.   It was basically for

27   **JAMES MACKEY   E-76532       DECISION PAGE 8   5/06/05**

1    crime.  Self-control is certainly a program that

2    you should involve yourself in.  Therefore, a

3    longer period of observation and evaluation of the

4    prisoner is required before the Board shall find

5    that you're suitable for parole.  Here's what the

6    Panel's is recommending, that you remain

7    disciplinary-free, that you continue to participate

8    in self-help programs to intensify your effort in

9    that area, and that you cooperate with the

10   clinician in completing a new psychological

11   evaluation.  We're going to ask the clinician to

12   look at your violence potential in the free

13   community, significance of alcohol and drugs as it

14   relates to the commitment offense, the extent to

15   which you have explored the commitment offense and

16   come to terms with the causative factors.  And I

17   think that's a biggy from my perspective.  It's

18   just one Commissioner speaking is that you need to

19   develop insight, the extent that you have explored

20   the crime and come to terms with the causative

21   factors, whatever they were.  And maybe it was just

22   greed in your case.  But you really need to come to

23   terms with -- Excuse me.  I'm losing my voice.

24   That concludes the reading of the decision.

25   Commissioner, do you have any comments for the

26   prisoner?

27   **JAMES MACKEY   E-76532        DECISION PAGE 9    5/06/05**

1          **DEPUTY COMMISSIONER DININNI:**  I wanted to

2     commend you for your completion of the

3     refrigeration program and heating.  That is a very

4     good field, very employable field.  And also I want

5     to commend you for your participation in EOP, or

6     Enhanced Outpatient Program.  Those are the most

7     severely ill inmates -- mentally ill inmates we

8     have.  And any help they can get is very important.

9     It's a terrible crime.  You orchestrated that

10    crime.  That will never change.  Let me be clear

11    about that.  The period of time since that crime

12    occurred is very short in my mind.  And I wish you

13    the best of luck.  I hope you keep doing what

14    you're doing as far as your incarceration goes.

15    That one 115 is only administrative for horse

16    playing.  That's very, very good.  And I know how

17    hard that is to do.  I've spent 20 years working

18    inside.  So I know how that goes.  So good luck to

19    you, sir.

20         **PRESIDING COMMISSIONER WELCH:**  Okay.  We did

21    review the two letters that were submitted.

22    However, we didn't read them into the record

23    because Counsel objected via the 10-day rule.  We

24    will include these in the prisoner's file and ask

25    that they be placed in the C-File so they can be

26    used at your next hearing.  But we did take a look

27    **JAMES MACKEY   E-76532        DECISION PAGE 10   5/06/05**

1   at these two letters that were submitted.  One was

2   from Romas, the mayor of Burbank.  The city of

3   Burbank.  And the other one is from the Farmers,

4   (inaudible) majority leader in the assembly, fourth

5   -- third -- fourth and third districts.  We took a

6   look at those.  And we'll have them included.  Yes,

7   ma'am.

8        **ATTORNEY MONTGOMERY:**  I have a question.

9   You indicated you'd like him to be involved in a

10  victim awareness program.

11       **PRESIDING COMMISSIONER WELCH:**  If possible.

12       **ATTORNEY MONTGOMERY:**  Do you happen to know

13  of one at Mule Creek?

14       **PRESIDING COMMISSIONER WELCH:**  No, I don't.

15  I don't know if they have them over here or not,

16  but I will certainly encourage him to explore and

17  to find out if they do.  And if they do, I would

18  encourage him to get involved in that.

19       **ATTORNEY MONTGOMERY:**  Okay.

20       **PRESIDING COMMISSIONER WELCH:**  But I don't

21  know if they have them over here or not.  Maybe

22  your client -- Do you know if there's a victim

23  awareness program here?

24       **INMATE MACKEY:**  Not that I know about, no.

25       **PRESIDING COMMISSIONER WELCH:**  Okay.

26       **ATTORNEY MONTGOMERY:**  The other thing,

27  JAMES MACKEY  E-76532      DECISION PAGE 11  5/06/05

135

 1    Commissioner, you indicated you wanted the

 2    psychologist to address the significance of alcohol

 3    and drugs in the commitment offense.

 4         PRESIDING COMMISSIONER WELCH:  I just want

 5    him to take a look at it.  As I've previously

 6    stated, and even as your client testified, he was

 7    sober, and he had no problems with alcohol.

 8         DEPUTY COMMISSIONER DININNI:  Most important

 9    --

10         PRESIDING COMMISSIONER WELCH:  But certainly

11    --

12         DEPUTY COMMISSIONER DININNI:  -- is we ask

13    for a personal interview about the life crime,

14    because as you stated, it sounds like -- because

15    there was a two and a half hour personal interview

16    noted in the report.  So what they talked about, I

17    don't know.  But per your statement we ask that

18    they speak of the life crime --

19         ATTORNEY MONTGOMERY:  Thank you.

20         DEPUTY COMMISSIONER DININNI:  -- to give

21    your client an opportunity.

22         PRESIDING COMMISSIONER WELCH:  But certainly

23    one of the factors I would like for them to look at

24    is to explore with your client whether he had a

25    problem with alcohol or drugs.  And he testified

26    today that he didn't.  But certainly I would like

27    JAMES MACKEY  E-76532      DECISION PAGE 12  5/06/05

1    for him to talk to the psychologist about it.  But

2    I didn't see anything in this.  But the point is,

3    did I see anything in his record to indicate that

4    he had a problem with alcohol or drugs, I did not.

5         ATTORNEY MONTGOMERY:  Okay.  Thank you.

6         PRESIDING COMMISSIONER WELCH:  Okay.  All

7    right Good luck to you.  The time is approximately

8    -- what is it, 1420?  Okay.

9                        --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23    PAROLE DENIED FOUR YEARS              SEP 3

24    THIS DECISION WILL BE FINAL ON:_____.

25    YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26    DATE, THE DECISION IS MODIFIED.

27    JAMES MACKEY   E-76532       DECISION PAGE 13   5/06/05

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, APRIL ALLEN, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 136, and which recording was duly recorded at MULE CREEK STATE PRISON, at IONE, CALIFORNIA, in the matter of the INITIAL PAROLE CONSIDERATION HEARING of JAMES MACKEY, CDC No. E-76532, on MAY 6, 2005, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated May 21, 2005, at Sacramento County, California.

April Allen
Transcriber
**CAPITOL ELECTRONIC REPORTING**