# EXHIBIT F

o
• CALIFORNIA PENAL CODE SECTION 3046

§3046.

(a) No prisoner imprisoned under a life sentence may be paroled until he or she has served the greater of the following:

(1) A term of at least seven calendar years.

(2) A term as established pursuant to any other provision of law that establishes a minimum term or minimum period of confinement under a life sentence before eligibility for parole.

(b) If two or more life sentences are ordered to run consecutively to each other pursuant to Section 669, no prisoner so imprisoned may be paroled until he or she has served the term specified in subdivision (a) on each of the life sentences that are ordered to run consecutively.

(c) The Board of Prison Terms shall, in considering a parole for a prisoner, consider all statements and recommendations which may have been submitted by the judge, district attorney, and sheriff, pursuant to Section 1203.01, or in response to notices given under Section 3042, and recommendations of other persons interested in the granting or denying of the parole.  The board shall enter on its order granting or denying parole to these prisoners, the fact that the statements and recommendations have been considered by it.

# EXHIBIT G

**BOARD OF PRISON TERMS**
**LIFE-TERM MENTAL HEALTH EVALUATION**

### PSYCHOSOCIAL ASSESSMENT

## I. *IDENTIFYING INFORMATION*

| | |
|---|---|
| **Inmate Name:** | MACKEY, James Oliver |
| **CDC Number:** | E-76532 |
| **DOB (Current Age):** | 8/12/64 (40) |
| **BPT Calendar Date:** | 2004 |
| **Controlling Offense:** | PC 187, Murder, First Degree |
| **Date of Offense (Age at Time):** | 2-28-89 (24) |
| **County of Offense:** | San Joaquin County |
| **Sentence:** | 25 Years to Life |
| **Date Entered CDC:** | 11-20-90 |
| **Location of Inmate at Time of Evaluation:** | Mule Creek State Prison |
| **Date Entered Above Institution:** | 1-11-93 |
| **Classification Score:** | 19 (10-06-04) |
| **Dates of Evaluation:** | 10-16-04 and 10-26-04 |
| **CDC Evaluator:** | Janet M. Mahoney, Ph.D. |
| | Licensed Psychologist |

## II. *SOURCES OF INFORMATION*

James Oliver Mackey (CDC No. E-76532) was interviewed at Mule Creek State Prison on 10-16 and 10-26-04 for a total of approximately two-and-a-half hours. His Central File and Unit Health Record were reviewed by the undersigned. This report is a composite of information from these sources.

Inmate Mackey was informed that the interview was not confidential and that a report with the results of the evaluation would be submitted to the Board of Prison Terms (BPT). The inmate appeared to understand the nature of the evaluation and the possible consequences of the interview. It was my conclusion that it was not necessary to provide auxiliary aides or assistance to achieve communication.

### III. CONTROLLING OFFENSE

On February 28, 1989, Mr. Mackey's accomplice, Carl Hancock, lured realtor Laurence Carnegie to a piece of property east of Lodi where Mr. Mackey, waiting in a darkened garage, shot Mr. Carnegie with a crossbow as part of a murder-for-hire agreement with a businessman named Michael Blatt. Interrupted by a woman who drove onto the property, Mr. Mackey kicked the injured victim into unconsciousness and he and Hancock loaded the victim into the trunk of a rental car. They drove some distance (reports hypothesize Mendocino County) before stopping the car. Determining that Mr. Carnegie was still alive, they completed the murder by strangling the victim with a length of rope that had been purchased earlier in the day. They then drove to another location in Mendocino County and dumped the body.

A second murder-for-hire of a man named John Farley was planned but never executed. Mr. Farley had a lawsuit against Mr. Blatt.

The inmate's written statement about the offense is transcribed into the Life Prisoner Evaluation prepared for the December 2004 Calendar. As for the victim, Mr. Mackey stated that he did not know him, but he did know who he was. Inmate Mackey stated that Blatt blamed the victim's lawsuit against him (Blatt) as the reason that the Mackeys could not purchase the condominium in which they were living. He asked Mr. Mackey to arrange for his murder. Mackey then hired fellow football player, Carl Hancock to participate in the murder.

In Mr. Mackey's Central File is an 11/20/90 letter from San Joaquin County D.A. John Phillips' letter that was written before the second trial of Mr. Blatt in which Mr. Mackey testified for the prosecution. Mr. Mackey pointed to this letter as evidence that an early parole was part of his plea bargain and as exchange for testimony in the Blatt prosecution.

In our interview, Mr. Mackey said, "that wasn't me," not in denial of his participation, but in denial of that which he is capable. He stated that he was sorry for the crime, but made points that attempted to mitigate his responsibility. He stated that he was a victim of Michael Blatt. He stated that his original intent was to contract out the murders and not participate in them directly. He stated that the reason why it was he who shot the crossbow was that he was better at it than his crime partner. He stated that Hancock performed the final strangulation. It was important for me to know that he was going to pass the murder fee on to Hancock, that he (Mackey) had done this solely to curry favor with Blatt. Each of these statements is a weak attempt to deny responsibility.

## IV. BACKGROUND INFORMATION/LIFE HISTORY

### Developmental History

Inmate Mackey reported that, to the best of his knowledge, his mother experienced no prenatal or perinatal problems in her pregnancy. He stated that, to his knowledge, there were no problems with his attaining developmental milestones. Inmate Mackey denied a history of enuresis, firesetting, or cruelty to animals. He denied being the victim of childhood sexual abuse. He reported that, as a child, his stepfather had physically abused him.

### Family History

Mr. Mackey's mother's first marriage was to a man named Esbridge. This marriage produced three sons. At the time of Mr. Mackey's birth, his mother was married to a man named Mackey. This marriage produced one son and one daughter. Mr. Mackey stated that his father is actually a man named Clarence Rolin, a Korean and Vietnam War veteran with whom Mrs. Mackey was having an affair. Shortly after the inmate was born, the Mackeys were divorced. The inmate's mother then married a man named Walker for "a couple of years." This marriage produced a daughter. In all, the inmate has four half-brothers and two half-sisters. Finally, the inmate's mother married a man named Holmes. Inmate Mackey stated that Holmes would strip the inmate naked and beat him with an extension cord. Inmate Mackey reported that stepfather Holmes also molested one of his sisters. Mr. Mackey stated that his stepfather was in the Merchant Marines, so there would be periodic respites from the abuse. He stated that his mother was usually working two jobs.

Mr. Mackey stated that his mother favored him and saw him as her "love child." Naturally, this caused issues with his siblings. He stated that he did not want to be at home when his mother wasn't there and that, in early years, he would be in trouble at school for fighting. He reported going to school after being beaten by his stepfather with blood stuck to the back of his shirt. He stated that once, when a teacher was bringing him home, he confided in her about the abuse in the household. He stated that the teacher took him into the house and told his stepfather what he had said. Mr. Mackey stated that he got a worse beating after the teacher left.

Mr. Mackey reported that he didn't like to take orders, but as he got older, he found that he could take direction from whoever was his coach. At school, he was popular, adapted a persona of a "tough guy or rebel, wanting to do my own thing and not be part of the crowd."

Mr. Mackey reported that his mother died last December. Mr. Mackey reported that he had met his biological father once, when he was 17. Since his mother's

death, Mr. Mackey has made contact with his biological father, who lives in Oklahoma.

Inmate Mackey told me that he is in contact with two of his siblings: his sister, Angela Criner of Tulsa, and his brother, Kenneth Esbridge of French Camp. Mrs. Criner, 42, is married, has two children, and has no drug or criminal history. The siblings have telephone contact twice a month.   Mr. Esbridge, 45, is divorced. He is a government employee at Sharp's Army Depot. He has been imprisoned for drug sales.

In a second review of Mr. Mackey's Central File, I found that on 5/13/04, he had been given permission to correspond with another half-brother, Robert Esbridge, at the Federal Correctional Institution in Beaumont, Texas.

<u>Education</u>

Inmate Mackey reported doing well in school, both academically and in sports. He stated that he was able to help the siblings who gave him so much trouble at home with their homework. He reported graduating high school and getting a football scholarship to University of the Pacific (UOP.) He graduated from UOP with a degree in physical education.  Information in his Central File confirms this.

While in prison Mr. Mackey stated that he has pursued correspondence education and has applied to graduate school in Humanities at California State College – Dominguez Hills.

<u>Marital History/Children</u>

Inmate Mackey reported that he married in May, 1987. Mr. Mackey reported that Sharon came from a wealthy Sacramento family and was used to nice things. While he still had feelings for another women, his first real girlfriend, he married Sharon. "Her mother died just before I was going to break up with her. I ended up getting married for all the wrong reasons. It was very comfortable."   A son, Kevin, now aged 15 was produced from this marriage. Although mother and son live in Elk Grove, there has been no contact in the past five years.

Mr. Mackey married Janet Walther in 1993. He reported that had known her since junior high school. He stated that she lives in Manteca and has two daughters aged 23 and 17. Mr. Mackey reported that his wife is a logistics coordinator (product orderer) for a food company. He said that she is also a dance instructor.  Inmate Mackey reports that his wife has no criminal or substance abuse history.

Military History

The inmate has never been in the military.

Employment History

Mr. Mackey reported that his first job was a paper route. When he was 13, he lied to say that he was 15 or 16 and was able to get a job as a janitor. He also stated that he had early experience in coaching, landscaping, and working on a military base as a taxi driver.

Mr. Mackey reported that the first summer of college, he worked landscaping. The second summer, he reported functioning as a bodyguard for his ex-wife's mother who was having trouble with a business partner, and the third summer he reported being a loader at a cabinet-manufacturing business.

Inmate Mackey suffered knee injuries while playing college sports. He remembered that as he was graduating, he went to the LA Raiders training camp. Even though it was not surprising that he didn't make the cut, when he returned north, Mr. Mackey told others that **he** had turned the Raiders down because it was important to keep up appearances.

During college, Mr. Mackey started developing a business as a personal trainer, and on graduation, he became a real estate sales person. He reported that he also sold sports stories to the local paper while in college, and since he has been in prison, he reported that he had a story published (1995) in "Magazine for Christian Youth."

Within the institution, Mr. Mackey is currently employed as a clerk in the Enhanced Outpatient Program. Sometimes he is employed as an EOP Aid in the same program. Mr. Mackey usually achieves "exceptional" work ratings.

