IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JAMES MACKEY,

    Petitioner,                    No. 2:07-cv-00347 ALA (HC)

    vs.

MICHAEL MARTEL, Warden[1],       <u>ORDER</u>

    Respondent.

_____/

Pending before the Court are James Mackey's ("Petitioner") application for a writ of habeas corpus pursuant to 28 U.S.C. §2254(a) (doc. 1), Respondent's Answer (doc. 19), and Petitioner's Traverse (doc. 21). Also before the Court are the parties' supplemental briefs filed in response to this Court's April 7, 2008 order requesting additional briefing on supplemental authority, if any, related to this matter (doc. 23). For the reasons discussed below, Petitioner's application is denied.

**I**

**A**

Pursuant to a plea agreement, Petitioner entered a guilty plea to one count of first-degree

---

[1] Michael Martel is substituted for his predecessor, Richard Subia, as the warden where the prisoner is incarcerated, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

1

1  murder in violation of California Penal Code § 187.  He was sentenced on November 20, 1990,

2  to serve a sentence of twenty-five years to life.

3      As part of the written plea agreement, the District Attorney agreed to write a letter

4  recommending the Petitioner's early release, in exchange for the Petitioner's cooperation and

5  testimony in another case arising out of the same murder.

## B

The probation report prepared for the trial court's sentencing proceedings described Petitioner's crime as follows:

> SUMMARY OF OFFENSE
> The real estate agent Lawrence Carnegie stood with his back to an open garage door on property at 14152 East Tokay Colony Road, Lodi, he was shot in the back with the bolt from a crossbow fired by James Mackey.  Mackey had been hiding inside the garage, waiting for Carnegie to be lured into position by Carl Hancock, so Mackey could shoot Carnegie.
>
> The shooting occurred the evening of February 28th, 1989.  Moments after Carnegie was shot, a car driven by Denise Brock drove onto the property.  Brock and the children in her car saw Carnegie on the ground, saw Carl Hancock running toward Brock's car, and saw Mackey standing over Carnegie with his back to the car.  Those in the car were unable to give Sheriff's Deputies any more complete description of Mackey than the description of his clothing.
>
> Brock was frightened by the activity she happened upon and quickly backed out of the driveway.  She drove to a residence on Tully Road and called the "911" emergency dispatcher and reported what she had seen.
>
> When deputies from the Sheriff's Department went to the residence on Tokay Colony Road, they found a bloody sleeping bag, the bloody bolt from a crossbow, and Lawrence Carnegie's car.  Carnegie and the two men described by Brock could not be found.
>
> Carnegie's body was found the next afternoon in a rural area along Highway 128 in Sonoma County.  Subsequent investigation by Sheriff's Deputies, involving hundreds of man-hours of investigation, reveled that James Mackey had rented a Ford on February 28, 1989, that matched the description of the car Brock had seen parked at the shooting scene.  The car eventually was traced to Southern California.  Deputies retrieved

> the car and had it examined by criminalists who found dried blood in the Ford that matched Carnegie's blood.
>
> Mackey was arrested for Carnegie's murder on June 1, 1989. He told investigators before and after his arrest several different versions of his role in the murders.
>
> Mackey eventually implicated Carl Hancock as the person who helped him kill Carnegie. Mackey implicated Michael T. Blatt, a wealthy local businessman, property developer, and business agent for athletes, as the individual who solicited and paid Mackey to have Carnegie killed.

Ex. "A" to Application, Probation Officer's Report, November 20, 1990.

## II

On May 6, 2005, the Board Of Prison Terms ("BPT") concluded that Petitioner was not suitable for parole because he would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. Petitioner filed a petition for a writ of habeas corpus before the San Joaquin County Superior Court claiming that the BPT's May 6, 2005 decision and the prosecutor's statements at the BPT hearing violated the plea agreement. The San Joaquin County Superior Court denied his petition in a written order on March 6, 2006.

On May 1, 2006, Petitioner filed a petition for a writ of habeas corpus in the California Supreme Court. That court summarily denied the petition on December 13, 2006. Petitioner filed a timely application for a writ of habeas corpus in this Court pursuant to 28 U.S.C. §2254(a) on January 13, 2007 raising the same claim asserted in his state court petition. Respondent concedes that Petitioner exhausted his state court remedies.