## V. CRIMINAL HISTORY

According to his Central File, Mr. Mackey has no prior criminal history. Within the institution, Mr. Mackey has received one CDC-115 for horseplay occurring on Christmas Day, 1996:

> ...While returning from the evening meal, I observed MACKEY grab Woods by the jacket and throw Woods in a circular motion towards door 2 of building 6. MACKEY continued to walk, with several other black inmates, towards building 7. When Woods caught up to the slow walking group of black inmates, MACKEY again quickly grabbed Woods by the jacket and pulled Woods down. MACKEY then placed his right arm around Woods' head in a headlock. I notified OBB, via radio, to put the yard down. Both MACKEY and Woods sat down on the track. Myself and other responding staff placed both inmates in handcuffs and

escorted them to the program office. It should be noted, that upon arriving at the incident neither inmate appeared excited or agitated. During the interviews, both inmates claimed they were horseplaying. MACKEY was trying to remove Woods' hat to expose Woods' haircut. Both inmates demeanor was more consistent with horseplay than with a physical altercation. . .

There were no counseling memos in Mr. Mackey's Central File.

## VI. SUBSTANCE ABUSE HISTORY

Mr. Mackey reported a minimal substance use history. He reported that he had used wine and beer, but that he could nurse a beer all night. He reported that he had never been drunk. And he reported that he tried marijuana once in the eighth grade. This is consistent with the information in the Probation Officer's Report.

Mr. Mackey reported that he had attended Alcoholics Anonymous for about six months in 1999.

## VII. INSTITUTIONAL ACTIVITIES

I found the following documents for the last decade in the inmate's C-File

Chronos representing efforts at self-development:

| Date | Activity | Provider |
|---|---|---|
| 9/26/04 | "Forty Days of Purpose," Bible Study | Pastor Scott Barham |
| 8/1/04 | "Breaking the Cycle," Part 2 (15 Weeks) | Pastor Scott Barham |
| 4/1/04 | "Breaking the Cycle," Part 1 | Pastor Scott Barham |
| 12/3/03 | "Supernatural Ministries" (17 weeks) | Pastor Scott Barham |
| 8/1/03 | "Taking the Limits Off Life" (12 Weeks) | Pastor Scott Barham |
| 2/1/02 | "The Four Agreements" | M. Kay, CCII |
| 5/10/01 | "Houses of Healing" | M. Merritt CCII |
| 7/8/99 | "Communication Styles and Skills" | M. Merritt CCII |
| 8/6/98 | "Great Truths of the Bible-Tier One" | Crossroads Bible Institute |
| 10/9/95 | "Understanding Your Feelings" | M. Merritt, CCII |
| 5/1/95 | "A Framework for Recovery" | M. Merritt CCII |

Laudatory chronos:

| Date | Activity | Provider |
|---|---|---|
| 1/22/04 | EOP Aid | N. Andrews, Psych Tech |
| 7/12/02 | Lifesaving of inmate. | C.O. E. Hobbs |
| 3/8/01 | Invaluable assistance in Mental Health Program. | R. Geyser, Recreational Therapist |
| 12/21/99 | Mental Health Program | Lynn Arbios, Medical Scty |
| 3/21/96 | 27 months as CC-II clerk | R. W. Townsend, CCII |
| 4/14/94 | Laudatory CC-II clerk | R.X. Perry, CCII |

Certifications
6/29/04      EPA Section 608 Universal Certification  96% score
10/1/04      Heating/Ventilation/Air Conditioning/Refrigeration
6/9/04       Paralegal Foundation Course Professional Career Development
             Institute Cumulative Grade 96

## VIII. PSYCHIATRIC AND MEDICAL HISTORY

Mr. Mackey has no mental health complaints and has never had any mental health treatment.

Medically, he reports that he has joint problems in both knees and both shoulders. Since 1998, he has had a problem with headaches when he tries to concentrate. He describes the headaches as the muscles around his temples "bunching up." He has had an MRI and is waiting for follow-up medical evaluation.

## IX. CLINICAL ASSESSMENT

### A. CURRENT MENTAL STATUS/TREATMENT NEEDS

Inmate Mackey is a soft-spoken  His speech was clear and of a normal rate and rhythm. He was cooperative with the interview, eye contact was good, and no psychomotor difficulties were evident.

The inmate's mood was euthymic. His affect was mildly subdued. The inmate denied perceptual disturbances. His thought process was sequential. There was no evidence of psychotic process and no delusional material was expressed. When asked to interpret proverbs, he had no difficulty with abstractions.

He was alert and fully oriented. He had one concentration lapse in serial sevens: He lost track after 51, corrected to 64, then recorrected to 61 and proceeded to the end without further interruption. He could spell WORLD forwards and backwards. Mr. Mackey could remember three out of three items immediately and at five minutes. I noted no problems with long-term memory. He seemed to have above average intelligence. Judgment, in response to formal questions, was good. Practical judgment in most situations also seems good.

I have no treatment recommendations for Mr. Mackey.

MACKEY James Oliver                E 76562                          11-17-04
                    BOARD OF PRISON TERMS EVALUATION

### B. *DIAGNOSTIC IMPRESSION*

Axis I:         V71.09  No diagnosis
Axis II:        V71.09  No diagnosis
Axis III:       Headaches; joint pain
Axis IV:        Incarceration, life term
Axis V:         85

## X. *PLANS IF GRANTED RELEASE*

If granted release, Mr. Mackey plans to live with his wife, Janet Walther-Mackey in Manteca. In his Central File there are two job offers, one as a forklift operator at $14.00/hour and one as a machine operator as $11.00. Additionally, Mr. Mackey is fully qualified with an EPA certification as a heating, ventilation, air-conditioning, and refrigeration technician that is apparently quite a marketable skill. Mr. Mackey has performed exceptionally well as a clerk and has a college degree. His parole plans are viable and there is no doubt that Mr. Mackey has the skills to both obtain and maintain a job in the community.

Mr. Mackey also has plans to continue his interest in writing.

## XI. *RISK FOR VIOLENCE*

Mr. Mackey was a high-functioning individual in the community and has continued to be a high-functioning inmate. He has no juvenile history, no substance abuse history, and has been an excellent programmer within CDC. Outwardly, he has both the abilities and interpersonal skills for a successful parole.

In this case, the dynamics lie within the crime scenario, and to the extreme and violent lengths to which Mr. Mackey was willing to go for personal gain and recognition. On interview, Mr. Mackey attempted to mitigate his responsibility for his own actions by shifting blame onto others. (See Section III.)

In my opinion, Mr. Mackey poses a moderate risk for reoffense if released to the community at this time.

## XII. *CONCLUSION*

James Oliver Mackey is a 40 year-old African-American inmate convicted of PC 187, Murder in the first degree, for a murder-for-hire that occurred in 1989. Mr. Mackey has no juvenile history, no prior criminal record and no substance abuse issues. Within CDC, he has been an excellent programmer, with only one CDC-

115 that was for horseplay.   His CDC work evaluations have ranged from satisfactory to exceptional, most often being placed at exceptional.

Due to the nature of the crime and Mr. Mackey's inability to take full responsibility for it, it is my opinion that Mr. Mackey poses a moderate risk for violence as a calculated, preplanned means to an end if released to the community at this time.


Janet M. Mahoney, Ph.D.
Contract Psychologist

MULE CREEK STATE PRISON
Health Services Unit
4001 Highway 104
Ione, CA  95640

August 11, 1993

## PSYCHIATRIC EXAMINATION FOR BOARD OF PRISON TERMS

This is the first report to the Board of Prison Terms and is the
result of a 30-minute interview and review of the C-File, a single
contact for this report only.

PSYCHIATRIC EXAMINATION:  The inmate reports his current developments
and progress as having received no 115's working as a porter.  He has
vocational skills as a coach.    He does not attend any self-help
groups.  He has a Bachelor's degree in physical education and he was
a real estate agent.  He indicates the crime occurred because he
panicked.

MENTAL STATUS EXAMINATION:   The inmate is a well developed, well
nourished, muscular individual who appears his stated age.  He was
neatly dressed and well groomed.  He was relaxed and cooperative.
His speech was of normal intensity, rate and inflection and he was
spontaneous.    His affect was normal and thought content was
appropriate to affect.  His flow of thought was normal.  He denies
depressive ideation or suicidal ideation.  He has normal associations
of thought.  He is oriented as to time, place and person.  His memory
is intact.   His intellectual functioning appears to be normal.
Attention and concentration were good.  He has some insight but
impaired judgement.   He continues to be somewhat vague about the
causative factors of his crime, has little self-understanding which
calls into question his motivation for change and the sincerity of
his rehabilitation.

DIAGNOSIS:  (DSM IIIR)  Axis I   (312.39)    Impulse control disorder
                                             NOS
                        Axis II  (V71.01)    Adult antisocial behavior.
                        Axis III             None known.
                        Axis IV              2, mild
                        Axis V               A GAF of 90 and a GAF of 90
                                             over the past year.

PSYCHIATRIC CONCLUSIONS:  The diagnosed psychopathology is directly
related to the criminal behavior.  The offense was largely a function
of the psychopathological state.   During observation in the
institution the inmate has psychiatrically shown no significant
change.   In a less controlled setting such as return to  the
community, the inmate is considered likely to remain the same.

(Continued)

COPY TO INMATE
VIA CC-1  9-7-93 bw

MACKEY, J.              E76532           MCSP              08-11-93    CVM/bf

SUGGESTED ACTIONS:
It's recommended at some point that he attend Category X program to help him clarify the causative factors of his crime.  Its recommended he be continued in the present rehabilitation program as continued benefit is likely.  Its recommended he be placed in a vocational setting where his vocational skills can be used.  If he is to be considered for parole or release, his violence potential outside a controlled setting in the past is considered to  have been about the same as the average inmate and is currently less. Any conditions for parole should include close supervision and attendance at the parole outpatient clinic.