## III

### A

Petitioner contends in his application for a writ of habeas corpus that the San Joaquin District Attorney's Office breached the written plea agreement in violation of his state and federal due process rights. He contends that this Court should grant either "grant rescission or specific performance of the contract, ordering petitioner's immediate release from prison based

on time served." Application for Writ of Habeas Corpus of James Mackey at page 7:20-21.

Title 28 of the United States Code §2254(d) provides that:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under § 2254(d)(1), "[a] state court decision is 'contrary to'. . . clearly established [United States Supreme Court] precedents if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases,' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Early v. Packer*, 537 U.S. 3, 8 (2002) (citing and quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).

Under the "unreasonable application" clause of § 2254(d)(1), a federal court may grant habeas corpus relief if the state court identified the correct governing legal principle from the Supreme Court's decisions, but unreasonably applied that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413. A federal habeas court, however, "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 412; *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous'").

The court looks to the last reasoned state court decision as the basis for the state court judgment. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002). Here, Petitioner alleged in the

petition he filed in the San Joaquin County Superior Court that his federal constitutional right to due process was violated. Because the California Supreme Court summarily denied Petitioner's petition for a writ of habeas corpus in which he raised the same claim, this Court must look through that denial to the San Joaquin County Superior Court's reasoned decision regarding the same federal constitutional claim.

### B

Petitioner contends in his application that this Court has jurisdiction over this matter because the Due Process Clause of the Fourteenth Amendment protects a California prisoner's right to enforce the terms of his plea agreement. Respondent does not contest the existence of a protectable due process interest in the enforcement of a plea agreement. He maintains, however, that this Court may not grant Petitioner's application pursuant to § 2254(d) because the state court's denial of habeas corpus relief was not contrary to clearly established federal law, as determined by the United States Supreme Court nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. This Court must determine whether the state court's failure to find a breach of the plea agreement was unreasonable.

### V

### A

Petitioner contends that the BPT's decision to deny his parole violated his plea agreement because he pled guilty based upon assurances from his attorney, Hamilton Hintz, and District Attorney John Phillips, that he would be released from prison after serving sixteen years and eight months. Application for Writ of Habeas Corpus of James Mackey at page 3-4.

His reliance on *In re Moser,* 862 P.2d 723 (Cal. 1993), for this proposition is misplaced. In *In re Moser*, the court noted that "[t]he people...conced[ed] the trial court's error in incorrectly advising petitioner of the applicable parole term prescribed by statute for second degree murder." *Id.* at 726.

Here, the Petitioner has not claimed to have received "erroneous advise from the trial court." *Id.* at 724.  Instead, he argues that his attorney and the District Attorney improperly induced him to plead guilty in exchange for the District Attorney's promise to recommend an early parole date.  Application for Writ of Habeas Corpus of James Mackey at page 3-4.  The record does not support this contention.  The plea agreement does not provide for any assurance of a predetermined release date.  On the contrary, the relevant provision of the signed plea agreement explicitly disavows any such promise:

> 6. District Attorney John D. Phillips shall personally write the letter to the Board of Prison Terms and or the California Department of Corrections recommending that James Oliver Mackey and Carl Charles Hancock Jr. be released at the earliest possible time upon having served the minimum sentence for first degree murder.  California Law now provides that the indeterminate sentence for first degree murder is 25 years to life. It is believed that the earliest possible release date for a person so convicted of first degree murder is two thirds of the minimum or sixteen years eight months.  However, the actual release date will be determined by the Board of Prison Terms or its equivalent agency.

Ex. "C" to Application, 2:4-15.  This provision simply requires the District Attorney to submit a letter to the Board of Prison terms that recommends an early release for the Petitioner.  On November 20, 1990, District Attorney Phillips submitted a letter to the Department of Corrections recommending the Petitioner's early release, consistent with the language of the agreement.

**B**

The Petitioner contends that the plea agreement contains ambiguous language as it would be "unreasonable to conclude that the parties actually intended that the determination of petitioner's actual release date would remain open-ended...." Application for Writ of Habeas Corpus of James Mackey at page 19:13-15.  Therefore, he maintains that

> [b]ecause the contract is ambiguous concerning **when** the Board or its equivalent agency must determine petitioner's actual release date, that the term must be interpreted as understood by the District Attorney and petitioner at the time the contract was entered.

6

> *Moser, Toscano, supra*. The parties agreed and understood that petitioner would be released after serving a minimum term consistent with the District Attorney's written recommendation.