*Clyde V. Martin M.D. FAPA*    *James Milleman MD CMO/A*

CLYDE V. MARTIN, M.D., FAPA
Staff Psychiatrist



CVM/bf


Orig: C-File
   cc: Med. File
       C&PR
       BPT Desk
       Dr. Martin

# EXHIBIT H

LIFE PRISONER EVALUATION
INITIAL PAROLE CONSIDERATION HEARING
DECEMBER 2004 CALENDAR

MACKEY, JAMES OLIVER        E-76532

I.  COMMITMENT FACTORS:

A.  LIFE CRIME:

Inmate Mackey was received into the California Department of Corrections on 11-20-90, from San Joaquin County (case #45624) subsequent to a conviction for PC 187 Murder in the First degree.  He is serving a sentence of 25 years to life with a minimum eligible parole date (MEPD) of 01-29-06.  A crossbow was used in the commission of this crime.  Victim: Lawrence Carnegie, age Unknown.  Source: Probation Officers Report.

1.  Summary of Crime:

On 02-28-89 deputies from the San Joaquin Sheriff's Department were dispatched to a residence on Tokay Colony Road in Lodi, California, due to a report of two men assaulting another man at that location.  As deputies arrived at the crime scene they found a bloody sleeping bag, a bloody bolt from a crossbow, and a vehicle belonging to the victim Lawrence Carnegie.  The reporting witness Denise Brock told deputies that as she approached the residence she saw the victim lying on the ground.  One suspect (later identified as the defendant James Mackey) was standing over him, and another suspect (later identified as the co-defendant Carl Hancock) was quickly approaching her vehicle, which she and her small children occupied.  Ms. Brock became fearful of the situation and quickly drove to a near by residence, where she called 911.  The next afternoon Mr. Carnegie's body was found in rural area along Highway 128 in Sonoma County.  He had been shot in the back with the bolt from a crossbow.  The cause of death however was from strangulation.  After a lengthy investigation a rental car matching the description of the vehicle seen at the crime scene was located in Southern California.  It was later determined that this vehicle was in fact rented to the Defendant James Mackey on the date the crime was committed.  Further investigation revealed traces of dried blood matching that of the victim Lawrence Carnegie in the vehicle.

Offense Summary

2.  Prisoner's Version:  Forgive me if this is a bit lengthy, but to understand how this terrible crime evolved I must start at the beginning of its development.  Hopefully this helps.  I met Michael Blatt during the Spring of 1985 while

attending the University of the Pacific on a football scholarship. I had been successful on the football field the season before, and I believe that was when Baltt first noticed me. I had seen Mr. Blatt many times on our sideline during games, but had never met the man. I knew that he was a rich developer who gave money to the program and that he was generous to some of the more successful players. Blatt had also gone into business as a professional sports agent with the man who had recruited me out of high school, and was one of my former coaches at UOP, Frank Bauer. Frank and I were very close during my career at UOP and it was he who first encouraged my becoming friends with Michael Blatt. As my star continued to rise as a ball player, Blatt began to take more interest in me until we were lunching together and I was visiting him at his home. Many people warned me to be careful of Blatt, that he was a user, but Blatt had never asked anything of me but my friendship, so I chalked those negative opinions as jealousy and continued to spend as much time as I could with my new mentor. During my senior year, Blatt encouraged me to do my best and assured me that I had an NFL career ahead of me. I agreed with him, of course, thinking myself invincible until the ligaments in my right knee were torn three games from the end of the season. I felt that my football career was over, but I did not want anyone else to think that, so I began to plan my fall back, an excuse about why I didn't want to play anymore. After graduating in the Spring of 1987, I was completely out of my element, and to cover up for my feeling totally lost, I married my then girlfriend, now ex-wife, and went to a try-out with the L.A. Raiders when I knew that my knee was not ready, both within a week. It had the desired effect, everyone thought I had everything under control. When I came back from a very unsatisfying training camp I quickly informed my friends that I would not be going back to the Raiders because I was choosing not to, knowing that I was going to be waived anyway. I felt that the only way that I was going to regain my former status was to be financially successful, and to do this I would learn all I could from Michael Blatt. When I informed Blatt of my plan, he agreed to help me and offered me a job, which I declined (I had seen the way he treated employees and chose to remain a friend). I told him that I was going to get my real estate license and I needed any help he could. At this time my wife inherited some money and we were unsure how to invest it, so I went to Blatt for advice. He had just purchased 17 condominiums in Stockton and offered to sell me one of them as an investment at the same price he'd paid. It was and incredible deal, so we jumped on it. Blatt encouraged us to move in prior to the sale, but assured us that we could get 100% financing on the place if he listed the sale price higher than he would actually sell it to us. We moved in a few weeks later and were soon spending thousands painting, wallpapering and re-carpeting. After approaching several banks about loans, we were ready to buy the place, but were informed by Blatt that there was a problem; one of his former employees (Laurece Carnegie) was suing him and he could not sell the condos yet and that we would have to pay rent until we could buy. He said it would be a matter of a few weeks. Nearly a year went by with me constantly pestering Blatt about the sale before he first said to me, "this would be a done deal if Carnegie wasn't around." I didn't pay the comment any attention initially. A year later, I believe it was the summer of 1988 when Blatt and I were riding along I-5 in his car discussing the condo situation once again that he spoke about how much easier it would be if Carnegie was not ruining things. I still didn't take the conversation seriously then, so it did not seem weird to me that we began discussing murder and the disposal of bodies. A few months later I was in Blatt's office listening to

him give me advice about how to handle my marriage and my new girlfriend when I brought up the condo again. The rent was very expensive and was draining my wife and I dry. Once again Blatt was very sympathetic but said he could do nothing because of Carnegie. I had seen Carnegie earlier in the day selling the condominium he owned next door to mine and said hello, so I was even more discouraged. When Blatt said, " He doesn't want the condominiums sold to insiders, friends of mine." I became even more upset and finally said the words Blatt had been waiting for, "Do you want me to see if I can find someone to take care of him?" I also wanted Blatt to believe that I was dependable, someone who got things done, but I was too naïve to recognize the smile of satisfaction on his face, but I see it clearly now. I asked two friends if they knew of anyone who could "take care of someone," and received a yes from a friend and former teammate, Carl Hancock. I went to see Blatt a few days later and asked him how much he was willing to pay. " Whatever it takes" was his reply. I told Carl that he would be paid 15k for what he would do, and that I did not want to know any of the details. I did suggest that whoever did this should call Carnegie, who was also a real estate agent, and make an appointment to see a property out in the country where there wouldn't be witnesses. A few months went by and Blatt was becoming anxious for news about Carnegie, and in an attempt to impress Blatt, I decided that I would become personally involved. By then I knew that Hancock had been in touch with Larry Carnegie himself and that he was to be in on the deed. I told Blatt that I was to meet with the person who would commit the crime in Phoenix on February 26, 1989, and that I needed to take him a down payment of at least $3,000.00. What I really had in mind was to meet my girlfriend, who was visiting her brother, and seeing my best friend, Scott Brooks, play basketball. Scott played for the 76ers at the time, and I had not seen him ply professionally. Blatt gave me the money and I made the trip. When I returned to Stockton, I had made up my mind to go along with Carl the next day to make sure everything went smoothly. I went to Blatt's house that night and told him that I needed more money to buy supplies as I had been instructed in Phoenix. I gave $2,000 to Hancock and we drove to Modesto where we bought a crossbow and a sleeping bag at Big 5. That night we drove to Lake Tahoe to establish an alibi. The next evening, we purchased rope at a hardware store and Hancock phoned Carnegie and asked him to meet us at a property east of Lodi, where we waited. Carl and I were dressed in jeans and tee shirts and it was very cold that night. Carl had met and spoken with Carnegie, so it was decided that I would wait in a dilapidated garage until Carl led Carnegie inside were I would fire the crossbow. Carnegie was late, and it became dark and colder in the garage. After a half hour of shaking and trying to talk myself out of what I was doing I began to think about Blatt, and remembered all those things people had said about him, but instead of helping me to make the decision to leave, it scared me. I do not know if I was out of it because of the cold or just because of the situation I was in, but when I thought things out, they became clearer to me, if I didn't do this, Blatt would get someone else to do it. He would know that I knew who did it and would not be too happy about that and would not want me hanging around as a loose end. Sheriff detectives later informed me that I was probably right, but the decision I made was not only poor, but cowardly. When Mr. Carnegie arrived at the property, Carl allowed himself to be shown around the property, but when he tried to get Carnegie to how him the inside of the garage, Carnegie balked. I was glad that I at least had an excuse when Blatt found out that Carnegie was alive the next day, but Carl maneuvered Carnegie into position in front of the door. I

- 3 -

wanted so badly for him to move, but Carl somehow kept him there.  To many thoughts were going through my head at the time for me to say what I was thinking.  All I can recall is that I was terrified.  I raised the crossbow and aimed it at the opening in the door.  It was very dark by then and I could only see Carnegie's shadow (Carl was much bigger).  I aimed at the shadow, closed my eyes, fired, and quickly knelt back down behind a large piece of sheet rock where I had been hiding.  I heard Carnegie gasp, and he and Carl moved away from the garage.  Carnegie yelled, "Don't shoot!  Don't shoot!" and I heard Carl whispering something to him.  A few minutes later, Carl entered the garage and said that he needed help with Carnegie.  We went over to where Mr. Carnegie lay on the ground.  When we reached him I told Carl to go back to the car we had rented to get the sleeping bag while I raised Carnegie, who was conscious, to a sitting position with my arm around his shoulders.  I decided then to get into the car and drive away, Carnegie had not seen my face and could not identify me in the dark.  I was not worried about Carl, he would just have to leave town.  Just as these thoughts were passing through my mind, a car pulled into the property driveway, shining its lights onto the entire sad situation.  I kept my face turned away from the light, sure now that I would make a run for it as soon as that car left.  Meanwhile, Carl was caught fully in the headlights and panicked, running toward the car waving his arms.  I have no idea what he was doing, but the people in the car were not sticking around to find out and neither was I.  Just as the car turned toward the road, its lights hit my back again, and when I turned away I saw Larry Carnegie  looking at me.  I saw the look of recognition in his eyes but was sure when he said, "You're fucked."  It was my turn to panic then.  I punched Carnegie and kicked him until he was unconscious and yelled to Carl to bring the sleeping bag.  We put Carnegie in the sleeping bag and placed him in the trunk of the car.  Our original plan was to take Mr. Carnegie's body to Tahoe and drop him into the lake but I was afraid to do anything I had been planning to do, so we drove west toward Napa.  After driving this way for a while I recognized were we were.  My brother-in –law had been to a private school in a town called Booneville in the Mendocino Mountains.  I thought that we could leave Mr. Carnegie's body there and he would not be found for a while.  When we arrived in the mountains near the school, I pulled off the road behind a hill where we would not be seen.  Carl got out and I popped the trunk.  Carl came back and told me that Carnegie was still alive.  I told him that I had already done a lot more than I was supposed to and that he would have to finish it himself.  After a little while Carl got back in the car and said it was done.  We did not want to leave the body so the school so we drove back to a turnout on a hill and took Mr. Carnegie out of the trunk and rolled him down a hill.  We then drove toward the Bay area and dropped the crossbow and remaining arrows off a bridge.  I felt so sick and afraid that the next evening I called Blatt and told him that I needed money to leave the country.  The next morning I met Blatt at his home where he gave me an envelope which contained $3,000.  I picked up my girlfriend and we drove to Los Angeles and took a plane to Mexico the next day.  We stayed only two days, I was too sick to eat, and we returned to L.A.  A few days after returning to Stockton, I broke up with my girlfriend and returned to my wife, who was pregnant.  My plan was to buy the condominium from Blatt and have nothing else to do with him.  My wife and I had actually made an offer on a home in Sacramento when I was approached by Sheriff's detectives.  One of the detectives who was working on the Carnegie case had actually purchased my home a few months before, so we had gotten to know each other.  He invited me to my former home to