*Id.* at page 19:4-9 (emphasis in original). There is, however, no ambiguity within the plea agreement. Petitioners interpretation that the District Attorney's recommendation would carry the weight of a guarantee is foreclosed by the express language of the plea agreement which clearly states that "the actual release date will be determined by the Board of Prison Terms or its equivalent agency." Ex. "C" to Application, 2:13-15.

Petitioner's plea agreement was not conditioned upon a promise by the District Attorney that he would be released on parole at the earlier possible time. Instead, Petitioner entered his guilty plea in this matter based on the promise that the District Attorney would recommend that Petitioner be released on parole at the earliest possible date. The District Attorney did so. Accordingly, Petitioner received specific performance of that promise. The BPT was not required to follow the District Attorney's recommendation and ignore its statutory duty to determine Petitioner's suitability for release on parole.

## C

Petitioner also contends that Deputy District Attorney Eual Blansett's statements at the May 6, 2005 parole hearing breached the District Attorney's obligation to recommend the Petitioner's early release. The hearing transcript provides a record of the relevant statements as follows:

> **Deputy District Attorney Blansett:**
> Mr. Commissioner, if I may just for a moment, I'm not going to make any statement whatsoever contrary to the negotiations that were reached between Mr. Hintz and Mr. Phillips, but there are some misrepresentations. And I'm sure it's based upon the stated facts as Counsel understands it that have been made to this Board that I think are very important. One is that this was not a contract that was meant to bind in any way any commission regarding how they saw Mr. Mackey and --
>
> **Presiding Commissioner Welch:** And we throughly understand that.

| | |
|---|---|
| 1 | **Deputy District Attorney Blansett:** Pardon? |
| 2 | **Presiding Commissioner Welch:** We thoroughly understand that. |
| 3 | **Deputy District Attorney Blansett:** Okay. |
| 4 | **Presiding Commissioner Welch:** The District Attorney cannot bound the Board. |
| 5 6 | **Deputy District Attorney Blansett:** And that never, never the intent of the negotiations to bind -- |
| 7 | **Presiding Commissioner Welch:** We understand that. |
| 8 9 | **Deputy District Attorney Blansett:** The other thing that Counsel made reference to, and that is that Mr. Mackey turned himself in. That was not the stated facts. |
| 10 11 12 | **Presiding Commissioner Welch:** Now we're getting into an area where – hold on Counsel. We're getting into an area – normally if the District Attorney is going to make comments, it's before Counsel speaks. And then afterward Counsel can address any issues that she might address. |
| 13 14 15 | **Deputy District Attorney Blansett:** I agree with the Commissioner. The only reason I spoke up was because what I perceived to be information being presented to the Commission that was not the true stated offense. |
| 16 | **Presiding Commissioner Welch:** Well, let me ask you this. |
| 17 | **Deputy District Attorney Blansett:** Yeah. |
| 18 | **Presiding Commissioner Welch:** Do you want to make a closing statement? |
| 19 20 | **Deputy District Attorney Blansett:** Not contrary to the negations [sic] that were made in the case. |
| 21 | **Presiding Commissioner Welch:** Let's do this. I'll let you speak, and I'll give Counsel her turn back. |
| 22 | **Deputy District Attorney Blansett:** That'd be fine. |
| 23 | **Presiding Commissioner Welch:** Okay. |
| 24 25 26 | **Deputy District Attorney Blansett:** There were – Actually, the three important areas, I've covered one, and the Commissioner appears to understand the state of the negotiations. In regards to Mr. Mackey, Mr. Mackey did not turn himself in to authorities in the sense that he found out they were investigating him, and |

| | |
|---|---|
| 1 | therefore, turned himself in. He actually was brought in for questioning. He made a statement, initial statement that implicated himself in the murder as an accessory, which used to be called an accessory before the fact. Now it's a principle [sic] in the commission of the murder, but denied any involvement in the actual murder. Mr. Mackey then agreed to cooperate with law enforcement. And having a wire attached to his body, he went in to Mr. Blatt's office with the idea that he was going to get Mr. Blatt to implicate himself in the murder. But what Mr. Mackey did, unfortunately, was to alert Mr. Blatt to the fact that he was wired, which caused Mr. Blatt then not to implicate himself, plus not to implicate Mr. Mackey any further than Mr. Mackey had already implicated himself. Mr. Mackey at that point then after he did that, went to a local attorney, Bud Marks, who then called me up and said that Mr. Mackey now wanted to turn himself back in and cooperate fully with us. And at that point, Mr. Mackey then was taken into custody. So in that sense, he did turn himself in at that point, but that didn't consider the activities that occurred before that time. |