discuss real estate, but I knew what the conversation would be about. Before going to the house, I asked my cousin, Jonathan Holmes, to drive by the place to make sure there were no police cars in the vicinity. When I arrived at the house I was met at the door not only by Gary Coffey, whom I had sold the house to, but also Detective Petter Rosenquist. They immediately informed me that I was in big trouble. When I asked why, Coffey stated that Carnegie's blood had been found in the trunk of the car I had rented. I denied that I knew anything about it. After about thirty minutes of questioning, the officers decided to take me downtown where they photographed me and took my fingerprints. They then put me into a holding cell for approximately 3 hours. I asked to be allowed to call an attorney and was told that I could not. After this I thought that I could say anything and it wouldn't be able to use it against me, so I asked to speak with a friend who was an assistant D.A, George Dunlap. I told George that I had only rented the car at Mr. Blatt's request but knew nothing about who had driven it. He urged me to tell the truth and cooperate and I agreed. The Assistant DA who was handing the case is named Fual Blansett. I met with Mr. Blansett and the detectives and agreed to wear a wire into Blatt's office an initiate a conversation about the murder. They said they would contact me within a few days to give me details. When the detectives called me a few days later, I was afraid, but I knew that I had to go. The deputies put a microphone behind my tie and a small device in an inside pocket of my jacket. When I walked into Blatt's office he was on the phone. When he turned to me I immediately mouthed the words, "I'm wired." He continued to talk on the phone while he took out a legal pad and wrote, "Are you wired?" I nodded. As he hung up the phone he wrote, "what do you want me to say?" I shrugged and began to act like I was afraid the cops were onto me and asked Blatt questions about the murder as I was instructed by the officers. Blatt played dumb the whole time and said I should cooperate with law enforcement. I did not want to say anything because I did not want Blatt to mention everything he knew of my own involvement. When I returned to the detectives they said that we would try again on another day. That day I went to see an attorney I had worked with before and partially informed him of my involvement in the crime and my need for representation. On June 1, 1989, as I was driving home I noticed a squad car near my home and knew that something was wrong. I needed to think, so I drove out near the river. My passport was in the car and there was about $10,000 in the bank that I could take, but I decided I could not leave my wife, and did not want to spend the rest of my life running. I called my wife and my mother and told them not to worry, but I was in trouble. I didn't explain, but I assured them I would be okay. I then drove to my attorney's home where I decided the best thing to do would be to turn myself in. My attorney accompanied me downtown to the Sheriff's office to inquire about a warrant for my arrest. The desk Sergeant told us that there was not one, but as we were walking out, Detective Rosenquist waked up behind us and informed me that he was coming to pick me up and I was arrested. After nearly a month in the San Joaquin County Jail trying to make a deal, in exchange for my testifying against Blatt at trial I would receive a reduced sentence, I learned from my attorney that Carl Hancock had been arrested and had placed me at the crime scene. I then made a deal with District Attorney John Phillips. In exchanged for my testimony he would write a letter to the Board of Prison Terms. There were actually two trials. Both ended in hung juries, and the D.A.'s office did not feel they could win a third, so Blatt was released and has been free ever since. Prior to the first trial I was informed by law

enforcement that Blatt had solicited my murder. I felt at the time that I should try to reach out to Mr. Carnegie to express my remorse and try to explain how this horrible crime had happened. I was informed by A.D.A Blansett that he would deliver a letter to Mr. Carnegie's father, so I did write the letter, as inadequate as it seemed, and sent it to Blansett.

3. Aggravating/Mitigating Circumstances:

    a) Aggravating Factors:

During the commission of the crime the prisoner had a clear opportunity to cease but instead continued.

The prisoner went to great lengths to hide the body or to avoid detection.

The prisoner intentionally killed the victim by lying in wait.

    b) Mitigating Factors:

The prisoner has a minimal or no history of criminal behavior.

## II. PRECONVICTION FACTORS:

JUVENILE RECORD:  NONE.

ADULT CONVICTIONS AND ARRESTS:  NONE.

PERSONAL FACTORS:  Subjects parents separated when he was an infant, and he has not maintained a relationship with his biological father for several years.  Subject has six siblings, four brothers and two sisters. Three of his older brothers have also served time in prison.  Mackey has one son from a relationship that ended in divorce on February 13, 1989  Mackey has since remarried.  Despite Mackeys less than ideal upbringing he was able to graduate from East Union High School, and go on to obtain a Bachelor of Arts Degree in Sports Medicine from the University of the Pacific.  After graduating Mackey acquired his real estate license, and was working as a real estate agent at the time of his arrest.  Mackey has no significant history of drug or alcohol abuse.

## III. POSTCONVICTION FACTORS:

A. SPECIAL PROGRAMMING/ACCOMODATIONS:    Mackey did not have any disabilities that prevented him from participating in any programs.

B. CUSTODY HISTORY:    Subjects custody was established at MAX-A from 11-29-90 until 02-26-91 as a safety precaution due to the media attention surrounding his case.   A review of the current post conviction progress report, revealed no other unusual circumstance that required clarification.   Subject is currently enrolled in Vocational Refrigeration and Air Conditioning.

C. THERAPY AND SELF-HELP ACTIVITIES:    A review of the current post conviction progress report revealed no unusual circumstance that required clarification.   Subject has received the following Certificates of Completion A Framework for Recovery 03-14-95, Laubach Literacy Action Volunteer Tutor Workshop 12-01-93, Crossroad Bible Institute 08-06-98, Communication Styles and Skills 01-08-99, and House of Healing Anger Management 04-25-01.

D. DISCIPLINARY HISTORY:    Subject has only received one disciplinary CDC RVR 115 during his incarceration.   This rule violation was for the specific act of Horseplay on 12-25-96, and was reclassified as an administrative violation.

E. OTHER:    At his last BPT Documentation hearing, the board recommended that he continue his Self-help Therapy, and Learn a Vocational Trade.   Subject has followed these recommendations.


## IV. FUTURE PLANS:

Mackey's is a College Graduate and is certified in Air Condoning and Refrigeration work.   He also has completed a paralegal course while incarcerated.   Mackey does not foresee any problems with his residence or finding and maintaining a job.

A. RESIDENCE:

Janet Walther-Mackey
613 Lupton Street
Manteca, CA. 95337
Hm 209-825-5814
Cell 209-479-8594

Rebecca A. Williams
587 Victory Avenue
Manteca, CA. 95336
209-823-7043

B. EMPLOYMENT:

Kevin Haslebacher
Plant Manager
Cottage Bakery
209-365-5446

Armando Gomez
Plant Supervisor
209-613-1593

- 7 -

C. <u>ASSESSMENT:</u>  I do not foresee any problems with Subjects plans for parole. Subject has provided documentation to support his residence, and employment plans as well as several letters of support from friends and family members.

## V.  <u>USINS STATUS:</u>

Not Applicable.

## VI. <u>SUMMARY:</u>

A. Prior to release, the prisoner could benefit from the following:

1.  Continued disciplinary free behavior.
2.  Upgrading academically/vocationally.
3.  Continue in self help/therapy programs.

C. This report is based on a several short interviews with the prisoner, incidental contact on the facility, and a review of his central file lasting approximately four hours.

D. Prisoner was afforded an opportunity to review his central file in order to prepare for his appearance before the Board of Prison Terms and chose to review his file (see CDC 128B dated 10-01-04).

E. No accommodation for the purposes of effective communication is required per the Armstong Remedial Plan (ARP).


Prepared by:                                    Reviewed by:


A. Christian                                    D. Arnold
Correctional Counselor I (A)                    Correctional Counselor II
Facility B                                      Facility B


- 8 -

LIFE PRISONER: POSTCON~ _ON PROGRESS REPORT

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

INSTRUCTIONS

TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT.  SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 09/01/04 to 01/31/05 | | | **ADDENDUM** <br><br> **PLACEMENT:**    MCSP  **CUSTODY:**  MEDA  **VOCATIONAL TRAINING:** Mackey remained in his Vocational Air Conditioning and Refrigeration assignment until October 8, 2004 when he was unassigned due to completing the program.  He completed with all satisfactory marks on his CDC 128E progress reports.. **ACADEMICS:**    None noted during this review period. **WORK RECORD:** Mackey was assigned a Program Aide for the Enhanced Outpatient Program on facility "B" on 10/16/04. **GROUP ACTIVITIES:** Mackey received three laudatory chronos during this review period. He attended 13 weeks of a study group entitled "Breaking the Cycle", chrono dated 12/1/04. He completed a 40 week course entitled "The Purpose Driven Life", chrono dated 11/15/04.  He successfully completed the "40 days of Purpose" Bible study, chrono dated 9/30/04.  **PSYCHIATRIC TREATMENT:** Mackey was not a participant in the Mental Health Deliver System during this review period. **PRISON BEHAVIOR:** Mackey did not receive any disciplinary reports during this review period. **OTHER:** Mackey was voluntarily transferred to facility "C" on January 19, 2005, during Mule Creek's conversion of facility "C" to a level III SNY. |