**Presiding Commissioner Welch:** Okay.

**Deputy District Attorney Blansett:** The other issue, which to me is an important one in terms of correcting the facts, and I would say this, I worked with James Mackey, probably spent more time with James Mackey than any male ever spent with him in his entire life, probably unfortunately including his own father. I got to know him very well. He gave me a full statement of the entire case. Mr. Mackey's statement to me was that he went back to the trunk. That he took the rope, and that he aided in the strangulation of Larry Carnegie. When he testified at trial, he testified that he went back there, took the rope, and then went back to the car. So I was very disappointed when I read his statement in the material that was presented to me, because that's not what the state of the evidence was either to me, or as presented at trial by he and Carl Hancock. So those are the three areas I felt the Commission needed some clarification. But again, that's not in any way to go back on the deal that Mr. Phillips made. They're merely to clarify those areas for the Commission.

Ex. "E" to Application, Parole Hr'g Tr., May 6, 2005, 92-96. The Petitioner characterizes Mr. Blansett's comments at the hearing as "impliedly advocating against petitioner." Application for Writ of Habeas Corpus of James Mackey at page 21. These "adverse" statements, the Petitioner contends, undermined the District Attorney's recommendation and thus breached the plea agreement.

In support of his contention, Petitioner relies heavily on *Santobello v. New York*, 404

U.S. 257 (1971). In *Santobello*, the Supreme Court held that the prosecutor inadvertently breached the plea agreement by making a sentencing recommendation, even though, "the State had promised petitioner before the plea was entered that there would be no sentence recommendation by the prosecution." *Id.* at 259. The issue in *Santobello* was not whether the breach occurred, as it was "conceded" by the prosecution, but rather, what effect the breach had on the plea agreement. *Id.* at 262. The Supreme Court held that the prosecutor's error was attributed to "an unfortunate lapse in orderly prosecutorial procedures...[due to]...the enormous increase in workload of the often understaffed prosecutor's offices." *Id.* at 261.

Here, the existence of a breach is contested. The state court and the Respondent appropriately point to Mr. Blansett's statement to the parole board that he "cannot and will not do anything to undermine the letter" of recommendation from Mr. Phillips to demonstrate that Mr. Blansett did not contradict the recommendation. Ex. "E" to Application at 16:2-4. A review of the hearing transcript confirms the state court's determination that Mr. Blansett's comments were not interpreted by the BPT to be adverse to the Petitioner as he merely clarified a few factual inconsistencies in the Petitioner's presentation regarding the Petitioner's offense and subsequent surrender to authorities. Moreover, his desired neutrality at the hearing did not contradict Mr. Phillips's recommendation for an early release. This point was emphasized by the presiding commissioner when reading the decision:

> "[Mr. Blansett] appeared today and actually he did not present an objection. He was neutral. He just appeared as an observer basically. So he didn't voice his opinion in terms of your suitability one way or the other from what I gathered from speaking to him."

*Id.* at 128:18-24.

Petitioner further argues that "[b]y remaining 'neutral' and failing to voice an opinion in support of Petitioner's parole, as the Commissioner observed, no support was provided and the strength of Mr. Phillips's letter was weakened." Traverse of James Mackey, 3:22-24. The plea agreement, however, only obligated the District Attorney to support an early release by

10

1 submitting a letter of recommendation.  Petitioner has not presented any evidence in support
2 of his claim that the District Attorney's letter of recommendation was weakened by Mr.
3 Blansett's neutrality.

**Conclusion**

The plea agreement between the District Attorney and the Petitioner did not guarantee an early release.  It simply required the District Attorney to submit a letter of recommendation for an early release to the parole board.  This was done.  Deputy District Attorney Blansett's comments during the parole board did not undermine his office's recommendation nor did they violate any terms of the plea agreement.  Thus, the state court's decision to deny Petitioner's state habeas corpus petition was neither contrary to, nor an unreasonable application of, controlling case law of the United States Supreme Court, nor an unreasonable application of the facts.

It is therefore hereby ORDERED that Petitioner's application for habeas corpus relief and his request for an evidentiary hearing are DENIED.  The clerk is directed to enter judgement, close the case, and notify petitioner of the Court's order.

/////

DATED: September 10, 2008

/s/ Arthur L. Alarcón
UNITED STATES CIRCUIT  JUDGE
Sitting by Designation