CORRECTIONAL COUNSELOR SIGNATURE

*R. Thomason*

DATE 2/1/05

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| MACKEY, JAMES | E-76532 | MCSP | 12/2004 | SUB |

PAGE 1 of 1

BPT 1004 (REV. 7/86)

## CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 08-31-03 to 09-01-04 | | | **PLACEMENT:** Subject remained at MCSP during this review period. **CUSTODY:** Subjects custody remained MED A during this review period. **VOCATIONAL TRAINING:** Subject was enrolled in Vocational Refrigeration and Air Conditioning on 03-11-04, and is currently assigned to that position. Subject has received satisfactory performance evaluations in this assignment. He also received his certification as a Universal Technician 06-24-04. **ACADEMICS:** Subject completed a Paralegal Foundation Course by correspondence on 04-06-04. **WORK RECORD:** Subject worked as a clerk during this review period and received exceptional work performance evaluations. **GROUP ACTIVITIES:** Subject participated in "Supernatural Ministries" from 08-06-03 to 11-26-03, "Breaking the Cycle" from 12-03-03 to 07-28-04. **PSYCHIATRIC TREATMENT:** None during this review period. **PRISON BEHAVIOR:** Subject received no disciplinary during this review period. **OTHER:** Subject received a 128 B Informational Chrono on 01-22-04 from N. Andrews, Psychiatric Technician, commending him for his extraordinary work with the EOP program. |

**ORDER:**

☐ BPT date advanced by _____ Months          ☐ BPT was affirmed without change

☐ PBR date advanced by _____ Months.         ☐ PBR was affirmed without change

SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed

☐ Add or modify _____

☐ Schedule for Progress Hearing on appropriate institution calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| | | PAGE **3** of **3** | | |
| MACKEY, JAMES | E-76532 | MCSP | 12-2004 | INITIAL |

Case 3:07-cv-00347-ALA    Document 1-5    Filed 01/13/07    Page 26 of 46

**CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT**

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 08-31-01 to 09-01-02 | | | **PLACEMENT:** Subject remained at MCSP during this review period. **CUSTODY:** Subjects custody remained MED A during this review period. **VOCATIONAL TRAINING:** None during this review period. **ACADEMICS:** None during this review period. **WORK RECORD:** Subject worked as a clerk, and as an EOP Aid during this review period. He received exceptional work performance evaluations in both assignments. **GROUP ACTIVITIES:** Subject participated in the "Stay Out of Prison" (STOP) program during this review period. **PSYCHIATRIC TREATMENT:** None during this review period. **PRISON BEHAVIOR:** Subject received no disciplinary during this review period. **OTHER:** Subject received a 128 B Informational Chrono on 07-12-02 from E. Hobbs, Correctional Officer, commending Mackey for his actions in possibly helping save the life of another inmate. |
| 08-31-02 to 09-01-03 | | | **PLACEMENT:** Subject remained at MCSP during this review period. **CUSTODY:** Subjects custody remained MED A during this review period. **VOCATIONAL TRAINING:** None during this review period. **ACADEMICS:** None during this review period. **WORK RECORD:** Subject worked as a clerk during this review period and received exceptional work performance evaluations. **GROUP ACTIVITIES:** Subject participated in "Taking the Limits Off Life" from 05-13-03 to 07-30-03. **PSYCHIATRIC TREATMENT:** None during this review period. **PRISON BEHAVIOR:** Subject received no disciplinary during this review period. **OTHER:** None during this review period. |

**ORDER:**

☐ BPT date advanced by _____ Months          ☐ BPT was affirmed without change

☐ PBR date advanced by _____ Months.         ☐ PBR was affirmed without change

SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed

☐ Add or modify _____

_____

☐ Schedule for Progress Hearing on appropriate institution calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| | | **PAGE 2 of 3** | | |
| MACKEY, JAMES | E-76532 | MCSP | 12-2004 | INITIAL |

BOARD OF PRISON TERMS                                                              STATE OF CALIFORNIA

# LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

[ ] DOCUMENTATION HEARING

[X] PAROLE CONSIDERATION HEARING

[ ] PROGRESS HEARING

**INSTRUCTIONS**
TO CDC STAFF:   DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
TO BPT STAFF:    FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
                 ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT.  SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 08-31-99 to 09-01-00 | | | **PLACEMENT:**  Subject remained at MCSP during this review period. **CUSTODY:**  Subjects custody remained MED A during this review period. **VOCATIONAL TRAINING:**  None during this review period.. **ACADEMICS:**  None during this review period. **WORK RECORD:**  Subject worked as a clerk during this review period and received exceptional work performance evaluations. **GROUP ACTIVITIES:**  None during this review period. **PSYCHIATRIC TREATMENT:**  None during this review period. **PRISON BEHAVIOR:**  Subject received no disciplinary during this review period.  **OTHER:**  Subject received a 128 B Informational Chrono on 12-12-99 from L. Arbios, Medical Secretary, acknowledging his volunteer work in the Mental Heath Program. |
| 08-31-00 to 09-01-01 | | | **PLACEMENT:**  Subject remained at MCSP during this review period. **CUSTODY:**  Subjects custody remained MED A during this review period. **VOCATIONAL TRAINING:**  None during this review period. **ACADEMICS:**  None during this review period. **WORK RECORD:**  Subject worked as a clerk during this review period and received above average, and exceptional work performance evaluations. **GROUP ACTIVITIES:**  Subject participated in Alcoholics anonymous from 07-01-00 to 12-31-00. Subject also participated in the "Stay Out of Prison" (STOP) program during this review period. **PSYCHIATRIC TREATMENT:**  None during this review period. **PRISON BEHAVIOR:**  Subject received no disciplinary during this review period. **OTHER:** Subject received a 128 B Informational Chrono on 03-08-01 from R. Geyser, Recreational Therapist, acknowledging his exceptional work in the Mental Heath Program. |

| CORRECTIONAL COUNSELOR SIGNATURE | DATE |
|---|---|
| _(signature)_ | 10-01-04 |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| MACKEY, JAMES | E-76532 | MCSP | 12-2004 | INITIAL |

**PAGE 1 of 3**

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 0/97 to 0/98 | | | Inmate Mackey remains at MCSP on Facility B with Close B custody, CS of 15. Inmate Mackey continues to be assigned as a clerk, CDC 101 Work Supervisor's Reports reflects exceptional work, also excellent work habits and his performance of job duties is appreciated by all staff. On 7-7-98 he appeared before UCC Facility B for his Program review. Committee is in receipt of a CDC 128C dated 6-23-98 written by Dr. G. Douglas medically unassigning Subject through 12-31-98 pending neuralogic evaluation for headaches. Inmate Mackey will retain A1/A status until exhaustion of ETO, then will revert to A2/B status. On 8-18-98 he appeared before UCC for a Program review. Committee acts to rescind medical unassignment dated 7-7-98 grant "S" time from 7-7-98 until re-assigned due to a CDC 128C dated 8-18-98. His CS was reduced to 7. Inmate Mackey was disciplinary free this time period. He did participate in Great Truths of the Bible and graduated from the tier one course on August 6, 1998. |
| 10-98 to Present | | | Inmate Mackey remains at MCSP on Facility B with Close B custody, CS of 7. On 1-27-99 he was seen by UCC for an Annual review. Inmate Mackey is currently assigned as a program clerk and he is receiving above average work reports. Committee acts to reduced his custody to Med A. Committee adjusted his CS to 1. UCC also elects to continue on present program. Inmate Mackey continues to remain disciplinary free. Inmate Mackey has participated in Communication Styles and Skills and completed the course on 1-8-99. |

**ORDER:**

☐ BPT date advanced by _____ months.     ☐ BPT date affirmed without change.

☐ PBR date advanced by _____ months.     ☐ PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**

☐ Previously imposed conditions affirmed.

☐ Add or modify _____

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| MACKEY, JAMES | E-76532 | MCSP | DOC 10/99 | |

BPT 1004 (REV. 7/88)         PAGE _____ of _____         PERMANENT ADDEN

BOARD OF PRISON TERMS                                                    STATE OF CALIFORNIA

# LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING

☐ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

## INSTRUCTIONS

**TO CDC STAFF:** DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.

**TO BPT STAFF:** FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 10/96 to 10/97 | | | Inmate Mackey is a 35 year old, Black, 1st termer received CDC 11-20-90 from San Joaquin County for Murder 1st with a sentence of 25 year to life. He has no prior arrest with no gang affiliations.

This report is the third BPT Documentation Hearing for Inmate Mackey, E-76532 and will cover his behavior and progress from 10-26-96 until the present time. It is noted that his MEPD is 1-29-2006.

Inmate Mackey remains at MCSP, Facility B with Close B custody with a CS of 23. On 12-25-96 he received a CDC 115 for Horseplay and reclassified as an Administrative. On 2-11-97 he appeared before UCC for his Annual review. He is currently assigned to Facility B, Captain's Clerk and his CS was reduced by 8 points making his CS 15. Committee acts to refer his case to the CSR with recommendations MCSP-III override alternate SCC-III. Inmate's request is based on family ties, complete Master's Thesis and work based on him being a vital asset to the Program Services Unit as a clerk. Inmate Mackey has not participated in any self help programs during this time period. |

CORRECTIONAL COUNSELOR SIGNATURE    D. May    C CR    DATE 8/30/99

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| MACKEY, JAMES | E-76532 | | MCSP | DOC 10/99 |

BPT 1004 (REV. 7/86)                        PAGE 1 of _____

☐  DOCUMENTATION HEARING

☐  PAROLE CONSIDERATION HEARING

☐  PROGRESS HEARING

INSTRUCTIONS
 TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
 TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
                ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| | | | Inmate Mackey is a 31 year old, black, 1st termer received CDC 11-20-90 from San Joaquin County for Murder 1st with a sentence of 25 years to Life.  He has no prior arrest history.  The CDC 812 reflects enemy concerns with no gang affiliations. |
| | | | This report is the second BPT Documentation Hearing for Inmate Mackey, E-76532 and will cover his behavior and progress from 10-14-93 until the present time.  It is noted that his MEPD is 1-29-2006. |

COPY TO INMATE
VIA CC-1 9/6/96

CORRECTIONAL COUNSELOR SIGNATURE                                    DATE

C. Johnson CCI

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING D |
|---|---|---|---|---|
| MACKEY, JAMES | E-76532 | MCSP | OCT/96 | |

BPT 1004 (REV. 7/86)                      PAGE 1 of _____

BOARD OF PRISON TERMS                                                                    STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 10-14-95 to Present | | | Inmate Mackey appeared before UCC on 2-8-96 for Annual review. His CS was adjusted to 23, making him eligible for Level II review. He was received exceptional grade from his work supervisor. Additionally he received certificate for successfully completing "Framework for Recovery" and is participating in the Masters Program in health, PE, and sports therapy and medicine via correspondence from LaSalle University, Mandenville, Louisiana. He has also participated actively in a voluntary class entitled Understanding Your Feeling which is a 15 session course. Committee acted to refer to CSR RX: MCSP-III override alternate SOL-II, CPP. He was endorsed by CSR on 3-4-96 for SOL-II. On 3-14-96 he appeared before UCC for Program review. He was re-referred back to CSR based on him being a vital asset to the program service unit as a clerk and his studies from La Salle University which was still in effect. Committee acted to rescind action of 3-4-96, refer to CSR RX: MCSP-III override per CSR for MCSP-III override based on administrative placement of work. He remains disciplinary free with Close B custody. |

**ORDER:**

☐ BPT date advanced by _____ months.   ☐ BPT date affirmed without change.

☐ PBR date advanced by _____ months.   ☐ PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**

☐ Previously imposed conditions affirmed.

☐ Add or modify. _____

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| MACKEY, JAMES | E-76532 | MCSP | OCT/96 | |

BPT 1004 (REV. 7/86)                    PAGE 4 of 4                    PERMANENT ADDENDA

CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 10-14-94 to 10-14-95 | | | Inmate Mackey appeared before UCC on 1-5-95 for Annual review. Based on two disciplinary free periods and two work performance periods, his CS was adjusted to 31. Committee elected to CPP (Counselor's Clerk). He remained disciplinary free. On 3-24-95 he appeared before UCC for Program review. Due to Close B custody procedures per DOM Section 62010 dated 1/95, Committee acted to increased his custody from Med A to Close B, CPP. |

**ORDER:**

☐ BPT date advanced by _____ months.      ☐ BPT date affirmed without change.

☐ PBR date advanced by _____ months.      ☐ PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**

☐ Previously imposed conditions affirmed.

☐ Add or modify _____

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| MACKEY, JAMES | E-76532 | MCSP | OCT/96 | |

BPT 1004 (REV. 7/86)

PAGE 3 of 4

PERMANENT ADDENDA

## CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| **YEAR** | **BPT** | **PBR** | |
| 5-1-93 to 10-14-93 | | | Inmate Mackey was reviewed in absentia on 8-25-93 by Facility C UCC for Program review. At Inmate's request he was removed from Acad/ABE waiting list based on TABE test with a GPL of 12.9 plus. On 9-2-93 he appeared before Facility B UCC for initial review. He was transferred from Facility C to Facility B on a non-adverse per PA agreement based on enemy concerns regarding his commitment offense. He was assigned to the Yard crew on 9-14-93 with Close B custody and CS of 47. On 10-8-93 he appeared before UCC for Program review. Committee acted to reduce custody to Med A, remove from Yard crew assignment and placed on position assignment as Relief clerk. |
| 10-14-93 to 10-14-94 | | | Inmate Mackey appeared before UCC on 10-28-93 for Post Board review. He appeared before BPT on 10-14-983 for Doc #1 hearing. The Board recommended he participate in self-help therapy or group activities. He was placed on 10/96 calendar for Doc #2 hearing. Committee elected to continue on present program (CPP). On 1-6-94 he was reviewed in absentia per pre-annual interview of 1-4-94. He received a maximum reduction of 8 points reducing his CS to 39. Committee acted to CPP. |

**ORDER:**

- [ ] BPT date advanced by _____ months.
- [ ] PBR date advanced by _____ months.
- [ ] BPT date affirmed without change.
- [ ] PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**

- [ ] Previously imposed conditions affirmed.
- [x] Add or modify _____

- [ ] Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| MACKEY, JAMES | E-76532 | MCSP | OCT/96 | |

BPT 1004 (REV. 7/86)

PAGE 2 of 4

PERMANENT ADDENDA

Case 2:07-cv-00347-ALA    Document 15    Filed 01/12/07    Page 34 of 46

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 11-20-92 to Present | | | On 12-9-92, he appeared before Fol-UCC for Annual review which covered from 1-92 to 1-93. He was assigned AD-SEG library clerk. His CS was reduced to 47 based on 2 disciplinary free periods and two work performance periods. Committee elected to refer to CSR, RX: MCSP-III altn. CMFS-III based on Level III review. He was endorsed by CSR on 12-23-92 to MCSP-III. |
| | | | On 1-13-93, he appeared before MCSP-Fac C UCC for Initial review. He was released to GP at Close B custody A1/A status, PO Acad/ABE and SS/WL, priority hire, refer to Medical for food handling. He was assigned Program Service Porter on 1-23-93. He is scheduled for a Documentation #1 hearing on the October 1993 hearing calendar. |

ORDER:

☐ BPT date advanced by _____ months.        ☐ BPT date affirmed without change

☐ PBR date advanced by _____ months.        ☐ PBR date affirmed without change

SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed.

☐ Add or modify _____

_____

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| MACKEY, JAMES | E-76532 | MCSP | OCTOBER/93 | |

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 11-20-91<br>to<br>11-20-92 | | | On 12-19-91, he appeared before Fol-A UCC for Initial review. He went out to court on 11-13-91 as a witness testifying against a co-defendant in a retrial in San Joaquin County and is considered an enemy. He was released to A-GP. He was placed on special skills (clerk) waiting list at A1/A status, Close A, effective 7-13-91. He was assigned AD-SEG asst. law clerk on 12-20-91.<br><br>On 3-24-92, he appeared before Fol-A UCC for Initial/Annual review. He was received at Folsom on 3-23-92 from OTC (Alameda Co.) as a result of testifying as a witness in the highly publicized murder trial against a co-defendant. Committee acted to release to GP, PO special skill WL at A1/A status, Close A custody with CS of 55 based on 2 disciplinary free periods and 1 work performance period. He was assigned to the Recycling crew effective 4-1-92. |

ORDER:

☐ BPT date advanced by _____ months.    ☐ BPT date affirmed without change

☐ PBR date advanced by _____ months.    ☐ PBR date affirmed without change

SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed.

☐ Add or modify _____

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| MACKEY, JAMES | E-76532 | MCSP | OCTOBER/93 | |

BPT 1004 (REV 7/86)                    PAGE __2__ of __3__                    PERMANENT ADDENDA

Case 2:07-cv-00347-ALA    Document 1-5    Filed 01/13/07    Page 36 of 46

# LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

- [X] DOCUMENTATION HEARING
- [ ] PAROLE CONSIDERATION HEARING
- [ ] PROGRESS HEARING

**INSTRUCTIONS**

TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.

TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 11-20-90 to 11-20-91 | | | This is Inmate Mackey, E76532, first Documentation Hearing. He is a 29 year old, Black, first termer, received CDC 11-20-90 from San Joaquin County for Murder 1st with a sentence of 25 years to Life.<br><br>On 11-29-90, Inmate Mackey appeared before DVI-ICC for Initial AD-SEG review being placed in AD-SEG due to testifying in San Joaquin County on a murder trial that received wide spread media attention. There was no central file and Committee acted to retain AD-SEG, single cell for his safety and for the safety and security of the institution.<br><br>On 12-20-90, he again appeared before DVI-ICC for 30 day AD-SEG review. He was again retained in AD-SEG, single cell, CS 61, pending CSR action and transfer. He was endorsed by CSR on 1-23-91 to PBSP G/P. On 2-15-91, the case was redirected to FOL-IV, rescinding CSR action of 1-23-91 due to population pressure.<br><br>On 2-26-91, he appeared before Fol-UCC for Initial review. Committee acted to release to GP and PO SS/WL with Close A custody at A2/B status. He was assigned to Recycling crew at A1/A status, Close A on 7-12-91. |

| CORRECTIONAL COUNSELOR SIGNATURE | DATE |
|---|---|
| Johnson cct | |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| MACKEY, JAMES | E-76532 | MCSP | OCTOBER/93 | |

**COPY TO INMATE VIA CC-1** 9/7/93

BPT 1004 (REV. 7/86)

PAGE 1 of _3_

# EXHIBIT I

# ANNUAL TB CHRONO
## TB SKIN TESTING

DISTRIBUTION

CENTRAL FILE: ☑
MEDICAL FILE: ☒
INMATE: ☒

INMATE TB ALERT CODE    **22**

DATE: 05-06-2004

*S. Zangli RN*
_____
S. Zangrilli, RN

---

NAME and NUMBER    Mackey, James  E-76532  7-117    CDC-128-B (Rev. 4/74)

This inmate attended 13 weeks of a 1 hour study group BREAKING THE CYCLE Part 3, the ultimate solution to destructive patterns from August 4, 2004 to November 24, 2004. The key ideas covered in this Dr. James Richards book included the following:

1. Trapped by Opinions
2. Is Jesus Enough
3. Overcome Shame
4. Overcome Confusion
5. Feelings & Actions
6. Solution to Shame
7. Blind leading Blind
8. Completeness
9. Voice Conscience
10. Good works Testify
11. Heart Physics
12. Missing Ingredient
13. Quantum Physics
14. Radical Gospel
15. Destructive Addiction
16. Righteous Reality
17. Resurrection Power
18. Spirit Living
19. Set Your Heart
20. Abundant Life

He has been given tools to face life with a new confidence, having keys to personal empowerment. He has learned to disconnect   from the feelings of lack and inadequacy, because of the righteousness of Christ. He is to be commended for his time and effort in the group process.

cc: Inmate

*Pastor Scott Barham*
Pastor Scott Barham, Protestant Chaplain

DATE    December 1, 2004    (LAUDATORY / BREAKING THE CYCLE)    MCSP/Ione    GENERAL CHRONO

---

NAME and NUMBER    MACKEY    B-7-117L    E-76532    CDC-128-B Rev. 4/74

Inmate MACKEY has completed a 40 week course entitled "The Purpose Driven Life", answering one of life's most important questions: What on earth am I here for? The answer is knowing God's purpose for my life. The course was from Feb. 4, 2004 to Nov. 3, 2004. He has grown to no longer allow his crime and misbehavior to identify who he is. He is growing in the grace and knowledge of his Lord and Savior, Jesus Christ. He has shown commitment and is walking in newness of life, resulting in a healthy and successful life that will bring honor and glory to Jesus.

*Pastor Scott Barham*
Pastor Scott Barham
Protestant Chaplain
Cc.: C-File, Writer, Inmate

DATE    November 15, 2004    Mule Creek State Prison    GENERAL CHRONO

On 09/26/04, James Mackey ALA successfully completed 01/18/04 40-days of Purpose, Bible
Study. The 40-days of Purpose is based on the best selling book, The Purpose-Driven Life.
The program is a small group, hands on, in depth study of; Purpose # 1-You Were Planned
For God's Pleasure; Purpose # 2-You Were Formed For God's Family; Purpose # 3-You Were
Created To Become Like Christ; Purpose # 4-You Were Shaped For Serving God; and Purpose
# 5-You Were Made For a Mission;  Mr. Mackey's participation has been very valuble to the
other men. He has grasped the 5-Purposes of his life with God, applied them to his life,
and used them to encourage others. Mr. Mackey is a serious well grounded man of God.  His
insights, pleasant attitude and renewed mind demonstrate a positive change in his lifestyle,
that brings honor and glory to God.

ORIGINAL: C-File
     CC: A. Christian, CCI                    S. BARHAM, PROTESTANT CHAPLAIN
         Writer                               Mule Creek State Prison
         Inmate

DATE     09/30/04          (SELF HELP-RELIGIOUS)       MCSP-IONE     GENERAL CHRONO

---

On 6-9-82 Mr.MACKEY,  completed all high school requirements at,
EAST UNION HIGH SCHOOL, required for his High School Diploma.
His official High School transcripts state that he is a High School
graduate.

Orig:   Central File
  cc:   Education File
        CCI
        Writer-2                             L. BERNARDO
        Literacy Coord.                      High School Coordinator
        Inmate

DATE:  8-11-04            (Informative)                   MCSP/Ione

---

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

This inmate attended 15 weeks of a 1 hour study group BREAKING THE CYCLE Part 2, the ultimate
solution to destructive patterns from April 7, 2004 to July 28, 2004. The key ideas covered in this
book by Dr. James Richards included the following:

1. The Cycle             6. Deserving/Qualified   11. Dead Works          16. Power of Promise
2. Deceit of lack        7. Son or Slave          12. Grace & Truth       17. Results Reveal Logic
3. Complete in Jesus     8. Motive for Service    13. Law Substitute      18. Doctrinal Test
4. Illogic of lack       9. The Turning Point     14. Radical Message     19. New Perspective
5. Wrong Questions      10. Right in Jesus        15. Belief Cornerstone  20. Reshape Your Heart

He has grown to no longer allow his crime to identify who he is. He sees the necessity to step out of
the mold of his past, and to be renewed in his mind to the promises of the finished work of the cross
of Jesus Christ, resulting in a healthy and successful life.

cc: Inmate                                      Pastor Scott Barham, Protestant Chaplain

DATE     August 1, 2004  (LAUDATORY / BREAKING THE CYCLE) MCSP/Ione       GENERAL CHRONO

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS
CDC 128A (4-74)

**NAME and NUMBER** Mackey    James    E76532

Inmate Mackey    E76532    has successfully demonstrated and completed all criteria pertaining to safe refrigerant handling and recovery, as mandated by EPA Section 608 of the Clean Air Act of 1990.  Inmates test scores qualify him for the rating as **Universal** certified technician.

Test Site: MCSP Voc. A/C  R Program

Test Date: 24-Jun-04

Test Administered by M. Sandoval    Proctor Number 100784

Original  C-File

cc:    CCI
       Education
       Writer
       Inmate

M. Sandoval, Vocational
Instructor Voc.

---

**NAME and NUMBER**  MACKEY, JAMES    E-76532    7-117

CDC-128-B (Rev. 4/7.

This inmate attended 15 weeks of a 1 hour study group BREAKING THE CYCLE Part 1, the ultimate solution to destructive patterns from Dec. 3, 2003 to March 31, 2004. The key ideas covered in this book by Dr. James Richards included the following:

1. The Defining Moment
2. The Sense of Lack
3. Naked and Vulnerable
4. Identity Recovered

5. Driven by Lack
6. The Qualifying Factor
7. What We Were Told
8. The Heart of the Gospel

9. From First to Last
10. Power of Righteousness
11. Flawed Logic

He has learned how to end his repeated struggles and break out of destructive cycles through his revelation of being in right standing with God. As a result, this inmate is now walking in greater peace and happiness. He is no longer driven by what he does not have, but rejoicing in what he has because of his relationship with Christ.

cc: Inmate

Pastor Scott Barham, Protestant Chaplain

DATE    April 1, 2004    (LAUDATORY / BREAKING THE CYCLE) MSCP/Ione    GENERAL CHRONO

---

**NAME and NUMBER**    MACKEY    E-76532    B7-117L    CDC-128-B (Rev. 4/74

Inmate MACKEY, E-76532, 7-117L, who is assigned as an EOP Aide, is to be commended for his assistance and extraordinary dedication to his assignment and to the inmate participants in the EOP program.  The personal attention Mr. Mackey gives to individual inmates is far greater than is expected from an EOP Aide and demonstrates his genuine desire to see this program succeed.  He accomplishes this by helping the inmates in the program improve their quality of life through talking, listening and generally making himself available to these men.  He has the ability to gain the trust of inmates who are new to the program and are going through times of adjustment, which takes a great burden from staff, allowing us greater freedom to do our jobs.  His hands-on approach is very effective and should be a model for other inmates in this position.

Original:  C-File
       cc:    CCI
              Writer
              Inmate

N. ANDREWS
Psychiatric Technician
Facility "B"

DATE    01/22/04    (LAUDATORY)    MCSP-IONE    GENERAL CHRONO

He attended 17 weeks of the st[ ] group SUPERNATURAL MINISTRIES [ ] August 6, 2003 to November 26, 2003. The key [ ]as covered in the above book by D[ ]ames Richards included:

1. Living Organism
2. Unleashing Power
3. God's secret weapon
4. Priorities
5. Church history
6. Living vision
7. The investment
8. Personal Growth
9. Creative nature
10. Showing Jesus
11. Ministry calling
12. Not ministering?
13. Sanctifying Jesus
14. Give an answer
15. Sacrifice
16. Take to Church
17. House to house
18. Spoken Word
19. Reconciliation
20. Witnessing
21. Spirit baptism
22. Resisting devils
23. Healing sick
24. Follow-up
25. Backslidden
26. New Believers
27. Spiritual warfare
28. Plan of action

Every person has gifts, skills and abilities that can be easily unleased. The above man has learned to share his changed life in a conversational manner. He is to be commended for his growth.

cc: Inmate

*Pastor Scott W Barham*

Pastor Scott Barham, Protestant Chaplain

DATE    12/03/03    [LAUDATORY / SUPERNATURAL MINISTRIES]    MCSP/Ione   GENERAL CHRONO

---

NAME and NUMBER    **MACKEY    E-76532    7-117**    CDC-128-B (Rev. 4/74)

Inmate Mackey attended 12 weeks of a 1 hr. study group TAKING THE LIMITS OFF LIFE from May 14, 2003 to July 30, 2003. The key ideas covered in the above book by Dr. James B. Richards included:

1. Taking limits off
2. Lost in wilderness
3. Negative thinking
4. Eye of faith
5. Self-Esteem
6. Circumstances
7. Everything possible
8. Help my unbelief
9. Remove obstacles
10. His word sufficient
11. Commitment
12. See as God sees
13. God is love
14. Self-worth
15. Heart persuasion
16. Operating bold faith
17. No more limits
18. God's promises
19. Cast away unbelief
20. Power for life

Mr. Mackey has learned to not limit what God can do through his life by changing his perception of God. He has learned the ways he limits himself, and how to stop doing so. He is to be commended for his willingness to grow mentally and spiritually in life.

cc: Inmate

*Pastor Scott W Barham*

Pastor Scott Barham, Protestant Chaplain

DATE    August 1, 2003   [LAUDATORY / TAKING THE LIMITS OFF LIFE]   MCSP/Ione   GENERAL CHRONO

---

NAME and NUMBER    **MACKEY, JAMES    E-76532    B7-117L**    CDC-128-B (Rev. 74)

The above named inmate is authorized to receive and send books and study materials to and from PROFESSIONAL CAREER DEVELOPMENT INSTITUTE, THE SCHOOL OF PARALEGAL STUDIES, so that he may participate in the PARALEGAL STUDIES course, via correspondence. This work has been authorized by the MCSP Operational Procedure for Educational Services #MC3-53090. This approval is not to be construed as approval for the possession of more than ten (10) books and/or other study materials in this Inmate's cell at any one time. A hardcover textbook will be allowed if softcover is not available. Computer, video and online services are not available. Inmate will be solely responsible for all financial costs. This chrono will be valid for one year, 7/23/03 - 7/23/04.

*G. Swarthout*    *V. Federico*    *M. Moreno*

G. Swarthout, Associate
Warden, Central Services

V. Federico, Supervisor of
Correctional Education Programs

M. Moreno
College Coordinator

Orig: C-File, cc: I/M Ed. File, Supervisor, Mailroom,
Package C/O, R&R, Proctor, College Coordinator, Inmate

DATE   July 23, 2003    CORRESPONDENCE COURSE    MCSP-Ione    **GENERAL CHRONO**

The above named inmate is authorized to receive and send books and study materials to and from OHIO UNIVERSITY so he may participate in the ENG 361: CREATIVE WRITING and the BIOS 345: HUMAN PHYSIOLOGY course, via correspondence. This work has been authorized by the MCSP Operational Procedure for Educational Services #MC3-53090. This approval is not to be construed as approval for the possession of more than ten (10) books and/or other study materials in this Inmate's cell at any one time. A hardcover textbook will be allowed if softcover is not available. Computer, video and online services are not available. Inmate will be solely responsible for all financial costs. This chrono will be valid for one year, 5/30/03 - 5/30/04.

G. Swarthout, Associate
Warden, Central Services

V. Federico, Supervisor of
Correctional Education Programs

M. Moreno
College Coordinator

Orig: C-File cc: I/M Ed. File, Supervisor, Mailroom,
R&R, Proctor, College Coordinator, Inmate

**DATE** May 30, 2003   CORRESPONDENCE COURSE   MCSP-Ione   **GENERAL CHRONO**

-------------------------------------------------------------------------

NAME and NUMBER   MACKEY   E-76532   B7-117L   CDC-128-B (Rev. 4/74)

Inmate MACKEY, E-76532, 7-117L, who is assigned as an EOP Aide, is to be commended for his assistance and diligence. On 07/12/02, Mr. Mackey alerted staff that an EOP inmate was down and required medical assistance. As he was performing his assignment, he heard a strange sound coming from the lower C-Section shower and went to investigate. Upon arriving at the shower, Mackey found an EOP inmate laying on the shower floor, covered in blood. Mackey immediately alerted staff of what was happening, allowing us to respond promptly. Mr. Mackey's alertness and diligence possibly saved this inmate's life and should be recognized.

Original:   C-File
cc:   R. Williams, CCI
      Writer
      Inmate

E. HOBBS
Building #10 Floor Officer
Facility "B" 2/W

DATE   07/12/02   (LAUDATORY)   MCSP-IONE   GENERAL CHRONO

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS
CDC 128 B (4-74)

NAME and NUMBER   MacKey, James   E-76532   07-117L

Inmate MacKey (E-76532, 07-117L), is to be commended for his voluntary participation in the course entitled "The Four Agreements". This inmate participated fully, displayed a positive attitude towards improving himself, and his attendance and participation were very good. "The Four Agreements" is a component of the MCSP 'Stay Out of Prison' (STOP) program.

Original:   C-File
cc:   Writer
      Inmate

M. Kay
M. KAY, CCII
Program Specialist

DATE:   February 01, 2002   *"STOP" Program, Course Completion*   GENERAL CHRONO

Case 2:07-cv-00347-ALA    Document 1-5    Filed 01/13/07    Page 43 of 46

NAME and NUMBER        Mackey        E-76532        07-117L

Inmate Mackey (E-76532, 07-117L), is to be commended for his voluntary participation in the "Emotional Literacy" course entitled "Houses of Healing". Topics discussed in this class included: *Anger Management; Improving Coping Skills;* and *Dealing Effectively with Shame, Guilt, and Forgiveness.* This inmate participated fully and displayed a positive attitude towards improving himself. His attendance and participation were very good. "Houses of Healing" is a component of the MCSP 'Stay Out of Prison' (STOP) program.

Original:     C-File
cc:          Writer
             Inmate

*M. Merritt*

M. MERRITT, CCII
Program Specialist

DATE:     May 10, 2001

*"STOP" Program, Course Completion*

GENERAL CHRONO

---

NAME and NUMBER        MACKEY, JAMES        E-76532        B7-117L        CDC-128-B (Rev.4/74)

Since its inception, Mr. MACKEY has always made himself available to the Mental Health Program. When a new system of tracking the EOP inmate groups was needed, Mr. MACKEY helped design and implement the new system, and took on the daunting job of ordering supplies, equipment and furniture needed to set up the program from outside vendors and created data bases, forms and individual tracking sheets for approximately 150 inmates, all while performing his assigned duties as CCII's Clerk and Facility Captain's Clerk. These duties are now performed by three clerks who are assigned full-time. Mr. MACKEY'S assistance to this program has been invaluable and his attitude regarding helping inmates and staff should be commended. He has definitely been an asset to the Mental Health Program and I feel that he will be an asset to community when he is paroled. In your consideration of his parole, please keep these things in mind.

Original:     C-File
             Writer
             Inmate

*Robert T. Geyser CRTS*

R.T. GEYSER
Recreational Therapist
Facility "B"

DATE   03/08/01        (LAUDATORY)        MCSP-IONE        GENERAL CHRONO

---

NAME and NUMBER        MACKEY   E-76532        CDC-128-B (Rev. 4/74)

INMATE MACKEY        HAS BEEN AN ACTIVE PARTICIPANT IN ALCOHOLICS ANONYMOUS FOR THE SIX MONTH PERIOD OF JULY 1, 2000, THROUGH DECEMBER 31, 2000.

HE IS TO BE COMMENDED FOR HIS DEDICATION TO THE GROUP AND PERSONAL COMMITMENT TO RECOVERY.

CC:     C-FILE
        COUNSELOR
        INMATE
        WRITER

*Bob*

BOB DiPIERO
STAFF SPONSOR
MCSP

DATE   JANUARY 8, 2001        ALCOHOLICS ANONYMOUS        MCSP-IONE        GENERAL CHRONO

NAME AND NUMBER:  MACKEY, JAMES  E-76532    B-7-250L    CDC 128B

The above named inmate is authorized to receive and send books and study materials to and from LaSalle University, 634 Village Lane North, Mandeville, La. 70471. so that he may participate in the "The MASTERS PROGRAM in HEALTH, P. E., and SPORTS THERAPY & MEDICINE", via correspondence.
This work has been authorized by the Associate Warden, Central Services, via Supervisor of Correctional Education Programs.  This approval is not to be construed as approval for the possession of more than ten (10) books and/or study materials in this inmate's cell at any one time.  The inmate will be solely responsible for all financial costs.  This chrono will be valid for one year, May 18, 1995 through May 18, 1996.

ALICIA RAMIREZ-BREWER, Ed.D.          C. REASOR
Supervisor of Correctional            Associate Warden
Education Programs                    Central Services

Original: C File
cc:  Inmate, Education File, CCI, Teacher, Education Office,
     R & R, Mailroom, College Coordinator, and Literacy Facilitator

5/18/95    CORRESPONDENCE COURSE          MULE CREEK STATE PRISON

---

NAME and NUMBER MACKEY  E-76532  B7-250L                    CDC-128-B (Rev. 4/74)

From January through March 1995, the STay Out of Prison (STOP) Program at Mule Creek State Prison offered a 12 session course entitled "A Framework For Recovery".  This inmate volunteered to enter the program and successfully graduated.  His attendance and participation were good.  He displayed the desire to make positive changes in his life.  He is now eligible for "graduate group" and other advanced classes and has expressed interest in ongoing personal growth and program participation.

M. MERRITT, CCII
Facility "B"

ORIG:  C-File
cc:    Inmate

DATE  5-1-95    S.T.O.P. PROGRAM GRADUATION - MCSP          GENERAL CHRONO

NAME and NUMBER      **MACKEY, E-76532**           B 7-250 L           CDC-128-B (Rev. 4/74)

Inmate Mackey, E-76532 has performed the duties of a Correctional Counselor
II's clerk, facility "B", for several months.  His attitude, willingness to
accept additionally assignments and his reliability has proven to be an asset
to the operation of classification process.  The documents that Mackey
provided are accurate and consistent.  Additionally, inmate Mackey displays a
pleasant attitude and willingness to accept additional assignments.

Thanks for making my job a little easier.


**R.X. PERRY, CCII**
**MCSP Facility "B"**          GENERAL CHRONO

DATE     **4/14/94**



NAME and NUMBER      MACKEY      E-76532           CDC-128-B (Rev. 4/74)

This is to document that I/M  MACKEY, E-76532, has successfully completed the MCSP
Laubach Action Tutor Training Workshop.  The Laubach program is being used to increase
literacy among the inmate population by providing training to peer tutors who will
in turn help other inmates.  This instruction in reading, writing, speech patterns,
and other academic skill areas is being carried out in accordance with California
State Legislative Intent and CDC Policy, and it utilizes  training methods developed
in conjunction with the U.S. Department of Education.  This inmate has completed the
12 hours of training required for the completion of this "Each One Teach One" program.
His involvement in this training demonstrates his willingness to expand his own learning
and his desire to help others do the same.

Orig:  C-File
  cc:  CCI
       Writer
       I/M

**C. GUEFFROY**
MCSP Literacy Facilitator

DATE   December 1, 1993                                    GENERAL CHRONO

Case 2:07-cv-00347-ALA   Document 1-5   Filed 01/18/07   Page 46 of 46

I want to acknowledge the assistance inmate Mackey has been providing the Mental Health Services department. For approximately the last two years, inmate Mackey has volunteered his assistance in purchasing equipment and supplies for the department. He has demonstrated a high level of competency. He has been able to obtain necessary information in making purchases. I want to thank inmate Mackey for all of his help these past years. He has demonstrated a positive and helpful attitude. His assistance has enhanced the quality and success of Mental Health Services.

Orig:  Central File
  cc:  Medical File
       Inmate
       Counselor

*Lynn Arbios*

LYNN ARBIOS
Medical Secretary

DATE        12-21-99

GENERAL CHRONO

---

Inmate MACKEY, E-76532, has been assigned as CCII's clerk for 27 months. During this period, MACKEY has proven himself to be reliable, dependable, and trustworthy. He completes all assigned tasks with the minimal amount of supervision, consistently displays pride in maintaining accuracy, and he has established an excellent rapport with both staff and inmates. MACKEY demonstrates initiative at his work site, and is both willing and capable of providing guidance and assistance to his fellow inmate workers. His knowledge of the UCC operation has been an invaluable asset to counseling staff, and he has maintained a pleasurable demeanor while coordinating inmate appearances for UCC actions. MACKEY'S is a "sensitive" assignment, and he has not once compromised the trust placed in him by staff. He displays interest in his day-to-day duties, and is not hesitant in "taking the extra step" to ensure above average work. It is readily apparent that MACKEY has chosen to better himself while incarcerated, without allowing himself to become institutionalized.

cc: C-File
    Writer
    Inmate

*R.W. Townsend*

R.W. TOWNSEND
Correctional Counselor II

DATE    3/21/96        (LAUDATORY)      MCSP-IONE            GENERAL CHRONO

---

During the months of July, August and September, 1995, this inmate participated actively in a volunteer class entitled, "Understanding Your Feelings." The 15-session course covered topics including anger management, modifying responses to various feelings, and developing empathy and assertive communication skills. His attitude and attendance were very good.

ORIG: C-File
  cc: Writer
      Inmate

*M. Merritt*

M. MERRITT
Correctional Counselor II
Mule Creek State Prison

DATE     10-19-95     (LAUDATORY: SELF-HELP CLASS)     MCSP          GENERAL CHRONO